NAVI SINGH DHILLON (SBN 279537)
navidhillon@paulhastings.com
CHRISTOPHER J. CARR (SBN 184076)
chriscarr@paulhastings.com
DEBORAH SCHMALL (SBN 112052)
deborahschmall@paulhastings.com
LUCAS GRUNBAUM (SBN 314180)
lucasgrunbaum@paulhastings.com
PAUL HASTINGS LLP
101 California Street, 48th Floor
San Francisco, California 94111
Telephone: (415) 856-7000
Fax: (415) 856-7100

Attorneys for Defendant
PACIFIC BELL TELEPHONE COMPANY

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE,<br><br>Plaintiff,<br><br>v.<br><br>PACIFIC BELL TELEPHONE COMPANY,<br><br>Defendant. | Case No. 2:21-cv-00073-MCE-JDP<br><br>**DEFENDANT'S SUPPLEMENTAL STATUS REPORT**<br><br>Judge:      Hon. Jeremy D. Peterson<br>Courtroom:  9<br>Date:       July 19, 2023<br>Time:       2:00 p.m. |

1    Defendant Pacific Bell Telephone Company (AT&T) respectfully submits this
2    supplemental status report in advance of the conference set for July 19, 2023.

3    *First*, AT&T corrects the statement in Plaintiff's July 12, 2023 status update to the Court
4    that AT&T "confirmed" it is prepared to commence the cable removal process on September 6,
5    2023. ECF No. 40. Not so. As stated in AT&T's status update filed on July 11, 2023, the parties
6    remain at an "impasse" regarding removal of the cables at Lake Tahoe. ECF No. 39.

7    *Second*, *The Wall Street Journal* (Journal) last week published a series of stories asserting
8    lead-clad telecom cables in Lake Tahoe and located elsewhere raise a significant public health
9    concern. AT&T strongly disagrees with the Journal's reporting, particularly given AT&T's own
10   testing on the same cables, the results of which were previously filed in this action.[1] ECF No. 33-
11   1. AT&T sent a meet-and-confer letter to Plaintiff explaining why the recent reporting is inaccurate
12   and why the status quo in this case must be preserved. A true copy of that letter is attached as
13   **Exhibit A**.

14   As detailed in the attached letter, the Journal's assertions regarding Lake Tahoe are based
15   on testing of water samples collected by the same divers that aided Plaintiff in this litigation.
16   Although AT&T has not been provided with the complete test results, the information reported by
17   the Journal differs dramatically from the expert testing commissioned by AT&T. Under the
18   circumstances, AT&T submits the responsible course of action is to develop a further record rather
19   than remove the Lake Tahoe cables and work cooperatively with regulators and other stakeholders
20   on a risk assessment.

21   AT&T is not alone in this conclusion. In fact, just yesterday, in an open letter to the U.S.
22   Environmental Protection Agency, the Environmental Defense Fund recommended that the "EPA
23   should assess the condition of the underwater cables to determine their condition, their current and

---

[1] Although the Journal seeks to raise the specter of a broad public health issue, lead-clad telecom cables make up a small part of AT&T's network. Based on its records, AT&T estimates that lead-clad cables represent less than 10% of its copper footprint of roughly two million sheath miles of cable, the overwhelming majority of which remains in active service. More than two thirds of its lead-clad cabling is either buried or in conduit, followed by aerial cable, and with a very small portion running underwater. There are varying costs of installation, maintenance, and removal by cable type (aerial, buried, buried in conduit, underwater).

anticipated releases to the environment, and the risks posed by their removal or leaving them in place." AT&T agrees.

We will be prepared to discuss this matter further at the upcoming status conference.

Respectfully submitted,

DATED: July 18, 2023

PAUL HASTINGS LLP

By: /s/ Navi Singh Dhillon
NAVI SINGH DHILLON

Attorneys for Defendant,
PACIFIC BELL TELEPHONE COMPANY

- 3 -
DEFENDANT'S SUPPLEMENTAL STATUS REPORT

# EXHIBIT A



1(415) 856-7080
navidhillon@paulhastings.com

July 18, 2023

*VIA E-MAIL*

Mr. J. Kirk Boyd, Esq.
548 Market Street, Suite 1300
San Francisco, CA 94104
jkb@drjkb.com

Re:   *Meet-and-Confer Letter - Cable Removal Impasse*
      *CSPA v. Pacific Bell Telephone* Company, Case No. 2:21-cv-00073-MCE-JDP (E.D. Cal.)

Dear Mr. Boyd:

On behalf of Pacific Bell Telephone Company (AT&T), we write in response to California Sportfishing Protection Alliance's (Plaintiff) recent status update (filed July 12, 2023) and to further meet and confer under Section 2 of the Consent Decree. Contrary to the assertions in Plaintiff's status update, the parties remain at an "impasse" regarding cable removal. In this letter, we explain why AT&T believes it is now in the public interest to leave the cables in place to permit further analysis by interested parties, including the U.S. Environmental Protection Agency (EPA).

### RECENT DEVELOPMENTS

In this matter, AT&T has always maintained that its lead-clad telecommunications cables pose no danger to those who work and play in the waters of Lake Tahoe, but in 2021, AT&T agreed to remove them simply to avoid the expense of litigation. Now, recent reporting by *The Wall Street Journal* (Journal) has placed these cables at the center of what it claims is a national public health crisis. Based on our repeated testing of these cables—data and methods we have made publicly available—we have serious concerns with the Journal's testing methods and the reliability of its results and reporting.

In the spirit of transparency and informed public health, the parties should agree to maintain these cables in place to permit further analysis by any qualified and independent interested party, including the EPA, and allow the safety of these cables to be litigated with objective scientific evidence rather than sensationalized media coverage. To do otherwise would give the misimpression that these cables present a health risk, which they do not, and would destroy evidence necessary for all relevant facts to be made public in court. Indeed, in its letter to the EPA yesterday, the Environmental Defense Fund recommended that the "EPA should assess the condition of the underwater cables to determine their condition, their current and anticipated releases to the environment, and the risks posed by their removal or leaving them in place."[1] For the reasons below, AT&T agrees.

### A CLOSER LOOK AT THE JOURNAL'S REPORTING

The Journal's reporting on lead-clad cables depends primarily, if not exclusively, on environmental testing that, according to its reporters, was commissioned by the Journal. As explained below, the Journal's

---

[1]   *See* Attachment A, Letter from Environmental Defense Fund to Adm. Regan (EPA), dated July 17, 2023.



July 18, 2023
Page 2

sampling at sites around the country was not performed by disinterested, objective experts, but by individuals with clear agendas and conflicts of interest. Some are even the same individuals who prompted Plaintiff to file this lawsuit.

Moreover, we now know that the sampling for the Journal's testing was both funded by the Environmental Defense Fund and targeted on sites the Journal believed were most likely to obtain the result it wanted: high lead levels. As Below the Blue, an organization founded by the individuals responsible for the sampling of cables in Lake Tahoe and elsewhere, expressly admits: "[s]ampling locations were chosen in part by their likelihood to show high lead levels."[2]

The Journal's failure to disclose that it relies on testing funded by an advocacy organization and designed to generate selectively high lead levels calls into question the integrity of the reporting. Given these newly discovered facts, it is not surprising that the Journal's reporting rests on a fundamental scientific flaw: it equates alleged lead *concentration* levels with potential lead *exposures* and leaps to the sensational conclusion that lead cables present a serious public health *risk*. These three concepts—(i) hazards, (ii) exposures, and (iii) risks—are scientifically distinct.

The mere presence of a potential hazard (e.g., lead) without exposure considerations (e.g., are people actually ingesting lead and, if so, from what source, in what amounts and for how long?) provides no meaningful information about human health risks. It is incorrect to suggest that a public health risk exists in the absence of that critical exposure information. Courts routinely dismiss conclusory allegations of public harm when, just as is the case with the Journal's reporting, there is a failure to present evidence of exposure. *Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc*., 575 F.3d 199, 214 (2d Cir. 2009) (affirming dismissal, and noting "[s]tanding alone . . .the fact that some [] samples" showed the presence of lead "does not support the conclusion that the site is contaminated so as to pose a potentially serious risk of harm").[3]

Although the Journal has not released its complete testing information, its Lake Tahoe test results differ dramatically from the testing commissioned by AT&T in 2021 as set forth in the report we filed last month in the public record. AT&T's expert testing is based on the best available methodologies. The test results show that no lead was detected leaching from the cables and the "very low" lead concentrations detected in the lake during field investigations are "characteristic of background levels, not a release from the cables." Lead is ubiquitous in the environment and has many major sources. Yet over decades of careful scientific research in the U.S. and abroad, neither regulators nor scientists have ever identified telecom cables as a significant source of lead. The Journal ignores these basic facts.

To put it mildly, the Journal's story has caused increased public interest in the subject matter of this litigation, raising the specter of a purported public health crisis even though lead-clad telecommunications cables make up a small part of AT&T's network. Under the circumstances, AT&T submits the responsible course of action, consistent with the public's interest in transparency and AT&T's obligation to act responsibly, is

---

[2]     *See* MARINE TAXONOMIC SERVICES, LEAD CABLE INVESTIGATION 5, https://belowtheblue.org/edf-report.

[3]     *See e.g., City of Evanston v. N. Ill. Gas Co*., 381 F. Supp. 3d 941, 963 (N.D. Ill. 2019) (rejecting environmental claims, stating: "the problem with this argument is the lack of probative evidence that the [hazardous substances] in the soil are likely to be encountered or cause any actual harm to humans or wildlife"); *Miller v. City of Fort Myers*, 424 F. Supp. 3d 1136, 1146 (M.D. Fla. 2020) ("The 'mere presence' of contamination 'is alone not enough to constitute an imminent and substantial endangerment.'").



July 18, 2023
Page 3

to maintain the Lake Tahoe cables in place while working cooperatively with regulators and other stakeholders on an appropriate risk assessment as recommended by the Environmental Defense Fund in its recent letter to the EPA.

To facilitate constructive discussions, further background follows.

## BACKGROUND

Plaintiff commenced this action in January 2021. Shortly thereafter, AT&T retained Haley & Aldrich, a prominent environmental consulting firm, to test water quality next to the cables, as well as remote locations in Lake Tahoe to gather background water quality information. Haley & Aldrich's team of highly experienced and specialized scientists performed robust testing using the best available methodologies and concluded the lake's water quality is not adversely impacted by the two legacy telecommunication cables.

Summarizing the data collected, the experts reported:

> Analytical results from lake water samples collected during the investigation, using the best available methodologies to achieve the lowest detection limits possible, were largely non-detect for lead, including in the samples collected nearest the subject cables (within approximately 4 inches).

The experts further reported:

> In the few collected samples where lead was detected, concentrations were very low (just above the method detection limit) and within the same range regardless of proximity to the subject cables. These results suggest the low lead concentrations detected during the field investigation are characteristic of background levels, not a release from the cables.

Those testing results are consistent with decades of independent scientific studies in the United States and elsewhere supporting the conclusion that lead-clad cables pose no significant risk to the public or the environment.[4] Lead is a very stable metal. It has low corrosion rates in environmental conditions like those present in Lake Tahoe, which has cold, hard water. When exposed to the elements, lead naturally forms a "protective layer" of insoluble compounds that guards against corrosion. That protective layer serves to prevent the release of lead from the cables into the environment.

Further, because lead is a heavy metal, any lead from limited leaching that may occur tends to settle out of the water—rather than dissolve into it. Lead tends to bond with organic matter in the sediment to form insoluble compounds that do not mix with water. In the context of Lake Tahoe, one of the largest lakes in the United States, what little lead from telecom cables that could potentially dissolve would be naturally diluted by the vast quantities of water in the lake (tens of trillions of gallons). As a result, and as confirmed by AT&T's testing, any lead leaching from the cables in Lake Tahoe does not have a significant impact on public health or the environment.

---

[4] *See, e.g.,* ATSDR, *Where is Lead Found?* (May 24, 2023), https://www.atsdr.cdc.gov/csem/leadtoxicity/lead_found.html; Electric Power Research Institute, Inc., Environmental Impacts of Lead from Paper-Insulated Lead-Covered Cables, Report No. 1009513 (2004)



July 18, 2023
Page 4

Even though expert evidence contradicted Plaintiff's allegations, AT&T agreed to remove the cables as part of a voluntary resolution set forth in a Consent Decree simply to avoid the expense and burden of litigation. Consistent with the Consent Decree, AT&T promptly began to secure all necessary government approvals and permits to remove the cables.  The table below reflects those efforts.

| No. | Agency | Approval Date |
|---|---|---|
| 1 | Lahontan Regional Water Quality Control Board | October 25, 2022 |
| 2 | Tahoe Regional Planning Agency | March 9, 2023 |
| 3 | California Department of Fish and Wildlife | March 20, 2023 |
| 4 | California Department of Parks and Recreation | March 24, 2023 |
| 5 | California State Lands Commission | April 3, 2023 |
| 6 | U.S. Army Corps of Engineers | April 12, 2023 |
| 7 | U.S. Forest Service | April 28, 2023 |

Notwithstanding AT&T's diligent efforts, the parties reached an impasse with respect to the timing of the cable removal.  Both parties provided the Court with their respective positions in filings in advance of the last status conference and, in connection with its filing, AT&T filed the results of Haley and Aldrich's testing at Lake Tahoe—the only evidence of water quality in the record.  Plaintiff has not filed any test results with the Court.

Prior to the Journal's reporting, AT&T had every intention to remove the cables in Lake Tahoe consistent with the terms of the settlement.  But the landscape has changed dramatically.

### SIGNIFICANT CONCERNS WITH THE WALL STREET JOURNAL'S REPORTING

Beginning on July 9, 2023, the Wall Street Journal published a series of stories claiming that legacy lead-clad cables pose a significant risk to human health and the environment.  Specifically, the Journal made the Lake Tahoe cables, and the individuals who performed the unscientific testing, a central focus of its reporting.  To date, however, the Journal has refused to release the entirety of its claimed data or testing to substantiate its assertions.  Indeed, the limited information that has been shared by the Journal only raises serious questions regarding the reliability of its data and the accuracy of its assertions, especially in light of AT&T's prior testing.  The limited information disclosed by the Journal suggests the testing at Lake Tahoe suffers from numerous factual and methodological errors including:



July 18, 2023
Page 5

1. *Failure to conduct exposure analysis.*

As noted, the Journal improperly conflates the alleged presence of lead in the environment with the unsupported conclusion that members of the public are necessarily exposed to those alleged concentrations for extended periods, thereby presenting a serious public health risk.

The Journal's attempt to paint "toxic" lead cables as a public health threat akin to the lead pipe drinking water issue that came to light in Flint, Michigan is incorrect.  Lead pipes are a contained space, which means that when lead corrodes it goes directly into the drinking water that passes through the pipes creating a direct pathway for human exposure.  That is why local water authorities follow established and highly effective protocols to treat drinking water to inhibit corrosion.  There is no remotely comparable exposure pathway associated with lead-clad telecom cables.  Neither Plaintiff nor the Journal has identified a plausible theory of potential exposure, much less any actual evidence of exposures.

2. *Reliance on biased "experts" and unreliable testing.*

The Journal's testing at Lake Tahoe was not performed by disinterested experts, as would be expected from an objective media organization.  As the Journal acknowledges in its reporting, the testing it commissioned on the Lake Tahoe cables—and at many other locations across the country—was performed by Mr. Jones and Ms. Fortner of Marine Taxonomic Services (MTS).  In fact, Mr. Jones and Ms. Fortner are the same individuals who prompted Plaintiff to file this lawsuit.  ECF No. 16-2 ("Counsel met on several occasions with divers that brought the existence of the Cables to counsel's attention."); ECF 16-1 ("[Plaintiff's] investigation included several discussions and meetings with divers that had discovered the Cables, and reviewing the evidence and information the divers had obtained regarding the Cables.").  And as reported in the media, they have a "continuing partnership" with Plaintiff to this day.

Mr. Jones and Ms. Fortner are professional divers, not expert environmental scientists.  They co-founded Below the Blue, a non-profit environmental group that has actively pressed for the removal of the Lake Tahoe cables for years and views itself as a "watchdog."[5]  In addition to their conflicts of interest, there are numerous concerns with MTS's disclosed sampling approach, including how they collected samples 1 cm away from the cables with a syringe, all without disturbing the cable or the surrounding sediment.  The water samples relied on by the Journal therefore likely included sediment and other particulate with lead that otherwise would not have been collected had proper sampling techniques been followed.  The results of these unfiltered samples taken by divers from a lakebed near sediments also were improperly compared to drinking water standards, which apply to water coming out of a tap.  And as noted, the divers admit they chose sampling locations to achieve high readings of lead levels.

The Journal also reportedly worked with a consultant, Jack Caravanos, to make unrealistic and irresponsible exposure assumptions, such as children drinking water while swimming within 1 centimeter of cables sitting at the bottom of Lake Tahoe.  The Journal failed to note in its reporting that a federal court has barred Mr. Caravanos from testifying as an expert in the past for using unreliable methods.  *Amorgianos*

---

[5] *See* BELOW THE BLUE, www.belowtheblue.org (last visited July 18, 2023).  At the time the Consent Decree was entered in November 2021, Below the Blue issued a press release touting its efforts with Plaintiff and other community organizations to remove and dispose of the cables in a "continuing partnership" and were described by the League to Save Lake Tahoe as a "watchdog to make sure AT&T… get[s] the cables out of lake as soon as possible."  *See* BELOW THE BLUE, *Telephone Company to Remove Toxic Underwater Cable from Lake Tahoe*, https://belowtheblue.org/press-releases.



July 18, 2023
Page 6

*v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 268-70 (2d Cir. 2002) (finding Caravanos's testimony "rested on a faulty assumption" and employed an "unreliable methodology").

### 3. Additional defects.

The Journal's reporting contains other errors as well. For example, the Journal evaluates the quality of pond water by using the EPA's action level for lead in drinking water. Similarly, the Journal improperly attempts to stoke public fear by suggesting that sediments found at the bottom of lakes and ponds or under bridges and levees are "play areas" subject to more stringent EPA soil screening standards. They clearly are not.

In the absence of unbiased scientific evidence showing why decades of existing science is wrong, there is no basis to claim that lead-clad telecom cables pose a public health risk or are a major source of lead in the environment. As a result, the prudence of preserving the cables in place for further inspection by truly independent bodies, including the EPA, should be self-evident.

## CONCLUSION

AT&T cares deeply about the health and safety of its people, customers and the communities it serves. Despite what has been reported, AT&T would never dismiss any health risk or concern to them. And AT&T's commitment to health and safety is unwavering. Consistent with that commitment, AT&T is taking even more action:

- AT&T is working with union partners to add a voluntary testing program for any employee who works with or has worked with lead-clad cables. It will be offering the testing on company time and at company expense. This expands on AT&T's previous practice of providing blood-lead testing for technicians involved in lead-clad cable removal and following all applicable laws and regulations relating to the handling of lead-clad cables.

- While AT&T has previously tested lead-clad cables and continues to believe that they pose no public health risk, AT&T takes any health concern seriously and is conducting additional testing beyond Lake Tahoe, including the locations identified in the Journal's stories.

- AT&T is performing in-person site visits where lead-clad cables are present to inspect their condition and determine if any action is necessary.

Given the heightened public interest, and consistent with AT&T's long tradition of acting responsibly in the communities in which it does business, AT&T has no reasonable choice but to preserve the status quo and leave the cables in their current state until further information and data are collected. To that end, AT&T has recently engaged another prominent, third-party environmental consulting firm to perform additional water quality testing next to the cables in Lake Tahoe. That testing occurred last month, and its initial results are fully consistent with the prior findings of Haley & Aldrich—and directly conflict with both Plaintiff's allegations and the Journal's recent reporting. Further testing also may be required after AT&T receives more information from Plaintiff and the Journal in response to discovery.

The parties are already at an impasse regarding removal of the cables and the Journal's reporting only creates an additional layer of complexity. Indeed, numerous market analysts are speculating without any



July 18, 2023
Page 7

basis on what regulators may require in the future and what those regulations will cost.[6] Under the circumstances, AT&T submits that the responsible course of action is to develop a further record. With more information, AT&T, the public, and other stakeholders can more fully evaluate what AT&T contends are gross inaccuracies in the Journal's reporting.

As you know, the Consent Decree allows either party to terminate the agreement if the cables are not removed within 90 days after all regulatory approvals are obtained and no agreement exists on a specific removal date. The 90-day deadline is July 27.

Although we are willing to continue to meet and confer before July 27, AT&T believes that we should agree to preserve the status quo so the safety of the cables may be fully adjudicated. If Plaintiff does not agree, AT&T anticipates exercising its contractual right to vacate the Consent Decree and resume this litigation so that the safety of these cables can be established based on reliable, scientific evidence that can be shared with the public and other stakeholders.

Sincerely,

Navi S. Dhillon
of PAUL HASTINGS LLP

cc:   Christopher J. Carr, Deborah Schmall, Lucas Grunbaum, Paul Hastings LLP
      All counsel for Plaintiff

---

[6] In the July 17 letter cited in footnote 1, the Environmental Defense Fund, Below the Blue, and Clean Water Action sent a joint letter to the EPA recommending wholesale removal of these cables *only in* limited cases. The letter went on to state that above-ground cables still in use can be "protected" or "encapsulated," while the condition of underwater cables should be further assessed to determine the risk posed to the public. These recommendations, from ardent environmental advocates, are a far cry from any suggestion that all lead-clad cable be immediately removed as an imminent public health risk.

# **<u>ATTACHMENT A</u>**



July 17, 2023

Administrator Michael Regan
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460
Regan.Michael@epa.gov
*Sent by email only*

Re: Uncontrolled release of lead to water and surface soil from lead-sheathed cables

Dear Administrator Regan:

The Environmental Defense Fund (EDF), Below the Blue, and Clean Water Action ask the Environmental Protection Agency (EPA) to investigate the uncontrolled release of lead into the water or surface soil from more than 2,000 lead-sheathed telecom and power cables across the nation with more than 300 of these cables posing a threat to the source of drinking water for communities. Without EPA intervention, we expect that the risk posed by the cables will increase as they further deteriorate and release lead into the environment. The agency should act pursuant to its response authorities in section 104 of the Comprehensive Environmental Response, Compensation and Liability Act (CERLCLA) (42 U.S.C. § 9604) and in section 1431 of the Safe Drinking Water Act (SDWA) (42 U.S.C. § 300i).

As EPA reaffirmed in its 2022 *Strategy to Reduce Lead Exposures and Disparities*, "very low levels of lead in children's blood have been linked to adverse effects on intellect, concentration, and academic achievement."[1] Just last week, EPA made clear that "there is no safe level of lead" and "even low levels are detrimental to children's health."[2] Further, not only children are at risk; last month the American Heart Association described lead as a posing an increased risk of cardiovascular disease to adults.[3] Due to the well-documented health effects posed by lead, EPA has designated it as a hazardous substance pursuant to Section 101 of CERCLA and has established a Maximum Contaminant Level Goal (MCLG) of zero pursuant to SDWA.[4]

---

[1] EPA, EPA Strategy to Reduce Lead Exposures and Disparities in U.S. Communities, October 27, 2022, https://www.epa.gov/system/files/documents/2022-10/Lead%20Strategy.pdf, referencing EPA, Integrated Science Assessment (ISA) for Lead (Final Report, Jul 2013), https://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=255721.
[2] EPA, Biden-Harris Administration Proposes to Strengthen Lead Paint Standards to Protect Against Childhood Lead Exposure, July 12, 2023 at https://www.epa.gov/newsreleases/biden-harris-administration-proposes-strengthen-lead-paint-standards-protect-against.
[3] Gervasio et al., Contaminant Metals as Cardiovascular Risk Factors: A Scientific Statement From the American Heart Association, J Am Heart Assoc. 2023;12:e029852. DOI: 10.1161/JAHA.123.029852. https://www.ahajournals.org/doi/10.1161/JAHA.123.029852.
[4] See 40 C.F.R. § 302.4 and 40 C.F.R. § 141.51.

We recognize that lead-sheathed telecom and power cables were not identified in EPA's 2022 Strategy[5] as a source of lead exposure. However, the extent of the problem was not understood until the *Wall Street Journal* published a series of articles last week.[6] From our perspective, reducing the risks from these cables is entirely consistent with the Strategy's goal of reducing community exposures to lead sources. Their combined risk may be lower than other sources such as lead-based paint and lead service lines, but it appears to be significant.

As documentation of the need for EPA to investigate, we reference the following:
- Marine Taxonomic Services (MTS), *Lead Cable Investigation*, June 30, 2023;[7]
- Wall Street Journal, *America Is Wrapped in Miles of Toxic Lead Cables*, July 9, 2023;[8]
- Wall Street Journal, *How the Journal Investigated Hidden Lead Cables Circling the U.S.*, July 9, 2023;[9]
- Wall Street Journal, *Bayou Teche is an Epicenter of America's Lead Cable Problem*, July 10, 2023;[10] and
- Wall Street Journal, *AT&T and Verizon Knew About Toxic Lead Cables – and Did Little*, July 12, 2023.[11]

Based on the documents, we group the lead-sheathed cables into three categories for EPA to prioritize and provide recommendations for action:

**Aerial cable – prioritize for immediate removal**:
- ***The situation***: The *Wall Street Journal* "identified about 250 aerial cables alongside streets and fields next to schools and bus stops, some drooping under the weight" and described the extent of lead releases in Coal Center, Pennsylvania, Wappingers Falls, New York, and West Orange, New Jersey. In Coal Center, the investigation documented that an isotopic analysis "showed the lead in the soil mirrored the lead from the cable and was unlike the background lead in that area."[12]
- ***Our recommendation***: Where these aerial cables have been abandoned, EPA should ensure they are immediately removed. If still in use, they should be protected to prevent leaching and abrasion from the weather, marked as lead-sheathed, and taken out of service as soon as possible, followed by removal. EPA should also ensure surface soil contaminated by the aerial cables is removed or permanently covered.

**Accessible to children – prioritize for immediate removal:**
- ***The situation***: Many of the lead-sheathed cables and junction boxes where cables are spliced are accessible to the public from the ground with many near playgrounds, schools, child-care facilities, and greenways where inquisitive children may be exposed.

---

[5] EPA, EPA Strategy to Reduce Lead Exposures and Disparities in U.S. Communities, October 2022, https://www.epa.gov/system/files/documents/2022-10/Lead%20Strategy.pdf.

[6] Wall Streat Journal, Lead Legacy: A Wall Street Journal investigation, https://www.wsj.com/articles/lead-legacy-a266d59b.

[7] https://blogs.edf.org/health/wp-content/blogs.dir/11/files//MTS_EDF-Lead-Cable-Investigation_Final.pdf.

[8] https://www.wsj.com/articles/lead-cables-telecoms-att-toxic-5b34408b?st=llb93zx51u7j8vx&reflink=desktopwebshare_permalink.

[9] https://www.wsj.com/articles/lead-cables-investigation-att-methodology-1703dbb0?st=atvf0gdbggt552t&reflink=desktopwebshare_permalink.

[10] https://www.wsj.com/articles/lead-cables-louisiana-telecoms-59f36ffe?st=ncthctna7h8mswt&reflink=desktopwebshare_permalink.

[11] https://www.wsj.com/articles/att-verizon-lead-cables-telecom-5e329f9?st=ad4u4g1d4xq2gdw&reflink=desktopwebshare_permalink.

[12] https://www.wsj.com/articles/lead-cables-telecoms-att-toxic-5b34408b?st=llb93zx51u7j8vx&reflink=desktopwebshare_permalink.

The *Wall Street Journal* gave New Iberia, Louisiana as an example and documented through isotope analysis that the nearby soil contamination was from the cable.[13]

- ***Our recommendation***: Where children can access abandoned lead-sheathed cables, EPA should ensure the accessible portions are immediately removed. If still in use, they should be encapsulated and labeled. Where possible, accessible portions should be taken out of service and removed. EPA should also ensure surface soil contaminated by the cables is removed or permanently covered.

**Underwater cables – assess their risk, prioritizing those in source water protection areas:**

- ***The situation***: The *Wall Street Journal* identified "more than 1,750 underwater cables" and took "samples from nearly 130 underwater-cable sites." The reporters shared the location of the underwater cables with EPA which found that roughly 330 of 1,750 were in source water protection areas. These areas are important to protect the supply of community drinking water systems. The reporters' site investigation found lead "on the banks of the Mississippi River in Louisiana, the Detroit River in Michigan, the Willamette River in Oregon and the Passaic River in New Jersey." In addition, "roughly 80% of sediment samples taken next to underwater cables . . . showed elevated levels of lead."[14] In Lake Pend Orielle, Idaho, the investigation documented through an isotopic analysis lead found in the sediment nearby cables was similar to that from the cables, and not from broader environmental contamination.
- ***Our recommendation***: EPA should assess the condition of the underwater cables to determine their condition, their current and anticipated releases to the environment, and the risks posed by their removal or leaving them in place. Based on this assessment, EPA should ensure action is taken to protect public health, prioritizing cables located in source water protection areas.

We recognize that EPA has many competing priorities and limited resources. The agency should look to the two telecom companies that are responsible for installing or managing the vast majority of the lead-sheathed cables to support the assessment and actions needed to protect the public from potential exposure.[15]

For more information or discuss the request, please contact EDF's Tom Neltner at tneltner@edf.org or 317-442-3973.

Sincerely,

*Tom Neltner*

Tom Neltner, Senior Director, Safer Chemicals
Environmental Defense Fund


Seth Jones and Monique Rydel-Fortner, Cofounders
Below the Blue
Monique@belowtheblue.org

---

[13] https://www.wsj.com/articles/lead-cables-louisiana-telecoms-59f36ffe?st=ncthctna7h8mswt&reflink=desktopwebshare_permalink.
[14] https://www.wsj.com/articles/lead-cables-telecoms-att-toxic-5b34408b?st=llb93zx51u7j8vx&reflink=desktopwebshare_permalink.
[15] https://www.wsj.com/articles/att-verizon-lead-cables-telecom-5e329f9?st=lcs4si97oqbp7lu&reflink=desktopwebshare_permalink.

Lynn Thorp, National Campaign Director
Clean Water Action
lthorp@cleanwater.org

cc:
- Barry Breen, EPA Acting Assistant Administrator for the Office of Lead and Emergency Management
- Radhika Fox, EPA Assistant Administration for the Office of Water
- Grant Cope, EPA Senior Counselor to the Administrator

_____

*About the organizations authoring the letter and requesting EPA action:*

**Environmental Defense Fund**[16] *is an international, non-profit environmental organization dedicated to using science, economics, and law to build a vital Earth – for everyone. EDF's Healthy Communities program strives to make air, water, food, and household products safer through cutting-edge research, wide-ranging partnerships, and a focus on strengthening laws and policies that protect health.*

*The* Wall Street Journal *reached out to EDF to learn more about the risk of lead cables in lakes, rivers, and streams around the country. EDF learned of Below the Blue and talked with its cofounders, who also work at Marine Taxonomic Services, Ltd. (MTS). EDF agreed to provide guidance, assistance, and funding to MTS to help identify cables and conduct sampling. EDF's goal was to understand the extent to which lead-sheathed cables pose a public health risk, especially to drinking water sources, that may need to be addressed. Consistent with that goal, EDF provided guidance and technical assistance to MTS and the Wall Street Journal when questions about lead arose.*

**Below the Blue**[17] *is a community-based, non-profit organization based in Lake Tahoe. Its goal is to remove foreign debris from bodies of water, educate the public about pollution, and collect data that will help facilitate policy change and enforcement. It has been focused on lead-sheathed cables for more than five years. It works closely with a team of environmental lawyers, local agencies, and residents to help guide their work. Its co-founders are employed by MTS.*

**Clean Water Action**[18] *is a non-profit environmental organization whose mission is to protect our environment, health, economic well-being, and community quality of life. It organizes strong grassroots groups and coalitions, and campaigns to elect environmental candidates and to solve environmental and community problems. It operates nationally, regionally, and locally.*

---

[16] http://www.edf.org/about.
[17] https://belowtheblue.org/about-us-1.
[18] https://cleanwater.org/who-we-are.