# EXHIBIT A

**Lead Contamination Conference Call 7-18-23**

**Moderator:** Good day, and welcome to the Lead Contamination Conference Call. At this time all participants have been placed on a listen-only mode. The floor will be open for questions and comments following the presentation. It is now my pleasure to turn the floor over to your host, Alec Vaughan. Sir, the floor is yours.

**Alec Vaughan:** Thank you, and good afternoon, everyone, and thank you all for joining us today for our call on lead cable contamination. My name is Alec Vaughan and I'm a Senior Analyst on the Special—Special Situations team at Capstone. Capstone is a policy analysis and regulatory due diligence firm, and because our clients invest in publicly traded securities, I would like to ask all participants to not discuss any non-public or confidential information, or any information regarding which you owe a duty of confidentiality to your employer. So, today's call will be focused on the Wall Street Journal's investigation into the telecommunication industry's usage of lead cables throughout the United States. We are joined today by Bill Verick, an attorney at Klamath Environmental Law Center with over 34 years of experience in environmental law. Bill also represented the California Sportfishing Protection Alliance in their lawsuit against Pacific Bell Telephone Company, a subsidiary of AT&T whose lead cables were found at the bottom of Lake Tahoe. Bill, I can quickly pass it over to you for a brief introduction on yourself and any other opening remarks that you may have.

**William Verick:** Sure. So, I graduated—after I graduated from law school, I worked for a downtown San Francisco law firm for a couple years doing mainly securities litigation, ironically. And then I did—I didn't set up the Klamath Environmental Law Center for a while but I—I did forestry defense, mainly trying to stop logging of old growth redwood trees on private land in California. And I almost went—became homeless doing that, because it was so unremunerative that I just couldn't keep doing it. So, I got into doing mainly proposition—California Proposition 65 enforcement of the right to know provisions of Proposition 65. I've been doing—that's been the bread and butter of my practice now for—since 1995. And what I've done with my colleagues is, among other things, several large industry-wide settlements that were a form of private rule-making, setting reformulation standards for things like lead in maple syrup, PCBs in fish oil supplements, lead in the insulation on computer and consumer electronic cords and things like that. I've also done a couple of cases involving just the Proposition 65 discharge to drinking water provisions, and I've done enforcement actions under the Resource Conservation Recovery Act, otherwise known as RCRA. So, that's, that's my bio.

**Alec Vaughan:** Awesome. Great. Thank you so much, Bill. And so, let's dive in first with some prepared questions that I have today, and then towards the end of the call I'll open up the line to give the audience a chance to ask any questions that they may have.

**Lead Contamination Conference Call 7-18-23**

So first off, I think a natural place for us to start would be your work with the Lake Tahoe case. So, can you provide a bit of a lay of the land for everyone on the call regarding how the lawsuit came about, what provisions were used to bring the lawsuit, and how it was determined that the abandoned cables belonged to an AT&T subsidiary?

**William Verick:** Yeah. So, we had been interested—my colleagues and I had been interested in an abandoned cables case for a long time, and we hadn't even thought about Lake Tahoe. And we didn't bring one because we couldn't think of a way that we could access one of those cables and actually dig down to it, because most of the, most of what we were thinking about were submerged cables, actually, digging down to it and testing it to see if it had lead. And, you know, you have to have a certain amount of evidence to bring a case. If you don't, you can be sanctioned. So, what happened with us was there was this diver, Seth Jones, who is—plays a prominent part in the Wall Street Journal's articles, and he is a professional diver that does, you know work—very, lots of different kinds of work, and he's got a, he's got a thing about disposal of, you know, garbage into Lake Tahoe. You know, working, he finds piles of construction debris from when they built somebody's mansion on Lake Tahoe. And he found these cables, and did a little bit of read up on them and got an idea of what they, what they, what they were made of. And what the status of the cables were, they had been abandoned I think in the 1980s or maybe the early '90s. And to abandon them on the bottom of Lake Tahoe, which is owned—the bottom of Lake Tahoe is owned by the State of California. He had to get—they had to get a permit from the State Lands Commission. And the State Lands Commission said, okay, you can abandon them there, but you have to cut the ends off of them and pull the ends into the lake far enough so that they would be submerged deep enough that nobody could hit them with a boat and so that they couldn't be seen. And so, they were left there. And so, they were abandoned. And so, Seth cut like about a six-foot section of this four-inch cable that probably weighed 200 pounds and retrieved it and brought it—cut a foot of it off, and took it all apart, and weighed the various components, and determined that every foot of that cable contained three pounds of lead. He brought the rest of it to us, and we got a kiddie swimming pool and filled it with Lake Tahoe water and let the cable sit in it for like a day, and then we took a water sample, and sent it off to a lab, and had astoundingly high levels of lead in the water. So, we had the evidence that we needed to bring the case. So, we were pretty certain that it was AT&T or AT&T subsidiary whose cable it was, because of the size of it. And when it was put in, AT&T basically had almost a complete monopoly on telephone service in California, with a few minor exceptions. And so, we went to the State Lands Commission and we did a Public Records Act request asking for any communications with Pacific Bell Telephone Company and the State Lands Commission regarding telecommunications cables on the bottom of Lake Tahoe. And we got a response to that, and that showed that the cables were Pacific Bell's. And

so, we had what we needed to—what you have to do under both Proposition 65 and RCRA, the Resource Conservation Recovery Act, is you have to send notice letters to public authorities. And with, under Prop 65, you have to wait 60 days, and under RCRA you have to wait 90 days. And if a public agency wants to take the case, well then you can—you don't get to run the case, but you can come along for the ride. And neither public—no public authorities wanted to take the case, and so we filed the case in Eastern District of California in Sacramento, and drew a judge who was pretty unfavorable to Prop—to environmental concerns of any sort, which, you know, that was, that was in the background of everything that we did on the case. We knew that we had a judge that was not good for us. So, we negotiated with AT&T, and they agreed to take out the cables. And so, we reached an agreement where they would do an evaluation. They would figure out how much it was going to cost, and if it was going to cost less than $1.5 million they would take them out. And if it was going to cost more than that, they could refuse to take them out, and then we could just continue with the lawsuit and try to make them take it out. And so, they went through two years of permitting, and it takes a long time to get all the permits that you need, especially on some kind of an icon, icon like Lake Tahoe. And that's just about played out now. The permits have been issued, and AT&T is going to begin removing the cable right after Labor Day.

**Alec Vaughan:** Great. Thank you. Really appreciate you giving a good lay of the land there and background on the Lake Tahoe case. So, one of the things that we're all trying to think through here is whether or not it makes sense from an environmental perspective to just leave some of the lead cables in the ground or in the water, or if it's better to have all of them removed. So, curious if there was any work done in the Lake Tahoe case to determine whether removing the cables would actually cause more contamination or if removing the cables was seen as favorable.

**William Verick:** Yeah, well, in those—in these kind of cases, and we've done a bunch of cases involving contamination—the polluter always claims that it'll be worse if we try to do anything than if, anything that costs us money will be worse for the environment than if, if it didn't cost us money. And so that's an argument that they use, and it's not a completely implausible argument. The cables in Lake Tahoe, I don't know if you—I mean, there are some pictures of them in the Wall Street Journal studies, I mean stories, and they're just laying on the lake bottom. They're not buried or anything like that. And so, I mean, the argument can be made that moving the cable might cause some sediment to come off of it, and so it would cause momentary turbidity in the water, and we just laughed that off. And I don't think—we don't think that that was a serious argument. There are, a lot of the kind of argument that you're talking about, though, is really—would really be site-specific. Like what all, what all is there in addition to the cable? The notion that you would get, make it worse—things worse, is that if you were

to dig it up, and contaminated dust around it would get all over the place, and spread and contaminate people, and contaminate the workers. But for the most part, these cables, the lead part of these cables is deep inside the cables. And there's, you know, lead—some of the data that the Wall Street Journal came up with showed that there is lead contamination of the soil right around it, and there are tons of ways of dealing with that. This is not a new thing, digging things up. And if there's contaminated soil, digging the soil up and sending it off to a landfill, it may not make sense to dig the soil up and get rid of it, depending on what the level of lead contamination is and where it is. If it's in water, it probably is more of a concern. I think under the law, under RCRA, people could be made to clean it up, to dig it up, and clean up the contamination regardless of where it is, because the standard under RCRA is if something may, and the word is may, cause an imminent and substantial endangerment to human health or the environment. And the environment includes, you know, algae in Lake Tahoe, and sort of freshwater plankton, and stuff like that. So, the standard is pretty, is pretty strict under RCRA. Generally, the approach taken by government agencies is to not do that. It's been fairly permissive, and the agencies don't want to have that kind of a nightmare on their hands.

**Alec Vaughan:** Interesting. So, just to clarify quickly, you're saying under RCRA, that would mandate a cleanup of not only the lead cable, but also the contaminated soil, water, that is surrounding the cable. Did I understand that correctly?

**William Verick:** Yeah. They don't clean up contaminated water unless it's, like, isolated somewhere. How could they clean up contaminated water in Lake Tahoe? Lake Tahoe is, you know, over 1,000 feet deep in places and it's, you know, it's a giant lake. And the lead spreads out into the lake, and as soon as you get in there and start trying to do anything in an area where you might have an increased—temporarily increased level of contamination, you're just going to stir up the water, and it's going to mix it in with the rest of the water of Lake Tahoe. That, that kind of cleanup would definitely be more destructive than it would be worth, because if you just take a water sample from some random place in Lake Tahoe, you're going to find virtually no lead in it. So, as much of the lead that has soaked out of that cable as has done, lead levels, overall lead levels in Lake Tahoe are super low.

**Alec Vaughan:** Got it. Got it. So in the settlement with AT&T, I'm curious, was the recycling or the recovery value of the lead cable used to offset any cleanup cost considerations?

**William Verick:** Well, I would, I would, I would think so. It's going to be recycled, and the information that we have from recyclers is that those cables are really valuable and desirable to recycle. Now, we don't—you know, our negotiations with AT&T, we took

that into account. We just presumed that that would be something that they would do, and we presumed that they're going to, you know, accept bids from recyclers to recycle that stuff once it's taken out of the lake. In other places we know, in places like Ohio, some of these cables have been taken out and recycled. And the recyclers pay for the privilege of taking the cables out. They're worth enough to do that. That may not be the case in all places, but the materials definitely are valuable, and, and AT&T is mighty rich, but they're not rich enough that they could just, like, give that stuff away. So, we presume that they are going to make—you know, get some revenue from that, whether it completely offsets the cost of the cleanup. I kind of doubt that, but it'll come close. And I mean, I think the, the biggest chunk of cost of the cleanup in Lake Tahoe is the permitting, not the actual removal of the cable. Getting—you know, hiring the consultants that you need to deal with the Army Corps of Engineers, and like 18 different state agencies, and jumping through all the hoops that each one of them want you to do, and all the, you know, all the fancy documents that have to be produced and all that, I mean that must have cost a lot of money. I mean, I'm on the public—I'm on the board of a public drinking water agency, a local agency. You know, when we get a grant to replace like a mile of water line, the grant includes, you know, like $50,000 just for the, to pay for the permitting compliance that we have to do to be able to do that. So to do, to remove the cables, the permitting, and you're going to have to get permits to do that, that's going to be expensive. But I don't know how much it would be in that case.

**Alec Vaughan:** Do you think the permitting issue is exclusive to California or do you think other states have similar kind of onerous permitting rules that would make this more expensive?

**William Verick:** Oh, I think a lot of, I think a lot of states have those permitting rules, and the Army Corps of Engineers is nationwide. So, if you're dealing with water, any kind of navigable water, so where these things go under the Great Lakes, for example—and I'm sure they crisscross Lake Michigan in multiple places—where they go under the Mississippi River, or any of the major rivers, across San Francisco Bay, across Long Island Sound, across Chesapeake Bay, Biscayne Bay, you know, you're going to have to get permitting from, permits from the Army Corps of Engineers at least. And, you know, and the permitting model that is used is, what happened is California passed the California Environmental Quality Act, and then the federal government passed the National Environmental Policy Act, which is patterned after the California Environmental Quality Act. And then lots of states passed their own similar Environmental Review Acts patterned after NEPA. And so, not all states have those provisions, but a lot of them do.

**Alec Vaughan:** Got it. Got it. Okay. And one other thing I want to touch on, too, in the Lake Tahoe case is what factors of the Lake, of the Lake Tahoe case were impacted by

the fact that Lake Tahoe is a source of drinking water? Like, how could the case have gone differently if it was a lake that wasn't being used for drinking water?

**William Verick:** Well, in California, the State Water Resources Control Board has passed a resolution that says that all surface fresh water in the state is considered to be a source of drinking water. That means that it can be used for drinking water with a few exceptions. If it's super polluted already, it's not. And if it's somewhat brackish, it's not. But, you know, any spring that's bubbling up, if it runs off of somebody's property, road—water running in a road ditch is considered a source of drinking water. So, Proposition 65 applies to sources of drinking water, the discharge to drinking water provisions of that apply to drinking water. And so that would—that means that in California, that provision could be used, you know, for the Napa River, for the Sacramento River Delta, the Sacramento River, the San Joaquin River, the, you know, the Klamath River, and, and any kinds of, like, freshwater wetlands that the cables might be running through as well. I'm not sure that anybody but us would think about bringing a case like that. But we're certainly thinking of it.

**Alec Vaughan:** Got it. Got it. Okay. And I'll ask a pretty open-ended one here as we kind of shift gears towards the current situation. So, just wanted to gauge if you had any reactions or opening thoughts that you'd like to kind of share after you read the Wall Street Journal's investigative piece.

**William Verick:** Yeah. Well, one of them was humility, because, you know, we litigated the Lake Tahoe case that was kind of brought to us on a platter. And the Wall Street Journal went out and spent a lot of time and did a lot of digging, and found out stuff that we wish we had known when we were bringing the case. We didn't go to Lake Tahoe and take water samples near the cable. They did. And we didn't take samples of soil near cables. They did. And, you know, until this article came out, I didn't realize that they were, these leaded pipes, smaller ones, are—had been suspended from telephone poles that run through residential neighborhoods. I didn't know, I didn't know that was the case. So yeah, I thought—I was in awe of the job that the reporters for the Wall Street Journal did. They deserve a Pulitzer, in my opinion.

**Alec Vaughan:** Yeah. Yeah. There's definitely some thorough reporting on their end. So, look—taking a look at what can be done moving forward, there seems to be a few different authorities the EPA has at its disposal to mandate the telecom providers to clean up the lead cable. So, one that we touched on is RCRA, or the Resource Conservation and Recovery Act. One could be the Comprehensive Environmental Response, Compensation, and Liability Acts, also known as CERCLA, or Superfund. And then there's also the Safe Drinking Water Act. So, I was curious, do you have any

insight into which of these are the most likely avenues the EPA could take for remediation?

**William Verick:** Well, I mean, if the, I mean, if the EPA decided to do something, I would think that they would be crazy not to use all of those. You're not, you're not limited to only one. You can use all of them. You throw, I mean RC—you have to understand that RCRA and CERCLA are complementary. They're not-- it's not one or the other. One of them is intended to provide the, the power to get a court to order somebody to clean something up. That's RCRA. And then CERCLA is focused on who has to pay for the cleanup. And, you know, when it was first passed, there was a tax on chemicals. And so there was a fund that was generated, and so the government had money that was generated that way to help pay for the cleanups. That's why it was, part of it was called cleanup. But I don't think—that's not that relevant anymore. CERCLA is used—I can give you a couple of examples. CERCLA is used even in—well, it's used by state agencies. For example, when the state agency has brought an action—in California it would be the Department of Toxic Substances Control. And so, there was a battery recycling plant in Southern California that, you know, went on for years, it was a smelter. And it contaminated a vast area of the poorer parts of Los Angeles with massive amounts of lead. And so, by the time the agency finally got around to trying to get them to clean it up, you know, a lot of contamination had happened. So, Exide just basically went belly-up. It went bankrupt. It got relieved of its obligations to do any cleanup or pay for any cleanup by the bankruptcy court. And it ceased to be—in October of 2020, it ceased to be—it ceased to exist as a functioning business entity, that's what it said. And so, then what happened is the Department of Toxic Substances Control used CERCLA to go after the people who brought the lead to the smelter, the people who transported it to the smelter, and, you know, tried to get them to have to pay for it too. And, you know, even a company like AT&T would, would be really, really, really, really challenged to pay for a cleanup that has contaminated, you know, several square miles of Los Angeles with toxic levels of lead dust. And so, you know, they're going to do cleanups here, and they're going to do a little bit of cleanup there and they're going to leave large areas, you know, contaminated, and that's just the way it goes. So, I would expect that probably the biggest thing that I learned from the Wall Street Journal article was that in 1956—by the year 1956, AT&T was using 100 million pounds of lead a year, and that it had its own smelters. And a lead smelter is way different from these cables. Lead smelters cause massive Superfund sites, which is what the Exide plant in Los Angeles was. There was a big lead smelter up in a place called Wallace, Idaho, up in the panhandle of Idaho, that contaminated, like, you know, 50 miles of one of the most beautiful wild and scenic rivers in the whole United States, and all the communities along, along the way. And it was the same thing. The smelter company went bankrupt, and then it was the government left picking up the pieces,

trying to find other people that they could stick with the cost as well, and business entities declaring bankruptcy to get out of having to pay for it. So that's, that's how things tend to work. You know, if you're interested in what's going to happen to AT&T's stock price, and, you know, the alternative—the way that they might deal with the smelter thing is to declare bankruptcy. Well, what does, what does that do you know, to people who hold common stock? I don't know that that's going to happen. Nobody's gone after AT&T's smelters yet. But I think some people are thinking about it.

**Alec Vaughan:** Mm-hmm. So, I guess the natural extension to what you were talking about is, could AT&T try to pin some of these costs on maybe some of the cable manufacturers? Would that be something that wouldn't surprise you?

**William Verick:** Yeah. Under CERCLA, you know, there are things called PRPs, potentially responsible parties. It's basically anybody who, who touched or concerned the offending real estate or objects. And so, we did some cases here in Northern California involving wood treatment, chemical pentachlorophenol where, you know, Louisiana Pacific, Georgia Pacific, Pacific Lumber Company, major, you know, Fortune 500 companies, were using this chemical to spray on to lumber that was being used to build homes. And every single one of these mills that used it has a toxic plume underneath it. And what happened with a lot of these places, one that, one I can tell you about, in particular, because I know a lot more about it is, the company went bankrupt. The company that owned the, the company that owned it went—the mill went bankrupt because of this. The banks refused—the banks that held the mortgages on the property refused to, to foreclose on the mortgage because they didn't want to wind up with a deed granting them title to that property because then they would be on the hook. And what wound up happening is the widow of one of the guys who was one of the owners, they wound up taking her house. So, it came down to that. And that's, that's the kind of thing that can happen. That litigation is, you know, it involves rooms full of lawyers where junior associates are set to sit around a conference table, while, while, you know, while a deposition is being taken. And, you know, you have like 25 lawyers sitting in there, each one of them billing. So, that's the kind of thing that happens when they're fighting over who winds up having to pay for it.

**Alec Vaughan:** And so, I guess, understanding the mechanics of that a little bit, if EPA orders a cleanup, what is kind of the protocol for paying for it? Is it EPA initially pays for the cost of it, and then whoever is a PRP, or potentially responsible party, will then reimburse EPA, is that how it works?

**William Verick:** I think it's a fairly—I don't think there's any set model for that. I mean, I have to, I have to say that I don't practice under CERCLA. I mean, I know about it, and I

know about some of the implications of it. My experience is that the EPA might want to try to order a company to do something, but a company, if it's going to cost the company a lot of money, the company is going to say, so sue me. And that's what winds up happening. And so, the litigation takes years, and nothing gets cleaned up while the litigation is happening. And the companies try to, you know, compartmentalize all of their environmental liabilities into some subsidiary, and then have that subsidiary declare bankruptcy. There's all that kind of maneuvering that goes on. And they're all suing each other. And it's a full employment act for lawyers, that's for sure.

**Alec Vaughan:** And I know, so most of your experience—

**William Verick:** I mean, wait, let me just add to that, which is, since the days—since the CERCLA fund, the cleanup fund has—I don't, I don't think that was renewed by Congress when it, when it came up. And the tax on chemical, the chemical industry is not in place anymore. And so, the EPA doesn't have the money, they don't have the money appropriated, you know, Congress doesn't like, just, appropriate them, like, you know, $25 billion a year to do cleanups. They have to, they have to litigate that, and force the private companies to come up with it. And if it's bad enough, I mean, if it's killing people, if kids are dying, and fish are going belly up, then the government might, might clean it up, but I've never seen that happen.

**Alec Vaughan:** Got it? Got it. Okay, super helpful. So, I've got a few more prepared questions here. But given where we are on time, I'd like to give our audience a chance to ask any questions they may have. So, operator, can you please provide instructions for the audience so they can ask questions?

**Moderator:** Certainly. At this time, we'll be conducting a question and answer session. If you have any questions or comments, please press *1 on your phone at this time. We ask that while posing your question, you please pick up your handset if listening on speakerphone to provide optimum sound quality. One moment while we poll for questions. Your first question for today is coming from Ian. Ian, your line is live.

**Ian:** Hi. So, I recognize that it's self-serving for the folks that installed these cables to be against remediation. But I guess how—it just strikes me that pulling a cable, dragging a cable off the bottom of Lake Tahoe is probably going to release a lot more lead into that environment. Is that, so is that actual—are they just going to yank it out of there? Or how, how do you go about removing that such that you're not really exacerbating the problem? And can you sort of extrapolate that to remediation costs elsewhere?

**William Verick:** Yeah, so these cables, the ones that, unlike Tahoe—and I would think that most of the buried cables that have lead in them—what they are is, there is a lead pipe that's about two inches in diameter. The walls of it are about a quarter-inch thick. And running through that are these pairs of these thin wires that are copper wires, that are insulated. And they're twisted, and they go through, and then around that is like some kind of like a tar, bituminous-like sealant. And then on top of that—and that's, and that's like half an inch thick. And then on top of that are these quarter-inch steel rods. And you can see them in some of the pictures in, from the Wall Street Journal's article. And those wrap around the outside, and they're, you know, they're a quarter-inch in diameter, so they don't just rust out and fall apart. They're, they're actually in, in fairly good condition. And those are on the outside of, of that, so that, they're also protecting the cable from, you know, most of the kind of insults that it might get. And then, on top of that is burlap soaked in bitumens like tar, tar-soaked burlap to try to keep the water from getting in. But that, that stuff is falling apart. And , when you pull the cable, when you manipulate the cable, it's not going to wind up causing that much lead to come out. And, you know, what AT&T had to do for, to get the permit to take the cable out of Lake Tahoe, they had to have a doc—they had to put together a document that showed basically, like every 100 feet, what they were going to be doing over eight miles, and how they were going to be lifting it up very carefully, and then get it, once it's on board a ship, cutting it. And so, none of the cuttings are falling into the lake, and all the measures that they're having to do to take that. And then when the boat gets really loaded, then that's transferred, you know, to a barge that takes it to the dock. So, they're being very careful. And when it's on land, it's even a lot easier, I think. You just—they're not buried that deep, and you dig around them, and you lift them up, and you cut them. And most of them, I suspect, are along public right-of-ways, public thoroughfares. So, along Highway 101 in California, along I-5, along Highway 99, along railroad right-of-ways, because, you know, that's just, just makes sense that they would put it there rather than having to negotiate with individual property owners to run it across their property.

**Moderator:** Your next question for today is coming from Louis. Louis, your line is live.

**Louis:** Hi, thank you. I just wanted to know if you had any thoughts on how this could either expand or be limited because, I mean, a lot of this stuff was laid in the, you know, '30s, or, I mean, in theory, the original American Bell, I think was founded in the late 1800s. And then it's been, you know, broken up and turned into a lot of different things over the years. How does that, you know, how does that kind of translate into the modern incarnation of AT&T or, you know, any other kind of telecom carriers? Wouldn't at some point there be—well, I guess I'll just leave the question at that. Thanks.

Lead Contamination Conference Call 7-18-23

**William Verick:** Yeah, the, obviously, the age of the cables and where they were put does—would tend to limit the personal injury liability that AT&T may have been responsible for because statute of limitations are like a year, three years, maybe. And the real big exposures from these cables were caused to the people who were installing them and to their families. And so that's not really happening anymore. But if the cables are bleeding lead out into the environment, they are an imminent and substantial endangerment to the environment. And to that extent, there is no—under RCRA, there is no statute of limitations. And under CERCLA, you can go after people who, you know, three ownerships back, you can go after them. You can, you know, you can get anybody who was involved, anybody who owned the land, even for a while and then sold it, all the people who helped bring the lead to the place, the people who installed it, the people who abandoned it, the people who owned it. And so, to the extent that government is going to be—have an appetite for doing something like that, well, that remains to be seen. I think whether, yeah, I just—I'll be interested to see if the government wants to do something about that. But if they wanted to, you know, the legal theory is there. You know, whether a judge, even though the law may be clear, would want to, you know, subject AT&T to that kind of financial pain and anxiety, that remains to be seen. Judges tend to be from the same class as the people who are the management of companies like AT&T. And they have, you know, the same kind of ideology and values as those people do. So, they tend to identify with them much more than somebody who's a worker or somebody like that who would get exposed. It's not that big a deal to them. Their kids aren't going to get exposed.

**Moderator:** Your next question for today is coming from Phillip. Phillip, your line is live.

**Phillip:** Great, thank you. Yeah, my question was, obviously, in the specific case you're talking about, it was a lead-screened cable. But, you know, we've got a legacy of all sorts of telecommunications cables, you know, plastics, PTFVs, petroleum jelly, all sorts of other, you know, less serious contaminants. But the general telco strategy has been, you know, where it's inconvenient or expensive to remove, they've done exactly what AT&T did in the situation you're talking about, which is just they essentially abandoned the asset in place. Do you think that these other materials, and that general strategy, will come under broader threat as a result of the Journal's campaign?

**William Verick:** You mean other, other materials like fiberoptic cables and things like that?

**Phillip:** No, other materials in abandoned—so these are the old copper cables that are being replaced by fiber. So, there are other less hazardous materials in those cables. And then also, just as a result of that, the general strategy of, you know, cutting the

Lead Contamination Conference Call 7-18-23

ends of the cable and just abandoning it in place. Do you think that'll become more difficult for the telecommunications players as a result of the Journal's campaign?

**William Verick:**  Huh. I don't know if it will become more difficult. My experience is that the real money to be made by private lawyers and by private plaintiffs on this is in personal injury. And personal injury cases to be brought would be very difficult. And to bring a case to force an industry like the, like the telecommunications industry to dig up toxic stuff that they've buried, you know, that's a public interest kind of case. It's not a case—you know, you can get, there's a fee shift, there are fee shifting statutes, so lawyers can get paid fees, but they're not going to get like one third of some giant, you know, settlement that's going to be done. And so, the kind of law firms that, you know, that are, that practice in the environmental field that are similar to the securities litigation folks like Bill Lerach used to be, and Elizabeth Cabraser and people like that, they're—they don't do these kinds of cases. They don't do cleanup cases. It's a public interest thing, and so it's a much smaller and less well-financed group of private lawyers who are, like me, who are doing it. And it's—because you're not going to become a millionaire doing this. You get paid, you know, what your going hourly rate would be times the number of hours you've worked if you win, and that's it. And so, it's people like us and public agencies that will be doing it. And the public agencies are not very well-financed anymore to do this kind of litigation. They just—and the people who work from them, for them, the public agencies, are somewhat demoralized, because of the number of times that they've worked up cases that they wanted to bring and their bosses have told them that they can't do it. And so, there's not a lot of, there's not a lot of—in my opinion, there's not a lot of pressure on agencies to do anything about this. And there's and they're not inclined to want to do anything about it. They don't like to be told about contamination. They don't want to hear about it. And, you know, there's always going to be some district attorneys out there, maybe an attorney general in one or two states that want to make a name for themselves and really are concerned about the environment who might bring something. But I don't think there's going to be a rush, a flood of public interest lawyers or public agencies that are going to be jumping on a bandwagon and trying to flog AT&T.

**Moderator:**  Your next question is coming from Michael. Michael, your line is live.

**Michael:**  You kind of addressed the question in what you just said in terms of maybe public agencies are hesitant to bring action quickly to AT&T, but what do you think AT&T and, like, the Verizons of the world are doing, you know, right now? Like, you know, the article was pretty damning. Do you think that it's going to change anything about how they spend money or do business in the near-term? Or is it going to be, like, a non-event in terms of how they run their businesses today?

Lead Contamination Conference Call 7-18-23

**William Verick:**  You mean beyond the cables? Are you asking me whether I think that the embarrassment that they were caused by the Wall Street Journal article will make them be more environmentally sensitive? I doubt that. You know, one of the things that I saw in the Wall Street Journal article was that AT&T—it looked like AT&T was, or one of their executives was actually floating an idea for how it could be dealt with, that the government would pay for a bunch of the cleanup, and they would pay for some of it, and some of their other contractors and stuff, people who were involved, would come up with some money too and they would, you know, reach some kind of deal that would take care of everything forever. And, you know, just like the, the oxycodone litigation let the Sackler family off the hook, all those guys will be let off the hook too. And I think that that's what, I think that that's what AT&T is signaling that they would be willing to go along with.

**Michael:**  Right. So, it's not like they're preparing for, like, a huge settlement cost, or if they lose a lawsuit, it's going to cost a lot of money that could affect their, like, near term spending plans elsewhere in the business. They probably think that there's a way to solve this issue without impacting the rest of their business, or how they're planning to, like, spend.

**William Verick:**  Yeah, well, AT&T can afford, you know, as many lawyers as it wants until the cows come home. And they can delay this for 10,15 years before they have to do anything other than, you know, pay a bunch of lawyers. And, you know, the people that they're hiring are costing them $800 to $1,000 an hour for people who are partners. And, you know, it'll cost them, it could cost them, you know, $10, $15 million a year. But that's nothing for AT&T, they'll just say to themselves, we need 10 to 15 more, million more dollars per year, let's just jack up the phone, the, the cell phone rates, and they basically have a monopoly. So why can't, why wouldn't they do something like that? I think they're more likely to do that if the government insists on anything that's going to cost them a lot of money. They'll just delay it for as long as, as long as they can. And that can be for a long, long time.

**Michael:**  Got it. That's helpful. Thanks.

**Alec Vaughan:**  Bill, I've got a number of quick questions sent to my inbox here that I want to try to squeeze in as many as we can before our time expires at 1:00 pm. So, I'll just go ahead and read off one by one, and you can give a quick reaction to. So, first one is just seeking to clarify what happens if a company is sued and declares bankruptcy. And if the company emerges from bankruptcy, does liability stay with that emerged company?

**William Verick:** Well, it all depends on what the bankruptcy court orders. But generally, you know, ever since John, Johns Manville sort of set the, the standard for that, you know, when, with the asbestos litigation. They declared bankruptcy, and then they got off the hook. They didn't have to pay anything more. They came out of bankruptcy, chapter 7—I mean, chapter 11, I believe, and, you know, stayed in business. So that can happen. Exide wound up going belly up because they had smelters like, like 15 states, it wasn't just California. They went belly up and they were just, they went—I think they went through chapter 7 and they were liquidated, and ceased to be a business entity anymore. So, it you know, it depends, and it depends on the bankruptcy trustee, and it depends on the bankruptcy judge, too.

**Alec Vaughan:** Got it, and then I'll try to fit in one more quick one. And it's just a question about the precedent of lead pipes which are continuing to be used fairly broadly, even for drinking water, and why are the telco cables going to result in a large liability when lead pipes are still pretty fairly broadly deployed?

**William Verick:** Well, the only reason is that, I mean, I think that the personal injury that's caused by lead pipes, what happened to the kids in Flint, just alone, if, you know, could put any, even maybe even put AT&T out of business, what they could recover for what was done to them. That generally, you know, all lead water pipes are way worse for the environment than, than what AT&T's got going because people are drinking the water that's flowing through them. And they're sitting in the soil too, just like AT&T's lead pipes but people are drinking from them. So, but the difference is that AT&T is a private company and it's like one of the deepest pockets on the entire planet. You know, the city of Flint—what the city of Flint is, you know, probably has a budget the size of what AT&T spends on their Christmas party.

**Alec Vaughan:** Yeah, yeah. Understood. And why would you—this is another email question that we've gotten.—why would you suspect that EPA would want to bring this kind of a case even to begin with? Or is that the sense that you're getting, that EPA does want to bring a case like this?

**William Verick:** Well, I mean, I can't speak of EPA like it's a person. It's a, it's an organization that has its own internal politics, and it's governed by external politics as well. You know, Donald Trump's EPA is way different from Joe Biden's EPA. And the people who are the political appointees, they're all very sensitive to, you know, their funding base, their funder, the funder base of their bosses. And AT&T, I'm sure, is smart enough to give money to both parties. So, I mean, let's face it. That's, that's how politics works in America. And the EPA is a political animal. And the people who get hired there

get hired for certain reasons. And the people who have—who are the political appointees in there are, are appointed there for certain reasons. And one of them is that they certainly have to take into consideration anything that a major company like AT&T thinks about something that they're about to do. And so, there may be people in positions of power in the EPA that want to do it, that want to do something like that and they might actually do something like that. But—so you have to, you have to, if you want to figure out what AT&T, what the EPA is likely to do, you actually have to look at who's in charge, and who's in charge of the divisions that would be involved in this kind of an enforcement action, and what their track record is. And I haven't done that work on this. But that's what I would do if I was trying to figure that out.

**Alec Vaughan:**  Yeah, I think you made a lot of really, really great points there, Bill. We've got, we've got just one more question. I know you've been very generous with your time today. So, hopefully, we can squeeze this last one in quickly. And I think this is a good one. So, when would EPA kind of require this cleanup under certain circumstances, right? So, for example, if the cable is in a lake or in a water area and clearly leaking, then you'd have to clean it up. But if a cable is just buried somewhere, and abandoned, and not near any drinking water, then what would EPA do with that? I guess, like, what is kind of the range of mandates that EPA can, can offer here?

**William Verick:**  Yeah, well, AT&T could, I mean, EPA could do, could make them clean it up even when it's not, you know, leaking in a lake, if they wanted to. But obviously, no—you know, EPA or none of the state agencies that are responsible for this kind of thing have the budget or the inclination to be hard-ass about this. And so, they're more likely to respond to public pressure to do something. And that's going to be, you know, that's going to be, that's going to depend on the location, who is being exposed and hurt by this. You know, if it was poisoning executives on a golf course, it would be, you know, it would be more likely to result in them doing something about it than if it's just buried in some residential neighborhood and nobody's really getting exposed to it.  And they're not going to—I would bet my eye teeth that they're not going to order AT&T to rip up every, you know, every mile of this cable nationwide.  That's just not going to happen. And private enforcers like me, we're only going to bring the best cases that we can because they're plenty of them out there, and, you know, it's not something's that's subject to like cookie cutter cases that you can do everywhere. So, I suspect that it's not going to be a major drain on AT&T's finances. I think it's something that they can handle, and they have the if—they have the political skills and connections to shape the various outcomes that are likely to happen.

**Alec Vaughan:**  Got it, got it.  Perfect. Well, that's the end of our Q&A session and the end of our conference call. Bill, I want to thank you again so much for hopping on the

Lead Contamination Conference Call 7-18-23

phone with us today.  We really appreciate you taking the time.  And for everyone else who's on the phone, thank you so much for joining us today. This has been great.  So, hope everyone has a great day and take care.

**William Verick:**  Thank you. Good-bye.

**Moderator**:  Thank you. This concludes today's conference call.  You may disconnect your phone lines at this time and have a wonderful day.  Thank you for your participation.

[END FILE]

CERTIFICATION

I, Brian Echon, certify, under the laws of the State of California, County of Los Angeles, that I am a professional transcriber/reviewer and I am one of two transcribers who transcribed and reviewed the digital audio file entitled: "Lead Contamination Conference Call – 7-18-23" to the best of my ability. I am a subcontractor for Keystrokes, a transcription and translation company located in Santa Monica, California.

Date: _____

_____*bae*_____

CERTIFICATION

I, Matthew Allbritton, certify, under the laws of the State of California, County of Los Angeles, that I am a professional transcriber/reviewer and I am one of two transcribers who transcribed and reviewed the digital audio file entitled: "Lead Contamination Conference Call – 7-18-23" to the best of my ability.  I am a subcontractor for Keystrokes, a transcription and translation company located in Santa Monica, California.

Date: _____

_____