Joshua Koltun (Bar No. 173040)
One Sansome Street
Suite 3500, No. 500
San Francisco, California  94104
Telephone:  415.680.3410
Facsimile:  866.462.5959
joshua@koltunattorney.com

Attorney for Third Party Witnesses
Below the Blue,
Marine Taxonomic Services, Ltd,
Seth Jones, and Monique Rydel-Fortner

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE,

        Plaintiff,

v.

PACIFIC  BELL TELEPHONE COMPANY

        Defendant

Case 2:21-cv-00073-JDP

**MEMORANDUM IN SUPPORT OF
BELOW THE BLUE** *et. al.'s*
**MOTION TO PARTIALLY
RECONSIDER ORDER TO COMPEL
AND FOR PROTECTIVE ORDER**

Joshua Koltun ATTORNEY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Joshua Koltun ATTORNEY

## *TABLE OF CONTENTS*

TABLE OF AUTHORITIES ...................................................................................................... ii

Introduction ............................................................................................................................... 1

Factual Background ................................................................................................................... 4

Procedural Background .............................................................................................................. 6

Argument ................................................................................................................................... 8

I.    It is appropriate for the Court to partially reconsider its order to compel with respect to BTB/MTS's claim of privilege, because BTB/MTS raised its objection but was unable to litigate it before this Court until it secured the undersigned counsel. ........................................... 8

II.    BTB/MTS is entitled to invoke the First Amendment Reporter's Privilege here ...................... 9

A.    Anyone who intends to publish information to the public may invoke the Reporter's Privilege ................................................................................................................. 9

B.    The Privilege covers all information that the reporter has chosen not to publish .......... 13

C.    The disclosure of information by a reporter does not constitute a "subject matter waiver" of other related information ................................................................. 13

III.    AT&T cannot show that this is one of the "exceptional" cases in which the requester can overcome the Reporter's Privilege. ........................................................................... 14

A.    AT&T's burden is heavy ........................................................................................ 14

B.    AT&T has not exhausted other sources; on the contrary, it insists that it has already conducted independent testing to determine whether the Cables have created a public health hazard ........................................................................................... 15

C.    The information sought is cumulative of what AT&T already had, and which BTB/MTS recently produced. ............................................................................. 16

D.    AT&T cannot show that the information it seeks is sufficient, by itself, to establish an element of its case .................................................................................................. 17

Conclusion ................................................................................................................................. 19

### TABLE OF AUTHORITIES

**Cases**

*Anti-Defamation League of B'nai Brith v. Superior Court,* 67 Cal.App. 4th 1072, 1092-94 (1998) ....12

*Britt v. Superior Court,* 20 Cal. 3d 844, 852 (1978) ................................................................12

*Builders Ass'n of Greater Chicago. v. Cty. of Cook*, 1998 U.S. Dist. LEXIS 2991, at *14-16 (N.D. Ill. Mar. 10, 1998) ..........................................................................................................12

*City of L.A. v. Santa Monica BayKeeper*, 254 F.3d 882, 885 (9th Cir. 2001) ........................8

*Damiano v. Sony Music Ent.*, 168 F.R.D. 485, 499 (D.N.J. 1996 ....................................14

*Edwards v. Arizona*, 451 U.S. 477, 480, 482 (1981) .......................................................8

*Giannini v. Cty. of Sacramento*, 2022 U.S. Dist. LEXIS 140332, at *2-3 (E.D. Cal. Aug. 3, 2022) (....8

*Gonzales v. NBC*, 194 F.3d 29, 35 (2d Cir. 1998) .......................................................13, 18

*Hernandez v. Tanninen*, 604 F.3d 1095, 1100 (9th Cir. 2010). .......................................14

*Hydranautics v. FilmTec Corp.,* 306 F. Supp. 2d 958, 968 (S.D. Cal. 2003) ......................8

*In re Gray Media Grp. Inc.*, 2023 U.S. Dist. LEXIS 10534, at *10 (D. Haw. Jan. 20, 2023) ............17

*Keefe v. City of Minneapolis*, , 2012 U.S. Dist. LEXIS 187017, at *17-18 (D. Minn. May 25, 2012) .18

*Kurzynski v. Spaeth*, 196 Wis. 2d 182, 197-98, 538 N.W.2d 554, 560 (1995) ....................18

*Leonard v. Clark*, 12 F.3d 885, 889 (9th Cir. 1993) .....................................................9

*Lovell v. City of Griffin, Ga.*, 303 U.S. 444, 452 (1938) ...............................................11

*Michael v. Estate of Kovarbasich*, 2015 U.S. Dist. LEXIS 168901, at *12 (C.D. Cal. Dec. 11, 2015) ........................................................................................................14, 15

*Palandjian v. Pahlavi*, 103 F.R.D. 410, 413 (D.D.C. 1984) ..........................................9

*Phoenix Newspapers, Inc. v. Reinstein*, 240 Ariz. 442, 450, 381 P.3d 236, 244 (2016) .....................15

*Rancho Publications v. Superior Court*, 68 Cal. App. 4th 1538, 1547 (1999) ....................12

*Riley v. City of Chester*, 612 F.2d 708, 716 (3d Cir. 1979) .........................................15

*Rogers v. Home Shopping Network, Inc.*, 73 F. Supp. 2d 1140, 1145-46 (C.D. Cal. 1999) ..............15

*Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993) ("*Shoen I*") ....................................passim

*Shoen v. Shoen*, 48 F.3d 412, 416 (9th Cir. 1995) (*"Shoen II"*) .........................14, 16, 17, 18

Joshua Koltun ATTORNEY

*United States ex rel. Vuitton Et Fils S.A. v. Karen Bags, Inc.*, 600 F. Supp. 667, 671 (S.D.N.Y. 1985) ..............................................................................................................................................17

*United States v. Burke*, 700 F.2d 70, 78 (2d Cir. 1983) ...............................................................17

*United States v. La Rouche Campaign,* 841 F.2d 1176, 1182 (1st Cir. 1988) .............................15

*Wright v. Fred Hutchinson Cancer Rsch. Ctr.*, 206 F.R.D. 679, 682 (W.D. Wash. 2002). .................17

*Von Bulow v. Von Bulow*, 811 F.2d 136, 145 (2d Cir. 1987) .............................................10, 11

*Zerilli v. Smith*, 656 F.2d 705, 712 (D.C. Cir. 1981) ..................................................................15

**Rules**

Fed. R. Evid. 502(a) ...................................................................................................................13

Fed.R.Civ.P. 45 (d)(2)(B)(ii) .........................................................................................................1

Fed.R.Civ.P. 54(b) ....................................................................................................................1, 8

Fed.R.Evid. 401 ..........................................................................................................................17

Local Rule 230(j) .......................................................................................................................1, 9

Joshua Koltun ATTORNEY

Joshua Koltun ATTORNEY

***Introduction***

This is a motion for partial reconsideration of this Court's Order compelling Third Party Witness Below the Blue ("BTB/MTS"[1])  to produce documents [DE 80], pursuant to Fed.R.Civ.P. 54(b) and Local Rule 230(j), and for a protective order under Fed.R.Civ. P.26(c) against producing documents or information in connection with BTB/MTS's assistance to the *Wall Street Journal* ("*Journal*") in gathering news to disseminate to the public or to the Environmental Defense Fund ("EDF") in publishing a report to the public. [2]

The material as to which BTB/MTS has no objection – all of which relates specifically to the cables in Lake Tahoe at issue in this litigation -- has been or will be produced.   The production to date included thousands of pages of documents responsive to the subpoena, including maps, geolocation data, and videos, concerning the two cables in Lake Tahoe at issue in this litigation.[3]

AT&T argues that the subpoena sought relevant information, because BTB/MTS "brought [this case] to [plaintiff] on a platter."  DE 65-1 at 5:17. What BTB/MTS brought to plaintiffs on a platter is simply this: evidence of the ***now-undisputed*** fact that that AT&T had left two old lead-clad cables ("Cables") at the bottom of Lake Tahoe, which cables are the subject – the ***only*** subject-- of this environmental lawsuit.

What BTB/MTS brought to plaintiff, and much more, it has produced to AT&T.   That includes the precise geolocations of the places on the Cables that may be damaged or have other

---

[1] As explained herein, there were several identical subpoenas to four related third party witnesses Below the Blue, Marine Taxonomic Services, Ltd. (MTS), Seth Jones and Monique Rydel-Fortner for the identical set of documents in the possession and control of all four.  The issues herein apply to all subpoenas and all documents, and the term BTB/MTS is used here to refer both entities and both people.

[2] Since the Order is an interlocutory order rather than a final judgment, there is no deadline for making this request. To the extent that BTB/MTS's motion for extension of time cited such a deadline it was in error.

[3] As the undersigned counsel represented to the Court on December 21, BTB/MTS was reviewing its production to determine whether any responsive documents had been missed.  After meeting and conferring with opposing counsel concerning issues of ESI and electronic searching, BTB/MTS has engaged a third-party vendor to assist with these efforts to ensure complete production and also to assist with the production of documents with metadata.  Koltun Decl., ¶ 2.f.  It is BTB/MTS position that the costs of this vendor constitute a significant expense that should be borne by AT&T under Fed.R.Civ.P. 45 (d)(2)(B)(ii).  After the production has been completed BTB/MTS will meet and confer with AT&T concerning the amount at issue.

- 1 -

BTB/MTS Memo Supp Mot. Reconsider/Prot. Order                    2:21-cv-00073-JDP

concerns.  AT&T has whatever it could possibly need to accomplish what it claims it wants: "to allow development of a further record regarding the safety of the Cables in cooperation with the U.S. Environmental Protection Agency and other regulators."  DE 57 at 2:27-3:1.

What is at issue now is whether AT&T can *also* obtain access to information concerning the assistance that BTB/MTS provided to the *Wall Street Journal* ("*Journal*") in investigating lead cables around the country, ***after this case had settled***.  BTB/MTS was partially funded in that research by the Environmental Defense Fund ("EDF").

AT&T has been remarkably candid that it has reopened this case in order to provide a forum to rebut "the *Journal's* testing methods and the reliability of its results and reporting."  DE 41(Exh. A, p. 1).  AT&T originally represented to this Court that it would seek discovery directly from the *Journal* concerning the sampling and testing underlying its reporting.  But AT&T withdrew its efforts to obtain these documents directly from the *Journal,* and now seeks that information from BTB/MTS.[4]

BTB/MTS asserts the same First Amendment Reporter's Privilege as the *Journal* would have asserted if AT&T had persisted in its efforts.   The privilege applies to anyone who gathers information for the purpose of making a public report.  It is not in dispute that this is what BTB/MTS did.  A person who is a "reporter" in this First Amendment sense is entitled to protect any information that she chose not to publish in that report.

Once the witness establishes that the information in question was gathered for the purpose of such a report, the requester has a very heavy burden to meet.  The requester must meet all three of the following requirements in order to overcome the Reporter's Privilege.

First, AT&T must show that the information it seeks cannot be obtained from any reasonable alternative source.  Here, AT&T insists not only that it is ***possible*** to assess the safety of the Cables

---

[4] With regard to EDF, the issue is largely moot, as it is BTB/MTS's understanding the EDF has produced a lot of information that was subject to the privilege.  BTB/MTS is uncertain as to precisely which documents were produced and whether any were withheld, although it understands that some documents concerning the *Journal* may have been withheld.  AT&T's argument that such production constitutes a "subject matter waiver" as to other documents or information concerning lead-clad cables is discussed below in section II.B.  To require BTB/MTS to figure out which documents EDF has produced and which it has not, for the sole purpose of requiring EDF to produce a duplicate of the same document, is unduly burdensome and harassing.

independently of the *Journal's* reporting, but that it has already had two sets of experts perform such testing. Indeed, the whole reason it backed out of the consent decree was purportedly to enable such separate testing. Plaintiffs are seeking to do such independent testing as well. There is no need, then, for information concerning the investigation BTB/MTS conducted with the *Journal*.

Second, AT&T must show that the information it seeks will not be cumulative. Insofar as it claims that it needs information in order to perform "further testing" in Lake Tahoe, MTS/BTB has produced a very detailed survey of the damage to the Cables – particularly the unburied cable -- that would enable AT&T's experts to focus such further testing on large sections of the cable that they appear not to have tested.

Insofar as AT&T is seeking material to show that BTB/MTS is an environmental activist organization – and therefore "biased" –BTB/MTS has produced plenty of information to supplement what AT&T already has, and indeed the issue is not really in dispute.

Third, AT&T must show that the information it seeks is clearly relevant to an important issue in the case. This requires a showing that the information it seeks will be enough, without more, to establish an element of the case. But AT&T is not seeking information concerning the *Journal's* reporting because that information is needed to establish its case. On the contrary, as it openly admits, it is seeking that information because it hopes that it might serve to undermine the *Journal's* reporting. But evidence that is introduced to impeach is "collateral," not "clearly relevant to an important issue in the case." The safety of the water in Lake Tahoe is what is at issue in this case. AT&T contends that it can establish that through independent testing. The *Journal*'s reporting – even concerning Lake Tahoe -- is not itself at issue in the case, let alone an "important issue.". And *Journal*/BTB/MTS reporting concerning cables in other sites around the country is even further from being an important issue in the case.

AT&T openly admits that it wishes to use the forum of this case to rebut the *Journal*'s reporting. It is free, of course, to present its own experts and testing in this case. But it is highly improper to use the coercive power of this Court's discovery process to obtain information that it imagines will help it in a public relations campaign to counter the reporting by the *Journal*. This is a court of law, not the court of public opinion.

- 3 -

1

### *Factual Background*

2       Per its public mission statement, Below the Blue ("BTB") is a nonprofit "dedicated to

3  removing foreign debris from water bodies and educating the public about pollution."  Jones Decl., ¶1.

4  Based in Lake Tahoe, it "collects hands-on data that helps facilitate policy change and enforcement

5  while working with environmental lawyers, local agencies and residents."  *Id.*  It was cofounded by

6  Seth Jones and Monique Rydel-Fortner, who are, among other things, scuba divers.  *Id.*  BTB is

7  affiliated with the for-profit entity, Marine Taxonomic Services, Ltd. ("MTS").  *Id.* The undersigned

8  counsel represents all four entities with respect to the identical subpoenas served on all of them.  The

9  facts and arguments in this motion apply equally to BTB, MTS, Jones and Rydel-Fortner (collectively,

10  "BTB/MTS").

11       In 2012**,** while exploring the bottom of Lake Tahoe, Jones discovered a severed cable sticking

12  out of the lakebottom, and did not know what it would have been used for.  Jones Decl., ¶ 2.

13       In 2014, while working in that area, Jones  cut a piece off the exposed end of the cable and

14  brought it to the surface in order to ascertain its composition.  *Id.* The origins of the cable were

15  unknown to Jones at the time.  *Id.*  He placed the cable on a shelf in a warehouse for four years.  *Id.*

16  In 2018, Jones realized the cable he had set aside was a lead-sheathed submarine telecom cable.  *Id.*

17  At that point he performed an assay and determined that the cable was primarily composed of lead.

18  *Id.*

19       Over the next two years BTB/MTS attempted to interest government environmental regulators

20  in the lead cables at the bottom of the lake.  *Id.*¶ 3.  In 2020, Jones brought the matter to the attention

21  of Plaintiff's counsel, and gave them the cable section he had taken.  *Id.*  Subsequently Plaintiff

22  brought this lawsuit.  At no point did BTB/MTS conduct sampling of Lake Tahoe water for Plaintiff.

23  *Id.*

24       The Consent Decree was entered in November 2021.  *Id.*,¶ 4  Subsequently BTB/MTS worked

25  closely with Plaintiff counsel and AT&T personnel on the logistics of removing the Cables from the

26  lake.  *Id.* Indeed, AT&T asked MTS to bid on the project of removing the Cables.  *Id.*

27       In March 2022, the League to Save Lake Tahoe commissioned MTS to conduct an underwater

28  survey of the Cables. *Id., ¶ 5.*  BTB/MTS created a video showing the length of the Cable B, the long

- 4 -

cable on the bottom of Lake Tahoe that is **not** buried underground, with areas of concern  -- that is, damage, old repairs, areas where the cable is exposed during low water conditions, areas with anchor damage from recreational boating activities, areas of natural abrasion from trees, and where rocks/boulders have "crimped" the cable" or created a "kink" in the cable -- marked with zip-ties, and created maps showing GPS coordinates of those points, as well as the geolocation files themselves. *Id.*

   ***BTB/MTS has produced or is producing all responsive documents concerning everything discussed above***.

   Starting in January 2022, BTB/MTS began assisting the *Journal* on its investigation of lead-clad cables.  *Id.,* ¶ 6.  The *Journal* had already begun a complex investigation into documents that would show the possible location of long-forgotten lead-clad cables.   *Id.* Later, EDF funded BTB/MTS sampling work on the investigation, while the *Journal* funded the testing.  *Id.*  BTB/MTS also conducted a separate related investigation at the same time for EDF.  *Id.*  It was the expectation of all participants in each of these two separate investigations that they would conclude with the publication of public reports.  *Id.*

   That investigation involved many sites around the country, including Lake Tahoe.  *Id.,* ¶ 7. But in this respect the Lake Tahoe site was unusual, because in that case the presence of lead cables had already been confirmed.  *Id.*  At the other sites a large part of the investigation involved searching for and locating the lead-clad cables -- in Louisiana, Michigan, New Jersey, New York, and Oregon, to name a few places -- before the cables and the surrounding areas could be sampled and tested.  *Id.* BTB/MTS expertise and scuba-diving capacities were essential to this investigation.  *Id.*  The iterative process of this investigation required BTB/MTS and the *Journal* to share information back and forth concerning the sampling, the test results, concerning where lead-clad cables and potential safety hazards might be found, an inquiry that required the pooling of the collective expertise of the group. *Id.*  Again, the vast majority of these discussions focused on areas other than Lake Tahoe, since the location of the cables in Lake Tahoe was already known.

   During the week of July 9, 2023, the *Journal* published a series of articles concerning lead-clad cables, including an article that described the collaborative investigative process that the *Journal*

Joshua Koltun ATTORNEY

and BTB/MTS had undertaken together. *Id.,* ¶ 8, DE 65-9 Exh. F.  BTB/MTS published on its website the report it had prepared for EDF concerning its investigation, and the EDF also published it. *Id.*

BTB/MTS asserts the Reporters Privilege as to all information in BTB/MTS's possession concerning the two collaborative investigations it conducted with the *Journal* and EDF.

### *Procedural Background*

ATT has quite openly represented to the Court that it reopened this case in order to rebut the *Journal's* reporting.  DE 41, at 2.  It submitted to the Court a detailed analysis expressing AT&T's "serious concerns with the Journal's testing methods and the reliability of its results and reporting." *Id.,* Exh. A at 1.  The letter purported  to rebut the *Journal's* reporting as "biased" and "unreliable." *Id.,* Exh. A.  ATT represented that its own experts had conducted testing of the potential health risk from the Lake Tahoe Cables, that its results "differ dramatically" from the *Journal's*, and complained that the *Journal* "has not released its complete testing information."  *Id.,* Exh. A at 2.  AT&T represented that it would seek "***more information from … the Journal in discovery.***"  *Id.*, Exh. A at 6 (emphasis added).

Subsequently, on July 27, AT&T sent the Wall Street *Journal* a subpoena for documents concerning its  reporting on lead-clad cables,  along with a lengthy letter purporting to rebut the *Journal's* reporting and demanding the production of information, "beginning with the *Journal*'s testing at Lake Tahoe ***and elsewhere.***" Koltun Decl., ¶ 3, Exh. A, at 1 (emphasis added).  AT&T emphasized that "at each site tested [including Lake Tahoe], AT&T's results confirm the safety of these cables and contradict the *Journal*'s claims to the contrary."  *Id.* at 10.  The letter concluded by noting that during the week of July 9, shares of AT&T closed at its lowest levels since February 1994. *Id.*  Although the implication was that the shares had fallen because of the *Journal's* reporting, the letter did not mention that most of that drop in its share price had preceded the *Journal's* report. *Id.*

AT&T later attempted to serve the *Journal* with the subpoena, but withdrew it shortly thereafter.  *Id.*  Subsequently, BTB/MTS was served with the subpoena at issue here.  Identical subpoenas have been served or issued on MTS,  Jones and Rydel-Fortner.

Jones told defense counsel that he was looking for counsel and asked for an extension of time

Joshua Koltun ATTORNEY

to respond to the subpoenas.  Defense counsel responded that they would only grant an extension of time in exchange for "cooperation from you in accepting service and ***producing the documents*** on a rolling basis."  DE 65-18  at 3 (emphasis added).  Jones responded that he "object[ed] to the requests in the subpoena because they are burdensome, not related to litigation and violate my first amendment rights."  DE 65-18 at 2.

Jones sought to obtain legal counsel to respond to the various subpoenas.  Jones Decl., ¶ 10.  On August 26, BTB signed an engagement agreement with the Vance Center for International Justice.  *Id.* & Exh. A.  The Vance Center offers legal assistance in the following limited sense. As its website explains "[o]ur own lawyers work with clients to identify their needs, and we then invite law firms to work on the projects with us."  *Id.*[5]  The Vance Center's agreement reflected that limitation; it indicated that Vance Center lawyers would make their best efforts seek to find law firms with which to "co-counsel" (in other words, to provide full litigation representation).  *Id.* On more than one occasion Alexander Papachristou of the Vance Center told Jones, and also represented to AT&T, that specific law firms had agreed to represent BTB, only to later inform Jones and AT&T that the firm had withdrawn or declined such representation.  *Id*.  DE 65-16 at 3 (Papachristou confirms that Vance Center has secured counsel, who is getting up to speed); DE 81 (Transcript) at 10 (Defense counsel Karis: "we've been told several times [by Papachristou] that he had secured counsel and then we receive follow-up communication indicating that he no longer had secured counsel")

Jones showed up at the hearing on the Motion to Compel without counsel.  As the Court told Jones at the hearing, however, BTB is a corporate entity that cannot represent itself *pro se,* and thus BTB could not present any arguments in opposition to the motion.  *Id.,* at 5.  By the same token, BTB would not have been able to file written opposition *pro se.*  The Court indicated sympathy with

---

[5] *See* Law Firms & Clearinghouses | Cyrus R. Vance Center For International Justice (URL). The engagement agreement between Jones and the Vance Center stated that "the Vance Center agrees to represent Below the Blue in the matter described below."  The "subject of the engagement" was that "the Vance Center will ***provide legal advice*** related to the subpoena that Below the Blue has received from AT&T in [the instant] litigation," but "[p]lease note that the Engagement will ***not*** include representation in this or other litigation or any other formal proceeding (such as a lawsuit, investigation or administrative hearing."  Jones Decl., ¶ 10  & Exh. A (emphasis added).

1   BTB/Jones' difficulty and encouraged Jones to keep trying to obtain counsel. *Id.,* 5-7.  The Court

2   noted that the motion was unopposed, however, and granted the motion.  *Id.* at 7.

3           The undersigned counsel (Koltun) first spoke to Jones on November 22, the day before

4   Thanksgiving, and agreed to act as counsel for BTB/MTS.  Koltun Decl., ¶ 1.  To be clear, Koltun is

5   not cocounseling with the Vance Center and has had no dealings with them.  *Id.,*  Since being engaged

6   he has been working diligently to protect BTB/MTS's claim of privilege while at the same time

7   seeking to produce all responsive nonprivileged documents.  *Id.; ¶* 2;  DE 87 (motion for extension),

8   DE 92 (informal brief).

9

10                                          *Argument*

11   **I.      It is appropriate for the Court to partially reconsider its order to compel with respect to
         BTB/MTS's claim of privilege, because BTB/MTS raised its objection but was unable to
12       litigate it before this Court until it secured the undersigned counsel.**

          Under Fed. R. Civ. P. 54(b), any order adjudicating fewer than all claims in the action "may be

13   revised at any time before the entry of judgment." *Id.*  "As long as a district court has jurisdiction over

14   the case, then it possesses the inherent procedural power to reconsider, *rescind,* or modify an

15   interlocutory order for cause seen by it to be sufficient."  *City of L.A. v. Santa Monica BayKeeper*, 254

16   F.3d 882, 885 (9th Cir. 2001) (original emphasis).  Although, in general, courts are reluctant to do so

17   in the absence of a showing of clear error or manifest injustice, a district court may

18   "reconsider and revise a previous interlocutory decision for any reason it deems sufficient, even in the

19   absence of new evidence or an intervening change in or clarification of controlling law."  *Giannini v.

20   Cty. of Sacramento*, 2022 U.S. Dist. LEXIS 140332, at *2-3 (E.D. Cal. Aug. 3, 2022) (citing and

21   quoting  *Hydranautics v. FilmTec Corp.,* 306 F. Supp. 2d 958, 968 (S.D. Cal. 2003)).

22           The Reporter's Privilege is a constitutional right, "[r]ooted in the First Amendment."  *Shoen v.

23   Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993) ("*Shoen I*").  Waiver of constitutional rights "must not only

24   be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a

25   known right or privilege."  *Edwards v. Arizona*, 451 U.S. 477, 480, 482 (1981) (Fifth Amendment

26   right to counsel).  First Amendment rights can only be deemed to have been waived "upon clear and

27   convincing evidence that the waiver is knowing, voluntary and intelligent." *Leonard v. Clark*, 12 F.3d

28

- 8 -

BTB/MTS Memo Supp Mot. Reconsider/Prot. Order                                    2:21-cv-00073-JDP

Joshua Koltun ATTORNEY

885, 889 (9th Cir. 1993).

Here, BTB/MTS timely asserted its objection to producing documents but was unable to litigate the merits of those objections because – through no fault of its own -- it was unable until after the hearing to secure counsel that could litigate the issue. *Cf. Palandjian v. Pahlavi*, 103 F.R.D. 410, 413 (D.D.C. 1984) (reporter who "attempted, however inartfully" to assert the First Amendment privilege did not waive his rights, even if he failed to invoke the "precise legal phraseology. … It is clear to the Court that he was aware of his privilege and was trying to assert it in a difficult situation.").

The reason "why the facts or circumstances were not shown" by BTB/MTS "at the time of the prior motion," quite simply, is that, as the Court noted, it was ***legally barred*** from presenting such facts or circumstances.  L.R. 230(j); see DE 81 (transcript) at 5-7.

As noted above, BTB/MTS has produced whatever AT&T would need to perform an independent investigation of the safety of the Cables at issue in this case. The question presented now is whether AT&T may use this Court's coercive powers to obtain privileged information for use in a public relations campaign to counter the *Journal's* reporting about a nationwide issue concerning old lead-clad cables and their health and safety risks.  It would be a manifest injustice to allow that to occur without at a considering – on full briefing -- the issue of whether the First Amendment Reporter's Privilege protects such material.

## II.     BTB/MTS is entitled to invoke the First Amendment Reporter's Privilege here

### A.     Anyone who intends to publish information to the public may invoke the Reporter's Privilege

AT&T contends that BTB/MTS cannot assert the Reporter's Privilege because it did not have a written contract with the *Journal*.  DE 88 at 4:24-26; DE 93 at 1:15-27.  This betrays a fundamental misunderstanding of the Reporter's Privilege.  It does not require that the person invoking the privilege be employed by, have a contract with, or indeed have any association with, the mainstream media.  All that the person invoking the privilege need demonstrate is that she was engaged in "gathering news for dissemination to the public."  *Shoen I*, 5 F.3d at 1294.

The purpose of the privilege is not to protect the institutional media, but "society's interest in protecting the integrity of the newsgathering process, and in ensuring the free flow of information to the public," which is "of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice." *Id.* at 1292 (internal citation and quotation omitted).

The test is whether the person seeking to invoke the privilege had "the intent to use material - ***sought, gathered or received*** - to disseminate information to the public and [whether] such intent existed at the inception of the newsgathering process." *Id.* at 1293 (9th Cir. 1993) (emphasis added). That BTB/MTS clearly meets that test is demonstrated by AT&T's own description of BTB/MTS's role:

> In July of 2023, the *Journal* published articles asserting that lead-clad cables in Lake Tahoe and elsewhere raise a public health concern. The articles prominently cite Jones and Fortner for their work on the very cables at issue in this case. According to the *Journal*, Jones and Fortner "assisted the *Journal* in site visits, collecting the samples—sometimes through scuba diving—and tabulating the data," and "tested water samples from Lake Tahoe" for the *Journal* as recently as March 2023.[6] *Id.*, Exs. F at 5 and G at 8. BtB itself proudly states on its website that it "worked tirelessly behind the scenes" with the *Journal*, performing work that was "critical to the unleashing of two articles titled 'America is Wrapped in Miles of Toxic Lead Cables' and 'How the Journal Investigated Hidden Lead Cables Circling the U.S.'" *Id*, Ex. H at 1.

DE65-1 at 2:27-3:7; DE 93 at 3:12-14 ("Jones and Fortner acted not as news reporters but instead as consultants who ***gathered environmental samples*** at various sites around the country.")(emphasis added).

What matters, then, is not the witness' job, but her intent at the time she was gathering the information subject to the subpoena. If that information was gathered as part of an effort to make a report to the public, then that person is a "reporter" for purposes of the privilege. The "informative function asserted by representatives of the organized press . . . is also performed by lecturers, political pollsters, novelists, academic researchers, and dramatists." *Von Bulow v. Von Bulow*, 811 F.2d 136, 145 (2d Cir. 1987) (citation omitted).

---

[6] Thus it is hardly the case that the *Journal* has "remained silent" as to the role that BTB/MTS played in its reporting, as AT&T claims. DE 93 at 4:11. The *Journal's* description of BTB/MTS's role precisely describes conduct that meets the definition of "reporter" for purposes of the privilege.

Joshua Koltun ATTORNEY

By the same token, AT&T's argument that BTB cannot be a reporter because it is a nonprofit organization with an environmental mission is also erroneous.  DE 88 at 4n.4; DE93 at 1:21-24. BTB's activism in no way undercuts its claim to the privilege with respect to either the work on which BTB/MTS collaborated with the *Journal* on the one hand, or with EDF, on the other.  In both cases, the relevant question was whether BTB/MTS's investigation was undertaken with a view toward making a report to the public in some form.  As the Court of Appeal explained:

> [the] privilege is designed to protect investigative reporting, regardless of the medium used to report the news to the public. Investigative book authors, like more conventional reporters, have historically played a vital role in bringing to light "newsworthy" facts on topical and controversial matters of great public importance. At the turn of the century, for example, muckraking authors such as Lincoln Steffens and Upton Sinclair exposed widespread corruption and abuse in American life.   More recently, social critics such as Rachel Carson, Ralph Nader, Jessica Mitford, and others have written books that have made significant contributions to the public discourse on major issues confronting the American people. … What makes journalism journalism is not its format but its content.

*Id.* at  1293.  Thus, information gathered for political advocacy purposes is privileged if it was gathered with the intent to disseminate information to the public, because "the press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion."  *Id.* (citing and quoting *von Bulow* 811 F.2d at 144, and *Lovell v. City of Griffin, Ga.*, 303 U.S. 444, 452 (1938)); *accord von Bulow*, 811 F.2d 136, 144-45 ("liberty of the press is the right of the lonely pamphleteer who uses carbon paper or a mimeograph just as much as of the large metropolitan publisher who utilizes the latest photocomposition methods.") (internal citation omitted). Indeed, it would be difficult not to run afoul of the prohibition against content-based discrimination if the privilege were applied to some groups that disseminate information but not others.

It is significant that two of the muckraking[7]/activist authors on that list (Sinclair and Nader) actually ran for public office.  By the same token, the Reporter's Privilege may be claimed by

---

[7] Defendants denigrate BTB/MTS as "nothing more" than scuba divers, citing BTB/MTS's mission statement to "remove foreign debris from bodies of water, educate the public about pollution, and collect data that will help facilitate policy change and enforcement."  DE 88 at 4:24-26.  But that mission statement supports BTB/MTS's claim of privilege.  In gathering information by literally getting their hands in the muck at the bottom of Lake Tahoe, they were also "muckraking," that is investigating an environmental and public health concern to bring these concerns to the public.

Joshua Koltun ATTORNEY

- 11 -

Joshua Koltun   ATTORNEY

1   organizations that seek to promulgate their information and ideas in a public forum.  *Builders Ass'n of*

2   *Greater Chicago. v. Cty. of Cook*, 1998 U.S. Dist. LEXIS 2991, at \*14-16 (N.D. Ill. Mar. 10, 1998)

3   ("advocacy organization" Urban League was entitled to invoke the privilege to protect surveys and

4   interviews where the information garnered was to be disseminated to the public.); *Anti-Defamation*

5   *League of B'nai Brith v. Superior Court,* 67 Cal.App. 4th 1072, 1092-94 (1998)(public advocacy

6   organization successfully invokes Reporter's Privilege).

7   Here, it is undisputed that BTB is a public advocacy organization, and that BTB/MTS's

8   investigation was aimed at publishing information – not only through the *Journal* and separately with

9   EDF -- but directly on its own website.  DE 65-14 (Subpoena Request no. 9: "All Documents and

10   Communications concerning the Marine Taxonomic Services and Below the Blue Lead Cable

11   Investigation Report, available at https://belowtheblue.org/edf-report").  Thus even if BTB/MTS had

12   undertaken its investigation entirely on its own with the intention of publishing on its website, it

13   would be entitled to invoke the privilege.  Contrary to AT&T, BTB/MTS's privilege is not

14   "derivative" of either the *Journal* or EDF's privileges.  DE 88 at 4:27.  Each of these organizations

15   acted with the intent of making a report to the public.  That BTB/MTS undertook this investigation in

16   collaboration with the *Journal* – a mainstream media publication -- and separately with EDF – another

17   advocacy organization --only strengthens the conclusion that BTB/MTS is entitled to invoke the

18   privilege.  The First Amendment protects not only the free flow of information but also the

19   associations of people and organizations for the purpose of influencing public discourse and public

20   affairs.  Thus these private associations are protected from invasive discovery as well.  *See, e.g., Britt*

21   *v. Superior Court,* 20 Cal. 3d 844, 852 (1978) (quashing discovery by airport into those organizing

22   against it); *cf Rancho Publications v. Superior Court*, 68 Cal. App. 4th 1538, 1547 (1999) (First

23   Amendment privileges apply both to a newspaper's right to protect  sources' anonymity and the

24   sources' rights to anonymously organize public opposition to the subpoenaing party, a hospital).[8]

25

26   [8] AT&T characterized BTB/MTS's assertion of the Reporter's Privilege as "frivolous."  DE 88
     at 4:14; DE 93 at 1:25.  But in fact it is AT&T that advanced arguments as to why BTB/MTS is not a

27   "reporter" that have no support in the relevant caselaw – and none was cited.

28

**B.** **The Privilege covers all information that the reporter has chosen not to publish**

A witness who establishes that she was gathering information for the purpose of publishing a report to the public – in other words, that she is a "reporter" in the First Amendment sense – may invoke the Reporters Privilege to withhold any information that she has chosen **not** to publish.  In *Shoen I*, one issue was whether the privilege applied to the reporter's "resource materials" -- his notes and recollections of conversations with a source.  *Id.* , 5 F.3d at 1289.  The Court held that such unpublished information was subject to the privilege.  *Id.*  This was so without regard to whether the reporter had promised confidentiality.  *Id.*  As the Court explained, "the compelled disclosure of non-confidential information harms the press' ability to gather information … by converting the press in the public's mind into an investigative arm of prosecutors and the courts."  *Id.* at 1295.  "If the parties to any lawsuit were free to subpoena the press at will, it would likely become standard operating procedure for those litigating against an entity that had been the subject of press attention to sift through press files in search of information supporting their claims," which would "impair its ability to perform its duties."  *Gonzales v. NBC*, 194 F.3d 29, 35 (2d Cir. 1998).

**C.** **The disclosure of information by a reporter does not constitute a "subject matter waiver" of other related information**

AT&T contended in the meet-and-confer that EDF's disclosure of certain information that it had not published in its report constitutes a "subject matter" waiver of all related information concerning lead-clad cables held by EDF, BTB/MTS, or the *Journal*.  Koltun Decl., ¶ 4.  That contention is unsound.  The notion that the disclosure of certain information implies a waiver of the privilege as to related information flies in the face of the very nature of the Reporter's Privilege itself, which protects "unpublished information."

AT&T is importing the concept of "subject matter waiver" from the attorney-client context, in which **parties** are not permitted to selectively waive the privilege in such a way as to advantage themselves in litigation.  *See* Fed. R. Evid. 502(a) (intentional disclosure of attorney-client privileged information may waive privilege to an "undisclosed communication" on the "same subject matter" only if "they ought in fairness to be considered together.")  For example, a litigant who discloses "favorable portions" of the attorney-client communication waives the privilege as to the rest of

Joshua Koltun ATTORNEY

communications on the same subject.  *Hernandez v. Tanninen*, 604 F.3d 1095, 1100 (9th Cir. 2010).

The two privileges "serve different functions; … [w]hile the fundamental purpose of attorney work product is maintenance of confidentiality to protect to adversarial process, the issue of confidentiality is not the exclusive rationale behind the reporter's privilege, [which also is meant] to protect and foster the free flow of information."  *Damiano v. Sony Music Ent.*, 168 F.R.D. 485, 499 (D.N.J. 1996) (internal quotations, citations omitted).  The Reporter's privilege may be waived only to the extent that the reporter has given information to one litigant but refused to give it to the other.  *Michael v. Estate of Kovarbasich*, 2015 U.S. Dist. LEXIS 168901, at *12 (C.D. Cal. Dec. 11, 2015).[9]  But here BTB/MTS is asserting the privilege as to both parties, and neither party has the information.  Only AT&T is seeking to overcome the Reporter's Privilege.  Plaintiff has respected it.  Koltun Decl. ¶ 5.

Thus the production of a document by EDF in this case can have no greater impact than if that document had been published by EDF.  There can be no waiver of any information that was not produced.

### III.   AT&T cannot show that this is one of the "exceptional" cases in which the requester can overcome the Reporter's Privilege

#### A.     AT&T's burden is heavy

Once the witness shows that she is entitled to invoke the privilege, "the burden shifts" to AT&T "to demonstrate a sufficiently compelling need for the journalist's materials to overcome the privilege."  *Shoen I*, 5 F.3d at 1296.   In *Shoen II,* the Court set out the test for overcoming the privilege.  The party seeking information must show that the requested material is "(1) unavailable despite exhaustion of all reasonable alternative sources; (2) noncumulative; and (3) clearly relevant to an important issue in the case."  *Shoen v. Shoen*, 48 F.3d 412, 416 (9th Cir. 1995).  "[T]here must be a

---

[9] *See also id* at *15-16 ("Under the standard Defendant proposes, a party that is disadvantaged by a published fact may uncover an author's pre-publication materials solely because those materials may counter the published fact. Surely, such a principle was not envisioned by the Ninth Circuit when it articulated that disclosure of a journalist's or author's information was to be the exception, not the rule.  *Shoen II*, 48 F.3d at 416.")

- 14 -

Joshua Koltun  ATTORNEY

showing of actual relevance; a showing of potential relevance will not suffice." *Id.*

That is a heavy burden, designed to "ensure that compelled disclosure is the exception, not the rule." *Id.* If "the privilege does not prevail in all but the most exceptional cases, its value will be substantially diminished." *Id.* (quoting *Zerilli v. Smith*, 656 F.2d 705, 712 (D.C. Cir. 1981).

> **B.     AT&T has not exhausted other sources; on the contrary, it insists that it has already conducted independent testing to determine whether the Cables have created a public health hazard**

The Reporter's Privilege is designed to prevent the work of reporters from being used as a "research tool" by litigants. *Shoen I*, 5 F.3d at 1295 (citing *United States v. La Rouche Campaign*, 841 F.2d 1176, 1182 (1st Cir. 1988)). Thus the privilege cannot be overcome unless the requester makes a "strong showing" that "there is no other source for the information requested." *Riley v. City of Chester*, 612 F.2d 708, 716 (3d Cir. 1979). "The moving parties 'cannot escape their obligation to exhaust alternative sources simply because they feared that deposing [numerous] employees would be time-consuming, costly, and unproductive." *Shoen I*, 5 F.3d at 1297.[10]

Here, far from making such a strong showing, AT&T insists not only that it is **possible** to assess the safety of the lead-clad cables in Lake Tahoe – independently of the *Journal*'s reporting -- but that it backed out of the Consent Decree is precisely to enable such independent testing:

> the information reported by the *Journal* differs dramatically from the expert testing commissioned by AT&T. Under the circumstances, AT&T submits the responsible course of action is to develop a further record rather than remove the Lake Tahoe cables and work cooperatively with regulators and other stakeholders on a risk assessment.

DE 41 at 2. AT&T has represented to the Court that is has already had two different sets of experts perform such testing.[11] Plaintiffs, too, are seeking to perform such expert sampling and analysis. DE

---

[10] *Accord Michael*, 2015 U.S. Dist. LEXIS 168901, at *10-12; *Phoenix Newspapers, Inc. v. Reinstein*, 240 Ariz. 442, 450, 381 P.3d 236, 244 (2016) (trial court erred in finding that party had met burden of overcoming reporter's privilege where possibility remained that information might be obtained by interviewing witness); *Rogers v. Home Shopping Network, Inc.*, 73 F. Supp. 2d 1140, 1145-46 (C.D. Cal. 1999) (plaintiff had not exhausted other sources even though deposed nine witnesses, where other potential witnesses existed).

[11] DE 33 at 2 (AT&T's experts have performed "extensive water sampling and field investigations in and around the Cables in Lake Tahoe using the 'best available methodologies,' and

- 15 -

BTB/MTS Memo Supp Mot. Reconsider/Prot. Order                                    2:21-cv-00073-JDP

Joshua Koltun ATTORNEY

1   85 at 6:4-7, 8:9-21.

2          In any event, BTB/MTS has produced the video it created for the League to Save Lake Tahoe

3   that shows points of damage or other concerns on Cable B marked with zip-ties, and maps showing

4   precise geolocations of those spots. Jones Decl., ¶ 5.  The parties' experts, as well as the EPA and

5   "regulators" are free to use such information in their own testing. [12]

6          **C.      *The information sought is cumulative of what AT&T already had, and which***
          **       *BTB/MTS recently produced.***

7

8          Insofar as the privileged information AT&T is seeking might help it conduct "further testing"

9   of the safety of the water in Lake Tahoe,[13] that information is cumulative of information that

10  BTB/MTS has produced in this case, which include a detailed survey of damage and other areas of

11  concern on Cable B, the long, unburied cable at the bottom of Lake Tahoe.  By the same token, the

12  information sought by this subpoena concerning BTB/MTS's investigation in collaboration with the

13  *Journal* and EDF is cumulative of information that EDF produced to AT&T.

14         Any further information sought at this point is cumulative, and thus cannot overcome the

15  privilege.[14] *Shoen II*, 48 F.3d at  416.  AT&T's burden to show that the material it is seeking is

16  noncumulative cannot be met by speculation. *Jimenez v. City of Chicago*, 2010 U.S. Dist. LEXIS

17  122946, at *5 (W.D. Wash. Nov. 12, 2010).

18         To the extent that AT&T is seeking information that would show that BTB/MTS is "biased" –

19

20  concluded Lake Tahoe's 'water quality is not adversely impacted by the two legacy communications
    cables");  33-1, Exh. A (Haley & Aldrich report); DE 41 at 2 & Exh A at 3, 6 (AT&T has had
21  "another prominent, third party consulting firm" perform testing in Lake Tahoe that is consistent with
    Haley & Aldrich report); DE 91 at 1:12-16.

22         [12] Jones Decl., ¶ 5.  Significantly, this video and geolocation data is as to Cable B, a cable that
    stretches for several miles underwater and is ***not buried underground***, unlike Cable A.  *Id.*  AT&T's
23  experts conducted testing on only one station on Cable B, on a point that they claim is "weather[ed],"
    but that they do not claim exposed lead to contact with the water.  DE 33-1 at 4.
24         [13]  DE 41 at 6 ("Further testing may be required after AT&T receives more information from
    … the *Journal* in response to discovery.")
25         [14]  Certainly to the extent that BTB/MTS possesses duplicate copies of documents that EDF
    has produced, such documents are cumulative.  Indeed, even if there were differences between the
26  documents in BTB/MTS possession, it would be AT&T's burden to show that such differences are
    substantial enough to render them noncumulative.  *In re Gray Media Grp. Inc.*, 2023 U.S. Dist.
27  LEXIS 10534, at *13-15 (D. Haw. Jan. 20, 2023).

28

Joshua Koltun ATTORNEY

Joshua Koltun   ATTORNEY

"a nonprofit environmental group that has actively pressed for the removal of Lake Tahoe cables for years and views itself as a 'watchdog'" (etc. etc.), DE 41 at 5 & n. 5 – those facts are undisputed. Moreover, BTB/MTS has produced and will produce responsive documents concerning its relationship with plaintiffs' counsel and its activism concerning the Cables.  Any additional material supporting the contention of "bias" is cumulative. Impeachment evidence is cumulative where basic facts that purportedly undermine testimony are not in dispute.  *United States v. Burke*, 700 F.2d 70, 78 (2d Cir. 1983); *United States ex rel. Vuitton Et Fils S.A. v. Karen Bags, Inc.*, 600 F. Supp. 667, 671 (S.D.N.Y. 1985) (impeachment evidence cumulative where party already possesses sufficient material to impeach).

> **D.      AT&T cannot show that the information it seeks is sufficient, by itself, to establish an element of its case**

AT&T contends that it meets the third prong of the *Shoen II* test, because "as this Court has already found, the information sought is "relevant." DE 93 at 3:20-21.  AT&T misstates the standard; the third factor requires that the information be "clearly relevant to an important issue in the case[;]… there must be a showing of actual relevance; a showing of potential relevance will not suffice." *Shoen II*, 48 F.3d at 416; *Jimenez,* 2010 U.S. Dist. LEXIS 122946, at *6 (traditional definition of relevance under Fed.R.Evid. 401 is not applicable "where information is sought from a journalist" invoking the privilege).[15]

Under that exacting standard, information that "without more" is insufficient to establish an element of the claim is insufficient to overcome the privilege. *Shoen II,* 48 F.3d at 417; *In re Gray Media Grp. Inc.*, 2023 U.S. Dist. LEXIS 10534, at *10 (D. Haw. Jan. 20, 2023); *Wright v. Fred Hutchinson Cancer Rsch. Ctr.*, 206 F.R.D. 679, 682 (W.D. Wash. 2002).

---

[15]  Moreover, the Court may issue a protective order preventing the questioning of a reporter about any irrelevant matters that are not themselves covered by the Privilege but are closely related to the matters that are covered by the Privilege, on the ground that allowing such questioning would constitute an annoyance and undue burden and would "impair the interests protected" by the reporter's privilege.  *In re Gray Media Grp. Inc.*, 2023 U.S. Dist. LEXIS 10534, at *24-26 (D. Haw. Jan. 20, 2023) (citing *Shoen I*, 5 F3d. at 1292.)

Joshua Koltun ATTORNEY

The requirement that "actual," not "potential" relevance must be shown means that AT&T cannot be permitted to "sift" through BTB/MTS files of that investigation in the hope of learning something useful about the *Journal's* reporting. *Gonzales*, 194 F.3d at 35.

> The "clearly relevant" third aspect of the three-part *Shoen* test works in synergism with the first element to prevent the impressment of journalists as involuntary investigators for the parties. The corollary requirement that there be a showing of "actual" and not "potential" relevance prevents resort to newsgatherers' files and knowledge with the hope …that something will "turn up." This ensures that "'the burden on journalists' time and resources in responding to subpoenas,'" *[Shoen I,]*, 5 F.3d at 1295 (citation omitted), will be imposed only when necessary.

*Kurzynski v. Spaeth*, 196 Wis. 2d 182, 197-98, 538 N.W.2d 554, 560 (1995) (adopting Shoen II test).

Here, AT&T has represented to this Court that the "core issues" presented are whether the Cables in Lake Tahoe "present an imminent and substantial endangerment to health or the environment," per RCRA, or are "releasing a significant amount of lead," per Prop. 65.  DE 57 at 5:19:25.  AT&T has represented that it has engaged two sets of experts that have determined that Lake Tahoe water is safe.  DE 33 at 2; 33-1, Exh. A; DE 41 at 2 & Exh A at 3, 6.

This is a very peculiar situation.  Usually pitched battles are fought over the Reporter's Privilege where a party desperately wants information in the hands of the reporter, in order to make its case in court.  But here AT&T is seeking information concerning the *Journal's* reporting in order to **rebut it.**  It has made clear that it considers the *Journal's* reporting "biased" and unscientific, and in particular, that Jones and Rydel-Fortner are "biased 'experts.'" DE 41 at 5.  But the *Journal's* reporting is not itself at issue in this case, and neither Jones nor Rydel-Fortner will be testifying as experts in the case.  And the information AT&T seeks goes far beyond Lake Tahoe.

To the extent that any of the privileged communications would have any tendency to undermine or contradict the *Journal's* reporting, such evidence would not be "clearly relevant to an important issue."  Impeachment evidence is "collateral," not an important issue in the case.  *Shoen II,* 48 F.3d at 418. The mere possibility of impeachment evidence is an insufficient reason to vitiate the qualified privilege. *Keefe v. City of Minneapolis*, , 2012 U.S. Dist. LEXIS 187017, at *17-18 (D. Minn. May 25, 2012) (collecting authorities).  And, insofar as AT&T is seeking evidence concerning

lead-clad cables elsewhere in the United States, such information is even more collateral to the important issue in the case, which is whether the Cables in Lake Tahoe are safe.

AT&T is seeking privileged information not because it is "clearly relevant to an important issue in this case," but because it imagines that the privileged information will support its efforts to counter the *Journal's* reporting in the public arena.  DE 41 at 2 & Exh. A.   That is a manifestly improper purpose.  The Court should firmly reject this improper effort to misuse discovery for purposes other than litigation.

### Conclusion

This case is far from the sort of "exception" in which the Privilege can be overcome.  *Shoen II,* 48 F.3d at 416.  Indeed, if the showing presented by AT&T were sufficient to overcome the privilege, the exception would swallow the rule.

Since AT&T has not come close to showing that the privilege can be overcome, and indeed is seeking that privileged information for an improper purpose, BTB/MTS respectfully requests that the Order to Compel [DE 80] be vacated and that a Protective Order issue against production of privileged documents or information.

January 4, 2024

_____/s/_____

Joshua Koltun
Attorney for Third Party Witnesses Below the
Blue, Marine Taxonomic Services, Ltd, Seth
Jones, and Monique Rydel-Fortner