Joshua Koltun (Bar No. 173040)
One Sansome Street
Suite 3500, No. 500
San Francisco, California 94104
Telephone: 415.680.3410
Facsimile: 866.462.5959
joshua@koltunattorney.com

Attorney for Third Party Witnesses
Below the Blue,
Marine Taxonomic Services, Ltd,
Seth Jones, and Monique Rydel-Fortner

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE,<br><br>    Plaintiff,<br>v.<br><br>PACIFIC BELL TELEPHONE COMPANY<br><br>…………..Defendant | Case 2:21-cv-00073<br><br>**DECLARATION OF SETH JONES** |

I, Seth Jones, declare as follows:

1. I am the President of Marine Taxonomic Services, Ltd ("MTS") and Cofounder of its nonprofit arm, Below the Blue ("BTB"). Per its public mission statement, Below the Blue is a nonprofit "dedicated to removing foreign debris from water bodies and educating the public about pollution." Based in Lake Tahoe, it "collects hands-on data that helps facilitate policy change and enforcement while working with environmental lawyers, local agencies and residents." It was cofounded by myself and Monique Rydel-Fortner. We are, among other things, scuba divers. BTB is affiliated with the for-profit entity, Marine Taxonomic Services, Ltd. ("MTS"). I will refer to BTB, MTS, myself and Ms. Rydel-Fortner, collectively, as "BTB/MTS."

2. In 2012, while exploring the bottom of Lake Tahoe, I discovered a severed cable sticking out of the lakebottom, and did not know what it would have been used for. In 2014, while working in that area, I cut a piece off the exposed end of the cable and brought it to the surface in order to ascertain its composition. The origins of the cable were unknown to me at the time. I placed the cable on a shelf in a warehouse for four years. In 2018, I realized the cable I had set aside was a lead-sheathed submarine telecom cable. At that point I performed an assay and determined that the cable was primarily composed of lead.

3. Over the next two years BTB/MTS attempted to interest government environmental regulators in the lead cables at the bottom of the lake. In 2020, we brought the matter to the attention of Plaintiff's counsel, and gave them the cable section I had taken. At no point did BTB/MTS conduct sampling of Lake Tahoe water for Plaintiff.

4. After the Consent Decree was entered in this action, BTB/MTS worked closely with Plaintiff counsel and AT&T personnel on the logistics of removing the Cables from the lake. Indeed, AT&T asked MTS to bid on the project of removing the Cables.

5. In March 2022, the League to Save Lake Tahoe commissioned MTS to conduct an underwater survey of the Cables. BTB/MTS created a video showing BTB/MTS created a video showing the length of the Cable B with areas of concern -- that is, damage, old repairs, areas where the cable is exposed during low water conditions, areas with anchor damage from recreational boating activities, areas of natural abrasion from trees, and where rocks/boulders have "crimped" the cable" or

created a "kink" in the cable -- marked with zip-ties, and created maps showing GPS coordinates of those points. Cable B is the very long cable at issue in this litigation that is **not** buried underground, unlike Cable A. This project was completed quickly and was completely separate from the work we did with the *Wall Street Journal* described below.

6. Starting in January 2022, BTB/MTS began assisting the *Journal* on its investigation of lead-clad cables. The *Journal* had already begun a complex investigation into documents that would show the possible location of long-forgotten lead-clad cables. Later, EDF funded BTB/MTS's work on the investigation, while the *Journal* funded the testing. BTB/MTS also conducted a separate related investigation at the same time for EDF. It was the expectation of all of us participants in each of these two separate investigations that they would conclude with the publication of public reports.

7. That investigation involved many sites around the country, including Lake Tahoe. But in this respect the Lake Tahoe site was unusual, because in that case the presence of lead cables had already been confirmed. At the other sites a large part of the investigation involved searching for and locating the lead-clad cables -- in Louisiana, Michigan, New Jersey, New York, and Oregon, to name a few places -- before the cables and the surrounding areas could be sampled and tested. BTB/MTS expertise and scuba-diving capacities were essential to this investigation. The iterative process of this investigation required BTB/MTS and the *Journal* to share information back and forth concerning the sampling, the test results, concerning where lead-clad cables and potential safety hazards might be found, an inquiry that required the pooling of the collective expertise of the group. Again, the vast majority of these discussions focused on areas other than Lake Tahoe, since the location of the cables in Lake Tahoe was already known.

8. During the week of July 9, 2023, the *Journal* published a series of articles concerning lead-clad cables, including an article that described the collaborative investigative process that the *Journal* and BTB/MTS had undertaken together. BTB/MTS published on its website the report it had prepared for EDF concerning its investigation, and the EDF also published it.

9. After I received a copy of the subpoena in this case, I told defense counsel that BTB/MTS was looking for counsel and asked for an extension of time to respond to the subpoenas. Defense counsel responded that they would only grant an extension of time in exchange for

"cooperation from you in accepting service and **producing the documents** on a rolling basis." I responded that I "object[ed] to the requests in the subpoena because they are burdensome, not related to litigation and violate my first amendment rights."

10. I sought to obtain legal counsel to respond to the various subpoenas. On August 26, I signed an engagement agreement for with the Vance Center for International Justice, a true and correct copy of which I attach as **Exhibit A**. The Vance Center offers "legal representation" only in a very limited sense. As its website explains "[o]ur own lawyers work with clients to identify their needs, and we then invite law firms to work on the projects with us."[1] The Vance Center's agreement reflected that limitation, and indicated that Vance Center lawyers would make their best efforts seek to find law firms with which to "co-counsel" (in other words, to provide full litigation representation). Although I understood that Alexander Papachristou of the center was not admitted in California, my understanding was that I should direct all communications from defense counsel to Papachristou until such California co-counsel was engaged. I understood that to include such matters as negotiating extensions or accepting service of counsel. On more than one occasion I understood – and Papachristou so represented to AT&T -- that law firms had agreed to act as such co-counsel with the Vance Center, only to later learn that they had withdrawn or declined such representation.

I declare under penalty of perjury under the laws of the United States and California that the foregoing is true and correct.

Executed on January 3, 2023 at ___Solana Beach,___ California.

_____
Seth Jones

---

[1] *See* Law Firms & Clearinghouses | Cyrus R. Vance Center For International Justice (URL)