EXHIBIT A

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

Hariklia Karis, P.C.
To Call Writer Directly:
+1 312 862 2330
hariklia.karis@kirkland.com

300 North LaSalle
Chicago, IL 60654
United States

+1 312 862 2000

www.kirkland.com

Facsimile:
+1 312 862 2200

July 27, 2023

## VIA EMAIL AND UPS OVERNIGHT MAIL

Jason Conti, General Counsel & Executive Vice President
Ava Lubell, Assistant General Counsel
Wall Street Journal
1211 Avenue of the Americas
New York, NY 10036

Re:   *California Sportfishing Protection Alliance v. Pacific Bell Telephone Company*,
2:21-cv-00073-MCE-JDP (E.D. Cal.)

Dear Mr. Conti and Ms. Lubell:

We write on behalf of our client, Pacific Bell Telephone Company ("Pacific Bell"), in connection with the above-referenced case (the "Litigation"). Pursuant to Rule 45 of the Federal Rules of Civil Procedure, attached is a Subpoena Duces Tecum to *The Wall Street Journal* (the "Journal" or "WSJ") requesting, among other things, all sampling, testing, data, analysis, research, reports, and communications relating to lead-clad telecommunications cables and the articles published by the Journal on the subject during the week of July 9, 2023.

We send this courtesy copy of the subpoena so that we can discuss an efficient and convenient way to obtain the requested information, beginning with the Journal's testing at Lake Tahoe and elsewhere. To assist with our discussion, we detail below the reasons the materials requested are not only relevant under the Federal Rules of Civil Procedure, but why producing them is squarely in the public interest.

## EXECUTIVE SUMMARY

Pacific Bell and its affiliates (collectively, "AT&T") care deeply about the health and safety of their people, their customers, and the communities they serve. For decades, federal and state authorities have regulated lead-clad cables, and the science supporting their safe deployment has been well understood through years of scientific analysis, including studies published both in the United States and abroad. Indeed, even as the United States Environmental Protection Agency ("EPA") and other regulators have invested tremendous resources to catalog and address the primary sources of lead in the environment, lead-clad cables have never been identified as a significant source of lead exposure.

Austin   Bay Area   Beijing   Boston   Brussels   Dallas   Hong Kong   Houston   London   Los Angeles   Miami   Munich   New York   Paris   Salt Lake City   Shanghai   Washington, D.C.

## KIRKLAND & ELLIS LLP

July 27, 2023
Page 2

In its reporting on lead-clad telecommunications cables, the Journal did not share these important facts with its readers. Nor did the Journal disclose what long-standing scientific research has stated about the safety of lead-clad cables in infrastructure. Instead, the Journal wrote a series of articles claiming that, according to its own sampling and testing, lead-clad telecommunications cables are a "hidden health hazard." Among many assertions, the Journal speculated that children are in imminent danger from these "toxic lead cables" and that telecommunications companies have not meaningfully acted on known public health risks. Suffice it to say, AT&T disagrees with these conclusions, which stand in stark contrast with the established science and testing results that AT&T has already made available for public inspection.

When the Journal published its sensationalist accounts of its own testing at Lake Tahoe and elsewhere, the parties were working towards implementing the terms of a voluntary settlement of the Litigation. Now, with the Journal's reporting, the situation has changed dramatically. Because the Journal's assertions contradict long-standing science and independent prior testing of the Lake Tahoe cables, companies and regulators alike have a shared responsibility to inspect and understand the basis for the Journal's conclusions. Already, AT&T is working with the EPA and other stakeholders to address this question collaboratively and transparently. When it comes to worker safety and public health, AT&T will always act responsibly. That is why AT&T is now conducting additional testing which, like its prior testing at Lake Tahoe, is already contradicting the Journal's assertions. But without access to the information supporting – or not supporting – the Journal's reported conclusions, it is impossible for AT&T, the industry, regulators, or the public to evaluate the Journal's claims of widespread harm. Unfortunately, the Journal has repeatedly refused to share this information with AT&T, the industry, or, to our knowledge, anyone.

The attached subpoena is particularly appropriate because the cables at issue in this Litigation stand at the center of the Journal's reporting. We now know that the Journal's reporting effectively began in Lake Tahoe with the environmental advocates who collaborated with the Plaintiff to file this Litigation. We also know that the Journal's testing in Lake Tahoe and elsewhere rests upon extensive sampling performed by those same advocates and funded by the Environmental Defense Fund ("EDF").[1] In many ways, then, this Litigation is the origin story of the Journal's reporting, and it is a story riddled with conflicts of interest, bias, inaccuracies, and stunning failures to disclose facts that are relevant to, and may well be determinative of, the claims in this Litigation. This letter tells that story.

---

[1]   As described below, it is uncertain whether EDF's known funding of the sampling was in full or in part, but it is clear that the Journal did not disclose any funding by EDF in its initial reporting.

## KIRKLAND & ELLIS LLP

July 27, 2023
Page 3

### I.     LEAD-CLAD CABLES

To evaluate the Journal's reporting on this topic, one must first understand lead-clad cables. Lead-clad cables have been a critical component of our nation's infrastructure for many decades and they are well known and accepted by state and federal regulators.  From power cables to telecommunications cables, lead has long been used to protect interior wires from exposure to the elements because it is universally recognized as stable and does not rust.

Lead-clad cables are so durable that they continue to be used in our power grid, in our railway systems, and in the petrochemical industry.  In the 1990s, lead-clad cables were seen as an "especially suitable" method of providing power throughout the country due to its malleability, stability, and resistance to corrosion.[2]  As recently as the late 1990s, the EPA itself noted that lead was particularly effective in maintaining power lines operating at 15,000 volts.[3]  And even today, the state of Pennsylvania requires that "all high voltage wires installed underground shall be in the form of insulated lead-covered cables" and that "buried cables shall be continuously insulated and protected by a metallic sheath, preferably lead."[4]

After decades of research in the U.S. and abroad, neither regulators nor scientists have ever identified lead-clad cables, including telecommunications cables, as a significant source of lead or a danger to public health.  Surprisingly, the Journal's reporting does not cite *any* prior scientific research, all of which contradicts its assertions.[5]

---

[2]   Letter from Jeffrey L. Zelms, Chairman, Lead Industries Association, Inc., to Senator Harry Reid (June 7, 1990), reprinted in Lead Exposure Reduction, Hearing Before the Subcomm. on Transportation and Hazardous Materials of the Comm. on Energy and Commerce, House of Representatives, 102nd Cong., 1st Sess., Serial No. 102-104, at 121 (Oct. 23, 1991).

[3]   EPRI, Assessment of Paper-Insulated Lead-Covered Cable Condition: Electrical, Chemical, and Metallurgical Condition (Feb. 25, 2003), Table 2-1.

[4]   34. Pa. Code § 43.32(a), (c).

[5]   See, e.g., Jaspers, et al., "Investigation of Soil Pollution by Lead-Sheathed Telecom Cables," *Wire Industry* (2001); EPRI Technical Report, "Environmental impacts of lead from Paper-Insulated Lead-Covered Cable" (2004).  In the Jaspers study, researchers found no evidence of leaching from underground lead-clad cables and instead found lead concentrations near the buried cables in the study were *lower* than the overall national lead concentration and lower than many of the control sites.  They concluded that buried telecommunications cables created "no discernable influence" on lead levels in surrounding soil.  In the EPRI Technical Report, researchers concluded that "underground application of lead-sheathed power cables does not represent a significant risk to human health and the environment," and that "any lead released from the cable was quickly immobilized within 5 cm from the surface of the cable." *See also* Forsberg, et al., "Release of Pb from Lead-Sheathed Telecom Cables

KIRKLAND & ELLIS LLP

July 27, 2023
Page 4

## II.    MAKING THE NEWS VS. REPORTING THE NEWS

Importantly, this is not a situation where a newspaper is reporting on the work of another person or organization. To the contrary, as the Journal has repeatedly emphasized, its reporting rests on its own scientific analysis. It commissioned "experts" to assist "a team of reporters" in the field, and its "reporters visited" cable sites, "collected" samples, and "accompanied research divers, university scientists and environmental consultants around the country." In other words, the Journal is reporting that the Journal has itself discovered new scientific news. The purpose of the enclosed subpoena is to determine whether the Journal's claim is accurate as it relates to the cables at issue in this Litigation, but the answer to that question will also impact the full body of the Journal's reporting.

## III.    UNDISCLOSED CONFLICTS OF INTEREST IN THOSE WHO CONDUCTED THE JOURNAL'S TEST SAMPLING

Marine Taxonomic Services ("MTS") is the organization that "assisted" the Journal by collecting hundreds of samples around the country for the Journal's reporting, including all samples taken from Lake Tahoe. [6] According to the Journal, the individuals at MTS who collected the samples were two divers named Seth Jones and Monique Rydel Fortner. As the Journal writes, "[r]esearchers Seth Jones and Monique Rydel Fortner, from the environmental consulting firm Marine Taxonomic Services, collected lead, soil and water samples at the Journal's request" to support the Journal's research.[7] Likewise, MTS has stated publicly that it was "responsible for implementing the field investigations and sampling" in the Journal's research.[8]

To state the obvious, the reliability of any scientific testing depends on the samples taken of the subject being tested, and in Lake Tahoe and elsewhere, those samples were taken by Mr. Jones and Ms. Fortner. About them, we now know that:

---

in Soil," *International Wire & Cable Symposium Proceedings* (1994) (researchers concluding that although some lead was released from buried lead-clad cables under certain soil conditions, it was unlikely to pose a risk to human health).

[6]   *The Wall Street Journal*, "How the Journal Investigated Hidden Lead Cables Circling the U.S.," available at https://www.wsj.com/articles/lead-cables-investigation-att-methodology-1703dbb0.

[7]   *The Wall Street Journal*, "America is Wrapped in Miles of Toxic Lead Cables," available at https://www.wsj.com/articles/lead-cables-telecoms-att-toxic-5b34408b.

[8]   Marine Taxonomic Services and Below the Blue Lead Cable Investigation, available at https://belowtheblue.org/edf-report (the "EDF Report") at 2.

KIRKLAND & ELLIS LLP

July 27, 2023
Page 5

- Mr. Jones and Ms. Fortner run an environmental advocacy group called "Below the Blue," which has openly advocated for the removal of the Lake Tahoe cables.

- Mr. Jones saw the Lake Tahoe cables while diving and brought their existence to the attention of the Plaintiff, who later filed this Litigation.

- In fact, counsel for Plaintiff, Bill Verick, recently spoke publicly about the critical role that Mr. Jones played in the genesis of this Litigation, stating unequivocally that Mr. Jones brought him the case "on a platter."[9]

- According to Mr. Verick, Mr. Jones is a "professional diver" who has "a thing about disposal of … garbage into Lake Tahoe."[10]

These are the advocates who collected hundreds of samples for the Journal's reporting, including all samples taken at Lake Tahoe.

## IV.  "KIDDIE POOL" SCIENCE

From Mr. Verick's public comments, we also know how little the Plaintiff investigated its claims before filing this Litigation.  According to Mr. Verick, the facts are easily summarized: Mr. Jones dove to the bottom of Lake Tahoe, *cut off a portion of one cable*, and brought it to Mr. Verick.[11]  Then, in the words of Mr. Verick:

> [W]e got a kiddie swimming pool and filled it with Lake Tahoe water and let the cable sit in it for like a day, and then we took a water sample, and sent it off to a lab, and had astoundingly high levels of lead in the water.[12]

This experiment, using only a kiddie pool and a section of freshly-cut lead-clad cable ripped from an underwater cable, was the only scientific testing that Plaintiff performed before or

---

[9]    "Lead Contamination Outlook Conference Call," hosted by Capstone Special Situations, available at https://www.omnigage.io/email-voice/fzEi9kA4zJjxRUzgdDtGXn/wuSmCHATzQpZVbUyUJGghb/eyJ0eXAiOiJKV1QiLCJhbGciOiJIUzI1Ni J9.eyJlbnZlbG9wZV9pZCI6Ind1U21DSEFUelFwWlZiVXlVSkdnaGIifQ.UrT8luuhygZyjQl-L66VEqiXsvDGY2WYU2ttoaj02OI.

[10]    *Id.*

[11]    *Id.*

[12]    *Id.*

KIRKLAND & ELLIS LLP

July 27, 2023
Page 6

during this Litigation.[13] And by Mr. Verick's own admission, Plaintiff did not take any water samples near where the cable was found, nor did it take any soil samples.[14]   There is only the kiddie pool.  That this case was filed based only on "kiddie pool" science is a damning fact that was or should have been known by the Journal but was never disclosed to its readers.[15]

Finally, the folly of the kiddie pool experiment was recently captured well by Mr. Verick himself, who stated:

> Lake Tahoe is, you know, over 1,000 feet deep in places, and it's, you know, it's a giant lake" and "as soon as you get in there and start trying to do anything in an area where you might have increased, temporarily increased, level of contamination, you're just going to stir up the water and it's going to mix it in with the rest of the water of Lake Tahoe…"  and "if you just take a water sample from some random place in Lake Tahoe you're going to find *virtually no lead in it*. So, as much of the lead that has soaked out of that cable as has done, … *overall lead levels in Lake Tahoe are super low*.[16]

In its reporting, the Journal did not state whether it spoke to Mr. Verick at all, much less whether these and other opinions of his contradict the Journal's conclusions.

## V.     THE JOURNAL DID NOT DISCLOSE THAT THE ENVIRONMENTAL DEFENSE FUND FUNDED THE SAMPLING UNTIL PACIFIC BELL HIGHLIGHTED IT IN ITS RECENT STATUS REPORT TO THE COURT

When the Journal began its reporting on lead-clad cables, it did not disclose that any other organization funded any portion of the work necessary to reach its conclusions.  But now, we know

---

[13]   *Id.*

[14]   *Id.*

[15]   Indeed, the Journal should have known that, in a November 2021 press release, Mr. Verick said: "[w]e submerged a three-foot length of the cable in a plastic tub full of Lake Tahoe water" and "[a]fter one day, the test results showed 600 micrograms of lead per liter in the water. After three more days, it was up to 1200 micrograms per liter" which is "enough to require consumer warnings" and that therefore the lead-clad cables are "legally forbidden." Center for Environmental Health, "Pacbell to Remove Toxic Underwater Cable from Lake Tahoe's Waters," Nov. 11, 2021, available at https://ceh.org/latest/press-releases/pacbell-to-remove-toxic-underwater-cable-from-lake-tahoes-waters/.

[16]   "Lead Contamination Outlook Conference Call," hosted by Capstone Special Situations, available at https://www.omnigage.io/email-voice/fzEi9kA4zJjxRUzgdDtGXn/wuSmCHATzQpZVbUyUJGghb/eyJ0eXAiOiJKV1QiLCJhbGciOiJIUzI1NiJ9.eyJlbnZlbG9wZV9pZCI6Ind1U21DSEFUelFwWlZiVXlVSkdnaGIifQ.UrT8luuhygZyjQl-L66VEqiXsvDGY2WYU2ttoaj02OI (emphasis added).

KIRKLAND & ELLIS LLP

July 27, 2023
Page 7

that the EDF "funded" MTS's sampling work "alongside WSJ reporters."[17]  It was only after Pacific Bell filed its July 19, 2023 status report referencing this fact, that the Journal disclosed to its readers for the first time that MTS, the firm that did the sampling work upon which the Journal's reporting was based, "has received guidance and funding from EDF."  Before that disclosure, the Journal had reported only that EDF "provided guidance" to MTS.  Just yesterday, over two weeks since the first story ran, and following an EDF blog post describing "EDF's role in the WSJ investigation" as providing "guidance, assistance, and funding to MTS to help WSJ identify cables and conduct sampling,"[18] the Journal peeled back the onion even more.   It filed "Corrections & Amplifications" to three of its stories from the previous weeks, letting its readers know that it previously "didn't include information about the financial contributions made by two groups," that EDF, "a non-profit advocacy group, provided guidance and $85,000 to MTS to partly fund its field research for the project," and that "RTI International paid about $1,700 for some lab tests at the project's outset."[19]   As we have seen from other outlets seeking to evaluate the Journal's conclusions, those facts are critical and it is hard to understand why, after an 18-month investigation, the Journal failed to disclose them for so long.[20]

## VI.   BASIC CONCERNS WITH THE JOURNAL'S SCIENTIFIC TESTING

At the outset, it is important to note that the Journal's reporting suffers from a fundamental scientific flaw: it equates alleged lead *concentration* levels with potential lead *exposures*, thereby leaping to the sensational conclusion that lead from telecommunications cables alone presents a

---

[17]   On or around July 15, 2023, Below the Blue published a June 30, 2023 report it had prepared with MTS for the Environmental Defense Fund, which it titled in the link as the "edf report" and which described EDF's involvement with the Journal's reporting ("EDF Report").  Among other things, the EDF Report makes clear that EDF "contracted with MTS" and "funded" MTS's work "alongside WSJ reporters." https://belowtheblue.org/edf-report at 1, 2.   EDF has posted this same report on its website. https://www.edf.org/sites/default/files/2023-07/MTS_EDF%20Lead%20Cable%20Investigation_Final.pdf.

[18]   Environmental Defense Fund Blogs - EDF Health, "Lead Cables: 66,000 miles overhead or underwater - EDF Health," available at https://blogs.edf.org/health/2023/07/26/lead-cables-66000-miles-overhead-or-underwater/.

[19]   *The Wall Street Journal*, "How the Journal Investigated Hidden Lead Cables Circling the U.S.," available at https://www.wsj.com/articles/lead-cables-investigation-att-methodology-1703dbb0.

[20]   For example, on July 20, 2023, reporter Becky Quick asked a guest from the EDF how he responds to "some questions raised about it being an independent investigation not knowing that you and other environmental groups were involved."  CNBC Squawk Box, available at https://www.ncbc.com/video/2023/07/20/there-is-no-safe-level-of-exposure-to-lead-says-environmental-defense-funds-tom-neltner.

KIRKLAND & ELLIS LLP

July 27, 2023
Page 8

serious, never-before-reported public health risk.[21]  In this and other important ways,[22] the Journal is suggesting that lead-clad cables present the same health risk as lead water pipes.  From a public health standpoint, lead-clad communication cables are nothing like lead water pipes that carry drinking water.  Lead water pipes are a contained space, which means any lead that separates from the pipe itself has nowhere to go but into the drinking water that passes through them.  As Mr. Verick, counsel for Plaintiff, recently stated: "All lead water pipes are way worse for the environment than, than what AT&T's got going."[23]

But even beyond that fundamental flaw, new information has raised additional concerns with what the Journal failed to disclose adequately, if at all:

- As the EDF Report noted, MTS's "[s]ampling locations were chosen in part by their likelihood to show high lead levels."[24]  This one sentence, shared not by the Journal, but by its consultants, calls into question the integrity of its entire analysis.  An objective analysis would not have this sort of selection bias baked into its methodology.

- The Journal claims to have visited "about 300 cable sites" and "collected roughly 200 environmental samples at nearly 130 of those places," but it only reports on 17

---

[21]  The WSJ's leap that the existence of lead in the soil by buried cables equates to exposure to humans and presents a broad public health risk conflicts not only with existing science, but also with the WSJ's and its experts' own words.  In a July 13 WSJ podcast, WSJ reporter Susan Pulliam noted that "lead is really heavy, and when it leaches, tends to stay where it is."  In that same podcast, the Journal's expert Jack Caravanos said: "So one of the interesting chemical facts about lead is that it really doesn't migrate through the soil very easily. *The Wall Street Journal*, "America is Wrapped in Toxic Lead Cables," available at https://www.wsj.com/podcasts/the-journal/america-is-wrapped-in-toxic-lead-cables/67818cba-728c-4b17-8132-45d4a4bbe63c. And WSJ reporter Tom Gryta, in a July 13 Yahoo! Finance Live video interview acknowledged that "[l]ead is relatively stable. It's when you disturb it that it can become a problem." Yahoo! Finance Live, "Thousands of lead-covered cables found across U.S.: Report," available at https://finance.yahoo.com/video/thousands-lead-covered-cables-found-173229490.html.

[22]  The EDF Report is careful to make clear that the study was "preliminary," "not exhaustive," and only resulted in "high lead numbers at *some* locations." EDF Report at 64 (emphasis added).  Unlike the Journal's reporting that lacks such caveats, the EDF Report goes on to acknowledge the limitations of using the work performed by MTS and Beyond the Blue to make bold assertions of a public health risk, warning that "[a]dditional samples would need to be collected to assess any associated risks in a subsequent effort." *Id.* at 5.

[23]  "Lead Contamination Outlook Conference Call," hosted by Capstone Special Situations, available at https://www.omnigage.io/email-voice/fzEi9kA4zJjxRUzgdDtGXn/wuSmCHATzQpZVbUyUJGghb/eyJ0eXAiOiJKV1QiLCJhbGciOiJIUzI1Ni J9.eyJlbnZIbG9wZV9pZCI6Ind1U21DSEFUelFwWlZiVXlVSkdnaGIifQ.UrT8luuhygZyjQl-L66VEqiXsvDGY2WYU2ttoaj02OI.

[24]  EDF Report at 5.

KIRKLAND & ELLIS LLP

July 27, 2023
Page 9

of the 130 sites purportedly sampled.  Why were the other sites not included in its articles?  Is it because the other sites did not show elevated lead levels at all?

- The Journal's reporting insinuates that the telecommunications industry has been indifferent to occupational lead hazards facing its employees and even that AT&T and Verizon "knew the risks" but failed to impose adequate safety practices.  But the Journal did not even describe the protections that AT&T or Verizon deploy for those employees.  The vast majority of AT&T's workers have no or minimal interaction with lead-clad cables, and those who do receive comprehensive lead training and follow extensive practices to minimize their potential exposure. AT&T meets or exceeds federal and state OSHA requirements, and it continually works with its union partners and employees to ensure that compliance is rigorous and that its employees are safe.

- The Journal has refused to provide detailed information about controls for background sources and lead levels at the locations where it has done testing. Following applicable EPA standards and controlling for background sources and cross-contamination of the testing samples are critical because of the ubiquity of lead in the environment from historical and other sources. For example, AT&T's own sampling experts in Lake Tahoe were careful to ensure that their research vessel and all associated equipment were lead free and underwent enhanced decontamination procedures to avoid cross-contamination. From what AT&T's experts can determine based on the limited information provided by the Journal, the sampling methods do not appear to have followed these key protocols, calling the Journal's results into question and potentially explaining the wide discrepancy between   the   Journal's   limited   data   and   the   existing   literature.[25]

- The Journal's sole focus for reporting on "America's Toxic Lead Cable Problem" is the telecommunications industry, with each article leaving readers to believe that the only lead-clad cables that both exist and that were a part of its study, were in fact owned solely by the telecommunications industry.  But we now know from the EDF Report, prepared by MTS and Beyond the Blue, that the Journal investigated

---

[25]  For example, the Journal relied on testing that evaluated the quality of *pond water* by using the EPA's action level for lead in faucet *drinking water* and incorrectly suggested that sediments found at the bottom of lakes and ponds or under bridges and levees are "play areas" as defined by the EPA and subject to its more stringent soil screening standards, which they clearly are not.

KIRKLAND & ELLIS LLP

July 27, 2023
Page 10

and identified similar lead-clad *power* cables across the country.[26]  Why would the Journal not mention its lead-clad power cables research findings, or reference lead-clad power cables at all?

- The Journal's conclusions also rely on the work of consultant Jack Caravanos.[27] But the Journal failed to disclose that a federal court has barred Mr. Caravanos from testifying as an expert in the past for using unreliable methods and noted that he "did not actually read a single article as part of his literature survey." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 268-70 (2d Cir. 2002) (finding Caravanos's testimony "rested on a faulty assumption" and employed an "unreliable methodology").

## VII.   AT&T'S OWN TESTING CONTRADICTS THE JOURNAL'S CLAIMS

As discussed above, the established science, including independent testing at Lake Tahoe, teaches that lead-clad cables pose no public health risk.  Still, to address any concerns generated by the Journal's flawed reporting, AT&T has conducted additional testing at Lake Tahoe and is conducting additional testing at sites around the country, including those identified by the Journal. **So far, at each site tested, AT&T's results confirm the safety of these cables and contradict the Journal's claims to the contrary.**  Specifically:

- In 2021, AT&T engaged a prominent expert testing firm, Haley & Aldrich, to sample and analyze water near the cables in Lake Tahoe using the best available

---

[26]   As noted in the EDF Report, EDF sought "to understand the extent to which telecom *and power cables* running through rivers, streams, and lakes that serve as drinking water sources may have been constructed using lead pipe and which may now pose a public health risk that needs to be addressed." EDF Report at 1 (emphasis added). *See also id.* ("Verification of permit records included determining if cables were present at those locations and visually assessing the composition of telecom *and power cables*.") (emphasis added); *id.* at 8 ("Lead sheathed *power* cables had similar construction [to lead-clad telecom cables].") (emphasis added); *id.* at 9 (Regarding Louisiana, "[e]ighteen points of interest were recorded where visible lead sheathed cables were noted; of those eighteen points, six points contained lead sheathed *power* cables.") (emphasis added); *id.* at 10 (Regarding Bayou Teche, "[t]welve points of interest along the Bayou Teche contained visible lead sheathed cables, with both *power* and telecommunication cables at various locations.") (emphasis added).

[27]   The Journal quotes Mr. Caravanos nine times in its July 9 article, including to pronounce, without any evidence, his view that "'[a] new, uncontrolled source of lead like old telephone cables may partly explain' why children continue to have lead in their blood." Mr. Caravanos makes other bold unsupported claims about lead in the water, including that "a young child swimming for an hour in water and swallowing some of it, with lead content equivalent to that measured by the Journal ... could add 7.4 micrograms per deciliter of lead to his or her blood." He similarly claims that fishing at a pond with lead in the sediment "could have raised the lead in the blood ... to more than eight times the current CDC threshold" and that "a little dirt on your fingers" will elevate a child's "blood lead above the CDC level of 3.5."

**KIRKLAND & ELLIS LLP**

July 27, 2023
Page 11

scientific methods consistent with EPA standards.  Those tests showed that no lead was leaching from the cables and that there were very low lead levels overall in the Lake, characteristic of background levels, not releases from the cables.  Unlike the Journal, AT&T made the full report of this work available to the public.

- Then, just last month, AT&T engaged a different prominent expert to perform another round of water quality testing near the Lake Tahoe cables to determine if a different expert would get different results from AT&T's 2021 testing.  The results of that scientific study again demonstrate that there is no "hidden health hazard" at Lake Tahoe and that the lead-clad cables at Lake Tahoe do not pose a public health concern.  As it did with its 2021 results, AT&T will make this expert's full report available to the public.

- Now, AT&T has also engaged an expert to conduct testing of aerial lead-clad cables in the Detroit metropolitan area.  At each test location, those trained professionals are collecting hundreds of soil samples at varying distances from the cable for comprehensive lab analysis.   Although the testing is ongoing, preliminary results from the initial tested locations confirm what established science predicts: contrary to the Journal's speculation, these aerial cables are not a meaningful contributor of lead on the ground below them.  In fact, based on these preliminary results, there is *no* meaningful difference in detectable lead levels directly below the cables and across the street where no cables exist.  Moreover, the lead levels below the cables are substantially less than the average household soil lead levels in the Midwest as measured by HUD and are far less than the EPA thresholds.[28]

These results underscore the importance of inspecting the Journal's work in Lake Tahoe and elsewhere.  AT&T will be making these and future lead-clad cable test results available to the EPA for review and analysis, and we trust that the Journal will be doing the same.

---

[28]   Aerial cables in urban areas run along roads that once carried leaded gas burning vehicles, near lead painted homes and other structures, and in proximity to manufacturing facilities that used lead.  As EPA, HUD, and other regulators have documented for decades, background levels of lead in these areas tend to be higher than elsewhere, and claiming that lead levels below cables are "elevated" without any comparison to relevant background levels says nothing about risk associated with the cables. *See* "Lead in Soil," U.S. Environmental Protection Agency, available at  https://www.epa.gov/sites/default/files/2020-10/documents/lead-in-soil-aug2020.pdf;  "American Healthy Homes Survey II Lead Findings, Final Report," U.S. Department of Housing and Urban Development Office of Lead Hazard Control and Healthy Homes (October 29, 2021), available at 76, https://www.hud.gov/sites/dfiles/HH/documents/AHHS_II_Lead_Findings_Report_Final_29oct21.pdf.

KIRKLAND & ELLIS LLP

July 27, 2023
Page 12

**CONCLUSION**

While the Journal spent over 18 months on its reporting, it has taken AT&T less than three weeks to develop serious concerns with the stories that it published.  Unfortunately, in those same weeks, the harm caused by the Journal's reporting has already been felt by millions of Americans. During the week of July 9, shares of AT&T closed at its lowest level since February 1994, and shares of Verizon closed at its lowest level since August 2011.  Frontier was down 21%, and Lumen dropped more than 15%.[29]  Analysts estimated that those four stocks, held in millions of retirement accounts and investment funds, lost a combined $18 billion in market value.[30] Countless people depend on these stocks for their retirement, their income, and their children's education.

If the Journal truly believed that lead-clad cables pose a public health crisis, it is difficult to understand why the Journal kept that information to itself for so long.  In this respect, our concern with the Journal's decision-making centers not only on the reliability of its reporting, but on the choice to withhold for so long information that, according to the Journal, affects people's health.

For the benefit of public health and to further the search for the truth in this Litigation, we trust that you will comply with this subpoena promptly, as it seeks information that is both relevant to this Litigation and important to families and policymakers alike.  In the meantime, you may rest assured that AT&T will always act responsibly in response to new, reliable information that affects our employees, our customers, and our communities.  But without your full response to this subpoena, AT&T cannot even begin to assess whether the Journal's reporting qualifies as such information.

Sincerely,

Hariklia Karis

---

[29]   *The Wall Street Journal*, "AT&T, Other Telecom Stocks Sink After WSJ Investigation on Toxic Lead Cables," available at https://www.wsj.com/articles/at-t-other-telecom-stocks-sink-in-wake-of-wsj-investigation-on-toxic-lead-cables-7f0f9293?mod=livecoverage_web.

[30]   *Investor's Business Daily*, "Lead-Sheathing Issue Could Put Telecom Stocks In The Doghouse For Decades," available at https://www.investors.com/news/technology/telecom-stocks-lead-sheathing-issue-could-put-t-stock-vz-stock-in-doghouse/.

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Eastern District of California

| | |
|---|---|
| California Sportfishing Protection Alliance, | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 2:23-cv-00073-JDP |
| | ) |
| Pacific Bell Telephone Company, | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:          Dow Jones & Company, Inc.
c/o Corporation Service Company, 80 State Street, Albany, New York 12207-2543

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: The materials described in Schedule A

| Place: Kirkland & Ellis, LLP: Attn: Hariklia Karis, 601 Lexington Ave. New York, NY 10022 | Date and Time: 14 days from service |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      07/27/2023

CLERK OF COURT

OR      /s/ Hariklia Karis

_____          _____
*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Defendant Pacific Bell Telephone Company                    , who issues or requests this subpoena, are:
Hariklia Karis, Kirkland & Ellis LLP, 300 N. LaSalle St., Chicago, IL 60654,hkaris@kirkland.com, (312) 862-2330

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   2:23-cv-00073-JDP

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____            _____
                                                              *Server's signature*

                                                   _____
                                                              *Printed name and title*

                                                   _____
                                                              *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
   **(i)** is a party or a party's officer; or
   **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
   **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
   **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
   **(i)** fails to allow a reasonable time to comply;
   **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
   **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
   **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
   **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

   **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
   **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
   **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
   **(i)** expressly make the claim; and
   **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**SCHEDULE A**

**PACIFIC BELL TELEPHONE COMPANY'S
REQUESTS TO DOW JONES & COMPANY, INC. TO PRODUCE DOCUMENTS**

In accordance with the Federal Rules of Civil Procedure 45, You are requested to produce the following documents and tangible items for inspection.

**DOCUMENTS TO PRODUCE**

1.    All Documents and Communications with any persons (internal or external) or entities concerning sampling, testing, data, analysis, research, reports, permits, maps, or Studies relating to lead-clad cables at Lake Tahoe or elsewhere.

2.    All Documents constituting or relating to sampling, testing, data, analysis, research, reports, permits, maps, or Studies relating to lead-clad cables at Lake Tahoe or elsewhere.

3.    All Documents and Communications (internal or external) relating to the involvement of Marine Taxonomic Services, Ltd., Seth Jones, Monique Fortner, or Below the Blue in the Lawsuit.

4.    All Documents related to the experience or qualifications of Marine Taxonomic Services, Ltd., Seth Jones, Monique Fortner, Below the Blue, ALTA Environmental Corporation, RTI International, Altec Testing & Engineering, Inc., Environmental Council of the States, Environmental Defense Fund, Pure Earth Quest Diagnostics, MCH Strategic Data, Pace Analytical Services, Environmental Systems Research Institute, Inc. ("Esri"), and California Sportfishing Protection Alliance, or any other entity that performed sampling, testing, or analysis of lead-clad cables in water, soil or aerial environments, to do such sampling, testing or analysis.

5.    All Documents and Communications (internal or external), including pictures and videos, concerning any sections of lead-clad cables removed from Lake Tahoe, including but not limited to the sections of lead-clad cables removed by Marine Taxonomic Services, Ltd., Seth Jones or Monique Rydel Fortner.

6.    All Documents related to and Communications between You and any party described or otherwise referenced in the WSJ Articles, or Plaintiff or Plaintiff's counsel in the Lawsuit, for the performance of services relating to the WSJ Articles, the WSJ Investigation, or the Lawsuit, including but not limited to the Environmental Defense Fund, Marine Taxonomic Services, Ltd., Below the Blue, California Sportfishing Protection Alliance, Pace Analytical Services, Environmental Systems Research Institute, MCH Strategic Data, Quest Diagnostics, Pure Earth; Environmental Council of the States, Altec Testing & Engineering, Inc., RTI International, ALTA Environmental Corporation, Klamath Environmental Law Center, or any "environmental researchers".

1

7.  All Documents related to and Communications with external parties, including AT&T or other telecommunications companies, from March 1, 2023 to the present, requesting the disclosure of testing performed by or on behalf of the WSJ and concerning lead-clad cables, including all documents concerning the methodologies employed in the testing.

8.  All invoices for work performed relating to the WSJ Articles, the WSJ Investigation, lead-clad cables, or the Lawsuit, including but not limited to all individuals or entities listed in Request No. 6.

9.  All Documents and Communications concerning the Marine Taxonomic Services and Below the Blue Lead Cable Investigation Report, available at https://belowtheblue.org/edf-report (the "EDF Report").

10. All Documents and Communications concerning the method by which sampling locations were selected, including but not limited to Documents and Communications relating to the statement in the EDF Report that "[s]ampling locations were chosen in part by their likelihood to show high lead levels."

11. All Documents and Communications concerning any financial payment You or others made in connection with the WSJ Articles, the WSJ Investigation, or lead-clad cables, including payments made to:

  (i)     Seth Jones;

  (ii)    Monique Fortner;

  (iii)   Jack Caravanos;

  (iv)    Tom Neltner;

  (v)     Ben Grumbles;

  (vi)    Bruce Nelson;

  (vii)   Bryan Stolte;

  (viii)  Jennifer Redmon;

  (ix)    Braden Allenby;

  (x)     Gordon Binkhorst;

  (xi)    James Winn;

  (xii)   Dr. Philip Landrigan;

  (xiii)  ALTA Environmental Corporation;

  (xiv)   RTI International;

  (xv)    Altec Testing & Engineering, Inc.;

2

(xvi)    Environmental Council of the States;

(xvii)   Environmental Defense Fund;

(xviii)  Below the Blue;

(xix)    Pure Earth;

(xx)     Quest Diagnostics;

(xxi)    MCH Strategic Data;

(xxii)   Marine Taxonomic Services, Ltd.;

(xxiii)  Pace Analytical Services;

(xxiv)   Environmental Systems Research Institute, Inc. ("Esri");

(xxv)    California Sportfishing Protection Alliance; and

(xxvi)   Any of Plaintiff's counsel in the Lawsuit.

12.    All Documents and Communications relating to any permits requested or obtained by You or anyone acting on Your behalf to test, cut or remove any sections of lead-clad cables in or from Lake Tahoe.

13.    All Documents and Communications, including but not limited to any pictures, videos, or test results, relating to any "kiddie pool" used by You or anyone acting on Your behalf, including but not limited to Monique Rydel Fortner, Seth Jones or Marine Taxonomic Services, Ltd., to test lead-clad cables removed from Lake Tahoe or elsewhere.

14.    All Documents prepared by You, for the benefit of You, or provided to You concerning any Study, research or investigation on potential or actual adverse effects of lead-clad cables.

15.    All Documents and Communications concerning any lead exposure analysis conducted in connection with the WSJ Articles or WSJ Investigation.

16.    All Documents and Communications relating to Your participation in or funding of any test or Study related to or otherwise concerning lead-clad cables.


## TANGIBLE ITEMS FOR INSPECTION


1.    All samples or other tangible items on which You or any party acting at Your direction conducted any testing, analysis, evaluation, or investigation in connection with the WSJ Articles, the WSJ Investigation, or lead-clad cables.

The Requests for Production are being made in accordance with the below stated Definitions and Instructions.

## DEFINITIONS

1.      **"Communications"** means, without limitation, any oral communication, whether transmitted in meetings, by telephone, tape recordings, voice-mail or otherwise, and all written communications, including communications by e-mail or other electronic- or internet-based communications system.  For the sake of clarity, Communications shall include internal and external communications.

2.      **"Defendant"** means Pacific Bell Telephone Company.

3.      **"Document"** means all materials within the full scope of Federal Rule of Civil Procedure 34, including: all writings and recordings, including the originals and all non-identical copies (including, without limitation, e-mail and attachments, correspondence, memoranda, notes, diaries, minutes, statistics, letters, minutes, receipts, summaries, pamphlets, books, interoffice and intraoffice communications, photographs, charts, videotape, recordings, motion pictures, plans, drawings, surveys, and electronic, mechanical, magnetic, optical, or electronic records or representations of any kind.  For the sake of clarity, Documents shall include internal and external Communications.

4.      **"Environmental Protection Agency"** or **"EPA"** means the United States Environmental Protection Agency and any of its representatives or agents.

5.      **"Lawsuit"** means the case captioned *California Sportfishing Protection Alliance v. Pacific Bell Telephone Co.*, 2:21-cv-00073-JDP, currently pending in the Eastern District of California.

6.      **"News Outlet"** means any persons or entities engaged in the act of reporting news whether orally, in print, televised, via mail or e-mail, or on the internet, including all newspapers, magazines, periodicals, documentaries, television shows, list-servs, forums, blogs, vlogs, tweets, and posts.

7.      **"Study"** means any published or unpublished, reported or unreported, final or draft, performed or abandoned, planned, or proposed analysis, assessment, peer reviewed or non-peer reviewed, data collection, experiment, research, survey, test, or trial.

8.      **"WSJ Articles"** means the following Wall Street Journal articles, and any forthcoming articles related to the same subject matter: S. Pulliam *et al.*, *America is Wrapped in Miles of Toxic Lead Cables*, THE WALL STREET JOURNAL (July 9, 2023), available at https://www.wsj.com/articles/lead-cables-telecoms-att-toxic-5b34408b; J. West *et al.*, *How the Journal Investigated Hidden Lead Cables Circling the U.S.*, THE WALL STREET JOURNAL (July 9, 2023), available at https://www.wsj.com/articles/lead-cables-investigation-att-methodology-1703dbb0; S. Ramachandran *et al.*, *What AT&T and Verizon Knew About Toxic Lead Cables*, THE WALL STREET JOURNAL (July 12, 2023), available at https://www.wsj.com/articles/att-verizon-lead-cables-telecom-5e329f9; S.

4

Ramachandran *et al.*, *I Was Really Sick, and I Didn't Know From What*, THE WALL STREET JOURNAL (July 14, 2023), available at https://www.wsj.com/articles/lead-cables-exposure-workers-ca6d67f0; J. West *et al.*, *Bayou Teche is an Epicenter of America's Lead Cable Problem*, THE WALL STREET JOURNAL (July 10, 2023), available at https://www.wsj.com/articles/lead-cables-louisiana-telecoms-59f36ffe.

9.    **"WSJ Investigation"** means any investigation, research, sampling, testing, analysis, fact-finding, or diligence that the WSJ conducted, gathered, commissioned, or requested, relating to cables (of any type) or lead, leading up to, in connection with, or following the WSJ Articles.

10.   **"You," "Your,"** or **"WSJ"** means Dow Jones & Company, Inc., the Wall Street Journal, and any of their representatives, agents, employees, administrators, boards, vendors and other persons or entities acting on their behalf.

## INSTRUCTIONS

1.    The terms "or" and "and" shall be interpreted either conjunctively or disjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope.

2.    "All," "any," "each," and "every" shall each be construed as both "each" and "every" to bring within the scope of the request all responses that might otherwise be construed to be outside its scope.

3.    "Concerning" shall be construed to bring within the scope of the Request all documents that comprise, evidence, describe, refer to, or were reviewed in conjunction with, or were generated as a result of the subject matter of the Request.

4.    "Including" shall be construed to mean "including but not limited to."

5.    This Subpoena requests Documents and Communications in Your possession, custody, or control.

6.    All definitions set forth above are in addition to the defined words' standard meanings. If You contend that You do not understand the definition of the term or phrase used in any Request, then You should respond to that portion of the Request that You do understand and explain what it is that You do not understand with regard to the remainder of the Request. If You believe that any Request is overbroad in part, then You should respond to that portion of the Request that You do not consider overbroad and explain why You believe the remainder is overbroad.

7.    You are required to produce not only the original or an exact copy of the original of all Documents and Communications responsive to any of the Requests listed below, but also all copies of such Documents and Communications which bear any notes or markings not found on the original and all preliminary, intermediate, final, and revised drafts or

embodiments of such Documents and Communications. You are required to produce all versions of such Documents and Communications.

8. Produce all Documents in complete form, with each page marked with consecutive document control numbers, and with no redactions unless necessary to avoid producing privileged information (in which case the redaction should be reflected on a privilege log).

9. Produce Documents as they are kept in the usual course of business, or organize and label them to correspond to the categories in the Request.

10. If any document requested herein is withheld or redacted on the basis of any claim of attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity, You shall provide a written statement: (a) describing the nature of the document (e.g., letter, memorandum, minutes, telegram, notes, etc.); (b) specifying the date on which the document was prepared; (c) identifying the Person(s) who prepared or authored the document; (d) identifying the Person(s) to whom the document was sent, copied, or shown; (e) stating the privilege or other doctrine pursuant to which the document is being withheld from production and setting forth the basis for such claim of privilege or immunity from production; and (f) setting forth the subject matter of the document in a manner that, without revealing the information claimed to be privileged or protected, will enable Pacific Bell Telephone Company to assess the merit of that claim.

11. If You are unable to produce a Document or Communication requested, please state in writing why You cannot produce the Document or Communication, including whether: (a) it is missing or lost; (b) it has been destroyed; (c) it has been transferred voluntarily or involuntarily to others; or (d) it has been disposed of otherwise. In each instance, explain the circumstances surrounding such disposition and identify the Person(s) directing or authorizing the same and the date(s) thereof. If Your inability to produce the Document or the property is because it is not in Your possession or the possession of a Person or entity from whom You could reasonably obtain it, state the name, address, and telephone number of any Person You believe may have the original or a copy of any such Document or property.

12. These Requests are continuing in nature. If, after responding to the Requests, You obtain or become aware of any erroneous information that has been provided or any further responsive information, either directly or indirectly, a supplemental answer is required. You are under a duty to amend a prior response upon learning that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not been made known to Pacific Bell Telephone Company during the discovery process or in writing.

6