1   Joshua Koltun (Bar No. 173040)
    One Sansome Street
2   Suite 3500, No. 500
    San Francisco, California  94104
3   Telephone:  415.680.3410
    Facsimile:  866.462.5959
4   joshua@koltunattorney.com

5
    Attorney for Third Party Witnesses
6   Below the Blue,
    Marine Taxonomic Services, Ltd,
7   Seth Jones, and Monique Rydel-Fortner

8

9                    UNITED STATES DISTRICT COURT

10                   EASTERN DISTRICT OF CALIFORNIA

11

12
                                              Case 2:21-cv-00073-JDP
13  CALIFORNIA SPORTFISHING
    PROTECTION ALLIANCE,                      **BELOW THE BLUE'S**
14                                            **MEMORANDUM IN OPPOSITION**
                                              **TO PACIFIC BELL'S MOTION TO**
15            Plaintiff,                       **COMPEL [DE 104]**
    v.
16                                            Filed Herewith:
    PACIFIC  BELL TELEPHONE COMPANY           Declaration of Joshua Koltun
17                                            Declaration of Vishal Oza
              Defendant                       [Proposed] Order
18

19

20

21

22

23

24

25

26

27

28

*(left margin, vertical)* Joshua Koltun ATTORNEY

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joshua Koltun ATTORNEY

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

Introduction ........................................................................................................................... 1

Factual and Procedural Background ..................................................................................... 2

Argument .............................................................................................................................. 6

I.    AT&T's proposal that the Court grant to a "independent expert" the power to act as a special master with unreviewable authority to adjudicate which documents are responsive and deliver them to AT&T, is extraordinary and unwarranted ................................................................................... 6

    A.    AT&T's contention that BTB/MTS is some sort of quasi-party that -- based on its "role in this dispute" -- had preservation obligations that predate the Subpoena, is meritless and turns the First Amendment Reporter's Privilege on its head .......................................................... 10

    B.    AT&T's other accusations of malfeasance by BTB/MTS and its counsel are factually and legally unsound ................................................................................................................... 12

        1.    Although BTB/MTS has always been willing to meet and confer concerning the production of metadata, the Subpoena here did not require that it be produced ........................... 12

        2.    There is nothing wrong with the responding party's personnel gathering responsive documents; the attorney should be involved in the process but is certainly not responsible for collecting and searching the information himself ........................................................................ 15

        3.    Word searches are not some magical technique to determine responsiveness; they are one method of seeking to ensure that all potentially relevant documents are collected to be reviewed for responsiveness ................................................................................................................ 16

II.    The provisions of AT&T's proposed order concerning the scope of the privilege and the privilege log are unsound ................................................................................................................... 18

III.    Under Rule 45(d)(2)(B)(ii), AT&T is required to pay for any significant expense incurred by BTB/MTS in responding to the subpoena, including the cost of the ESI vendor it has hired. ............. 19

Conclusion ........................................................................................................................... 20

1

2

3

**TABLE OF AUTHORITIES**

**Cases**

*Barracuda Networks v. J2 Glob.*, No. 2:19-mc-00146-PSG (PJWx), 2020 U.S. Dist. LEXIS 183538, at *3-4 (C.D. Cal. July 17, 2020).................................................................................20

*Barton v. United States Dist. Court*, 410 F.3d 1104, 1111 (9th Cir. 2005) ..........................................19

*Benanav v Healthy Paws Pet In LLC No. C20-00421-LK*, 2022 U.S. Dist. LEXIS 150550 (W.D. Wash. Aug. 22, 2022. 8, 1*Chestnut v. Kincaid*, No. LKG-20-2342, 2022 U.S. Dist. LEXIS 20700, at *6-7 (D. Md. Feb. 4, 2022) ....................................................................................18

*DR Distribs., L.L.C. v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 861-62 (N.D. Ill. 2021)........13

*Guillory v. EHM Prods.*, No. CV 22-6185 FLA (RAOx), 2023 U.S. Dist. LEXIS 129685, at *9-10 (C.D. Cal. July 25, 2023) ..................................................................................................19

*Javo Beverage Co. v. Cal. Extraction Ventures, Inc.,* No.: 19-CV-1859-CAB-WVG, 2020 U.S. Dist. LEXIS 76043, at *24-25 (S.D. Cal. Apr. 29, 2020). .....................................................................13

*Laub v. Horbaczewski, ,* No. LA CV17-06210 JAK (KSx), 2019 U.S. Dist. LEXIS 130917, at *75-76, *90 (C.D. Cal. July 30, 2019 .....................................................................................11

*Legal Voice v. Stormans Inc.*, 738 F.3d 1178, 1184 (9th Cir. 2013). ....................................................19

*Procaps S.A. v. Patheon Inc.,* Case No. 12-24356-CIV, 2014 U.S. Dist. LEXIS 28263, at *5--8 (S.D. Fla. Feb. 28, 2014). ..........................................................................................................9

*Stolz v. Travelers Commer. Ins. Co.*, No. 2:18-cv-1923-KJM-KJN, 2020 U.S. Dist. LEXIS 74713, at *35 (E.D. Cal. Apr. 28, 2020)...............................................................................................8

*Tera II, LLC v. Rice Drilling D, LLC*, No. 2:19-cv-2221, 2022 U.S. Dist. LEXIS 68892, at *12-14 (S.D. Ohio Apr. 14, 2022)...............................................................................................8, 15

*Thomas v. Marshall Pub. Sch.*, No. 21-cv-2581 (PJS/DJF), 2023 U.S. Dist. LEXIS 156933, at *44-45 (D. Minn. Sep. 6, 2023). ...............................................................................................12, 19

*Toyo Tire & Rubber Co. v. CIA Wheel Grp., No.* SA CV 15-00246-DOC (DFMx), 2016 U.S. Dist. LEXIS 184189, at *3-5 (C.D. Cal. Feb. 23, 2016). ...........................................................8, 13

*UMG Recordings, Inc. v. Hummer Winblad Venture Partners (In re Napster, Inc. Copyright Litig.),*

462 F. Supp. 2d 1060, 1068 (N.D. Cal. 2006) ........................................................................11

*Weinstein v. Katapult Grp., Inc.*, No. 21-cv-05175-PJH, 2022 U.S. Dist. LEXIS 181635, at *5-6 (N.D. Cal. Sept. 29, 2022)........................................................................9, 10, 15, 16

*William A. Gross Const. Associates, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 256 F.R.D. 134, 136 (S.D.N.Y. 2009). ....................................................................................................................13, 17

**Other Authorities**

The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production, 19 Sedona Conf. J. 1 (2018); available at The Sedona Conference®. ..............................................................................................................passim

United States District Court for the Northern District of California model checklist for Rule 26(f) conferences ............................................................................................................13

**Rules**

Fed.R.Civ.P. 26........................................................................................................12, 18, 19

Fed.R.Civ.P. 34........................................................................................................7, 12, 14

Fed.R.Civ.P. 45........................................................................................................14, 19

Joshua Koltun ATTORNEY

*Introduction*

At the discovery conference on December 21, the Court urged AT&T and BTB/MTS"[1] to continue to meet and confer concerning BTB/MTS's document production.  Following those discussions, BTB/MTS hired Alvarez & Marsal ("A&M"), an ESI vendor with a national reputation, to assist it in the forensic collection of documents and in the production of ESI.  That forensic collection has been completed and the review and production is underway.

AT&T is dissatisfied, however, and has moved this Court to enter an extraordinary order in which an "Independent Expert" would be appointed that would not only perform a forensic collection, but would be given plenary unreviewable authority to determine what documents are responsive, and to produce them to AT&T.  AT&T argues that its proposed order would "ensure that responsive information is preserved in a forensically sound manner while protecting any of BTB's preserved privacy interests." DE 104-1 at 11: 5-6.  It does nothing of the kind.

Although the proposed order has a (flawed) provision concerning the protection of privileged documents, there is no provision for BTB/MTS to conduct any review of the many documents that may be swept up by the "expert's" word searches to determine whether they are in fact responsive, let alone whether they are commercial sensitive or invade the privacy of the individuals whose devices have been imaged.

Nor is there any reason why BTB/MTS' ESI vendor cannot proceed in the ordinary course to "ensure that responsive information is preserved in a forensically sound manner."  To justify its highly unusual proposal, AT&T gins up a series of accusations and insinuations of malfeasance, dishonesty, and gross negligence by BTB/MTS and its counsel.  The most (apparently) serious accusation is the insinuation that BTB/MTS may have lost or deleted information that it was obligated to preserve.  But that accusation depends on the meritless contention that BTB/MTS preservation obligations commenced years ago.  BTB/MTS is a third party, and had no obligations to preserve evidence prior to receiving the subpoena in this case.  AT&T's theory as to why BTB/MTS has extra obligations due

---

[1] As in other briefing, we will use "BTB/MTS" to refer to Below the Blue, Marine Taxonomic Services, Ltd., Seth Jones and Monique Rydel- Fortner.

Joshua Koltun ATTORNEY

to its "role in this dispute" turn the law on its head – in fact BTB/MTS "role" in assisting the *Journal's* investigation provides special protection from discovery, not special obligations.

Indeed, AT&T's brief relies generally on Rule 34 cases involving parties, who, among other things, would have met-and-conferred and reached agreement as to how to handle ESI prior to serving Rule 34 discovery.  The situation for third parties is different in this and other respects.  As explained below, AT&T's accusations of malfeasance or gross negligence are similarly based on legally and factually unsound premises.

### *Factual and Procedural Background*

It is not seriously disputed that BTB/MTS was unable to find counsel, through no fault of its own, before engaging Koltun (the undersigned).[2]  DE 99 at 7:6-18.  AT&T appears to have dropped its contention that BTB/MTS was represented by Mr. Papachristou of the Vance Center (DE 88 at 2:1-17), since its proposed protocol only recognizes attorney-client privilege as commencing the day Koltun was engaged which, according to AT&T, is the first date attorney-client privilege can "conceivably" start.)  DE 104-1 at 8:1-2.  Although AT&T now contends that Jones' uncounseled objections to the subpoena did not come until after the "deadline came and went," that statement is based on the false premise that the subpoena was served on August 4.  DE 104-1 at 2:27, 3:2.  In fact, as AT&T previously, and correctly, acknowledged, the subpoena was served on August 9, and the objection was made before the deadline had passed.  DE 65-1 at 1:13; 3:14-21; *see also* 104-1 (noting that deadline was August 23 -- not August 18).  AT&T refused to give MTS/BTB any extension of time to respond unless it agreed in advance to produce all requested documents.  DE 65-18 at 3.

Koltun was engaged on November 22, the day before Thanksgiving, and introduced himself to AT&T counsel on November 24.   Koltun Decl., ¶ 1, Exh. 1.  He proposed that, now that MTS had obtained counsel, that AT&T stipulate to give MTS a brief opportunity to respond to the various

---

[2]It would be naïve imagine that BTB/MTS simply had a string of bad luck in securing counsel. The fact that several of the large firms on the Vance Center's roster expressed interest in representing BTB/MTS -- some going so far as to agree to represent them, only to later withdraw -- suggests that these large firms ultimately decided not to represent them so as not to run the risk of being conflicted out of potentially lucrative defense work on future toxic tort cases involving lead-clad cables.

subpoenas so that the parties could expeditiously meet and confer and determine what disputes existed and present any such disputes to the Court.  *Id.*  AT&T counsel did not respond at all until Tuesday afternoon, November 28, at which point they proposed talking the next day.  *Id.*.  That same evening Koltun sent formal objections and responses to the subpoenas on behalf of the BTB/MTS.  *Id.*  The next morning (the 29th) Koltun and AT&T counsel met and conferred by Zoom call and followed up by email. *Id.*

Defense counsel did not give an inch of courtesy.  *Id., ¶* 2.  They declined to extend the November 30 deadline for BTB/MTS to produce documents (the next day), declined to extend the time to file a response to an OSC to MTS in the Southern District, also due the next day.  *Id.* They declined to stipulate that all matters concerning discovery from BTB/MTS be consolidated in this Court.  *Id.*   So Koltun was forced to file a motion for extensions of time with the Court, (ii) a motion in the Southern District to consolidate the proceeding concerning an identical subpoena to MTS in this Court, at the same time as (iii) he worked with BTB/MTS to make the massive production of documents, software files and videos discussed below.  *Id.*

On December 2, AT&T counsel emailed Koltun, complaining that BTB/MTS was "in violation" of the Court's order, and contending that BTB/MTS's request for extension "did not seek relief for the production obligations that the Court required."  *Id., ¶* 3*,* Exh. 2.  This assertion was mystifying, because the request had asked, among other things, for an "extension to produce all documents as to which there is no objection, from November 30 until December 7th."  DE 87 at 4:9  AT&T informed Koltun that it would "ask the Court to permit collection of BtB's files by an independent third party e-discovery vendor to facilitate compliance with the order … we intend to ask the Court to order this collection as soon as possible."  *Id.*  AT&T suggested four possible vendors, one of which was A&M.  *Id.*

AT&T's description of the process whereby BTB/MTS collected documents for production is incorrect, notwithstanding purportedly "confirming" emails or counsel's self-serving descriptions of the contentious and accusatory interrogations that occurred in the various meet-and-confer sessions. *Id., ¶* 4. Koltun had multiple lengthy discussions with Jones and Rydel-Fortner regarding the requests in the subpoena and what sorts of documents would be responsive.  *Id.*  Jones and Rydel-Fortner collected

1   documents potentially responsive to the requests and posted them on a shared drive so that Koltun could

2   review them and discuss them further.  *Id.*  Jones and Rydel-Fortner collected documents from files/folders

3   that they knew would contain responsive documents as well as conducted word searches for documents

4   and emails.  Koltun reviewed these collections of documents and made the productions that followed.  *Id.*

5   Koltun then sought to have an informal discovery conference as soon as possible, preferably before

6   December 7, but AT&T counsel did not make themselves available until December 21.  *Id.*

7          BTB/MTS produced thousands of pages of documents on December 4, and some more on

8   December 6.  *Id.,* ¶ 5. Documents that could be converted to PDF were converted to word-searchable PDF

9   and bates-stamped.  *Id.*  Numerous files that could not be converted to PDF, such as videos and

10  geolocation files were produced in native format.  *Id.*[3]  The documents were organized to correspond to the

11  requests in the subpoena, and BTB/MTS later supplied a roadmap that itemized the production by bates-

12  number.  *Id.* On December 7, the Court extended the deadline to produce documents as to which there was

13  no objection to December 7.  DE 90.

14         Koltun and AT&T counsel then met and conferred concerning this production.  AT&T made a

15  number of assertions about the purported legal deficiencies in the production, the merits of which are

16  discussed below.  Koltun Decl., ¶ 6.  Whatever the merits of those arguments, Koltun was willing to seek

17  to produce ESI in formats that enabled metadata to be associated with the produced documents.  *Id.*

18         In AT&T's informal brief concerning the motion to reconsider, it asserted that BTB/MTS's

19  production was missing some documents that had been produced by other witnesses. *Id.* ¶ 7. Seeing that,

20  Koltun consulted with BTB/MTS to determine why documents might have been missed.  *Id.* In meet-and-

21  confer discussions  AT&T declined to provide copies of the missed documents that might help BTB/MTS

22  refine its search, and has also declined to suggest what search terms it would propose to use. *Id.*

23         The night before the December 21 hearing, AT&T counsel (Kelley) sent an email that, among

24  other things, contained various suggestions as to how BTB/MTS might be able to produce certain

25  documents in native format.  *Id.,* ¶ 8. At the hearing, the Court urged the parties to meet and confer and

26

27          _____

          [3] AT&T described this production to the Court as "a few documents."  DE 88 at 3:16.

28

Joshua Koltun ATTORNEY

1   seek to resolve the issues concerning the production.  *Id.*  Koltun emailed Mr. Kelley to see if they could

2   discuss his suggested solutions.  *Id.*

3          Koltun conferred by Zoom with Messrs. Kelley and Nomellini and Ms. Harrison on December 22.

4   *Id, ¶.9.*  Koltun noted that there seemed to be a number of technical difficulties with Mr. Kelley's

5   suggestions.  *Id.*  Mr. Nomellini indicated, and Koltun agreed, that from a technical point of view it

6   would be preferable to have a vendor handle the issues of collection and preservation of ESI.  *Id.*Mr.

7   Nomellini sketched out a proposed protocol whereby (i) AT&T would hire a vendor that would collect

8   the devices from BTB/MTS and perform searches, (ii) the fruits of those searches would be disclosed

9   to both parties, with (iii) some sort of measure being taken to hold back documents subject to

10  BTB/MTS claim of privilege.  *Id.*  Koltun indicated that such a protocol might be acceptable to

11  BTB/MTS if the documents were provided directly only to BTB/MTS, which would then review for

12  responsiveness and privilege before producing.  *Id.*  Mr. Nomellini responded that that would be

13  unacceptable to AT&T because AT&T would be paying for the vendor. *Id.* Koltun then suggested that

14  although the parties might disagree about that issue, and present it to the court for resolution, in the

15  meantime it would speed up the production if his proposal were adopted in the interim, with AT&T

16  reserving its rights to ask for the court to impose its proposal. Mr. Nomellini declined to accept such

17  an interim solution.  *Id., see also* Exh 2 (Koltun email to Kelley, 1.2.2024.)

18         Koltun then went ahead and sought to engage such a vendor directly to begin work on the

19  forensic collection.  *Id.* ¶ 10.  Although Koltun felt that hiring an ESI vendor was overkill for a third

20  party , Koltun was persuaded that the technical capabilities of the vendor to conduct searches would

21  be superior to the limitations of the various software on BTB/MTS devices.  *Id.*  Given the contentious

22  and accusatory atmosphere between the parties, Koltun hoped that hiring a reputable ESI vendor help

23  resolve the dispute, or at least put it onto a more professional and courteous footing.  *Id.*  (He was

24  wrong, apparently).  *Id.*  Ultimately BTB/MTS was able to engage A&M, one of the vendors that

25  AT&T had previously suggested.  *Id.*  A&M has completed the collection and imaging of BTB/MTS

26  devices, and the process of document searching and production is underway.  *Id.*

27         On December 28, AT&T proposed the protocol it has since asked this Court to impose. *Id, ¶.*

28  11.  On January 2, Koltun let AT&T know that he rejected the proposed protocol and was in the

Joshua Koltun  ATTORNEY

- 5 -

process of hiring an ESI vendor directly.  *Id,* & Exh. 2.  He accepted Exhibit C of the proposed protocol, concerning the technical specifications regarding the production of ESI.  *Id.[4]*  He made the following proposal to AT&T:

> If AT&T wishes to propose its own list of word searches, the vendor can run those word searches. After running word searches, the vendor can generate a preliminary "hit list," which would help determine whether a given word has created an overly expansive universe of documents to review. We can meet and confer over that. An overly expansive universe will take longer to review for responsiveness, and such review may also constitute an added expense that BTB/MTS may seek to shift to AT&T.
> *Id., see also id.* (Koltun email to Kelley, 1.8.2024).

AT&T responded by the instant motion, asking the Court to appoint a neutral "Independent Expert" who would be given the powers described in its proposed protocol.

### Argument

***I.    AT&T's proposal that the Court grant to a "independent expert" the power to act as a special master with unreviewable authority to adjudicate which documents are responsive and deliver them to AT&T, is extraordinary and unwarranted***

BTB/MTS has engaged a third-party vendor to collect devices, forensically image them, and then assist in BTB's  review and production to ensure completeness of its document production, and that work is well underway.  Koltun Decl., ¶ 10.  AT&T is not satisfied by that and has moved the Court to appoint a "neutral third party vendor" to perform the inspection and imaging  DE 104-1 at 10:18-19 (emphasis added); DE 104-5, ¶1, 4.  This "Independent Expert"[5] would essentially be appointed to act as a special master with plenary unreviewable powers to produce documents to AT&T.  *Id.,* ¶ 4.  Unless the parties reach an agreement on the "search terms" to be used in determining responsiveness, the Independent Expert "may independently select any methods they deem appropriate to identify responsive documents."  *Id.*  There is no provision for the Court to review the "methods" selected by the Independent Expert.  Having selected its method and performed

---

[4] Since that technical protocol,  Exhibit C was not attached to AT&T's motion, it is attached here as ***Exhibit 3*** to the Koltun Declaration.

[5] The term "independent" is somewhat ambiguous.  A third-party vendor such as A&M, when engaged by a party such as BTB/MTS to assist it by forensically collecting and producing documents, is being engaged as an independent consultant to provide professional and objective advice in that process.

Joshua Koltun  ATTORNEY

Joshua Koltun ATTORNEY

its search -- with the exception of a (flawed) procedure for privilege review (discussed below in section II), the purportedly responsive documents are to be directly produced to AT&T. *Id.* ¶ 5.

AT&T insists that this special master protocol "ensure[s] that responsive information is preserved in a forensically sound manner while protecting any of BtB's preserved[6] privacy interests." DE at 11:5-6. But the protocol does nothing to preserve information in a "forensically sound" manner that A&M has not already done, and it does nothing to protect privacy. Jones and Rydel-Fortner would be submitting their computers and phones to be searched,[7] and yet will have have no opportunity to review the purportedly "responsive" documents to determine whether the Independent Expert has inadvertently swept unresponsive documents into the production, including highly personal or commercially sensitive documents.

There is no legal support for the extraordinary measure that AT&T is asking this Court to impose, particularly on a third party. Even where parties are concerned, the Sedona Principles[8] notes that Rule 34 inspections of ESI are "disfavored," because the "typical production, in which the responding party identifies and produces responsive information, allows the party with the greatest knowledge of the computer systems to search and utilize the systems to produce responsive information." *Id.* at 129. In cases where such an inspection is justified, the inspection procedure should

> be narrowly restricted to protect confidential and personally identifiable
> information and system integrity as well as to avoid giving the discovering
> party access to information unrelated to the litigation. Further, courts that have
> allowed access generally have required that the inspection be performed by a
> qualified consultant or vendor, and that no information obtained through the
> inspection be produced until the responding party has had a fair opportunity to
> review that information.

---

[6] It is unclear what AT&T means by the term "preserved" here. If AT&T means to suggest that BTB/MTS only "preserved" claims of privilege, but has waived any claims of privacy, the contention is meritless, because what is at issue here is AT&T's right to obtain access to ***unresponsive*** documents, including ones that may be commercially sensitive or involve personal privacy.

[7] DE 104-3, ¶ 2 ("all computers and mobile devices …belonging to Seth Jones and Monique Fortner at any time between January 1, 2020 and the present").

[8] The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production, 19 Sedona Conf. J. 1 (2018); available at The Sedona Conference®.

*Id.* (emphasis added); *accord, id.* at 142-3 (forensic data collection is "intrusive," and only the "first step of an expensive, complex and difficult process," that in the unusual circumstances where it is warranted, it must be accompanied by a protocol to protect privacy rights, privileges, "as well as the need to avoid copying ESI that is not relevant"), 162 (importance of protecting confidentiality and privacy in ESI).

Certainly the cases relied upon by AT&T to show malfeasance/dishonesty/gross negligence by BTB/MTS do not support the requested appointment of a special master.  In some of the cases, the remedy imposed by the court did not even involve requiring the party to use a third-party ESI vendor.[9] In *Benanav v. Healthy Paws Pet Ins. LLC*, for example, the Court ordered the parties to

> meet and confer in good faith to negotiate search terms that are designed to capture documents that are responsive to Healthy Paws' discovery request. The search terms should be in a format that is compatible with Plaintiffs' existing email search capabilities.

*Id.*, *No. C20-00421-LK*, 2022 U.S. Dist. LEXIS 150550, at \*16-17 (W.D. Wash. Aug. 22, 2022); *accord Toyo Tire & Rubber Co. v. CIA Wheel Grp., No.* SA CV 15-00246-DOC (DFMx), 2016 U.S. Dist. LEXIS 184189, at \*3-5 (C.D. Cal. Feb. 23, 2016).

In *Tera II, LLC v. Rice Drilling D, LLC*, the remedy ordered was to require the deficient responding party to hire an ESI vendor to assist it with the collection and production, and to conduct certain particular word searches that were requested and that the Court had reviewed and determined were "designed to produce relevant information."  *Id. No. 2:19-cv-2221*, 2022 U.S. Dist. LEXIS 68892, at \*12-14 (S.D. Ohio Apr. 14, 2022); *Thomas v. Marshall Pub. Sch.*, No. 21-cv-2581 (PJS/DJF), 2023 U.S. Dist. LEXIS 156933, at \*45 (D. Minn. Sept. 6, 2023) (defense counsel ordered to collect personal devices used by defendants and deliver them to a third party ESI vendor to image properly).

---

[9] In one case on which AT&T relies, the "forensic review" had nothing to do with ESI.  The court was using the term "forensic review" to refer to its efforts to admonish the responding party on precisely how it should go about searching for relevant documents.  *See Stolz v. Travelers Commer. Ins. Co.*, No. 2:18-cv-1923-KJM-KJN, 2020 U.S. Dist. LEXIS 74713, at \*35 (E.D. Cal. Apr. 28, 2020)

Joshua Koltun ATTORNEY

1      The case relied upon by AT&T that comes the closest to requiring a special master involved a

2      situation very different from this one.  Again, the case involved a party, and even then, and the ESI

3      vendor was not given anything close to the unreviewable powers requested here.  In *Procaps S.A. v.*

4      *Patheon Inc.,* there had been no supervision or consultation by counsel with the client concerning the

5      document search, and there was moreover substantial reason to be concerned that the plaintiff had

6      deleted or destroyed information after the litigation had commenced.  *Id.,* Case No. 12-24356-CIV,

7      2014 U.S. Dist. LEXIS 28263, at *5--8 (S.D. Fla. Feb. 28, 2014).  The court ordered plaintiff to

8      engage a particular ESI vendor to conduct a comprehensive forensic search of the plaintiffs ESI be

9      conducted, in order to attempt to locate any files that were deleted.  *Id.* at * 8-9.  The vendor was to

10     conduct a search; but the vendor was not given free rein to determine what was responsive or not.

11     Instead, the order required the parties to

12          agree to the following: (i) a preliminary list of proposed search terms ("Search
            Terms") that [the vendor] will use to search for relevant information; (ii) a
13          reasonable procedure by which the Search Terms may be reasonably refined, if
            necessary; and (iii) a suitable format for production, including the specific
14          metadata fields to be provided. If the parties are unable to agree to the Search
            Terms, a procedure for reasonably refining the Search Terms, or a production
15          format, then the parties shall ***immediately*** raise this issue with the Court.

16     *Id.,* 9-10 (original emphasis).

17          Here, BTB/MTS is a third party, and in any event has already hired an ESI vendor to assist

18     with the document collection and searching, so there is no point in ordering it to do so.  The situation

19     here is similar to that in another case on which AT&T relies.  In that case

20          Plaintiff searched his own email accounts, text messages, and files for
            information responsive to defendants' discovery requests. Defendant avers that
21          self-collection is insufficient, that plaintiff's counsel must instead conduct their
            own search of plaintiff's materials to ensure that all responsive materials are
22          produced. In response to defendant's earlier challenges regarding self-
            collection, plaintiff has now retained a third party to collect his emails and run
23          relevant searches, and all relevant materials have been turned over to defendant.
            Defendant does not trust the completeness of this search, and it calls for further
24          imaging of plaintiff's devices to uncover any additional communications.

25     *Weinstein v. Katapult Grp., Inc.*, No. 21-cv-05175-PJH, 2022 U.S. Dist. LEXIS 181635, at *5-6 (N.D.

26     Cal. Sept. 29, 2022).  The Court drily commented that "defendant's concern about the deficiencies in

27     plaintiff's self-collection appear well-founded given that his own review failed to recover several

28

responsive documents that were produced later."  *Id.*  The court noted that the plaintiff had "***remedied the situation***, however, by retaining a third-party vendor to image his emails and text messages."  *Id.* (emphasis added).  There was "no further action for the court to compel on this issue."  *Id.*

> ### A.     AT&T's contention that BTB/MTS is some sort of quasi-party that -- based on its "role in this dispute" -- had preservation obligations that predate the Subpoena, is meritless and turns the First Amendment Reporter's Privilege on its head

The Sedona Principles note that "[c]ivil litigation should not be approached as if information systems were crime scenes that justify forensic investigation at every opportunity to identify and preserve every detail."  *Id.* at 112.  And that was in a discussion of the reasonableness limitations on the obligations of the litigants themselves; as opposed to third parties.

The most (apparently) serious accusations of malfeasance and dishonesty on the part of BTB/MTS is that BTB/MTS has "lost responsive data from their phones" and that the "murky" circumstances surrounding the "alleged data loss" warrant the extraordinary measures AT&T is seeking.  DE 104-1 at 2:5-12, 2:18-19.  The insinuation here is that BTB/MTS, "lost responsive data *that it had some obligation to preserve.*  But that insinuation is false.  There is no murkiness about that issue.  The "loss of data" at issue here occurred well before any subpoenas were issued to BTB/MTS.  Jones got a new phone in May 2023 and Rydel-Fortner got one in November 2022.  Koltun Decl., ¶ 13.[10]  In both cases their current cellphones have some text messages that predate the date they acquired the new phones, but the text messages do not go back forever.  In Jones case they only go back a few months before the new phone was acquired, and in Rydel-Fortner's there are a few messages more than a year before the new phone but not many.  *Id.*  More importantly, as Koltun

---

[10] An indication of the profound silliness of AT&T's accusations is the claim that Koltun gave "incorrect" information when he said the phones "no longer exist," because "Fortner's phone still exists but got wet during a dive, and Jones gave his phone to MTS and its fate is uncertain."  DE 104-1 at 5:5-10.  Jones traded his old phone in to AT&T and that Rydel-Forter discarded the damaged phone.  Koltun Decl., ¶ 13. So technically these phones might still "exist," but not in a practical sense.

Joshua Koltun  ATTORNEY

Joshua Koltun ATTORNEY

1   discussed with the Court on November 21, both of them freely and frequently deleted text messages

2   *prior* to receiving the subpoenas.  Koltun reminded the Court that BTB/MTS is not a party to this

3   case, and that in any event at the time the messages were deleted, the case had settled.[11]

4        In meet-and- confer discussions, AT&T took the position that if any text messages were deleted

5   that *later became responsive to the subpoena,* that constitutes spoliation and justified AT&T asking

6   the Court for an order to collect BTB/MTS's devices.  *Id.*   AT&T's theory is alluded to in its

7   reference to "BTB's prominent role in the underlying dispute."  DE 104-1 at 2:26. The theory is that

8   by virtue of BTB/MTS having (i) brought the existence of the lead-clad cables to the attention of

9   Plaintiff's counsel and (ii) assisted the investigations of lead-clad cables with the *Journal* and EDF,

10  BTB/MTS obligation to preserve documents related to this "dispute" goes back years, at least to the

11  point in 2020.  *Id., see*  DE104-3 at ¶ 2, (protocol requires Jones and Rydel-Fortner to deliver devices

12  they owned from January 1, 2020 to the present).

13       That theory is meritless.  The obligation of a third-party witness to preserve documents

14  commences when it receives a subpoena for those documents.  *See, e.g., UMG Recordings, Inc. v.*

15  *Hummer Winblad Venture Partners (In re Napster, Inc. Copyright Litig.)*, 462 F. Supp. 2d 1060, 1068

16  (N.D. Cal. 2006).[12]

---

[11] BTB/MTS will have A&M examine the existing phones to determine whether there are any text messages that were not readily visible.  Koltun Decl., ¶ 13.  AT&T has confirmed to Koltun that it does not retain the text messages of its users, e.g. Jones and Rydel-Fortner.  Koltun Decl., Exh. 2 (Kelly to Koltun, 1/3/2023 at 11:20 am).

[12] By contrast, in *Laub v. Horbaczewski,* on which AT&T relies, the plaintiff appeared not to have made any effort to preserve text messages after the litigation commenced, had produced numerous responsive text messages from the relevant period, but appeared to have selectively deleted messages only between certain parties. *Id.,* No. LA CV17-06210 JAK (KSx), 2019 U.S. Dist. LEXIS 130917, at *75-76, *90 (C.D. Cal. July 30, 2019).  The remedy was that plaintiffs were ordered to search for responsive text messages and to contact their cell phone company to determine whether any text messages were recoverable, and identify exactly when each phone was replaced.  *Id.* at *76-77.  Defendant's request that the devices be turned over to a forensic examination was *denied*.  *Id.* at *77.

In *Thomas v. Marshall Pub. Sch.*, the defendants had not searched for responsive text messages and admitted that they had deleted text messages after the litigation hold.  *Id.* No. 21-cv-

Joshua Koltun ATTORNEY

The problem with AT&T's theory is not simply that it lacks support in the law, but that it turns the law on its head. BTB/MTS's assistance to the *Journal* in gathering information for its articles on lead-clad cables only relates to a "dispute" AT&T has with the *Journal* **in the public arena**. BTB/MTS "role" in that "dispute" does not saddle it with special discovery obligations; on the contrary, under the First Amendment, it provides BTB/MTS with special protections from discovery. *See* DE 99 (Memo Supp. Mot. Reconsider/Protective Order).

### B. AT&T's other accusations of malfeasance by BTB/MTS and its counsel are factually and legally unsound

Although Koltun has attempted to meet and confer with AT&T counsel in good faith, the initial sessions were more akin to a deposition in which several AT&T counsel sought to interrogate Koltun and trap him in various purported "admissions," that are reflected in AT&T's briefing and the various self-serving purportedly "confirming" emails. Koltun Decl. ¶ 12. Attempts by Koltun to straighten out AT&T counsel's misunderstandings or mischaracterizations, or in some instances to clarify issues as to which Koltun had misunderstood information or had learned additional information, are unfairly depicted as dishonesty in AT&T's briefing. *Id.*

Significantly, AT&T's various accusations of malfeasance are suffused with fundamental misstatements of the law, of the technical nature of ESI production, and of best practices.

### 1. Although BTB/MTS has always been willing to meet and confer concerning the production of metadata, the Subpoena here did not require that it be produced

AT&T's memorandum references "violations" of Rule 34, and the cases it relies on are all cases involving parties, as opposed to third party witnesses. DE 104-1 at 4:10 , 7:23-24. But when it comes to ESI, there is an important difference between the parties and third parties. Pursuant to Rule 26(f), the parties are required to meet in advance of discovery and hash out how they are going to

---

2581 (PJS/DJF), 2023 U.S. Dist. LEXIS 156933, at *44-45 (D. Minn. Sep. 6, 2023). In that case the Court ordered defense counsel to collect the phones and turn them over to an ESI vendor. *Id.*

handle ESI.  That may or may not involve the production of metadata, and if it does, one has to work out which metadata will be provided, and in what manner.[13]  The cases that AT&T relies on are ones in which the litigants had an opportunity to discuss such issues at the outset of the case; indeed they may have stipulated to an ESI protocol that was entered by the Court.  *See, e.g., Benanav,* 2022 U.S. Dist. LEXIS 150550, at *3.  Thus *Javo Beverage Co. v. Cal. Extraction Ventures, Inc.* does not indicate that the "failure to include metadata violated Rule 34," as AT&T claims (DE 104-1 at 4:9-12, but rather that it constituted a failure to comply with a protocol to which the parties had previously agreed.  *Id.,* No.: 19-CV-1859-CAB-WVG, 2020 U.S. Dist. LEXIS 76043, at *24-25 (S.D. Cal. Apr. 29, 2020).[14]

But when a third-party witness receives a subpoena, there has been no opportunity to discuss ESI issues.  The Sedona Principles notes that parties "issuing and responding to subpoenas can avail themselves of such an opportunity informally, a best practice that should be followed." *Id.* at 132.  As the court stated, in one of the case on which AT&T relies, "the best solution in the entire area of electronic discovery is cooperation among counsel." *Toyo Tire & Rubber Co.* 2016 U.S. Dist. LEXIS 184189, at *3-5 (quoting *William A. Gross Const. Associates, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 256 F.R.D. 134, 136 (S.D.N.Y. 2009).

Koltun tried to meet and confer in good faith with AT&T concerning ESI issues, and indeed the Court urged counsel to do so.  Although BTB/MTS did not agree to the extraordinary special master protocol proposed by AT&T, it did accept "Exhibit C," the technical protocol for the production of ESI and metadata proposed by AT&T.  Koltun Decl.,¶ 11, Exh 21 (Koltun to Kelly, 1.2.2024); Exh. 3 ("Exhibit C")

It's a pretty standard technical protocol of a sort typically agreed to between litigants as part of

---

[13] For example the United States District Court for the Northern District of California provides on its website a model checklist for Rule 26(f) conferences that, among other items, lists "The extent, *if any,* to which metadata will be produced and the fields of metadata to be produced" (emphasis added.)  *See* E-Discovery (ESI) Guidelines | United States District Court, Northern District of California (uscourts.gov)

[14] In another case on which AT&T relies, the court had admonished the parties to hash out ESI-related issues in advance, but they they had failed to do so, to the court's considerable irritation. *DR Distribs., L.L.C. v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 861-62 (N.D. Ill. 2021)

a Rule 26(f) negotiation over ESI.   Oza Decl, ¶ 1.  Contrary to AT&T's assertion, Exhibit C does not "guarantee that BTB produce all documents in their native format with appropriate metadata, as has always been required by the Subpoena and Rule 34."  DE 104-1 at 7:20-24.  On the contrary, the Exhibit C protocol requires that documents be *altered* from their native formats in order to make it easier, through the specialized software used by the vendors, to perform uniform word and metadata searches across different formats, and to enable documents to be bates-stamped.

Ttake for example, an email in its native .eml or .msg format. That email, in its native format, cannot be bates-stamped on each page; instead, one can rename the individual email file name with a single bates number. *Id., ¶* 2. Exhibit C requires that email to be handled as follows.  The native email(s) will be processed and loaded into an eDiscovery platform such as Relativity. *Id.* A TIFF file of the email(s) is created at page level. *Id.* A TIFF file is an image, similar to a PDF file where each page of that TIFF file can be bates-stamped and redacted as necessary. *Id.* The text of the email is extracted and a separate "text file" is created and loaded in Relativity for keyword searching, and the metadata is extracted and stored in a database such as SQL. *Id.*

All of this is very useful in processing the information in the document production.  It is not, however, required by the federal rules, which specifically provide that that the responding party "need *not* produce the same electronically stored information in more than one form."  Fed.R.Civ.P. 34 (b)(2)(E)(iii); 45 (e)(1)(B) (emphasis added)

In fact, the Subpoena itself did not specify what metadata it sought, nor specify ESI formats. DE 65-14.  *Compare* Fed.R.Civ.P. 45(e)(1)(B); Sedona Principles at 87 ("A requesting party that seeks production of ESI should, to the greatest extent practicable, clearly and specifically indicate each item or category of electronic information it seeks). The Subpoena did, however, specifically require that Documents be produced "in complete form, with *each page* marked with consecutive document control numbers."  DE 104-4 at 9 (emphasis added).  As explained above, that can only be done on an image such as a TIFF or PDF file, so it is *inconsistent* with producing the documents in native format.  Given this specific instruction, BTB/MTS made an initial production of documents in bates-stamped, word-searchable PDF form to comply with the subpoena in good faith, pending any further discussion of ESI issues.  Koltun Decl., ¶ 5.

1

2          **2.      There is nothing wrong with the responding party's personnel gathering**

3          **responsive documents; the attorney should be involved in the process but is
           certainly not responsible for collecting and searching the information himself**

4

5          According to AT&T, "in violation of the most fundamental principles of e-discovery, what

6  documents BTB has produced did not result from a document review conducted by an attorney," but

7  rather, "documents were self-selected by BtB's principals," Jones and Rydel-Fortner.  DE 104-1 at

8  1:21-23.  According to AT&T, Koltun should have "collect[ed] the computers and electronic devices"

9  from BTB/MTS and "conduct[ed] the review himself."  *Id.* at 5:3-5.

10         There is no such "fundamental principle" and the cases that AT&T cites concerning "self-

11 collection" say nothing of the kind.  What they say is that an "attorney or forensics expert" should

12 provide "direction and oversight."  *See* DE 104- 9:8-11 (quoting *Tera II, L.L.C.*, 2022 U.S. Dist.

13 LEXIS 68892 *14 (quoting the Sedona Principles)).[15].

14         That is exactly what happened here.  Koltun held extensive discussions with Jones and Rydel-

15 Fortner concerning the requests in the subpoena, and they searched for and collected documents,

16 which they posted to a shared drive so that he could review the documents, discuss them with Jones

17 and Rydel-Fortner, and produced them.  Koltun Decl., ¶ 4.

18         As the court commented, in one of the cases on which AT&T relies,
           Here, plaintiff is in the best position to determine the appropriate scope of the

19         search to respond to defendant's discovery requests. As the Sedona Principles
           recognize, "Responding parties are best situated to evaluate the procedures,

20         methodologies, and technologies appropriate for preserving and producing their
           own electronically stored information."

21 *Weinstein*, 2022 U.S. Dist. LEXIS 181635, at *4-5 (quoting Sedona Principle 6).  As the Sedona

22 Principles comment,

23         To meet its preservation and production obligations, the responding party must

24

25 _____

26         [15]  As the Sedona Principles note, "Self-collections by custodians may give rise to questions
   regarding the accuracy and completeness of collections if directions and oversight by legal counsel or

27 forensics experts are poor or non-existent."  *Id.* at 168.  While Koltun disputes that his supervision
   was poor, he nevertheless has engaged A&M precisely to create confidence in the collection.

28

Joshua Koltun ATTORNEY

Joshua Koltun ATTORNEY

1
2
3
4
5
6

> make a myriad of determinations necessary to identify, preserve, collect, process, analyze, review, and produce relevant and discoverable ESI for each case. The lack of uniformity and varying degrees of complexity in organizations and their information systems often require a very specific, indepth understanding of how that party handles its own information. …the analysis cannot be reduced to a generalized checklist of reasonable steps for every party to take in every action. …Instead, the responding party must make decisions on what is required to meet its preservation and production obligations **based on direct input from those inside the organization who create, receive, and store their own information (i.e., individual custodians) …** Rarely will a court or opposing party have direct access to the specific knowledge required to make those decisions.

7   Sedona Principles at 119, 120 (emphasis added).

8
9
   **3.   Word searches are not some magical technique to determine responsiveness; they are one method of seeking to ensure that all potentially relevant documents are collected to be reviewed for responsiveness**

10   Since, as discussed in the foregoing sections, the responding party has a superior

11   understanding of its own documents, it follows that the responding party is entitled to review any

12   documents found via a word search to determine whether the documents that are swept up in the word

13   search are, in fact responsive – not to mention sensitive or private.  Thus, for example, in one of the

14   cases relied upon by AT&T, the court rejected one of the requesting parties proposed word searches,

15

16   commenting that "Defendant's insistence on compelling plaintiff **to search for and review** all

17   documents that solely mention broad generic terms (e.g., "Options," "Advisor," "Shares," and

18   "Equity") over a seven-year period, without any reference to defendant or the Advisor Agreement, is

19   an improper fishing expedition, not proportional to the needs of the case."  *Weinstein*, 2022 U.S. Dist.

20   LEXIS 181635, at *4-5 (emphasis added).  In other words, the purpose of the word search is to find

21   *potentially* responsive documents, to be reviewed by the responding party and counsel to determine

22

23   whether they are in fact responsive.  AT&T suggests that there was something improper in BTB/MTS

24   insistence that it be allowed to review the results of the search to determine which documents were

25   responsive, but in fact that is a necessary best practice, and typically what is done.  *See* Sedona

26   Principles at 119-20, 129, 142-43.

27
28

- 16 -

Word searches are simply one way in which a party can seek to find potentially responsive documents, particularly in a large organization in a case in which many individuals were involved. It is certainly not some magic technique that can be used to determine responsiveness. As one court has commented:

> This case is just the latest example of lawyers designing keyword searches in the dark, by the seat of the pants, without adequate (indeed, here, apparently without any) discussion with those who wrote the emails. … [T]he message has not gotten through to the Bar in this District. … [W]here counsel are using keyword searches for retrieval of ESI, they at a minimum must carefully craft the appropriate keywords, with input from the ESI's custodians as to the words and abbreviations they use, and the proposed methodology must be quality control tested to assure accuracy in retrieval and elimination of "false positives."

*William A. Gross Constr. Assocs.*, 256 F.R.D. at 135-36.

AT&T has not gotten the message either. It seems to think that an "Independent Expert" will have superior knowledge to BTB/MTS about its documents, and that the "expert"will be able to determine responsiveness by its own word searches or whatever methods it deems appropriate. DE 104-3 at ¶4.

AT&T complains that BTB/MTS has not disclosed the terms it used to search for documents, and is critical of BTB/MTS for locating documents based on its own knowledge of the facts and where documents are kept. DE 104-1 at 2:17-18. BTB/MTS intends to rerun its searches using the superior word-searching capabilities of A&M, as well as A&M's ability to use data analytics to search for documents that are similar to those BTB/MTS previously found and produced based on their superior knowledge of their own files. Koltun Decl.,, Exh. 2 (1.2.2024 email Koltun to Kelley). Once it has rerun the searches, BTB/MTS is willing to share the search terms that it used.

But the issue is a red herring. AT&T's complaints about this are not well taken, because BTB/MTS has consistently and repeatedly offered to run searches using terms that AT&T would propose. AT&T has declined to propose any such search terms. *Id.*, Exh. 2 (1.8.2024 email).

**II.    *The provisions of AT&T's proposed order concerning the scope of the privilege and the privilege log are unsound***

The news media generally don't, and are not expected to, produce privilege logs concerning the Reporter's Privilege, because the breadth of that privilege concerning unpublished information is such that the log itself would "reveal[] information itself privileged or protected." Fed.R.Civ.P. 26(b)(5)(A)(ii); *Chestnut v. Kincaid*, No. LKG-20-2342, 2022 U.S. Dist. LEXIS 20700, at *6-7 (D. Md. Feb. 4, 2022). Nevertheless, BTB/MTS has agreed to produce a privilege log concerning matters as to which it claims Reporter's Privilege, without waiving its right to withhold from that log information that is itself privileged.

AT&T's proposed protocol artificially limites BTB/MTS claims of privilege by date parameters that are unsupported by law.

With respect to the Reporter's Privilege, BTB/MTS will not claim such privilege as to communications or document that predate its first involvement with the investigations on which it assisted the *Journal.* But there is no reason to think that the privilege terminates on the day the *Journal* published the first of its articles about lead-clad cables, July 9, 2023. DE-104-3, ¶ 5. The *Journal* continued to publish articles on the subject after that, and indeed published one today:[EPA Calls on Telecom Executives to Meet About Lead-Sheathed Phone Cables - WSJ](#), attached as Koltun Decl., Exh.4. But even if the *Journal's* reporting on lead-clad cables had definitively ceased, the reporters might well continue to discuss unpublished information that had been gathered as part of that earlier investigation, and such information continues to be privileged.

With respect to the Attorney-Client Privilege, AT&T's proposed protocol has things exactly backwards. Since the proposed protocol recognizes attorney-client privilege starting only on the date that Koltun was first engaged, AT&T is impliedly (and correctly) dropping its contention that Mr. Papachristou was representing BTB/MTS in this action.

But the fact that BTB/MTS did not ***engage*** legal counsel prior to Koltun does not mean that there is no privilege as to BTB/MTS communications with the Vance Center or any of the other lawyers with which it communicated in an ***attempt*** to secure counsel. "Prospective clients' communications with a view to obtaining legal services are plainly covered by the attorney-client privilege under California law, regardless of whether they have retained the lawyer, and regardless of

Joshua Koltun ATTORNEY

whether they ever retain the lawyer." *Barton v. United States Dist. Court*, 410 F.3d 1104, 1111 (9th Cir. 2005)

On the other hand, although the privilege clearly exists between BTB/MTS and Koltun, there is no need to produce a privilege log to the (ongoing!) communications between counsel and client. As one of the case relied upon by AT&T indicated "Any communications to or from … Defendants' litigation counsel—shall be excluded from the production and need not be logged in Defendants' privilege log." *Thomas*, 2023 U.S. Dist. LEXIS 156933, at *46 (D. Minn. Sep. 6, 2023).  Although "Rule 26(b)(5) does not contain a carve-out, '[c]ourts in this circuit routinely deny a motion to compel a privilege log of attorney-client communications or work product dated after commencement of litigation.'"  *Guillory v. EHM Prods.*, No. CV 22-6185 FLA (RAOx), 2023 U.S. Dist. LEXIS 129685, at *9-10 (C.D. Cal. July 25, 2023) (collecting authorities).

It is highly doubtful that AT&T has been providing, or would ever be willing to provide plaintiff with a running privilege log of all of its own ongoing communications amongst  the client and counsel.  That would be quite a task, given the number of attorneys AT&T throwing at this case. That AT&T would seek to require a third-party witness to provide such a log is an indication of the harassing and abusive nature of this discovery dispute.

### III.    Under Rule 45(d)(2)(B)(ii), AT&T is required to pay for any significant expense incurred by BTB/MTS in responding to the subpoena, including the cost of the ESI vendor it has hired.

As if this were a reason to grant its requested protocol, AT&T notes that it is "willing to bear the cost." DE 104-1 at 6:16.  But AT&T's willingness is irrelevant.

> Rule 45(d)(2)(B)(ii) requires the district court to shift a non-party's costs of compliance with a subpoena, if those costs are significant. The plain language of the rule dictates our conclusion. The rule states that the district court's order compelling compliance with a subpoena "***must*** protect a person who is neither a party nor a party's officer from significant expense resulting from compliance," Fed. R. Civ. P. 45(d)(2)(B)(ii) (emphasis added), and provides no exceptions. This language leaves no room for doubt that the rule is mandatory.

*Legal Voice v. Stormans Inc.*, 738 F.3d 1178, 1184 (9th Cir. 2013).  Consequently BTB/MTS is entitled to seek to force AT&T to bear the cost of hiring A&M to the extent the cost is "significant." *Id.*

Joshua Koltun ATTORNEY

The question whether any costs resulting from the subpoena are "significant" can only be determined on a full record after the costs have been incurred.  Thus, for example, in one case, a third party witness paid an ESI vendor $22729 for its services, as well as "a large amount of attorney fees," in responding to a subpoena.  *Barracuda Networks v. J2 Glob.*, No. 2:19-mc-00146-PSG (PJWx), 2020 U.S. Dist. LEXIS 183538, at *3-4 (C.D. Cal. July 17, 2020).  The requesting party argued that the amount spent on the vendor was "not significant to a company like [the witness], which is worth billions of dollars."  *Id.*  The court disagreed, and awarded the full amount of the vendor costs, as well as attorney fees in the amount of $52,110.  *Id,* *4,*10.

### *Conclusion*

Contrary to AT&T's meritless arguments, BTB/MTS is a third party, not some sort of quasi-party with special obligations.  AT&T contends that the protocol it is asking the Court to impose would "ensure that responsive information is preserved in a forensically sound manner while protecting any of BTB's preserved privacy interests.  DE 104-1  at 11: 5-6.  But AT&T has given no reason to suppose that A&M's forensic collection is insufficient. The protocol makes no effort to protect privacy interests, and on the contrary, is a serious departure from accepted ESI best practices.  The supposed justifications for the extraordinary order are founded on unsound legal premises.  For these reasons, BTB/MTS respectfully urge that the motion be denied.

January 11, 2024

                          /s/

Joshua Koltun
Attorney for Third Party Witnesses Below the Blue, Marine Taxonomic Services, Ltd, Seth Jones, and Monique Rydel-Fortner