1
2
3
4
5
6
7
8

Joshua Koltun (Bar No. 173040)
One Sansome Street
Suite 3500, No. 500
San Francisco, California  94104
Telephone:  415.680.3410
Facsimile:  866.462.5959
joshua@koltunattorney.com

Attorney for Third Party Witnesses
Below the Blue,
Marine Taxonomic Services, Ltd,
Seth Jones, and Monique Rydel-Fortner

9    UNITED STATES DISTRICT COURT

10   EASTERN DISTRICT OF CALIFORNIA

11
12
13   CALIFORNIA SPORTFISHING
     PROTECTION ALLIANCE,
14
              Plaintiff,
15   v.

16   PACIFIC  BELL TELEPHONE COMPANY

17
              Defendant
18

Case 2:21-cv-00073-JDP

**BELOW THE BLUE et al.'s REPLY
MEMORANDUM IN SUPPORT OF ITS
MOTION TO PARTIALLY
RECONSIDER ORDER TO COMPEL
AND FOR A PROTECTIVE ORDER**

19
20
21
22
23
24
25
26
27
28

Joshua Koltun ATTORNEY

*TABLE OF CONTENTS*

TABLE OF AUTHORITIES ............................................................................................................ii

Introduction.................................................................................................................................1

Argument ....................................................................................................................................2

I.    Reconsideration is appropriate because BTB/MTS had timely objected but was barred from presenting the facts and arguments supporting its claim of privilege.............................................2

II.   AT&T's procedural objections are meritless. ...................................................................................2

    A.   A privilege log is not required for assertions of the Reporter's Privilege, and is certainly not a prerequisite to moving for a protective order.............................................................2

    B.   It is proper for Marine Taxonomic Services, Ltd., Jones, and Rydel Fortner to join the motion ........................................................................................................................5

III.  BTB/MTS is a "reporter" for purposes of the Reporter's Privilege to the extent that it gathered information for purposes of a public report – as AT&T's own evidence demonstrates.................6

IV.   AT&T has not met its heavy burden of showing that this is one of the exceptional cases in which the Reporter's Privilege is overcome .........................................................................................12

    A.   AT&T has not shown by "clear and convincing" evidence that BTB/MTS has waived the Reporter's Privilege; indeed the legal principles on which it relies undercuts AT&T's claim of waiver ........................................................................................................12

    B.   AT&T cannot meet the exacting Shoen II test merely by declaring that it "seeks all of BTB's relevant information" – AT&T's interpretation of the test would eliminate the Reporter's Privilege .........................................................................................................13

Conclusion ....................................................................................................................................15

### TABLE OF AUTHORITIES

**Cases**

*Anti-Defamation League of B'nai Brith v. Superior Court,* 67 Cal. App. 4th 1072, 1092-94 (1998) .....9

*Beaver Cty. Emplrs. Ret. Fund v. Tile Shop Holdings, Inc.,* No. 16-mc-80062-JSC, 2016 U.S. Dist. LEXIS 74205, at *9 (N.D. Cal. June 7, 2016). ....................................................................9

*Branzburg v. Hayes,* 408 U.S. 665, 694-95 (1972) .............................................................................6

*Chestnut v. Kincaid*, No. LKG-20-2342, 2022 U.S. Dist. LEXIS 20700, at *6-7 (D. Md. Feb. 4, 2022); .........................................................................................................................................3

*Chevron Corp. v. Berlinger*, 629 F.3d 297, 308 n.4 (2d Cir. 2011) ................................................8

*Cusumano v. Microsoft Corp.*, 162 F.3d 708, 714 (1st Cir. 1998) .................................................7

*Damiano v. Sony Music Ent.*, 168 F.R.D. 485, 499 (D.N.J. 1996) .................................................3, 13

*F. Marc Schaffel Prods., Ltd. Liab. Co. v. TMZ Prods.*, *No.* CV 10-01306 GHK (SSx), 2010 U.S. Dist. LEXIS 151990, at *2-3 (C.D. Cal. Dec. 16, 2010). ..........................................................14

*Farr v. Pitchess,* 522 F.2d 464, 467-68 (9th Cir. 1975) ....................................................................7

*Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130-31 (9th Cir. 2003) ..........................3

*Gonzales v. NBC*, 194 F.3d 29, 35 (2d Cir. 1998) .........................................................................14

*Greater Chicago. v. Cty. of Cook*, 1998 U.S. Dist. LEXIS 2991, at *14-16 (N.D. Ill. Mar. 10, 1998) ..9

*In re Grand Jury Proceedings*, 5 F.3d 397, 402 (9th Cir. 1993) ...................................................7

*In re McCray*, 928 F. Supp. 2d 748, 755 (S.D.N.Y. 2013) ...........................................................9

*In re von Bulow,* 828 F.2d 94, 96, 100-103 (2d Circ. 1987). .......................................................12

*Kurzynski v. Spaeth*, 196 Wis. 2d 182, 197-98, 538 N.W.2d 554, 560 (1995) ............................14

*L.A. Mem'l Coliseum Com. v. Nat'l Football League*, 89 F.R.D. 489, 494 (C.D. Cal. 1981) ............13

*Livingston v. Kehagias*, No. 5:16-CV-906-BO, 2018 U.S. Dist. LEXIS 39545, at *7-8 (E.D.N.C. Mar. 9, 2018) ............................................................................................................................3

*McKevitt v. Pallasch*, 339 F.3d 530, 533 (7th Cir. 2003) ..............................................................4

*Mosely v. City of Chicago*, 252 F.R.D. 421, 426-27 (N.D. Ill. 2008) ...........................................4

*Mosley v. City of Chi.*, 252 F.R.D. 445, 448 (N.D. Ill. 2008) ......................................................4

Joshua Koltun ATTORNEY

*Palandjian v. Pahlavi*, 103 F.R.D. 410, 413 (D.D.C. 1984)....................................................................2

*Relevant Grp., LLC v. Nourmand*, No. CV 19-5019-ODW (KSx), 2021 U.S. Dist. LEXIS 262721, at

   *19-20 (C.D. Cal. July 26, 2021)....................................................................3

*Schoolcraft v. City of N.Y.*, No. 10 Civ. 6005 (RWS), 2014 U.S. Dist. LEXIS 56033, at *10-12

   (S.D.N.Y. Apr. 18, 2014)....................................................................4

*Shoen v. Shoen*, 48 F.3d 412, 416 (9th Cir. 1995) ("*Shoen II*") .........................................12, 13, 14, 15

*Shoen v. Shoen,* 5 F.3d 1289, 1295 (9th Cir. 1993) ("*Shoen I*") ....................................................passim

*Sines v. Yiannopoulos*, 2020 U.S. Dist. LEXIS 190520, at *16-17 (S.D.N.Y. Oct. 14, 2020)...............8

*Sony Comput. Entm't Am., Inc. v. Great Am. Ins. Co.*, 229 F.R.D. 632, 633-34 (N.D. Cal. 2005) .........3

*United States v. Cuthbertson*, , 630 F.2d 139, 143 (3d Cir. 1980).........................................................13

*von Bulow v. von Bulow*, 811 F.2d 136, 142-44 (2d Cir. 1987)). ....................................................8, 12

**Rules**

Fed. R. Civ. P. 26....................................................................3

Fed. R. Civ. P. 45....................................................................3

*Introduction*

AT&T argues that BTB/MTS[1] was merely a "source" for the *Journal* article, not a reporter. But as the Ninth Circuit has explained, a "reporter" for purposes of the First Amendment is anyone who gathers information with the intent, at the time, to make a public report. BTB/MTS did not simply provide the *Journal* with information that it already possessed, but rather embarked on a months-long investigation together with the *Journal's* reporters, in which it gathered information that would be published by the *Journal,* EDF, and BTB/MTS itself. That all three had the intention of making a public report from the outset of the investigations is shown not only by Seth Jones's testimony, but also by several documents that AT&T has put into the record.

AT&T confuses the issues by constantly referring to BTB/MTS's role in bringing the lead-clad Cables in Lake Tahoe to the attention of plaintiff. BTB/MTS is not claiming privilege as to that, or as to any interactions it may have had with plaintiff. BTB/MTS is only claiming privilege as to matters concerning the foregoing investigations with the *Journal* and EDF, which began after this case had settled.

AT&T seems to have dropped the contention that the disclosure of any information by EDF is a "subject matter waiver" of all information concerning lead-clad cables. But AT&T persists in importing inappropriate concepts of waiver from the attorney-client context. AT&T argues that it is BTB/MTS burden to prove, not only that it did not share unpublished information, but that no one else has shared such information. But there is no authority for the proposition that it is BTB/MTS's burden to show a lack of waiver. The whole concept that disclosure to a third party waives the Reporter's Privilege is unsound, because that privilege, unlike the attorney-client privilege, does not depend on confidentiality.

AT&T asserts that it can overcome the Reporter's Privilege because it is demanding "all of BTB's relevant documents," by which it means any *discoverable* documents. But the test is whether it can show that the documents are "clearly relevant to an important issue in the case," and the

---

[1] As in other briefing, we will use "BTB/MTS" to refer to Below the Blue, Marine Taxonomic Services, Ltd., Seth Jones and Monique Rydel- Fortner. Whether the latter three are entitled to join this motion is discussed below in section II.B.

Joshua Koltun ATTORNEY

relevance cannot be merely potential.  AT&T makes no attempt to show that it can meet that standard.

Indeed, by its own admission, it is seeking documents for impeachment purposes, which the Ninth

Circuit has specifically held does not meet the test.

*Argument*

**I.    *Reconsideration is appropriate because BTB/MTS had timely objected but was barred from presenting the facts and arguments supporting its claim of privilege.***

AT&T contends that BTB/MTS was represented by counsel prior to engaging Koltun.  DE 113

at 4:5-19, 6:16-19.  But AT&T obviously doesn't believe that.  In its motion to compel, filed

simultaneously with this motion, AT&T proposes a protocol for creation of an attorney-client

privilege log commencing on November 22, 2023, the day Koltun was engaged.  According to AT&T,

that is the first date attorney-client privilege could "conceivably" start.  DE 104-1 at 8:1-2.

Acting without counsel, BTB/MTS made a timely informal objection that preserved the

privilege at issue.  DE 65-18 at 2. *Palandjian v. Pahlavi*, 103 F.R.D. 410, 413 (D.D.C. 1984)

At the hearing on November 9, Jones told the Court that Papachristou of the Vance Center had

been trying unsuccessfully to secure counsel for BTB/MTS, a fact (i) the Court was familiar with, (ii)

was reflected in the record before the Court, and (iii) was confirmed by AT&T counsel.  DE 65-16 at

3; DE 81 at 10.  The Vance Center's "representation" was limited to these efforts to find counsel, an

arrangement that is reflected on the Vance Center's website and the terms of its engagement

agreement.  DE 100, ¶ 10 & Exh. A.

The reason BTB/MTS was not previously able to present these issues at the hearing was that it

was legally barred from doing so, as the Court noted at the time.  DE 81 at 5.  Now that BTB/MTS has

secured counsel who can, for the first time, present facts and arguments to support the claim of

Reporter's Privilege, reconsideration is appropriate.

**II.    *AT&T's procedural objections are meritless.***

    **A.    *A privilege log is not required for assertions of the Reporter's Privilege, and is certainly not a prerequisite to moving for a protective order.***

BTB/MTS has agreed to provide a privilege log concerning the documents as to which it

claims Reporter's privilege, without waiving its right to do so in a manner "that does not "reveal[]

Joshua Koltun ATTORNEY

1    information itself privileged." Fed. R. Civ. P. 26(b)(5)(A)(ii); 45(e)(2)ii).

2        AT&T contends that BTB/MTS's failure to provide a privilege log concerning the Reporter's

3    Privilege in advance of this motion is a "failure of proof" that is fatal to this motion.  DE 113 at 7:16-

4    8:6.[2]  That contention is meritless.

5        The reason that privilege logs are automatically produced for attorney-client communications,

6    is because there is a ***presumption*** of confidentiality as to any with the attorney, but the presumption is

7    lost if the communication is disclosed to a third party.  *Sony Comput. Entm't Am., Inc. v. Great Am.*

8    *Ins. Co.*, 229 F.R.D. 632, 633-34 (N.D. Cal. 2005). Thus a privilege log is a quick way to filter out the

9    communications as which the presumption does not apply, in which case the burden is then on the

10   proponent of the privilege to show that disclosure to that third party was "reasonably necessary to

11   accomplish the client's purpose in consulting counsel." *Id.* at 634.

12       By contrast, the Reporter's Privilege protects not only "confidential" information but also

13   "unpublished information."  *Shoen v. Shoen,* 5 F.3d 1289, 1295 (9th Cir. 1993) ("*Shoen I")*.  Thus,

14   unlike the attorney-client privilege, the presence of a non-journalist does not negate the privilege.

15   *Damiano v. Sony Music Ent.*, 168 F.R.D. 485, 499 (D.N.J. 1996).  A privilege log regarding

16   Reporter's Privilege is thus not very useful, and is difficult to create without disclosing unpublished

17   information.

18       For this reason, courts have held that a reporter need not produce a privilege log as to what she

19   claims is covered by the Reporter's Privilege.  *Chestnut v. Kincaid*, No. LKG-20-2342, 2022 U.S.

20   Dist. LEXIS 20700, at *6-7 (D. Md. Feb. 4, 2022); *Livingston v. Kehagias*, No. 5:16-CV-906-BO,

21   2018 U.S. Dist. LEXIS 39545, at *7-8 (E.D.N.C. Mar. 9, 2018).  Other courts, leaving open the

22

23       [2] Many of the cases cited by AT&T simply stand for the proposition that the court may order
     the person claiming privilege (generally attorney-client privilege) to prepare a privilege log, which
24   BTB/MTS has already agreed to do.  *See, e.g., Relevant Grp., LLC v. Nourmand*, No. CV 19-5019-
     ODW (KSx), 2021 U.S. Dist. LEXIS 262721, at *19-20 (C.D. Cal. July 26, 2021)
25       *Foltz v. State Farm Mut. Auto. Ins. Co.*, on which AT&T relies, is inapposite.  *Id.,* 331 F.3d
26   1122, 1130-31 (9th Cir. 2003).  That case did not involve a protective order that addresses a disputed
     issue of ***privilege***.  The question was what evidence was required to show "good cause" to issue
27   protective order under Rule 26 (c) "to protect a party or person from annoyance, embarrassment,
     oppression, or undue burden or expense."

28

Joshua Koltun ATTORNEY

possibility that a privilege log may be required in the future, have ruled that the absence of a privilege does not waive the Reporter's Privilege.  *Schoolcraft v. City of N.Y.*, No. 10 Civ. 6005 (RWS), 2014 U.S. Dist. LEXIS 56033, at *10-12 (S.D.N.Y. Apr. 18, 2014).

*Mosely v. City of Chicago,* on which AT&T relies, is not a persuasive precedent to the contrary. *Id,* , 252 F.R.D. 421, 426-27 (N.D. Ill. 2008).[3]  A few years before *Mosely* was decided, the Seventh Circuit decided not to recognize a Reporter's Privilege*,* but rather to decide such issues under the rubric of "reasonableness" or "undue burden."  *McKevitt v. Pallasch*, 339 F.3d 530, 533 (7th Cir. 2003).  Thus the court in *Mosely* stated that the reporters had "waived whatever claim of privilege they might have had" in the unpublished material – but there was no privilege to claim.  *Id.* (citing *McKevvit*).  Indeed, although the court stated that the privilege claim had been waived, it discussed on the merits the reporter's contention that the Reporter's Privilege existed in the Seventh Circuit and rejected it.  *Id.,* at 424-26.  Moreover, although the reporters had "waived" their nonexistent Reporter's Privilege claim by not providing a log, they had not waived their ability to argue that the subpoena's request for unpublished information was "unreasonable."  *Id.* at 427.

AT&T's contention that BTB/MTS failed to follow this Court's standing procedures is wrong as well.  The instant motion is both a motion to reconsider and a motion for a protective order.  The original motion to compel, by AT&T, had ***already*** set forth the requests at issue, although it had done so inaccurately, moving to compel on 20 document requests, where the underlying subpoena only had 18 requests.  *Compare* DE 65-2, Appendix A *with* DE 65-14, Schedule A.  The motion to reconsider was only asking partial reconsideration on a single issue of privilege, which corresponds to an identical objection to several of those requests:  "that the request calls for material that is subject to the First Amendment Reporter's privilege, insofar as it involves any documents or communications in connection with Witnesses' assistance to the Wall Street Journal ("WSJ") in gathering news to disseminate to the public, or to the Environmental Defense Fund ("EDF") in publishing a report to disseminate to the

---

[3] AT&T citation is to a later decision in that case, in which the reporters moved to reconsider the earlier decision cited in the text above.  They did ***not*** ask the court to reconsider the issue of waiver, but the court nevertheless chose to discuss it. *Mosley v. City of Chi.*, 252 F.R.D. 445, 448 (N.D. Ill. 2008).

1  public." DE 88-3.  Moreover, since the Court asked BTB/MTS to reframe the motion as a motion for a

2  protective order, that protective order applies across the board to past and future discovery, without

3  respect to the specific requests.  If the undersigned misinterpreted the application of this Court's

4  standing order to these circumstances, he did so in good faith and begs the Court's indulgence.

5      **B.    It is proper for Marine Taxonomic Services, Ltd., Jones, and Rydel Fortner to join
6            the motion**

7      AT&T contends that Marine Taxonomic Services, Ltd, Jones and Rydel-Fortner may not join

8  the instant motion, because, according to AT&T, they failed to comply with this Court's standing

9  procedures.  DE 113 at 8:8-23.  This is a dilatory objection.  Although AT&T purports to be frustrated

10 with the delays caused by BTB/MTS's inability to secure counsel, it now seeks to add to the delays by

11 requiring each entity to move separately on an issue that is identical to all four nonparties.  AT&T

12 itself admits that the "arguments apply with equal force" to all.  DE 113 at 1:27-28.

13     From the moment Koltun was engaged he sought to get to the heart of this matter as quickly as

14 possible.  He immediately contacted AT&T counsel and told them that (i) he represented all four

15 BTB/MTS individual and entities, (ii) that he would not be distinguishing between them for purposes

16 of discovery, and (iii) that he would meet and confer on behalf of all four.  DE 110-1.  He served

17 formal objections on behalf of all four.  DE 88-3.  He asked AT&T to stipulate that the motion

18 practice in the Southern District concerning MTS be transferred to this Court.  DE 110-1 at 4.  AT&T

19 refused, although the Southern District had specifically asked whether MTS would consent to the

20 transfer, which is the only relevant issue under Rule 45.  DE  110-1 at 3.  So Koltun was forced to file

21 a response to an OSC in the Southern District, to get these matters consolidated before this Court.  DE

22 110, ¶ 2.  The Court in the Southern District ordered the case transferred to this Court so that this

23 Court can make a "unified set of rulings on issues presented by . . . identical subpoenas" served on

24 MTS, BTB, and Jones.  [ED Cal. Case 2:23mc424, DE 21]; DE 107 (notice of related case).

25     BTB/MTS has produced documents on behalf of all four entities, and any production it makes

26 in the future will be on behalf of all four entities.

27     AT&T never asked for a discovery conference to discuss its motion to appoint an "independent

28 expert" to adjudicate all discovery disputes with BTB/MTS; instead it dropped a brief footnote into its

- 5 -

Joshua Koltun ATTORNEY

1   informal opposition brief to this motion.  DE 93 at 2:26-28.  By that motion, it seeks to have that

2   "Independent Expert" take control of "all computers and mobile devices used by Seth Jones or

3   Monique Fortner [for any work] for Below the Blue **or Marine Taxonomic Services or belonging to**

4   **Seth Jones or Monique Fortner at any time from January 1, 2020 to the present."**  DE 104-3.  This

5   in a purported effort to enforce "compliance by **Beyond the Blue"** with this Court's orders.  DE 104.

6      At the discovery conference on December 21, the Court asked Koltun to file a motion for a

7   protective order.  If AT&T's motion, filed simultaneously with this motion, can ask to seize the

8   personal phones of Jones and Rydel-Fortner, surely they should be allowed to join a motion for a

9   protective order that, as AT&T concedes, raises issues identical in all respects. That AT&T is seeking

10  to force this issue to be litigated in repeated identical motions is an indication of the harassing nature

11  of this discovery dispute.

12  ***III.    BTB/MTS is a "reporter" for purposes of the Reporter's Privilege to the extent that it
13         gathered information for purposes of a public report – as AT&T's own evidence
           demonstrates***

14     AT&T relies heavily on Justice White's opinion in *Branzburg v. Hayes* on the issue of the

15  application and scope of the First Amendment Reporter's Privilege, and criticizes BTB/MTS for not

16  "addressing" that opinion.  DE 113 at 10:19-23, 11:6-10 (citing *id.,* 408 U.S. 665, 694-95 (1972))

17  (Opinion of White, J.)  There is a very good reason why BTB/MTS did not address it.  The Ninth

18  Circuit has held that, outside the context of grand jury proceedings, the controlling opinion concerning

19  the Reporter's Privilege is not Justice White's opinion but the concurring opinion of Justice Powell.

20  In the context of grand jury proceedings, far from delineating the "distinction" between the reporter

21  and the source for purposes of that privilege (*see* DE 113 at 11:6-10), Justice White's opinion held,

22  that **neither the reporter nor the (confidential) source** has a privilege not to testify.  *Id.* at 693-95.

23  One of the reasons the privilege was denied was that grand jury proceedings are secret.  *Id.* at 695.

24     Justice White's opinion was joined by four other Justices, but one of those, Justice Powell,

25  wrote a brief concurring opinion.  *Id.,* 408 US at 709-10.  Justice Powell "emphasized" the "limited

26  nature" of the holding, and noted that in future cases the "claim to privilege should be judged on its

27  facts by striking a proper balance between freedom of the press and the obligation of all citizens to

28  give relevant testimony in criminal cases."  *Id.*  The other four Justices would have granted the

1    assertion of a Reporter's Privilege in the grand jury context.  *Id.* at 711- 752 (Opinions of Douglas, J.

2    and Stewart, J.)

3            Justice Powell's concurring opinion is the fountain from which all Reporter's Privilege

4    jurisprudence has flowed.  In *Farr v. Pitchess,* the Ninth Circuit had the opportunity to consider

5    whether, in a non-grand-jury criminal case, a reporter could claim a First Amendment privilege.  The

6    Ninth Circuit recognized that Justice Powell's concurring opinion "was needed to obtain a plurality,"

7    thereby confining the holding of *Branzburg* to the grand jury context.  *Id.* 522 F.2d 464, 467-68 (9th

8    Cir. 1975).  The court held that outside that context, "the claimed First Amendment privilege and the

9    opposing need for disclosure be judicially weighed in light of the surrounding facts and a balance

10   struck to determine where lies the paramount interest." *Id* at 468; *accord In re Grand Jury*

11   *Proceedings*, 5 F.3d 397, 402 (9th Cir. 1993).

12          In *Shoen I,* the court noted that in *Farr,* it had interpreted *Branzburg* as *"*establishing such a

13   qualified privilege for journalists," noting that "[e]ight of the other nine circuits that have decided the

14   question read *Branzburg* the same way." *Shoen I,* 5 F.3d at 1292 & n.5 (collecting authorities).  The

15   test for who may claim the privilege, in the Ninth Circuit as in many others, is whether the person

16   claiming privilege had "the intent to use material - sought, gathered or received - to disseminate

17   information to the public and [whether] such intent existed at the inception of the newsgathering

18   process" *Id.* at 1293.

19          This is a functional test.  Contrary to AT&T, it does not depend on whether the person

20   asserting the privilege describes themselves as a "reporter" (or a "journalist" or a "newsman").  DE

21   113 at 11:17-18, 24-26.  In one of the cases on which AT&T relies, the persons claiming the privilege

22   were "academic researchers and commentators, not professional newsmen."  *Cusumano v. Microsoft*

23   *Corp.*, 162 F.3d 708, 714 (1st Cir. 1998).  The court ruled that "[a]cademicians engaged in pre-

24   publication research should be accorded protection commensurate to that which the law provides for

25   journalists."  *Id.*  "After all, scholars too are information gatherers and disseminators."  *Id. "*Whether

26   the creator of the materials is a member of the media or of the academy, the courts will make a

27   measure of protection available to him as long as he intended 'at the inception of the newsgathering

28   process' to use the fruits of his research 'to disseminate information to the public.'"  *Id.* (citing *Shoen*

Joshua Koltun  ATTORNEY

- 7 -

1    *I*, 5 F.3d at 1293-94 and *von Bulow v. von Bulow*, 811 F.2d 136, 142-44 (2d Cir. 1987)).

2         Contrary to AT&T, there is no requirement that the reporter be "dispassionate."  DE 113 at

3    1:11, 11:28.  On the contrary, the pantheon of famous muckrakers and "social critics" invoked by the

4    court in *Shoen I* were quite passionate, and certainly they wrote with distinct points of view.  *Id.*, 5

5    F.3d at 1293.  Having a viewpoint, even a passionate viewpoint, does not disqualify one from the

6    privilege.  As one court has commented:

7           defendants imply that [the reporter] has a bias in favor of plaintiffs which prompted
            him to assist plaintiffs at the expense of an even-handed treatment of the issues. Even if
8           the Court assumes a bias in this case, defendants have not cited, and the Court has not
            found, any First Amendment authority that requires journalists to refrain from drawing
9           conclusions or holding opinions about the subjects on which they are reporting as a
            prerequisite to protection from compelled disclosure.
10   *Wright v. Fred Hutchinson Cancer Research Ctr.*, 206 F.R.D. 679, 681 (W.D. Wash. 2002): *accord*

11   *Sines v. Yiannopoulos*, 2020 U.S. Dist. LEXIS 190520, at *16-17 (S.D.N.Y. Oct. 14, 2020)

12   ("Respondent's style of disseminating information may be confrontational and biased, but it is not

13   wholly without journalistic content, and protecting even Respondent's muckraking style protects the

14   'public interest in the maintenance of a vigorous, aggressive and independent press capable of

15   participating in robust, unfettered debate over controversial matters.' [citation]"); *Chevron Corp. v.*

16   *Berlinger*, 629 F.3d 297, 308 n.4 (2d Cir. 2011) ("We do not suggest that a journalist loses or weakens

17   her privilege merely because her publication reflects her previously held point of view. Consistency of

18   point of view does not show lack of independence.")[4]

19

20

21       [4] The Ninth Circuit does not impose an affirmative burden on the reporter to demonstrate that
     it is "independent."  *Chevron* involved an unusual set of facts.  A documentary filmmaker had been
22   solicited by plaintiffs' attorneys to make a film about plaintiff's lawsuit, from the point of view of the
     plaintiffs, and the plaintiffs had exercised some editorial control over the final product.  *Id.* at 300-
23   304.  The Second Circuit held that these facts were sufficient to support the conclusion that the
     filmmaker was less like a journalist and more like an agent of the plaintiff.  *Id.*  The mere fact that the
24   journalist had been asked to investigate an issue and had presented it in a way that supported the point
     of view of the soliciting person would not have been enough to show a lack of independence.  *Id.* at
25   309.  By contrast, the fact that a filmmaker "(1) had a longstanding sympathetic relationship with
     Plaintiffs; (2) made certain public statements that reveal their intentions in making the Film and call
26   for Defendants to settle this civil litigation; (3) gathered interviews from Plaintiffs about the case well
     before they intended to publicly disseminate information relating to this case; and (4) received
27   assistance from Plaintiffs' counsel in creating both the book and the Film about the case" was not

28

Joshua Koltun ATTORNEY

By the same token, BTB/MTS's "stated interest in advocacy and litigation" does not disqualify it from asserting the Reporter's Privilege, nor does its status as a nonprofit dedicated to "educating the public about pollution." DE 113 at 11:17-20. The Reporter's Privilege may be claimed by advocacy organizations. *Greater Chicago. v. Cty. of Cook*, 1998 U.S. Dist. LEXIS 2991, at *14-16 (N.D. Ill. Mar. 10, 1998); *Anti-Defamation League of B'nai Brith v. Superior Court,* 67 Cal. App. 4th 1072, 1092-94 (1998).

To be sure, an advocacy organization may engage in activities that do not qualify as "gathering information for dissemination to the public."   Those other activities are not covered by the privilege. For example, the Anti-Defamation League was "a civil rights and human relations organization [which] engages in a broad range of activities designed to combat anti-Semitism, prejudice and bigotry of all kinds," and "many" of its activities were unrelated to "journalism," which the court defined as "the gathering and editing of material of current interest for presentation through print or broadcast media, or on the Internet, and available to interested members of the public."  *Id.* at 1092. Thus, although the ADL was entitled to invoke the Reporter's Privilege, the plaintiffs in a privacy action were entitled to limited discovery to determine whether their private information had been disclosed by the ADL to the governments of Israel or South Africa. *Id.* at 1094.

This is where AT&T engages in some sleight of hand.  It contends that BTB/MTS has not demonstrated that it had an intention to publish "'at the inception' *of their conduct* to *use their personal experiences* 'to disseminate information to the public.'" DE 11:11-13 (emphasis added). But BTB/MTS is ***not*** seeking to invoke the Reporter's Privilege to cover all of its "conduct" or

---

enough to disqualify a filmmaker from invoking the Reporter's Privilege. *In re McCray*, 928 F. Supp. 2d 748, 755 (S.D.N.Y. 2013).

Here, there is no claim that plaintiffs solicited BTB/MTS to investigate lead-clad cables with the *Journal* or EDF – which occurred after this case had settled. In any event no claim of privilege is made concerning BTB/MTS's interactions with plaintiffs; all such information has been or will be made available to AT&T.

Nor does *Beaver Cty. Emplrs. Ret. Fund v. Tile Shop Holdings, Inc.* stand for the proposition that journalists may not publish material with a distinct point of view.  *Id.,* No. 16-mc-80062-JSC, 2016 U.S. Dist. LEXIS 74205, at *9 (N.D. Cal. June 7, 2016).  The purported "journalists" were short-sellers who had published reports on companies in the hope of profiting off the drop in stock prices that their report might induce.  *Id.*

Joshua Koltun ATTORNEY

1    "personal experiences."  It is not seeking to withhold any information concerning its initial discovery

2    of the lead-clad Cables in Lake Tahoe, its efforts to interest government regulators in those Cables, its

3    bringing the Cables to the attention of plaintiff's counsel, or any of its interactions with plaintiffs.  DE

4    99 at 4:11-5:8  If AT&T wishes to inquire about BTB/MTS role as "catalyst" of this litigation it is free

5    to do so.  DE 113 at 2:16,22.  It is simply untrue that BTB/MTS handed information to the plaintiff

6    and now refuses to allow AT&T to see it.  DE 12:1-5.  Whatever BTB/MTS has shared with plaintiff

7    has been and will be made available; whatever it is withholding on the grounds of privilege it is

8    withholding from both sides.  DE 99 at 1:7-18-2:1-7; 5:7-6:5, 14:9-11.[5]

9         BTB/MTS's **only** claim of privilege is to the investigations it commenced with the *Journal* and

10   with EDF starting in January 2022, *after this case had settled*.  *Id.*

11        That BTB/MTS had the intention, **at the inception of that investigation,** to make a public

12   report based on the information it had gathered, is demonstrated not only by Jones's testimony, but

13   also by the very documents that AT&T has put into the record in opposition to the claim of privilege.

14   Jones is competent to testify as to nature of the complex investigations on which he and Rydel-Fortner

15   worked with the *Journal* and EDF, starting in January 2022.[6]  DE 99 at 5:9-26; DE 199, ¶ 6.

16        AT&T complains that Jones testimony -- that "it was the expectation of all participants in each

17   of these two separate investigations that they would conclude with the publication of public reports" –

18   has no "independent evidentiary support."  DE 113 at 10:16-18.  Not so!  His testimony is

19   corroborated by the *Journal's* own description of BTB/MTS's role in the investigation, on which

20   AT&T has relied (DE 65-1 at 3:1-4, 65-9).  It is corroborated by the contract between MTS and EDF

21   that AT&T has put in the record.  DE 113-1, Exh. 3.  The contract shows that MTS had already been

---

[5] The actual piece of Cable that BTB/MTS gave to plaintiff is in the hands of plaintiff, who has stated that it will make it available to AT&T.  DE 113-1, Exh. 9, at 2.  In any event, it is now undisputed that the Cable in question is lead-clad.

[6] AT&T's contention that Jones "implausibly" testifies on behalf of "all four entities and individuals" is unsupportable.  DE 133 at 12:24.  AT&T itself described the investigation as having been done by Jones and Rydel-Fortner.  DE 65-1 at 2:14-16, 3:1-7.  Why would the head of two companies, who participated in an investigation with one other member of the companies, not be competent to testify on behalf of all four entities and individuals?  Strangely, AT&T seems to be suggesting that he cannot testify on behalf of himself!  And, as discussed in the text, his testimony is corroborated by AT&T's own documents.

engaged with "preliminary investigative work" with the *Journal,* and that MTS's investigative work funded by the contract would be shared with the *Journal.  Id.* at 11, 13.  The contract recites that both MTS and EDF "have an interest in making any finding" from that investigation "publicly available," and that the aim would be for the "partners" to reach "consensus" before public distribution of those findings.  *Id.* at 1, 11.

It is undisputed that both EDF and BTB/MTS published that  report upon completion, which report AT&T has also submitted into the record. DE 113-1, ¶3, Exh. 2; DE 65-14 (Subpoena Request no. 9: "All Documents and Communications concerning the Marine Taxonomic Services and Below the Blue Lead Cable Investigation Report, available at https://belowtheblue.org/edf-report").  That report notes that the *Journal* reached out to MTS in 2022, and the EDF funded an initial study to

> validate the locations of abandoned cables and perform environmental sampling at locations adjacent to the cables.  MTS and the WSJ visited the cable locations that were identified by the WSJ.  MTS, alongside WSJ reporters, investigated numerous locations in six regions across the U.S., where the WSJ provided permit records showing historical cable locations within rivers, streams and lakes.
> …
> …With guidance from EDF, MTS and WSJ reporters visited these locations [in nine states, including Lake Tahoe.

*Id.* at 1, 2, 4.

AT&T contends that BTB/MTS's reading of *Shoen I* would expand the definition of a reporter to "include anyone who provided information to actual journalists with the expectation that it would be published."  DE 133 at 10:1-3.  But that is not so.  BTB did not merely "provide information" to a journalist.  BTB/MTS ***investigated*** a matter in collaboration with the journalist.  The published reports (by both BTB/MTS and the *Journal*) were the fruit of the ***new material*** learned as part of that investigation.  Someone who passes along material she happens to already possess to a journalist is a source.  To be a reporter, she must have "gathered" that material in the first place with a purpose of disseminating information to the public.  *Shoen I,* 5 F.3d at 1293-94.[7]

---

[7]Here, BTB/MTS published its own report on the internet, in addition to what was published by the *Journal.*  But one need not self-publish in order to invoke the privilege.  For example, investigative authors such as the one protected in *Shoen I* are generally hoping to find a commercial publisher for their work, which publisher may well subject their work to extensive editing.  With regard to the information that BTB/MTS gathered and shared with the *Journal,* its position is no

1

2

**IV.    AT&T has not met its heavy burden of showing that this is one of the exceptional cases in which the Reporter's Privilege is overcome**

3

AT&T has not met its heavy burden to show that this case is one of the "exception[al]" cases

4

in which the Reporter's Privilege can be overcome.  *See Shoen v. Shoen*, 48 F.3d 412, 416 (9th Cir.

5

1995) ("*Shoen II*").

6

**A.    AT&T has not shown by "clear and convincing" evidence that BTB/MTS has waived the Reporter's Privilege; indeed the legal principles on which it relies undercuts AT&T's claim of waiver**

7

8

9

AT&T asserts that the burden is on BTB/MTS to show that it has *not* waived the Reporter's

10

Privilege.  DE 113 at 12:17-18.  It cites no authority for that proposition, and there is none. On the

11

contrary, a First Amendment right can only be deemed to have been waived "upon *clear and*

12

*convincing* evidence that the waiver is knowing, voluntary and intelligent." *Leonard v. Clark*, 12 F.3d

13

885, 889 (9th Cir. 1993).

14

AT&T does not seem to be pressing the "subject matter waiver" theory that it has previously

15

put forth.  In its opening brief BTB/MTS argued that AT&T had imported the "subject matter waiver"

16

theory from the attorney-client context, and that it was inapplicable to the Reporter's Privilege

17

contexts.  DE 99 at 13:17-14:11.

18

While AT&T is no longer pressing the "subject matter waiver" theory, it nevertheless

19

continues, inappropriately, to rely on attorney-client cases.  DE 113 at 13:1-3.[8]

20

AT&T asserts that the privilege is waived "by sharing it with others or impliedly allowed

21

another to do so."  DE 113 at 12:18-13:1.  AT&T claims that "at least some of the information that

22

BTB/MTS possesses has been shared with Plaintiff and that BTB has taken no steps to stop such

23

different from a reporter on the *Journal's* staff who develops information for potential publication, the final form of which may be decided by other reporters and/or editors.  In both cases the information is developed for the purposes of a public report, even though the reporter will not have control over that final report.

24

25

[8] AT&T relies on *In re von Bulow*, which involves a waiver of attorney-client privilege.  *Id.,* 828 F.2d 94, 96, 100-103 (2d Circ. 1987).  Although both cases involve the alleged murderer Klaus von Bulow, *In re von Bulow* is not to be confused with the seminal Reporter's Privilege case, *von Bulow v. von Bulow*, 811 F.2d 136 (2d Cir. 1987).

26

27

28

sharing of information." *Id.* at 13:4-6.[9]  As discussed above in section II.A., the principle that attorney-client privilege is waived by the disclosure to a third party is inapplicable in the Reporters' Privilege context.  *Damiano*, 168 F.R.D. at 499.

In fact, one of the principles on which AT&T relies -- that  the Reporter's Privilege is held by the journalist, not the source – undermines its theory of waiver.  DE 113 at 9:10-20.  In *United States v. Cuthbertson*, the news media sought to keep confidential which of a set of individuals had given it interviews.  *Id.,* 630 F.2d 139, 143 (3d Cir. 1980).  The government had obtained waivers from each of its witnesses to disclose whether they had granted interviews.  *Id.* at 147.  The Court ruled that the waivers by the sources did not affect the rights of the journalists, because the "privilege belongs to [the journalists], not the potential witnesses, and it may be waived only by its holder."  *Id.* at 148; *accord L.A. Mem'l Coliseum Com. v. Nat'l Football League*, 89 F.R.D. 489, 494 (C.D. Cal. 1981).

This makes sense, because one of the primary purposes of the Reporter's Privilege is to protect the reporter from the burden of being sucked into litigation because she had reported on a matter of interest to litigants.  *Shoen I,* 5 F.3d at 1295.  The disclosure of information by another does not waive the privilege, because if it did, the reporter would end up in the position of a "research tool" of the litigants, undermining the free flow of information to the public.  *See id.*

Thus, contrary to AT&T, the failure by BTB/MTS to prevent ***other persons*** from disclosing information to the litigants in this case, did not constitute a waiver by BTB/MTS of its own rights not to disclose that information.  The disclosure of information by other parties cannot be a knowing and intelligent waiver by BTB/MTS.  *Leonard,* 12 F.3d at 889.

**B.** ***AT&T cannot meet the exacting* Shoen II *test merely by declaring that it "seeks* all of *BTB's relevant information" – AT&T's interpretation of the test would eliminate the Reporter's Privilege***

AT&T contends that it has met the (first) "exhaustion" prong of the *Shoen II* test by declaring

---

[9] AT&T's evidence of such sharing of information by third parties is pretty thin.  AT&T's theory is that BTB/MTS has the burden of showing, as to any particular document, that no third party has shared the document.  DE 113 at 12-14.  But there is no authority for the proposition that BTB/MTS has the burden to show a lack of waiver, let alone by showing that no third party has shared the information.

1    that it "seeks BTB's documents," and "***all*** of BTB's relevant information, including for example

2    documents and communications regarding the non-parties' sampling methodologies, how they chose

3    where and when to sample, what they used to collect and maintain samples, the conditions under

4    which they collected samples, chain of custody information, and their interpretation of the results of

5    their testing."  DE 133 at 13:23, 27-28, 14:1-3 (original emphasis).

6         But the court in *Shoen II* was emphatic that AT&T is ***not*** entitled to "all of BTB's relevant

7    information."  On the contrary, the third factor requires that the information be "clearly relevant to an

8    important issue in the case[;]… there must be a showing of actual relevance; a showing of potential

9    relevance will not suffice." *Id.*, 48 F.3d at 416.  "The 'clearly relevant' third aspect of the three-part

10   *Shoen* test works in synergism with the first element [exhaustion] to prevent the impressment of

11   journalists as involuntary investigators for the parties." *Kurzynski v. Spaeth*, 196 Wis. 2d 182, 197-98,

12   538 N.W.2d 554, 560 (1995) (adopting Shoen II test).

13        AT&T repeatedly misstates the "clearly relevant to an important issue" test as being merely

14   one of "relevance."[10]  Moreover, it degrades the test further, as merely requiring that the information

15   be "discoverable," which flies in the face of the court's admonition that the showing must be of

16   "actual relevance," as opposed to "potential."  *Compare* DE at 12:14 *with Shoen II*, 48 F.3d at 416.

17   AT&T's interpretation of the *Shoen II* test would eviscerate the privilege.  AT&T is demanding the

18   right to do precisely what is forbidden: to sift through BTB/MTS's files in the hope of finding

19   something that might undermine the *Journal's* reporting.  *Gonzales v. NBC*, 194 F.3d 29, 35 (2d Cir.

20   1998); *see* DE 113 at 14:11-26 (describing the unpublished information that AT&T seeks to obtain).

21        But the *Journal's* reporting is not itself at issue in the case, and certainly not "an important

---

[10]*F. Marc Schaffel Prods., Ltd. Liab. Co. v. TMZ Prods.*, relied upon by AT&T, does not stand for the proposition that mere "relevance" let alone "discoverability" is sufficient to meet the third prong of the *Shoen II* test.  *Id.  No*. CV 10-01306 GHK (SSx), 2010 U.S. Dist. LEXIS 151990, at *2-3 (C.D. Cal. Dec. 16, 2010).  The court was using the term "relevance" as a shorthand for the "clearly relevant to an important issue" test.  The case involved a complaint for copyright infringement and conversion; defendants had somehow obtained the copyrighted interview plaintiff had conducted and had broadcast it without plaintiff's consent.  *Id* at *2-3.  The court ruled that unpublished circumstances as to how defendant had obtained and posted the copyrighted content was clearly relevant to the important issue of "good faith," which was a prerequisite to defendant's defense of "fair use."  *Id.* at *10-11.

issue." What is at issue is the underlying question whether the Cables in Lake Tahoe are safe. AT&T will rely on its own expert's testing of Lake Tahoe waters, and plaintiffs are seeking to conduct their own sampling and testing as well. DE 85 at 6. AT&T's claims that the information it seeks is relevant/discoverable because it "would allow [AT&T] to explore the origins of the litigation and test the veracity of testimony of identified witnesses." DE 15:8-12. But BTB/MTS is not claiming the privilege as to "the origins of the litigation." As to "testing the veracity of testimony of identified witnesses," that is impeachment evidence, which the court in *Shoen II* specifically ruled did ***not*** meet the "clearly relevant to an important issue" prong of the test. *Id.,* 48 F.3d at 418.[11]

Moreover AT&T has not limited its request to documents concerning the Cables in Lake Tahoe, but rather seeks documents concerning BTB/MTS's and the *Journal's* investigation of lead-clad cables "at Lake Tahoe ***or elsewhere.***" DE 65-15 (Request 8) (emphasis added). Why that information would be relevant, let alone "clearly relevant to an important issue" in this case, AT&T does not even try to explain.

### *Conclusion*

Since AT&T's procedural objections to this motion are meritless, because its contention that BTB/MTS is not a reporter fly in the face of well-established law, and because AT&T has made no attempt to show that it meets the Ninth Circuit's test to overcome that privilege, BTB/MTS respectfully urges the Court to grant this motion.

January 11, 2024

_____/s/_____
Joshua Koltun
Attorney for Nonparties Below the Blue, Marine
Taxonomic Services, Seth Jones, and
Monique Rydel-Fortner

---

[11] Moreover, AT&T has not shown that there will be anything to impeach. AT&T claims that plaintiffs will rely on BTB-MTS's "data collection," DE 113 at 12:7 (citing Meier Decl., DE 113-1 at Exh. 9 at 11). But the interrogatory response cited refers only to the piece of cable that Jones gave to plaintiff at the outset of the case. BTB/MTS did not engage in any sampling of Tahoe waters for plaintiffs, nor did they conduct the "kiddie pool" test of which AT&T is so critical. DE 100, ¶ 3. And in any event BTB/MTS is not asserting privilege with respect to respect to any interactions BTB/MTS has had with plaintiff.

Joshua Koltun ATTORNEY