MATTHEW MACLEAR (State Bar No. 209228)
Email: mcm@atalawgroup.com
JASON FLANDERS (State Bar No. 238007)
Email: jrf@atalawgroup.com
ERICA A. MAHARG (State Bar No. 279396)
Email: eam@atalawgroup.com
J. THOMAS BRETT (State Bar No. 315820)
Email: jtb@atalawgroup.com
AQUA TERRA AERIS LAW GROUP
4030 Martin Luther King Jr Way
Oakland, CA 94609
Tel: (415) 568-5200

[Additional counsel on p. 2]

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE,<br><br>        Plaintiff,<br><br>    v.<br><br>PACIFIC BELL TELEPHONE COMPANY<br><br>        Defendant. | Case No.: 2:21-cv-00073-JDP<br><br>**DECLARATION OF MATTHEW MACLEAR IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS UNDER THE RESOURCE CONSERVATION AND RECOVERY ACT (42 U.S.C. § 6972(e)) AND CODE OF CIVIL PROCEDURE SECTION 1021.5** |

1   ANDREW L. PACKARD (State Bar No. 168690)
Email: andrew@packardlawoffices.com
2   LAW OFFICES OF ANDREW L. PACKARD
3   245 Kentucky Street, Suite B3
Petaluma, CA 94952
4   Tel: (707) 782-4060
Fax: (707) 782-4062
5

6   WILLIAM VERICK (State Bar No. 140972)
Email: wverick@igc.org
7   KLAMATH ENVIRONMENTAL LAW CENTER
1125 16th Street, Suite 204
8   Arcata, CA 95521
Tel: (707) 630-5061; Fax: (707) 630-5064
9

10  J. KIRK BOYD (State Bar No. 122759)
Email: jkb@drjkb.com
11  LAW OFFICE OF JOHN KIRK BOYD
548 Market St., Suite 1300
12  San Francisco, CA 94104-5401
Tel: (415) 440-2500
13

14  BRIAN ACREE (State Bar No. 202505)
Email: brian@brianacree.com
LAW OFFICES OF BRIAN ACREE
15  331 J Street, Suite 200
Sacramento, CA 95814
16  Tel: (916) 505-6861

17  WILLIAM CARLON (State Bar No. 305739)
Email: william@carlonlaw.com
18  LAW OFFICE OF WILLIAM CARLON
437 Post Street
19  Napa, CA 94559
Tel: (530) 514-4115
20

21

22

23

24

25

26

27

28

DECLARATION OF M. MACLEAR IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEY'S FEES AND
COSTS UNDER RCRA AND C.C.P. § 1021.5

Pursuant to 28 U.S.C. § 1746, I, Matthew Maclear, declare under penalty of perjury under the laws of the United States of America that the following facts are true and correct:

1.     The facts set forth in this declaration are based on my personal knowledge; if called to testify as a witness, I could and would competently testify thereto under oath.

2.     As to those matters that reflect a personal opinion, they reflect my personal opinion and judgment upon the matter.

3.     I am more than eighteen years old and am competent to testify as to the matters set forth herein.

4.     I am an attorney licensed to practice law in the State of California. I am a partner with Aqua Terra Aeris ("ATA") Law Group, representing California Sportfishing Protection Alliance ("Plaintiff") in the above referenced action.

5.     I make this Declaration in support of Plaintiff's Motion for Attorneys' Fees and Costs, filed herewith.

## I.     AUTHENTICATION OF ATTACHED EXHIBITS

6.     Attached hereto as **Exhibit 1** is a true and correct copy of the Final Amended Consent Decree ("Second Consent Decree").

7.     Attached hereto as **Exhibit 2** is a true and correct spreadsheet setting forth the time spent by each attorney on this case, recorded in tenths of an hour, with a description of what work was done.

8.     Attached hereto as **Exhibit 3** is a true and correct itemization of the costs incurred in this enforcement action.

9.     Attached hereto as **Exhibit 4** is a document providing invoices and other expenses related to the costs Plaintiff hereby requests reimbursement for, including a complete accounting of the time spent by each of the experts retained by Plaintiff for the prosecution of this matter.

10.    Attached hereto as **Exhibit 5** is a press release published by Plaintiff regarding the settlement of this lawsuit and documents released therewith.

DECLARATION OF M. MACLEAR IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEY'S FEES AND COSTS UNDER RCRA AND C.C.P. § 1021.5

11.     Attached hereto as **Exhibit 6** is a copy of Plaintiff's First Amended Responses to Defendant's Interrogatories, Set One.

12.     Attached hereto as **Exhibit 7** is a copy of Defendant's Amended Responses to Plaintiff's Requests for Admission, Set One.

13.     Attached hereto as **Exhibit 8** is a copy of Defendant's Amended Responses to Plaintiff's Interrogatories, Set One.

## II.     BIOGRAPHICAL INFORMATION

14.     I am a graduate of the University of California, Berkeley (in 1995) and the University of Pacific's McGeorge School of Law (in 2000).

15.     I was admitted to practice law in the State of California in November 2000. I have also been admitted to practice in the U.S. District Courts for the Northern, Central, and Eastern Districts of California.

16.     I am a founding partner of Aqua Terra Aeris Law Group, which I started in 2014.

17.     Prior to that, I was a gubernatorial appointee as the Assistant General Counsel for Enforcement for the California Environmental Protection Agency ("CalEPA") from January 2012 – April 2014.

18.     Prior to that, I was a sworn deputy district attorney for approximately twenty-five (25) counties through the Circuit Prosecutor Project with the California District Attorneys Association from April 2006 through December 2011, working with rural district attorneys on environmental, consumer protection, and worker safety civil and criminal cases on behalf of the People of the State of California.

19.     I began my career working on civil insurance defense cases for Adams Nye Sinunu Walker, Burke Williams & Sorenson, and Lewis Brisbois Bisgaard & Smith from 2000 to April 2006, including but not limited to groundwater contamination, contaminated properties, asbestos, and personal injury cases.

20.     My current practice focuses exclusively on public interest environmental law under both state and federal jurisdictions. I work on a variety of issues, including federal cases involving

DECLARATION OF M. MACLEAR IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEY'S FEES AND COSTS UNDER RCRA AND C.C.P. § 1021.5

the Clean Water Act, Clean Air Act, and the Resource Conservation and Recovery Act ("RCRA"). I also have significant experience in California State Court, practicing under the enforcement provisions associated with the Hazardous Waste Control Act, Air Resources, Fish and Game Code, Public Resources Code, Business & Professions Code, California Environmental Quality Act ("CEQA"), and Proposition 65, as well as other State environmental and consumer protection laws.

21.     In my capacity as partner, I represent national, state, regional, and local nonprofit organizations as well as numerous unincorporated associations of concerned citizens and individuals in federal and state litigation. I also continue to represent the People of the State of California as a Deputy District Attorney or enforcement counsel for air districts in northern and southern California. My experience includes litigation under all of the aforementioned statutory frameworks. My litigation experience encompasses all aspects of environmental litigation practice, including investigations, case development, motion practice, discovery, trial, and appellate work.

22.     A non-exclusive list of my ATA case work includes:

    a.  Air District Enforcement, Complaints Filed and Resolved

        i.  *Takhar v. People ex rel. Feather River Air Quality Management Dist*. (2018) 27 Cal.App.5th 15 (establishing anti-SLAPP liability on cross-complaint)

        ii.  *People ex rel. FRAQMD v. Sarbjit Thiara, et al*. (Super. Ct. Sutter County, 2015, No. CVCS14-00001978) (enforcement of abatement order and additional burning and excess emissions violations) (Super. Ct. Sutter County, 2017, No. CVCS16-0000877) (unpermitted operation of industrial dryers) (Super. Ct. Sutter County, 2022, No. CVCS22-0000478) (prohibited burning violations)

        iii.  *People ex rel. MDAQMD v. Village Valero* (Super. Ct. County of San Bernardino, 2016, CIVDS1616196) (excess emissions and false reporting enforcement matter)

DECLARATION OF M. MACLEAR IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEY'S FEES AND COSTS UNDER RCRA AND C.C.P. § 1021.5

iv. *People ex rel. Placer County APCD v. James Day, et al.* (Super. Ct. Placer Couty, 2020, No. S-CV-0043170) (contractor falsifying test records and causing excess emissions at gas stations)

v. *People ex rel. Placer County APCD v. Lincoln Shell* (Super. Ct. Placer County, 2018, No. S-CV-0039820) (gas station failing to comply with emissions limits)

**b. District Attorney Enforcement**

i. *People v. David M. Westby, et al.* (Super. Ct. Tehama County, 2023, No. 23CI-000176) (dilapidated mobile home park causing public health nuisances)

ii. *People v. Robert Eugene O'Connor, et al.* (Super. Ct. Tehama County, 2021, No. 20CI000041) (arson fire, storage and disposal of hazardous wastes)

iii. *People v. Wang Brothers Investments, LLC, et al.* (Super. Ct. Yolo County, 2021, No. CV-2017-1989) (sophisticated illegal marijuana grows in warehouses)

iv. *People v. Seecon Financial, et al.* (Super. Ct. Yolo County, 2022, No. CV-2018-1228) (Unfair Competition Act and CEQA violations concerning destruction of Native American cultural resources)

v. *People v. Anterra Corp., et al.* (Super. Ct. Ventura County, 2018, No. 201800521965CUMC) (commercial underground injection company violating hazardous waste violations)

vi. *People v. Woodland Biomass Power* (Super. Ct. Yolo County, 2017, CV17-532) (illegal disposal of hazardous waste as soil amendment)

DECLARATION OF M. MACLEAR IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEY'S FEES AND COSTS UNDER RCRA AND C.C.P. § 1021.5

c. **Joint Agency/Citizen Enforcements**

   i. *People v. Corteva Inc., et al.* (Super. Ct. Contra Costa County, MSC21-02036) (RCRA, Health & Safety Code) (Hazardous waste and RCRA violations at agricultural chemical plant)

   ii. *Communities for a Better Environment v.* Corteva Inc., et al. (N.D. Cal., 2019, No. 19-cv-08277-JSC) (same)

d. **Clean Air Act Citizen Suits**

   i. *Ass'n of Irritated Residents v. Owens-Illinois, Inc.* ((E.D. Cal.) 2020 U.S. Dist. LEXIS 76490) (lifting bankruptcy stay)

   ii. *Assn of* Irritated *Residents v. Owens-Illinois, Inc.* ((E.D. Cal.) No. 1:19-cv-01707-DAD-JLT) (consent decree entered)

   iii. *Assn of Irritated Residents v. Vitro Flat Glass, LLC* ((E.D. Cal.) No.: 1:19-cv-01512-DAD-BAM (E.D. Cal.)) (consent decree entered)

   iv. Assn *of Irritated Residents et al. v. CertainTeed LLC* ((E.D. Cal.) No. 1:20-cv-01064-JLT-SKO) (consent decree entered)

   v. *San* Joaquin *Raptor/Wildlife Rescue Ctr. et al. v. Ardagh Glass, Inc. et al.* ((E.D. Cal.) No. 1:22-cv-00595-AWI-SKO) (pending)

e. **Other Representative Citizen Suits**

   i. *San Luis Obispo Coastkeeper v. Santa Maria Valley Water Dist. et al.* ((9th Cir. 2022) 49 F.4th 1242) (Federal Endangered Species Act)

   ii. *San Francisco Baykeeper v. City of Sunnyvale* ((N.D. Cal. 2022) 627 F.Supp.3d 1102) (Clean Water Act)

   iii. *Ecological Rights Foundation v. Pacific Gas & Electric Co.* ((9th Cir. 2017) 874 F.3d 1083) (RCRA)

   iv. *Clean Water Action, et al. v. Valley Water Management Company* ((2016) Kern County Super. Ct., Case No. BCV-16-101158) (California Proposition 65 discharges to drinking water)

DECLARATION OF M. MACLEAR IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEY'S FEES AND COSTS UNDER RCRA AND C.C.P. § 1021.5

v.  *Inland Empire Waterkeeper and Orange County Coastkeeper v. Columbia Steel, Inc.* (C.D. Cal., 2023, No. 8:20-cv-01062-FLA- ADS) (Clean Water Act enforcement against structural steel facility)

vi.  *Orange County Coastkeeper v. RJ Noble Co. et al.* (C.D. Cal., 2021, No. SA CV 21-01233-DOC-DFM) (Clean Water Act enforcement against aggregate company)

vii.  *Orange County Coastkeeper v. OCCK v. ACD, LLC, et. al.* (C.D. Cal., 2024, No. 8:23−cv−02409−JVS−DFM) (Clean Water Act enforcement against cryogenic manufacturer)

23.     My 2024 rate for attorney work in the Eastern District of California is $650 per hour. Given my experience, skill, and reputation, my rate requested herein is reasonable.

24.     Indeed, in July 2024, in *Ecological Rights Foundation et al. v. Hot Line Construction, Inc.* (5:20-cv-01108-AB-kk), the Central District of California recently found that a rate of $950 per hour was reasonable for my services. Even when compared to the relatively lower rates more common in the Eastern District of California, this rate demonstrates the reasonableness of the $650 hourly rate offered herein.

## III.  FACTUAL AND LEGAL BACKGROUND

25.     Plaintiff is a non-profit public benefit corporation organized under the laws of California and based in Berkeley, California. Plaintiff is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of California's waters, including Lake Tahoe. Members of Plaintiff boat on and swim in Lake Tahoe and drink water drawn from the Lake. Members of Plaintiff also use Lake Tahoe to fish, bird-watch, view wildlife, and engage in scientific study. Plaintiff members also work on and in the waters of Lake Tahoe, making physical contact with the Lake on a regular basis. When Plaintiff's members contact or drink that water, to the extent that water contains lead, their body-burden of lead is increased and they, and/or their children, face an increased risk of sterility, neurodevelopmental toxicity, cancer, and other physical ailments associated with exposure to lead. To further its goals, Plaintiff actively seeks federal and

state agency implementation of state and federal laws that protect the integrity of California waters, and as necessary, directly initiates enforcement actions on behalf of itself and its members. The instant action is an example of this practice.

26.     I am informed and believe that Defendant Pacific Bell Telephone Company ("Defendant" or "Pacific Bell") is a corporation that provides telecommunications services in California. Pacific Bell is owned by AT&T, Inc. by and through AT&T Teleholdings. Pacific Bell does business as AT&T of California. Upon information and belief, Defendant generates over one billion dollars in sales annually.

27.     This action concerns two telephone cables ("Cables") located on land near and underwater in Lake Tahoe. The Cables were not buried, but simply placed on the lakebed over rocks, trees, and on sediment. The Cables are composed of several concentric layers of materials. The outermost layer is a jute material impregnated with a tar-like substance. Concentrically under the jute is a ring of steel cables one quarter inch in diameter that spiral along the length of the cable. Under the ring of spiraling steel cables is a thick layer of lead sheathing/conduit, and inside the lead conduit are copper telecommunication wires wrapped in paper. *See* **Exhibit 5**. Reduced to its component parts, according to an analysis weighing each component, each foot of cable is made up of 0.7 pounds of tar impregnated jute, 4.15 pounds of steel, 3.39 pounds of lead, 0.21 pounds of paper, 0.01 pounds of string, and 0.77 pounds of copper. The Cables contain more than sixty (60) tons or 120,000 pounds of lead conduit in total.

28.     The Cables are mostly submerged in shallow waters from Baldwin Beach beyond Rubicon Point to Lester Beach, including one in Lake Tahoe's Emerald Bay. The short cable lies across the mouth of Emerald Bay. The second, longer cable is approximately six miles in length and is located in shallow waters along the west shore of the Lake. There are severed ends of the short cable in Emerald Bay that expose the lead conduit directly to the water. Further, the long cable is worn, abraded, and frayed in places where the tar impregnated jute materials have been broken, exposing the lead sheathing to the open water.

29.     After the existence of the Cables was brought to the attention of Plaintiff, Plaintiff's counsel investigated the physical location and nature of the Cables and the ownership, placement, and abandonment of the Cables. Counsel met on several occasions with the divers that brought the existence of the Cables to Plaintiff's attention. Counsel also arranged for a piece of the Cables, forty (40) centimeters in length, to be immersed in a container of water from Lake Tahoe. Analysis by a state-certified laboratory of a sample of the water taken after one day of immersion showed that enough lead had dissolved from the piece of cable into the water to cause the water to have a concentration of six-hundred-and-fifty (650) micrograms of lead per liter of water. Analysis of a second sample of the water taken after seven (7) days showed that enough lead had dissolved from the piece of cable to raise the concentration of lead in the water to fifteen-hundred (1,500) micrograms per liter.

30.     Counsel also arranged for divers to inspect the Cables and photograph the Cables underwater. These inspections and photographs showed how the Cables have not been maintained and how boat anchors and debris had torn into parts of the Cables, exposing the lead sheathing that was originally designed to protect the copper strands from contact with water.

31.     Importantly, lead is a chemical that has long been known to cause neuro-toxicity. In the past decade, federal government agencies published the results of three large-scale overviews regarding the toxicity of lead. These overviews evaluated lead toxicity in light of the existing body of peer-reviewed, published research and are intended to represent the consensus of the scientific community. All of these overviews have found that lead is especially toxic to the developing nervous system. Indeed, there are various critical phases of the development of a central nervous system, including, for example, the genesis of synapses and synaptic pruning, and lead has been shown to impair both of these critical functions. Not surprisingly, humans and other animals exposed perinatally to lead exhibit impaired performance on tests designed to assess intelligence. All three of the federal agencies that conducted overviews of lead toxicity (the Agency for Toxic Substances and Disease Registry, the Environmental Protection Agency ("EPA"), and the National Toxicology Program) found that exposure to lead in developing humans impairs short-term memory

DECLARATION OF M. MACLEAR IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEY'S FEES AND
COSTS UNDER RCRA AND C.C.P. § 1021.5

1   and executive function. And lead has been shown to be toxic in this way at exposure levels as low

2   as can be measured. There is no level of lead exposure that has been shown not to cause

3   neurodevelopmental toxicity. It is well established that many compounds of lead are soluble in

4   water.

5           32.     In addition to investigating the physical nature and location of the Cables, Counsel

6   also investigated the placement, ownership, and abandonment of the Cables. This investigation

7   centered on agency records, both those records that are publicly available through online searches,

8   and through California Public Record Act ("PRA") requests. This investigation involved searching,

9   identifying, and reviewing records from the State Lands Commission, the Public Utilities

10  Commission, the California Department of Parks and Recreation, the Counties of El Dorado and

11  Placer, the Tahoe Regional Planning Agency, the Lahontan Regional Water Quality Control Board,

12  as well as other historical resources detailing the history of development around Lake Tahoe. These

13  investigations demonstrated that the Cables were (and are) owned by Defendant, were laid by

14  Defendant, and that Defendant discontinued use of the Cables while maintaining its rights of

15  easement. The investigations also revealed important details about the use and make-up of the

16  Cables and what Defendant had told relevant agencies regarding the Cables when seeking

17  permission to abandon them.

18          33.     The investigations also revealed that the water where the Cables had been placed is

19  used for drinking water. Lake Tahoe is a water of the State of California for purposes of the

20  California Fish and Game Code, and a source of drinking water within the meaning of California's

21  Safe Drinking Water and Toxic Enforcement Act. In fact, not only is Lake Tahoe designated as a

22  source of drinking water, but it is also an Outstanding National Resource Water under the Clean

23  Water Act.

24          34.     And the area where the Cables are located provides important habitat for endangered

25  and threatened species and is used for recreation by tens of thousands of visitors every year,

26  including Plaintiff's members.

27

28

DECLARATION OF M. MACLEAR IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEY'S FEES AND
COSTS UNDER RCRA AND C.C.P. § 1021.5

35.     After conducting the above-referenced investigations, Plaintiff's counsel researched the statutes and case law potentially applicable to various legal theories of liability and discussed the strengths and challenges of various theories with Plaintiff.

36.     Based upon this research, counsel determined that a cause of action could be stated and successfully prosecuted under RCRA. 42 U.S.C. § 6972(a)(1)(B). Congress enacted RCRA to provide a remedy for harm where, as here, disposal of solid waste may present an imminent and substantial endangerment to health or the environment, and authorized commencement of a civil action to enjoin such disposal of waste. *Id*. Congress also provided that a "court, in issuing any final order in any action brought pursuant to this section or section 6976 of this title, may award costs of litigation (including reasonable attorney and expert witness fees) to the prevailing or substantially prevailing party...." *Id*. § 6972(e). Counsel discussed this legal theory and other requirements of federal jurisdiction with Plaintiff and Plaintiff ultimately decided to go forward with prosecuting this claim.

37.     A prerequisite to filing a complaint under RCRA is the service of a Notice of Violation and Intent to File Suit letter upon the alleged violator, with copies sent to certain government agencies. 40 C.F.R. § 254.2. Accordingly, counsel for Plaintiff prepared and served a notice letter on the Defendant and the required agencies.

38.     In addition to a claim under RCRA, Plaintiff's counsel also determined that a cause of action could be stated and successfully prosecuted under the California Safe Drinking and Toxic Enforcement Act of 1986 ("Proposition 65"). Proposition 65 prohibits the discharge or release of substances listed by the State of California as causing cancer or reproductive toxicity to sources of drinking water. California Health & Safety Code section 25249.5 states, in pertinent part, that "[n]o person in the course of doing business shall knowingly discharge or release a chemical known to the state to cause cancer or reproductive toxicity into water or onto or into land where such chemical passes or probably will pass into any source of drinking water. . . ." Further, Proposition 65 provides that any person "violating or threatening to violate" the statute may be enjoined in a court of competent jurisdiction. Cal. Health & Safety Code § 25249.7. The phrase "threatening to violate"

is defined to mean creating "a condition in which there is a substantial likelihood that a violation will occur." Cal. Health & Safety Code § 25249.11(e). Violators are liable for civil penalties of up to $2,500 per day for each violation of the Act. Cal. Health & Safety Code § 25249.7.

39.     Further, regulations adopted by the California Attorney General expressly recognize the application of the fee shifting provisions of the California Code of Civil Procedure section 1021.5 to private enforcement actions under Proposition 65, providing that "the reduction or elimination of the discharge of listed chemicals establishes a significant public benefit." 11 C.C.R. § 3201.

40.     Proposition 65 also requires a prelitigation sixty-day Notice of Violation letter be sent to the alleged violator, the California Attorney General, the district attorney of every county in which the violation is alleged to have occurred, and the city attorneys of any cities with populations according to the most recent decennial census of over 750,000 and in which the violation is alleged to have occurred. Cal. Health & Safety Code § 25249.7(d); 27 C.C.R. § 25903.

41.     Counsel discussed this legal theory with Plaintiff, and Plaintiff ultimately decided to go forward with prosecuting this claim and bringing the claim under the supplemental jurisdiction of this federal court. 28 U.S.C. § 1367(a).

42.     Accordingly, counsel for Plaintiff prepared and served a sixty-day notice letter on the Defendant and the required agencies. For drafting efficiency, both the RCRA and Proposition 65 notice letters were combined in a single letter. (A copy of this letter is attached to the complaints on file in this action.)

43.     This action involves a novel application of these statutes to telecommunications cables and initial underlying legal research and consideration was critical. Indeed, although RCRA has been found to apply to discharges of hazardous waste from telephone poles, *Ecological Rights Foundation v. Pacific Gas and Electric*, 713 F.3d 502 (9th Cir. 2013), Plaintiff's counsel have found no prior case that has applied RCRA to *in situ* telephone cables. Similarly, although Proposition 65 has been applied to discharge of lead into drinking water, *People ex rel. Lungren v. Superior Court*, 14 Cal.4th 294 (1996), Plaintiff's counsel have identified no case that alleges a

1   discharge to drinking water in violation of Proposition 65 from an *in situ* telephone cable, let alone

2   underwater cables.

3       44.     After filing this matter, information was shared between the parties and a long and

4   involved settlement negotiation began. These settlement discussions required extensive telephone

5   conferences and the gathering and sharing of information.

6       45.     The parties ultimately reached agreement on a settlement arrangement and presented

7   that settlement for approval before this Court and the California Attorney General on September 13,

8   2021 (hereinafter "First Consent Decree").

9       46.     Pursuant to that First Consent Decree, Defendant agreed to diligently seek all

10  necessary permits and authorizations needed to remove the Cables. Upon obtaining the required

11  authorizations, Defendant agreed to remove the Cables within ninety (90) days, so long as the

12  physical removal of the Cables, exclusive of the costs associated with obtaining the relevant permits

13  or authorization or the costs associated with transportation or disposal of the Cables, would not cost

14  more than one million five hundred thousand dollars ($1,500,000). If the Cables were not removed

15  within the time period specified and no agreement could be reached on an extension, or the Cables

16  could not be physically removed for one million five hundred thousand dollars ($1,500,000) or less,

17  that First Consent Decree would be declared null and void and the parties would return to this

18  litigation.

19      47.     In addition to conditionally resolving the removal of the Cables, the parties agreed

20  that Defendant would reimburse Plaintiff for a portion of its attorney's fees. Specifically, Defendant

21  agreed to reimburse Plaintiff two hundred and twenty thousand dollars ($220,000) for attorney's

22  fees and costs. In the course of investigating, preparing, litigating, and settling the case to that point,

23  Plaintiff had incurred over $290,021 in attorneys' fees and costs prior to the first motion to approve.

24  In addition, the parties agreed that Defendant would not pay any civil penalty, given the costs it

25  would have to pay to timely remove the Cables and to reimburse Plaintiff for its fees and costs.

26  (Adjusted for inflation since September 2021, $290,021 is $333,359.74. *See* U.S. Bureau of Labor

27  Statistics, *CPI Inflation Calculator*, available at https://www.bls.gov/data/inflation_calculator.htm.)

28

DECLARATION OF M. MACLEAR IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEY'S FEES AND
COSTS UNDER RCRA AND C.C.P. § 1021.5

48.     In reaching these terms, Defendant was represented by the Paul Hastings firm, principally by attorney Navi Dhillon, a partner with the Paul Hastings firm.

49.     Despite having obtained all of the permits and approvals necessary to remove the Cables by June 2023, Defendant sought leave to vacate the First Consent Decree and reinitiate litigation after a series of news articles regarding the Cables and other, similar cables around the United States was published by the Wall Street Journal. Notice of Election to Vacate Consent Decree (ECF. 49) at 3.

50.     And this Court approved that request and vacated the First Consent Decree. Order Vacating Consent Decree (ECF. 55) at 2.

51.     After the First Consent Decree was vacated, Plaintiff retained new counsel –ATA – as lead counsel for this matter. Prior to ATA joining this matter, ATA represented Plaintiff for years in other citizen enforcement matters. ATA agreed with Plaintiff to provide legal services in this matter on a contingency fee basis. Plaintiff's retention of my firm required our firm to allocate a significant amount of our capacity, staff, and financial resources into this litigation, thereby preventing us from accepting other, subsequent offers for representation.

52.     Upon restarting litigation, Defendant retained counsel at Kirkland Ellis, principally through attorneys Hariklia ("Carrie") Karis and Peter C. Meier.

53.     Intensive discovery began shortly after the vacatur and included requests to parties and numerous third parties. When discovery amongst the parties started, Defendant retained a third firm, Crowell & Moring LLP, principally through attorney Kieran Tuckley, to help manage discovery-related matters.

54.     Plaintiff submitted initial disclosures and propounded sets of interrogatories, requests for admission, requests for production, and subpoenas. Counsel prepared and served on Defendant interrogatories, requests for production, and requests for admission, prepared for and conducted depositions, and participated in meet-and-confer conferences regarding Defendant's compliance therewith. In addition, counsel responded to Defendant's discovery requests and facilitated depositions requested by Defendant.

DECLARATION OF M. MACLEAR IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEY'S FEES AND COSTS UNDER RCRA AND C.C.P. § 1021.5

55.     Plaintiff submitted third-party subpoenas to the EPA and several of Defendant's investigating consultants, including Ramboll and Haley & Aldrich, in order to obtain information related to Defendant's investigation of the Cables and the extent, scope, and severity of the discharges associated with the Cables. And Plaintiff's counsel also responded to third-party discovery requests from other, non-parties.

56.     At the same time, Plaintiff conducted an extensive underwater Cables survey and commensurate comprehensive sampling regime. These investigations confirmed that the Cables are discharging lead into Lake Tahoe and that such lead was and is being absorbed by aquatic organisms in the Lake beyond a reasonable doubt.

57.     In addition, our firm undertook other investigations to obtain relevant documents and information that could shed light on the extent and scope of the Cables' discharges into Lake Tahoe. This included several Freedom of Information Act ("FOIA") requests, subpoenas, and several PRA requests.

58.     After depositions were planned and expert report preparation was almost complete, in June 2024, Defendant agreed to remove the Cables without conditions. Such negotiations resulted in the agreement attached hereto as **Exhibit 1** (hereinafter "Second Consent Decree").

59.     The Second Consent Decree, its supporting Motion to Approve, and this Motion and related supporting declarations have been served on the California Attorney General's Office for its review, with each providing at least 45 days for the Attorney General to object or not. The Motion to Approve the Second Consent Decree is set to be heard on November 7, 2024.

60.     Pursuant to the Second Consent Decree, Defendant agreed to diligently seek all necessary permits and authorizations needed to remove the Cables from Lake Tahoe. The Second Consent Decree recognizes that federal, State, or local agencies may need to authorize removal of the Cables.

61.     Defendant agreed to remove the Cables by November 30, 2024, or the next available date before Memorial Day 2025, based on weather conditions and consistency with permitting procedures ("Target Removal Date"). If, after the Target Removal Date, Defendant cannot complete

1   removal and/or disposal of the Cables, Defendant must notify Plaintiff and explain how it plans to

2   nevertheless promptly remove and dispose of the Cables. If the parties cannot agree on a modified

3   schedule, they must meet-and-confer within fourteen (14) days of receiving a request from the other

4   party to meet-and-confer. If the meet-and-confer fails, either because one or both parties fail to

5   meet-and-confer in good faith or because the meet-and-confer is otherwise unsuccessful, then, after

6   seven (7) days have elapsed from the date of the meet-and-confer, either party may seek any remedy

7   otherwise entitled to them by law, including by filing a motion with this Court for enforcement of

8   the Second Consent Decree.

9       62.    In addition, the Parties agree that no civil penalty will be paid pursuant to

10  Proposition 65 or RCRA, as previously approved by the Court.

11      63.    Though the Parties were able to resolve the substantive issues subject to this action,

12  they were not able to resolve the issue of Plaintiff's costs and attorneys' fees. Accordingly, the

13  parties have agreed to bifurcate the substantive remedies at issue in this matter with Plaintiff's

14  entitlement to fees and costs.

15  **IV.  PROSECUTION OF THIS ACTION**

16      64.    I have reviewed the time records of the attorneys that have worked on this case and

17  am familiar with how tasks have been assigned and actions conducted by the attorneys. Each of the

18  attorneys in the case has extensive litigation experience. As noted, the case was first handled by Mr.

19  Williams, Mr. Packard, Mr. Carlon, Mr. Verick, Mr. Boyd, and Mr. Acree. Aqua Terra Aeris Law

20  Group (including myself) was then brought in after the first settlement was vacated. As noted,

21  spreadsheets with each attorney's contemporaneously recorded billing records are provided

22  herewith. (While Mr. Williams and Mr. Acree were involved in the filing and initial litigation of

23  this lawsuit, both attorneys' participation tapered off shortly thereafter. Both Mr. Acree and Mr.

24  Williams ceased regularly working on this matter in August 2021.)

25      65.    During the time period from once the First Consent Decree was entered to shortly

26  after vacatur (November 2021 to September 2023), most case handling responsibilities were

27  handled by Mr. Verick, Mr. Packard, Mr. Boyd, and Mr. Carlon. Since October 2023, my firm has

28

litigated this case as lead counsel, coordinated the related investigations and experts, and engaged in settlement negotiations.

66.     The time and costs incurred in the investigation and prosecution of this action can be broken down into several categories. These are: Category 1 – Initial Factual Investigation (including research into the ownership of the Cables, historic agency actions and records concerning the Cables, researching local witnesses and impacts, initial sampling and analysis demonstrating how the Cables discharge lead, and the logistics and practical considerations implicit in removing the Cables); Category 2 – Initial Pleadings and Notice Letter (including the research, drafting, serving, and filing of the notice letter and complaints); Category 3 - Case Management and Evaluation of Claims (including coordinating with co-counsel, non-discovery motion practice, and the evaluation of potential claims that were ultimately not raised); Category 4 – Post-filing Factual Investigations (including retention of experts, investigators and divers, coordination with agencies, laboratories, and consulting experts, and compiling information necessary for expert opinions); Category 5 - Discovery (including propounding and responding to written discovery to and from Defendant, third-party subpoenas to various agencies, and Defendant's investigators, monitoring third -party subpoenas sent out by Defendant associated with the Wall Street Journal investigation, its investigators (Marine Taxonomic Services / Below the Blue), to Environmental Defense Fund and former staff thereof, multiple laboratories, and reviewing all the documents produced in this matter for tagging according to persons, topics, and legal claims and defenses); Category 6 - Settlement (including negotiations and work necessary to obtain this Court's approval of the First and Second Consent Decrees); and Category 7 – Fee Motion (including the time spent preparing, drafting, and arguing this fee motion). ATA took the lead on Categories 3 (after September 2023), 4, 5, and 7 and the second set of settlement negotiations (within Category 6). And the other counsel (Mr. Williams, Mr. Packard, Mr. Carlon, Mr. Verick, Mr. Boyd, and Mr. Acree) managed the work associated with categories one and two and the first set of settlement negotiations (within category six). That said, attorneys with my firm and our co-counsel (Mr. Packard, Mr. Carlon, Mr. Verick, and Mr. Boyd) worked collaboratively in preparing and responding to discovery requests and in negotiating the

Second Consent Decree. The summary tab in Exhibit 2 shows each timekeeper's hours in each category before billing-judgment-related cuts (including time that was cut, written off, or reclassified at paralegal or legal assistant rates).

67.     Category 1: This case involved significant factual investigation by attorneys prior to and as part of determining if a toxic discharge of lead was taking place and, if so, the extent of that discharge. This investigation included discussions and meetings with the divers that had discovered the Cables and reviewing the evidence and information the divers had obtained regarding the Cables. It also involved securing a piece of the Cables, the end of which was already cut off and was lying underwater, and having that sample tested in water taken from Lake Tahoe to assess the leaching and discharge of lead therefrom. It also involved testing the cable sample in a form mimicking the uncut cable in place under the water by capping the piece of cable with paraffin to prevent discharge from the end of the cable, and further forensic testing of the Cables by several labs.

68.     Likewise, Plaintiff's counsel investigated the history of the Cables' placement in the Lake and their ownership. This work involved investigation of online records from state agencies and the drafting and issuance of several PRA requests. Counsel also investigated the area where the removal work was to be done, including by contacting residents and investigating the proximity of the Cables to the properties of these residents

69.     A total of 224.6 hours were spent in Category 1 (initial factual investigation). *See* **Exhibit 2**. Notably, most of this time was already approved by this Court as reasonably incurred. *See generally* Amended Consent Decree (ECF. 22) at 2. After a 19.9% reduction for billing judgment, Plaintiff seeks recovery for 179.9 hours for Category 1. *See* **Exhibit 2**.

70.     Category 2: Counsel evaluated potential claims, researched the applicable statutory and regulatory frameworks controlling the Cables and discharges therefrom, and reviewed court decisions that related to any potential legal claims. Counsel also drafted a notice letter under both RCRA and Proposition 65 and drafted a complaint and several amended versions thereof. This action involves a novel application of these statutes to telecommunications cables and initial

DECLARATION OF M. MACLEAR IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEY'S FEES AND COSTS UNDER RCRA AND C.C.P. § 1021.5

underlying legal research and consideration was critical. Indeed, although RCRA has been found to apply to discharges of hazardous waste from telephone poles, Plaintiff's counsel have found no prior case that has applied RCRA to *in situ* telephone cables. Similarly, although Proposition 65 has been applied to discharge of lead into drinking water, Plaintiff's counsel have identified no case that alleges a discharge to drinking water in violation of Proposition 65 from an *in situ* telephone cable. It was accordingly reasonable and good practice for Plaintiff's counsel to conduct some level of independent research and then discuss the strengths and weaknesses of the legal theories with Plaintiff prior to filing this lawsuit or serving the notice letter. Plaintiff's counsel also discussed the strengths and weaknesses of these theories of liability with Plaintiff and came to the resolution that raising these claims was the strategic, prudent course.

71.     A total of 142.9 hours were spent in Category 2 (drafting and service the notice letter and complaints). *See* **Exhibit 2**. Notably, most of this time was also already approved by this Court as reasonably incurred. *See generally* Amended Consent Decree (ECF. 22) at 2. After an 18.61% reduction for billing judgment, Plaintiff seeks recovery for 116.3 hours for Category 2. *See* **Exhibit 2**.

72.     <u>Category 3</u> (Case Management and Evaluation of Claims): This lawsuit involved multiple phases, including a prior settlement and the vacatur thereof, complex discovery, expensive and detailed scientific testing and analysis, and the prosecution of fairly novel legal claims. And it required coordination between many attorneys at several firms. Managing this case, therefore, proved a cumbersome task at times. This category accounts for that and covers time spent on case management between Plaintiff's co-counsel as well as my firm's initial evaluation of the claims filed by the other, prior co-counsel and subsequent evaluation of potential additional claims. For example, Plaintiff and Plaintiff's counsel considered adding a separate Clean Water Act claim but ultimately abandoned that idea after detailed research and evaluation. A total of 520.3 hours were spent in this category. *See* **Exhibit 2**. After a 21.51% reduction for billing judgment, Plaintiff seeks recovery for 408.4 hours for Category 3. *Id*.

73.     Category 4: Once my firm was brought in as lead counsel, we undertook additional factual investigations into the Cables. Specifically, as noted, we retained divers to sample sediment around the Cables and then had those samples analyzed by a laboratory to determine the extent and scope of the discharges from the Cables. This required hiring and managing consultants and liaising with relevant agencies to obtain the requisite authorizations to undertake the sampling. Plaintiff conducted an extensive underwater Cables survey with a commensurate comprehensive sampling regimen of biofilm on the Cables, sediment from near and away from the Cables, water samples at and away from the Cables, biota samples of tissue from mollusks, snails, and crawdads from near the Cables, and the Cables themselves, all of which were included in isotopic analyses for fingerprinting the lead from the Cables. In addition, our firm undertook other investigations to obtain relevant documents and information that could shed light on the extent and scope of the Cables' discharges into Lake Tahoe. This included several FOIA requests and several PRA requests. A total of 489.3 hours were spent in this category. *See* **Exhibit 2**. After a 12.63% reduction for billing judgment, Plaintiff seeks recovery for 427.5 hours for Category 4. *Id*.

74.     Category 5: Discovery in this matter has been complex. Counsel prepared and served on Defendant two sets of interrogatories, one set of requests for production, and one set of requests for admission, prepared for and conducted depositions, and participated in meet-and-confer conferences regarding Defendant's compliance therewith. In addition, Plaintiff's counsel responded to Defendant's discovery requests and facilitated depositions requested by Defendant. Defendant did not make the discovery process easy; Plaintiff's counsel were obligated to meet and confer with Defendant's counsel twice to obtain legally sufficient responses to Plaintiff's first sets of interrogatories, requests for admission, and requests for production. Moreover, third-party discovery occurred. Plaintiff submitted third-party subpoenas to the EPA and several of Defendant's expert consultants, including Ramboll and Haley & Aldrich (two consultancies), in order to obtain additional information related to the extent, scope, and severity of the discharges associated with the Cables. And Plaintiff's counsel also responded to third-party discovery requests from other, non-

1  parties. All told, a total of 852.0 hours were spent in this category. *See* **Exhibit 2**. After a 12.93%

2  reduction for billing judgment, Plaintiff seeks recovery for 741.8 hours for Category 5. *Id.* at Ex. 2.

3       75.     <u>Category 6</u>: Time spent within this category can be divided into several

4  subcategories: (1) time spent negotiating the First Consent Decree and ensuring the implementation

5  thereof; (2) time spent participating in the vacatur process of the First Consent Decree, and (3) time

6  spent negotiating the Second Consent Decree. With regards to the first subcategory, settlement

7  negotiations began soon after the notice letter was served. Such discussions were then periodically

8  continued while additional information gathering and client discussions took place on each side.

9  Once the agreement-in-principle was reached and reduced to writing, the motion for the settlement

10  to be reviewed by the court needed to be drafted, filed, and served. A total of 174.6 hours of

11  attorney time were spent negotiating, drafting, and obtaining court and state approval for the first

12  settlement. *See* **Exhibit 2**. Notably, most of this time was also already approved by this Court as

13  reasonably incurred. *See generally* Amended Consent Decree (ECF 22) at 2.

14       76.     An additional 192 hours were spent on the vacatur process of that first settlement. *Id.*

15  (Much of this time is being written off per Plaintiff's counsel's billing judgment.)

16       77.     After the first settlement was vacated and litigation resumed, in June 2024,

17  negotiations began anew. Subsequent negotiations resulted in the Second Consent Decree. All told,

18  a total of 529.3 hours were spent on category 5 activities. *See* **Exhibit 2**. After a 14.06% reduction

19  for billing judgment, Plaintiff seeks recovery for 455.3 hours for Category 6. *Id.*

20       78.     <u>Category 7</u>: The seventh category of time spent accounts for Plaintiff's counsel's

21  time preparing this fee motion and negotiating with Defendant's counsel regarding fee and cost

22  related issues. This work included collating, organizing, and editing contemporaneously recorded

23  billing entries, drafting the motion and associated declarations in support thereof, researching

24  relevant caselaw and fee-related decisions to inform our rate-setting endeavors, and consulting with

25  other counsel regarding appropriate rates. All told, a total of 190.8 hours were spent in this category

26  to date. *See* **Exhibit 2**. After a 42.19% reduction for billing judgment, Plaintiff seeks recovery for

27  110.3 hours for Category 7. *Id.* Of course, additional hours related to the finalizing and filing of this

28

1  motion and its attendant documentation and then the drafting, finalizing, and filing of the

2  subsequent reply will be included along with the forthcoming reply brief.

3      79.    As explained in detail below, Plaintiff's counsel (namely myself) have undertaken

4  significant efforts to reduce their fees based on their billing judgment and in the interest of resolving

5  this matter expeditiously.

6  **V.   TASKS PERFORMED AND HOURS INCURRED IN THIS CASE**

7      80.    Along with Ms. Maharg, we supervised other attorneys on this matter and

8  coordinated our representation of the California Sportfishing Protection Alliance. As a result, I have

9  been involved in just about every aspect of Plaintiff's post-vacatur prosecution of this case.

10     81.    For example, I managed the experts and directed the investigative work performed

11 after our firm took over. Towards this end, I researched, identified, interviewed, and evaluated

12 which experts to retain, met with those experts, drafted, revised, and executed retention agreements

13 with those experts, and then supervised those experts as they undertook their obligations vis-à-vis

14 this litigation. Plaintiff retained six experts in this matter, with five of them being retained since

15 October 2023. Each expert provided input on the sampling plan, interpretations of the test results,

16 and expert opinions.

17     82.    Plaintiff's counsel caused additional complex underwater surveys and investigations

18 to occur. Those required divers to sample the water, sediment, algae, bitumen, and biota (crawdads,

19 snails, and mollusks) at, under, and around the Cables, as well as collecting reference samples at

20 increasing distances from the Cables. Specifically, we retained commercial divers, boat, and

21 remotely-operated-vehicle (or "ROV") operators to sample around the Cables according to the

22 Quality Assurance Protection Plan and Sampling & Analysis Plan ("QAPP" & "SAP") for

23 underwater sample collection prepared by Ian Wren, the principal investigator and hydrological

24 discharge expert. Surveying the cables took over a week to familiarize the divers with the cables

25 and map the locations, all while using the video capture feature of the ROV to identify locations to

26 sample. Sampling occurred on four separate days (April 9, 10, and 22, 2024 and May 15, 2024).

27 Each set of samples were transferred under chains of custody to analytical laboratories for analysis

28

to determine the concentrations, extent, and scope of the discharges from the Cables. Before sampling could occur, ATA liaised with relevant agencies and submitted complete applications with the QAPP, SAP, maps, GPS locations, survey videos, and insurance documents to obtain the requisite authorizations to undertake the sampling in Emerald Bay and D.L. Bliss State Parks. The sampling included multiple samples of biofilm/algae on and away from the Cables, sediment from under, near and away from the Cables, water samples at and away from the Cables, biota samples of mollusks, snails, and crawdads from at or near the Cables, and the Cables' bitumen and lead components themselves, all of which were included for samples prepared for isotopic analyses for fingerprinting the lead from the Cables.

83.     And I also worked with our expert consultants to help inform them about the litigation, prepare them for their contributions to the discovery process (be that the preparation of expert reports, written discovery requests, or depositions), and helped to facilitate their effective and efficient production of relevant expert opinions. Moreover, to facilitate this sampling plan, I worked with Mr. Beck and our experts to identify what permits would be required and apply for and acquire those permits. Expert fees were necessarily incurred in order to demonstrate that the Cables were and are discharging lead into Lake Tahoe in a serious, significant way. All told, this was a considerable undertaking.

84.     Further, I reviewed and analyzed sampling results produced by our team, Defendant, and third-parties related to the cables and lead discharges therefrom. And I supervised Ms. Trillo and Mr. Carlon in the preparation of a spreadsheet consolidating and organizing all of the sampling data conducted by Defendant, third-parties, and us.

85.     I also participated in the discovery process. I revised Plaintiff's responses to requests for protection, requests for admission, and interrogatories proffered by the Defendant, revised and edited requests for production, requests for admission, interrogatories, and subpoenas proffered by Plaintiff, reviewed other parties' document productions, reviewed and revised our initial disclosures, met and conferred with Defendant regarding its compliance with our discovery requests, participated in strategy calls with other co-counsel for Plaintiff, and helped to create a

tagging system for our associates to use when reviewing documents produced by other entities and reviewed and tagged many thousands of pages of documents myself. I also reviewed and analyzed a motion to compel submitted by the Defendant and reviewed Defendant's and a third-party's briefing regarding a discovery dispute relevant to this litigation. I also attended several discovery conferences. Moreover, and relatedly, I also managed Ms. Trillo and Mr. Beck in the propounding of third-party subpoenas.

86. A scheduling Order (ECF. No. 85) was issued shortly before ATA was retained. Along with Ms. Maharg, I managed our advocacy efforts with regards to modifying that schedule order in this litigation. First, we met with opposing counsel about this to attempt to find a resolution to the matter. And then, when that failed, we managed the drafting and filing of a Motion to Modify the Scheduling Order. I also consulted with labs, experts, and agencies to draft and revise my declaration submitted in support of that motion. (This was necessary to allow for the investigation described above.)

87. Further, along with Mr. Boyd and Mr. Packard, I coordinated efforts to secure financing for the prosecution of this case, communicating regularly with funders, including the Rose Foundation and the organization Clean Up the Lake and organizing the budgeting and invoicing process for our experts and sampling regime. All such time has been written off as billing judgment across all timekeepers.

88. Throughout all of this, I attended and often led regular meetings between myself, Ms. Maharg, Mr. Verick, Mr. Boyd, Mr. Williams, Mr. Acree, Mr. Carlon, and Mr. Packard to discuss the litigation and strategize regarding briefing, discovery-related issues, the factual investigation (*i.e.*, sampling and lab analysis), and other case-related issues.

89. Finally, though significantly, Ms. Maharg and I led the negotiations with the Defendant, culminating in the Second Consent Decree requiring Defendant to remove the Cables from Lake Tahoe. This required regular meetings with opposing counsel, strategy calls with Plaintiff's co-counsel, the drafting and subsequent revision of the consent decree, and preparation and submission of a Motion to Approve and a memorandum and declaration in support thereof.

90.     And I have managed our firm's preparation of this fee motion and the related documentation, including the preparation of **Exhibit 2**, our lodestar spreadsheet. Towards this end, I reviewed and edited the fee motion itself and its attendant memorandum of points and authorities and reviewed each timekeeper's hours and made adjustments based on my billing judgment as an experienced attorney and founding partner of my firm.

91.     Attached hereto as **Exhibit 2** is a true and correct copy of my chronological time records that document the time that I spent on this case. I personally and contemporaneously kept these records using computer timekeeping software and amended them for clarity documenting the hours I worked on this case for which I am seeking to recover an attorney's fee award.

## VI.   EXCERSISE OF BILLING JUDGMENT

92.     The practice of all attorneys and support staff at ATA is to record our time when we incur it. We use timekeeping software, and all timekeepers record their time in a maximum of six-minute or one-tenth-of-an-hour increments. Timekeepers can use the timers available through our timekeeping software and record the exact time spent on each task.

93.     I personally reviewed all the time entries from all attorneys and staff from the 2020 investigation through October 24, 2024. In reviewing the time records, I reduced timekeepers' rates and/or time spent in several ways. In so doing, I corrected dates amongst timekeepers for corresponding events (*i.e.*, teleconferences, calls, and hearings) where the descriptions matched but the dates entered by the timekeepers were off. I cut vague entries. I clarified abbreviated terms. I adjusted the lodestar and/or reduced hours for multi-hour tasks. I cut repeated tasks by the same timekeeper. I wrote off and wrote down time to avoid inconsistencies for corresponding events (*i.e.*, teleconferences, calls, and hearings) where timekeepers had matching dates and descriptions but the times recorded by each timekeeper were off (typically by defaulting to the lowest time recorded). I wrote off time for calls between timekeepers where only one timekeeper actually recorded that event. I eliminated or wrote off duplicate entries that appeared to be inadvertently added in the process of contemporaneous time keeping. I wrote off or wrote down block-billed entries. I wrote off or wrote down time spent on issues or claims that ultimately were not pursued (including

investigations into the chemical pentachlorophenol and possible trespass, nuisance, and Clean Water Act claims) and research related thereto. I reclassified work and reduced attorney and paralegal timekeepers' rates for tasks that would typically be performed by legal support staff but were instead performed by an attorney or paralegal. I wrote off or wrote down time spent on noticed parties that were ultimately not included in this litigation (including CalPeco and Nevada Power). I also wrote off time spent on pure administrative tasks and for fundraising to pay for the expensive underwater investigation and experts.

94.     Before exercising billing judgment, I reviewed each timekeeper's billing records (and supervised ATA associates assigned tasks) and noted any potential billing judgment issues for individual or sets of timekeeper entries. I then requested each timekeeper address these issues and then supervised Mr. Beck in checking and verifying consistency amongst their corrections. For instance, where we spotted instances where one timekeeper had an entry for a call with other timekeepers but some or all of the other timekeepers did not record an entry for that call, we added an entry to those timekeepers' billing records for consistency's sake and then wrote off that time completely. However, there are also entries where one timekeeper had an entry for a call with unidentified co-counsel and where no other co-counsel recorded a corresponding call on that same day. Similarly, these entries were written off entirely.

95.     Finally, I also cut time for certain timekeepers after certain dates depending on their involvement in the litigation at that point (in part to account for any potential duplication implicit in my firm taking over this litigation as lead counsel in October 2023).

96.     All told, Plaintiff's counsel cut between 12.53 and 40.10 percent of each attorney's billing entries. A complete accounting of these cuts is reflected in **Exhibit 2** attached hereto.

97.     As a result, the remaining time recorded for which Plaintiff's counsel seek recovery is focused on the tasks necessary to the effective litigation of this case, is not duplicative, and was reasonably incurred.

DECLARATION OF M. MACLEAR IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEY'S FEES AND COSTS UNDER RCRA AND C.C.P. § 1021.5

## VII. REASONABLENESS OF PLAINTIFF'S PROPOSED COST AWARD

98.     Attached hereto as **Exhibit 3** is a spreadsheet that includes a chronological accounting of the costs incurred by Plaintiff and Plaintiff's counsel in the prosecution of this litigation. And attached hereto as **Exhibit 9** is a document providing invoices and other expenses related to the costs for which Plaintiff hereby seeks reimbursement. The invoices and expenses in **Exhibit 9** track those listed in **Exhibit 3** and provide relevant details (including receipts) for Plaintiff's costs.

99.     In Total, Plaintiff incurred $133,768.51 in expenses to prosecute this case. Most of those costs cover sampling at the Cables and expert analysis thereof. The rest of those costs cover hearing transcripts, costs to cover Microsoft Cloud data storage increased specifically for this case, costs to cover Everlaw document management software, website hosting, storage, and membership (for the discovery process), filing fees, and shipping costs related to Plaintiff's application for a permit to undertake the above-mentioned sampling regime and other case related mailings.

100.     These costs were necessarily incurred because Defendant sought a adjudication of the safety of the Cables after the Wall Street Journal article came out in July 2023. Thus, Plaintiff expended funds to further establish that the Cables discharge lead, it gets into the algae which is a base food for the food chain of Lake Tahoe, there was lead in drinking water at Eagle Point Campground, and there was lead at much higher concentrations next to the Cables than from samples taken 15+ meters away. The costs were incurred for Plaintiff to investigate the impacts of the Cables and to prove the claims raised in this litigation. And the remaining costs were necessary to facilitate the discovery process and file documents related to this litigation. Moreover, recovery of these costs is allowable by law. These costs are correctly stated.

I declare, under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on the 31st of October 2024 in Orinda, California.

_/S/ Matthew Maclear_
Matthew Maclear