Joshua Koltun (Bar No. 173040)
One Sansome Street
Suite 3500, No. 500
San Francisco, California  94104
Telephone:  415.680.3410
Facsimile:  866.462.5959
joshua@koltunattorney.com

Attorney for Nonparty Witnesses
Marine Taxonomic Services, Ltd,
Below the Blue, Seth Jones, and
Monique Rydel-Fortner ("BTB-MTS")

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

Case 2:21-cv-00073-JDP

CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE,

        Plaintiff,

v.

PACIFIC BELL TELEPHONE COMPANY

        Defendant

Case No. 2:24-cv-00022-KJM-JDP

PACIFIC BELL TELEPHONE COMPANY,

        Movant,

v.

MARINE TAXONOMIC SERVICES, LTD.

        Respondent

**MEMORANDUM IN SUPPORT OF BTB-MTS'S MOTION TO SHIFT COSTS**

Zoom Hearing:  December 12, 2024
Time:          10 am
Courtroom      9
Judge:         Hon. Jeremy D. Peterson

## *TABLE OF CONTENTS*

TABLE OF AUTHORITIES ...............................................................................................ii

Introduction ...................................................................................................................... 1

Factual and Procedural Background ................................................................................. 2

Argument .......................................................................................................................... 5

I.    AT&T's argument that BTB-MTS is not entitled to cost-shifting because it is an "interested
      party" is without merit ............................................................................................ 5

   A. The obligation to pay "significant expenses" to nonparties is mandatory .................. 5

   B. The only "interest" the court may consider is whether the nonparty has a  substantial financial
      stake in the outcome of the litigation by reason of its own involvement in "underlying acts
      that gave rise to the lawsuit" .................................................................................. 7

   C. Here, AT&T's contention that BTB-MTS has a substantial financial stake in the outcome of
      this litigation is absurd and demonstrably false .................................................... 8

   D. AT&T's argument that BTB-MTS environmental advocacy disqualifies it from cost-shifting
      has been squarely rejected by the Ninth Circuit. .............................................. 10

II.   Dow Jones's agreement to pay or to advance any of these significant expenses does not negate
      AT&T's obligations to reimburse them. ................................................................ 12

III.  The "significant expenses" sought are reasonable; they include only time spent complying
      with the subpoena after January, when BTB-MTS hired an ESI vendor................... 13

IV.   BTB-MTS is also entitled to sanctions under Rule 45(d)(1) because AT&T and its attorneys
      pursued discovery against it for improper purposes ............................................ 17

Conclusion ...................................................................................................................... 19

### *TABLE OF AUTHORITIES*

**Cases**

*Barracuda Networks v. J2 Global*, 2020 U.S. Dist. LEXIS 183538 (C.D. Cal July 17, 2020).........7, 14

*Brandenburger v. Thompson*, 494 F.2d 885, 889 (9th Cir. 1974) ( ......................................................13

*Cornell v. Columbus McKinnon Corp.*, 2015 US Dist. LEXIS 105450 (N.D. Cal. Aug. 11, 2015) ..1, 7, 10

*Ed A. Wilson, Inc. v. GSA*, 126 F.3d 1406, 1409-10 (Fed. Cir. 1997) ...................................................12

*Franco v. Ruiz Food Prods.*, 2012 U.S. Dist. LEXIS 169057, at *55-56 (E.D. Cal. Nov. 27, 2012) ....15

*Gamefam v. WowWee Grp,* 2024 U.S. Dist. LEXIS 47464, at *17 (N.D. Cal. Mar. 18, 2024) ............14

*Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) ................................................................................15

*Legal Voice v. Stormans Inc.*, 738 F.3d 1178, 1184 (9th Cir. 2013) ("Legal Voice I")................passim

*Legal Voice v. Stormans Inc.*, 757 F.3d 1015, 1016-17 (9th Cir. 2014) ("*Legal Voice II*")....1, 2, 13, 16

*Mattel Inc. v. Walking Mt. Prods.*, 353 F.3d 792, 813-14 (9th Cir. 2003). ...........................................17

*McGillvary v. Netflix, Inc.*, 2024 U.S. Dist. LEXIS 185755, at *6-7 (C.D. Cal. Oct. 9, 2024).............15

*Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008) ..................................................15

*Nadarajah v. Holder*, 569 F.3d 906, 916 (9th Cir. 2009) ....................................................................12

*Nitsch v. Dreamworks Animation SKG Inc.*, 2017 U.S. Dist. LEXIS 34106, at *12-14 (N.D. Cal. Mar. 9, 2017). ........................................................................................................................................14

*Reed v. Town of Gilbert*, 576 U.S. 155, 64-65 (2015) ........................................................................11

*United States v. Columbia Broad. Sys., Inc.*, 666 F.2d 364, 371 (9th Cir. 1982). ..................................6

*United States v. McGraw-Hill Cos.*, 302 F.R.D. 532, 535-36 (C.D. Cal. 2014) ................................6, 8

*Valcor Eng'g Corp. v. Parker Hannifin Corp.*,2018 U.S. Dist. LEXIS 142120 (C.D. Cal. July 12, 2018) .....................................................................................................................................passim

**Statutes**

28 USC § 636(b)(1) ..............................................................................................................................4

**Rules**

Fed.R.Civ.P 45(d)(1)....................................................................................................................2, 6, 17

Fed.R.Civ.P. 45(d)(2)(B)(ii). ................................................................................1, 11, 17

Fed.R.Civ.P. 72(a); ................................................................................................4

L.R. 303 ................................................................................................................4

BTB-MTS Memo Supp Cost-Shifting Motion                    2:21-cv-00073-JDP / 24-cv-00022-KJM-JDP

Joshua Koltun ATTORNEY

### Introduction

Nonparty BTB-MTS seeks an order that AT&T reimburse the "significant expense" it incurred in complying with AT&T's subpoena, as well as its attorney fees for seeking such cost-shifting.  Such an award is ***mandatory*** under Fed.R.Civ.P. ("Rule") 45(d)(2)(B)(ii).  *Legal Voice v. Stormans Inc.*, 738 F.3d 1178, 1184 (9th Cir. 2013) ("Legal Voice I"); *Id.,* 757 F.3d 1015, 1016-17 (9th Cir. 2014) ("*Legal Voice II*").  These significant expenses include the fees for the ESI vendor (which AT&T had recommended) and the time counsel and BTB-MTS staff spent reviewing documents for production.

The various reasons AT&T has given for its refusal to pay these expenses, *see* DE 150, are without merit.

AT&T argues that BTB-MTS is not entitled to cost-shifting because it is an "interested party." But under the caselaw on which AT&T relies, the only issue is whether the nonparty has a significant enough ***financial*** stake in the outcome of the litigation to affect whether the costs it incurred should be considered "significant." *Cornell v. Columbus McKinnon Corp.*, 2015 US Dist. LEXIS 105450 (N.D. Cal. Aug. 11, 2015) at *8; *Valcor Eng'g Corp. v. Parker Hannifin Corp.*,2018 U.S. Dist. LEXIS 142120 (C.D. Cal. July 12, 2018) at *9-11.  AT&T's contention that BTB-MTS has such a financial stake is absurd and demonstrably false.

AT&T contends that BTB-MTS should be denied cost-shifting because it brought the environmental issue that gave rise to this litigation – AT&T's abandonment of lead-clad cables in Lake Tahoe – to the attention of regulators, plaintiffs' counsel, and the public.  That would unconstitutionally penalize BTB-MTS for its First Amendment activities.  The Ninth Circuit in *Legal Voice I* squarely ruled that a nonprofit advocacy organization that had brought attention to the issue that is the subject of the litigation was fully entitled to cost-shifting.  *Id.,* 738 F.3d at 1181.

AT&T argues that BTB-MTS did not comply or inadequately complied with the subpoenas before it engaged an ESI vendor, and thus its expenses were not spent in complying with the subpoenas.  But BTB-MTS is not seeking to be compensated for any of that.  It is only seeking to be compensated for the work of its staff, attorneys and the vendor once that vendor had been engaged.

AT&T argues that it need not pay for BTB-MTS attorney fees because Dow Jones has paid those fees and thus that BTB-MTS did not "incur" the expense.  But countless federal courts –

including the Ninth Circuit in *Legal Voice II* -- have ruled that a party "incurs" attorney fees whether or not that party is obligated to pay those fees. *Id.,* 757 F.3d. at 1017. Needless to say, BTB-MTS would reimburse Dow Jones out of any award.

BTB-MTS is also entitled to be reimbursed as a sanction under Rule 45(d)(1). AT&T should not be allowed to turn BTB-MTS into an involuntary uncompensated expert. AT&T vacated the Consent Decree so that it could use the discovery processes to force BTB-MTS to produce data underlying the *Wall Street Journal's* reporting so that it could be "adjudicated based on science in open court." But the *Journal*'s reporting was never an issue in the case. If AT&T had not forced BTB-MTS to produce the documents, neither side would have been able to use them. But before any expert discovery had taken place, AT&T agreed to remove the Cables without conditions. AT&T delayed removing the Cables without ever obtaining the "adjudication" that supposedly justified the delay. AT&T should not be able to saddle BTB-MTS with the huge expenses it forced it to incur in this unnecessary proceeding.

### *Factual and Procedural Background*

Marine Taxonomic Services, Inc. ("MTS") is an environmental consulting firm. Jones Decl., ¶1. Seth Jones is one of its principals; Monique Rydel-Fortner is an employee. *Id.* Jones and Rydel-Fortner founded a nonprofit organization, Below the Blue ("BTB"), dedicated to removing foreign debris from water bodies and educating the public about pollution. *Id.* MTS, BTB, Jones and Rydel-Fortner are referred to collectively here as "BTB-MTS."

Jones discovered a severed cable at the bottom of Lake Tahoe, and in 2018, realized it was a submarine telecom cable. *Id.* At that point MTS performed an assay and determined that the cable sheathed in lead. *Id.* Over the next two years BTB-MTS attempted to interest government environmental regulators in the lead cables at the bottom of the lake. *Id.*¶ 3. In 2020, Jones brought the matter to the attention of Plaintiff's counsel. *Id.* Subsequently Plaintiff brought this lawsuit. *Id.*

The Consent Decree was entered in November 2021. As described in more detail below, in section I.C, BTB-MTS worked for a while thereafter with Plaintiff counsel and AT&T personnel on the logistics of removing the Cables from the lake.

Starting in January 2022, BTB-MTS began assisting the *Journal* and the Environmental

Joshua Koltun  ATTORNEY

Defense Fund ("EDF") on an investigation of lead-clad cables, which culminated in BTB-MTS publishing a report on that investigation and the *Journal* publishing a series of articles in July 2023 on the subject. *Id.,* ¶ 8.

In August 2023, BTB and MTS were served with identical subpoenas. *Id.,* ¶. After defense counsel refused to give BTB-MTS an extension of time to look for counsel unless it agreed to produce the requested documents, Jones "object[ed] to the requests in the subpoena because they are burdensome, not related to litigation and violate my first amendment rights." DE 65-18 at 2, 3.

On August 26, the Vance Center for International Justice agreed to assist BTB-MTS by finding counsel from its roster of large law firms to represent it. Jones Decl., ¶ 9. The Vance Center let AT&T know that it was seeking to obtain counsel for BTB-MTS; it provided updates to AT&T as two law firms[1] initially agreed to represent BTB-MTS but then withdrew. Koltun Decl., Exh. I. (AT&T status report in S.D Cal.).[2]

Once it became evident that the Vance Center would be unable to fulfill its commitment to locate *pro bono* legal representation for BTB-MTS, outside counsel for the *Journal* contacted the undersigned counsel and indicated that Dow Jones would pay his fees if he would step in and represent BTB-MTS. Koltun Decl., ¶ 5. Koltun first spoke to Jones on November 22, 2023, and BTB-MTS signed a written engagement agreement with him. *Id.*

Koltun conferred with AT&T counsel, and committed that BTB-MTS would make a joint production of documents to the identical subpoenas. *Id.,* ¶ 6. He proposed that AT&T stipulate to transfer the motion to compel regarding the MTS subpoena, which was in the Southern District, so that the two identical subpoenas could be considered by this Court. *Id.* AT&T refused., so  Koltun

---

[1] The firms were Covington and Weil Gotschal. Jones Decl., ¶ 9.

[2] *See also* DE 65-16 at 3 (Papachristou confirms that Vance Center has secured counsel, who is getting up to speed); DE 81 (Transcript) at 10 (Defense counsel Karis: "we've been told several times [by Papachristou] that he had secured counsel and then we receive follow-up communication indicating that he no longer had secured counsel");

Joshua Koltun ATTORNEY

moved the court in the Southern District to transfer the MTS subpoena.[3]  The Court in the Southern District transferred the matter so that that this Court could "make a "unified set of rulings on issues presented by . . . identical subpoenas" served on MTS, BTB, and Jones. *Id.,* Exh. A.   Chief Judge Mueller has related the matter concerning the MTS subpoena to this case.  "Given that the first action is assigned to Magistrate Judge Jeremy D. Peterson, and that all parties … have not consented to the jurisdiction of a United States Magistrate Judge, the … case.. will be reassigned to the undersigned and Magistrate Judge Peterson for all further proceedings." DE 116 at 14:16.[4]

BTB-MTS made an initial production of documents in response to AT&T's subpoena, objected to producing documents concerning the investigation and reporting it had conducted with the *Journal*, and began meeting and conferring with AT&T concerning the review and production of ESI. DE 109 at 1-5; Koltun Decl., ¶ 7.

In January 2024, MTS signed a written engagement with Alvarez & Marsel ("A&M"), an ESI vendor that had been recommended by AT&T.  *Id., ¶* 8.  AT&T, however, objected to BTB-MTS reviewing its own documents.  DE 104.  Instead, it asked BTB-MTS to stipulate to a protocol whereby a "neutral third-party vendor" would collect BTB-MTS devices,  review the documents therein and make its own determinations of responsiveness based on word searches or by any "methods [the vendor] deem[ed] appropriate."  *Id.* at 6.  There was no provision for the Court to review such "methods."  *Id.*   BTB-MTS declined.  AT&T moved the Court to issue the proposed protocol as an

---

[3]AT&T has taken inconsistent positions concerning the identical subpoenas it served on BTB-MTS. On the one hand it refused to stipulate to consolidate the identical subpoenas before this Court.  It also took the dilatory position that MTS, Jones and Rydel-Fortner could not join BTB's motion for protective order.  DE 113 at 8:8-23; DE 114 at 5.  But on the other hand, in the context of a motion to compel based on the subpoena to ***BTB,*** it asked this Court for an order to have that "Independent Expert" take control of "all computers and mobile devices ***used by Seth Jones or Monique Fortner*** [for any work] for Below the Blue ***or Marine Taxonomic Services or belonging to Seth Jones or Monique Fortner at any time from January 1, 2020 to the present.***" DE 104, 104-3.

[4]AT&T misstates the BTB-MTS position.  DE 150 at 314-16.  BTB-MTS has never taken the position that it did not "consent" to Magistrate Judge Peterson making a ruling on this or any other discovery matter.  BTB-MTS's position is that, since it has never consented to have its rights finally adjudicated by a Magistrate Judge, it has the right to object to any such ruling and seek reconsideration by an Article III Judge.  *See* 28 USC § 636(b)(1); Rule 72(a); L.R. 303.  Chief Judge Mueller's related case order is consistent with BTB-MTS position.  DE 116.

Joshua Koltun ATTORNEY

order, and BTB-MTS opposed.  DE 104-1, DE 109.  The Court declined to issue the extraordinary order requested by AT&T and simply set a deadline for production.  DE 124 at 7.

In the meantime, Jones and Rydel-Fortner and Koltun had already begun, and continued, to work nonstop with A&M to search for responsive documents.  Koltun Decl., ¶ 8.  A&M imaged and downloaded the computers, various devices and accounts  that AT&T had demanded.  DE 104-3.[5] BTB-MTS counsel consulted with AT&T on possible word-searches but (working with Jones and Rydel-Fortner and A&M) made the ultimate determinations of responsiveness.  BTB-MTS reviewed tens of thousands of documents for responsiveness.  *Id.* ¶ 9.  After filtering and de-duplication, A&M processed over 1.3 million documents that were searched and reviewed for production.  BTB-MTS produced 18,182 Documents to AT&T.   *Id.,* Oza Decl., ¶ 3, 4.

MTS has asked AT&T to reimburse it for the significant expenses that it incurred in complying with the subpoena, to wit: $227,512 for fees charged by A&M, $68,860 in attorney fees, and $85,269 in hours spent by Jones and Rydel-Fortner (at their ordinary billable rates), for time spent reviewing documents in complying with the subpoena.  Jones Decl., ¶ 11 & Exh. E, Koltun Decl., ¶ 10 & Exhs. B-E.  The vast majority of these costs concerned BTB-MTS reporting with the *Journal* and EDF.  *Id.*  No expenses incurred prior to January 2024 are being sought.  *Id.*

### Argument

### I.  AT&T's argument that BTB-MTS is not entitled to cost-shifting because it is an "interested party" is without merit

#### A.  The obligation to pay "significant expenses" to nonparties is mandatory

As the Ninth Circuit has explained,

Although party witnesses must generally bear the burden of discovery costs, the rationale for the general rule is inapplicable where the discovery demands are made on nonparties. Nonparty witnesses are powerless to control the scope of litigation and discovery, and should not be forced to subsidize an unreasonable share of the costs of a litigation to which they are not a party.

---

[5]Over the course of the production, AT&T expanded its demands as to the persons whose devices and accounts to be searched, and BTB-MTS acceded to these demands, which further increased the amount of time that needed to be spent on searching and reviewing documents.  Koltun Decl., ¶ 8.

*United States v. Columbia Broad. Sys., Inc.*, 666 F.2d 364, 371 (9th Cir. 1982).  Rule 45(d)(1) provides that

> A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing **undue burden or expense** on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include **lost earnings and reasonable attorney's fees**—on a party or attorney who fails to comply.

*Id.* (emphasis added); *see also* Advisory Note (attorney fees include "the cost of fees to collect attorneys' fees").  The 1991 amendments added a provision to Rule 45(d) – which at the time was Rule 45(c) -- that, where the subpoena requires the production of documents, the court must "protect a person who is neither a party nor a party's officer from **significant expense** resulting from compliance."  Rule 45(d)(2)(ii) (emphasis added). In *Legal Voice I,* the Ninth Circuit held that the 1991 amendment "made cost shifting mandatory in all instances in which a non-party incurs significant expense from compliance with a subpoena," a requirement that was stricter than determining whether the subpoena imposed an "undue burden."  *Id.* 738 F.3d at 1184-85.  "[W]hen discovery is ordered against a non-party, the **only** question before the court in considering whether to shift costs is whether the subpoena imposes significant expense on the non-party."  *Id.* at 1184; *accord United States v. McGraw-Hill Cos.*, 302 F.R.D. 532, 535-36 (C.D. Cal. 2014) ("Someone must pay the costs of production—the issue is whether those costs should fall on a party to the suit or a non-party who is powerless to control the scope of discovery. The Ninth Circuit has clarified that the former bears the burden, to the extent that the expenses are significant.")[6]

In *Legal Voice I,* the Ninth Circuit had "no trouble" in concluding that an expense of $20,000 was a "significant expense," and thus the only issue for the lower court was how much of that amount should be shifted "to render the remainder non-significant."  738 F.3d at 1185.

This court should similarly have no trouble in awarding BTB-MTS the requested fees. AT&T's arguments that BTB-MTS is disqualified from cost-shifting because it is an "interested

---

[6] A determination as to what amount of fees are "significant," and thus subject to cost-shifting, may only be possible once the fees have been incurred, and thus is properly pursued by way of a cost-shifting motion.  *McGraw-Hill*, 302 F.R.D. at 537.

party" are without merit, as discussed in the next three sections.

### B. The only "interest" the court may consider is whether the nonparty has a substantial financial stake *in the outcome of the litigation by reason of its own involvement in "underlying acts that gave rise to the lawsuit"*

Since the only question is whether the nonparties' costs are "significant," the only "interest" that the court may consider is whether the nonparty has such a ***substantial financial interest*** in the litigation as to affect the "significance" of the expenses.

AT&T cites *Cornell* for the proposition that the most important factor "in determining whether cost-shifting is appropriate 'is the extent to which the nonparty has an interest in the outcome of the case.'"  DE 150 at 2:9-10 (citing *id.,* 2015 US Dist. LEXIS 105450 at * 13-14).  The court in *Cornell* made clear, however, that the "interest" to which it was referring was a ***financial*** interest, because, under the mandatory rule where "significant expenses" are to be shifted "as a matter of course," a factor can only be relevant "to the extent that it bears on the question of significance."  *Id.* at *8.

In *Cornell,* nonparty FedEx had a "direct financial interest" in the case.  *Id.* at * 9.   Plaintiff sued on a product liability claim.  Fedex, plaintiff's employer at the time of the accident, was liable for plaintiff's ever-growing medical expenses and disability benefits.  *Id.*  If plaintiff prevailed in the lawsuit, Fedex stood to recoup those expenses.  *Id.*  "FedEx's direct stake in the outcome of this case — namely, the prospect of recouping more than its cost of compliance — effectively renders the discovery expenses involved here far less 'significant' to FedEx."  *Id.,* *9-10.

Moreover, the court also considered Fedex's "ability to pay," noting that its "recorded net income of $2.57 billion," while not dispositive, "dwarfed" the expense at issue and weighed in favor of finding the expenses "insignificant."  *Id.* *10-11; compare Barracuda Networks v. J2 Global*, 2020 U.S. Dist. LEXIS 183538 (C.D. Cal July 17, 2020), at *4 ($22,000 in discovery costs "is significant to any company, even one like" the nonparty, which was "worth billions of dollars.")

*Valcor*, on which AT&T also relies, is similar and relied on the reasoning in *Cornell.  Id.,* 2018 U.S. Dist. LEXIS 142120 (C.D. Cal. July 12, 2018), *9-10.  The cost-shifting provision was designed to "protect those who are 'powerless to control the scope of litigation and discovery," not "entities which stand to benefit from certain litigation outcomes [by] evad[ing] discovery costs ***arising***

- 7 -

Joshua Koltun ATTORNEY

Joshua Koltun ATTORNEY

1  *from their involvement in the underlying acts that gave rise to the lawsuit*." *Id.* at *6 (emphasis

2  added).  In that case, the nonparty had "been intimately involved in the acts giving rise to the litigation

3  and has a financial interest in the case." *Id.,* *11.  The nonparty had manufactured the part that had

4  allegedly failed.  If plaintiff had succeed, the nonparty might have been liable to defendant; if

5  defendant prevailed the nonparty would benefit because plaintiff would have been required to

6  continue purchasing the part.  *Id*. at *11-12.

7  Moreover, even where the nonparty has a substantial financial stake in the litigation, that only

8  goes to determining the extent to which the costs are "significant" to that party; thus the court may

9  nevertheless shift substantial costs to the subpoenaing party.  For example, in *McGraw-Hill,* even

10  though the nonparties "may deserve the lion's share of the blame," the court stated that once the

11  nonparties filed their cost-shifting motion, "it is highly probably that some portion of the costs of

12  production will shift" to the subpoenaing party. *Id.*, 302 F.R.D. at 536 & n.1.

13  **C.**     **Here, AT&T's contention that BTB-MTS has a substantial financial stake in the**
14  **outcome of this litigation is absurd and demonstrably false**

15  BTB-MTS has no financial interest in the outcome of this litigation, and moreover, its

16  financial resources are negligible compared to AT&T.  AT&T should reimburse its expenses.

17  AT&T contends that BTB-MTS "stands to benefit from certain litigation outcomes to evade

18  discovery costs arising from their involvement in the underlying acts giving rise to the lawsuit."  DE

19  150 at 1:21-2:1 (citing and quoting *Valcor, supra*).  This is so, according to AT&T, because BTB-

20  MTS "sought to be awarded a contract under which MTS would have been paid by Pacific Bell to

21  remove the cables."  DE 150 at 1:13-14.

22  AT&T relies on two "dispositive" putative "facts" to support this contention. *Id.* at 1:20.  Both

23  of these supposed "facts" are demonstrably false, and the contention that BTB-MTS had a financial

24  interest such as would affect the "significance" of its discovery expenses is absurd.

25  One supposed "fact" is that Seth Jones "'personally wanted to sue' Pacific Bell, but ultimately

26  contacted 'environmental Lawyers' [i.e. plaintiffs' counsel] who filed the lawsuit."  *Id.* at 1:18-20.

27  That is false.  AT&T bases that contention on the following quotation from a text message by Jones:

28  "I've been in contact with some environmental Lawyers about the big cable.  And they are optimistic

1   it will get removed and ATT will be forced to pay.  They asked what we wanted … as in what we

2   personally wanted to sue them for."   DE 150 at 1 n.8.  But AT&T omitted the next sentences in the

3   text message:  "**I thought that was silly.  But I guess it's a thing.  Anyways we told him our only**

4   **interest is getting it removed.**"  Jones Decl., ¶ 4, Exh. A (TRCD000372).

5          The other supposed "fact" is that BTB-MTS "made a conscious decision to 'stay behind the

6   scenes' in this case so they could get paid for any cable removal work from the litigation."  DE 150

7   1:16-17.  That too is false, and is similarly based on a snippet from an email, sent in *2020*.  *Id.*

8          Here are the facts.  At the beginning of this this litigation, AT&T took a less adversarial

9   approach to the environmental issue raised by the Complaint.  Immediately after the Complaint was

10  filed, in January 2021, an AT&T employee arranged with plaintiff's lawyers for Jones and Rydel-

11  Fortner to give him a tour and show him the location of the lead-clad cables, both the submerged

12  portions and where they came on land.  *Id., ¶* 5.  In September 2021, the parties moved for the (first)

13  entry of the Consent Decree, and in November this Court entered it.  DE 16, 22.

14         BTB-MTS hardly "stayed behind the scenes."  When, in November 2021, the Court issued the

15  Consent Decree, BTB issued a press release in which it took credit for bringing the existence of the

16  Cables to public attention and pushing for their removal.  Jones Decl., ¶ 6, Exh. B.  Contemporaneous

17  media coverage similarly credited BTB as having discovered the Cables and brought them to public

18  attention.  *Id.,* Exhs C & D.

19         At the time, AT&T did not regard BTB-MTS' environmental advocacy as a problem.  BTB-

20  MTS continued to provide assistance to AT&T on locating the cables and with obtaining the proper

21  permits to remove them.  *Id., ¶* 7.  BTB-MTS provided this assistance *pro bono.*  In January 2022,

22  AT&T invited MTS to submit a bid for work relating to the removal of the cables.  *Id.*  MTS

23  submitted a bid for permitting and surveying work, but a different firm was hired in February 2022.

24  *Id.*

25         Thus it was clear by February 2022 that BTB-MTS was not going to get paid work from

26  AT&T.   If there were any doubt about this, however, that doubt was completely dispelled by July

27  2023, when the *Journal* published the articles about lead-clad cables.  At that point AT&T suddenly

28  took a far more adversarial position in this litigation and in particular with respect to the *Journal* and

Joshua Koltun  ATTORNEY

- 9 -

BTB-MTS.  It questioned the "integrity" of the *Journal's* reporting, among other reasons because it had relied upon sampling conducted by MTS, an organization AT&T described as "biased" and having a "conflict of interest," among other reasons because it had brought the cables to plaintiff's attention.[7]  DE 41 at 9.  AT&T reported to the Court that the parties were now at an "impasse regarding the removal of the cables," and demanded that the "safety of the cables be fully adjudicated." *Id.* at 10-11.  AT&T elected to vacate the Consent Decree so that it could seek discovery "in the hands of third parties" – i.e. the *Journal* and BTB-MTS – "so that the issues may be adjudicated based on science in open court."  DE 49 at 3:24-25.

The contention that, at the time it complied with the subpoena, BTB-MTS was was hoping AT&T would hire it to do permitting/surveying work is absurd.  By January 2024, when BTB-MTS began to incur the expenses of compliance with the subpoena, AT&T had (i) rejected MTS's bid for permitting work, (ii) actually completed that work, and (iii) purported to turn this proceeding into an adversarial forum to rebut the reporting of the *Journal* and MTS.  Jones Decl., ¶ 7.

And considering their relative financial resources shows, beyond a doubt, that the expenses at issue are clearly "significant" to BTB-MTS, and insignificant to AT&T.  *Legal Voice I*, 738 F.3d at 1185, *Cornell*, 2015 US. Dist. LEXIS 105450 at *10-11.  MTS has 16 permanent employees; 40 including seasonal staff.  Jones Decl., ¶ 2.  In the last four years, its net annual profit has varied from -$4451 to $792,983.  *Id.*  BTB currently has about $5000 in assets, and has never had more than $10,000, most of which was donated by Ms. Rydel-Fortner.  *Id.*  By contrast, in 2023 AT&T posted annual net income of $15.6 billion.  Koltun Decl., ¶ 13, Exh. G.

**D.** **AT&T's argument that BTB-MTS's environmental advocacy disqualifies it from cost-shifting has been squarely rejected by the Ninth Circuit.**

AT&T's alternative argument --that BTB-MTS is disqualified from cost-shifting because of its environmental advocacy -- is contrary to the law outlined in the previous sections.  It has been

---

[7]Indeed, far from claiming that BTB-MTS had "stayed behind the scenes," AT&T cited to this Court, as evidence of bias that at "the time the Consent Decree was entered in November 2021, Below the Blue issued a press release touting its efforts with Plaintiff and other community organizations to remove and dispose of the cables."  DE 41 at 9.

Joshua Koltun ATTORNEY

Joshua Koltun ATTORNEY

1    squarely rejected by the Ninth Circuit.

2          AT&T contends that BTB-MTS is an "interested party" because it "(i) discovered the Lake

3    Tahoe cables in 2012, (ii) cut a portion of cable in 2014 and provided it to Plaintiff's counsel for

4    testing, (iii) advocated publicly for the removal of the cables, … and (v) by Plaintiff's counsel's own

5    admission, "brought [the case] to [Plaintiff] on a platter."  DE 150 at 1:11-15.

6          None of those acts are "the underlying acts that gave rise to the lawsuit," and therefore they are

7    not a basis to diminish the share of the costs that AT&T must bear.  *Valcor, supra.*  It is ***AT&T's***

8    alleged environmental violations that gave rise to this lawsuit and will be remedied by the Consent

9    Decree.  BTB-MTS never faced any potential liability in this action. It will no more benefit than any

10   other member of the public from the Consent Decree whereby these Cables will be removed.

11         It may well be that AT&T considers BTB-MTS to be a wrongdoer for having brought the

12   Cables to the attention of environmental regulators, plaintiff's counsel, and the general public.  But

13   BTB-MTS's actions are not the basis of this lawsuit.  Indeed, those actions were protected First

14   Amendment activities, whether those activities are characterized as petitioning, activism or

15   journalism.[8]

16         The Ninth Circuit has specifically ruled that such First Amendment activities are no bar to

17   cost-shifting.  In *Legal Voice I,* the seminal case on cost-shifting, the nonparty was a nonprofit (Legal

18   Voice/Law Center) that had brought to the government's attention "reports of incidents" in which

19   pharmacists had refused to dispense emergency contraception, and had been "a member of a task force

20   that participated in a rule-making process" that led to the rule that was being challenged by plaintiffs

21   in that case. *Id.* 738 F.3d at 1181.  The court had "no trouble" ruling that the nonprofit advocate was

22   entitled to a cost-shifting of its "significant expenses" --$20,000.  *Id.*

23   _____

24   [8]Indeed, AT&T's proposed exception to the cost-shifting requirements of Rule 45(d)(2)(B)(ii) would
     unconstitutionally penalize BTB-MTS for those First Amendment activities.  *See Reed v. Town of*

25   *Gilbert*, 576 U.S. 155, 64-65 (2015) (a law that differentiates between actors based on the
     "communicative content" of their acts – the "types of ideas" conveyed – is a content-based regulation

26   subject to strict constitutional scrutiny and may be struck down even if it seems 'entirely
     reasonable.'").  Such an exception would be a powerful weapon that entities could use to chill public

27   scrutiny of their alleged violations of law or public policy.

28

Joshua Koltun ATTORNEY

**II.      Dow Jones's agreement to pay or to advance any of these significant expenses does not negate AT&T's obligations to reimburse them.**

AT&T has also refused to pay BTB-MTS attorney fees on the grounds that Dow Jones has been paying those fees: "BTB-MTS cannot demand reimbursement of expenses under Rule 45 that they have not ***incurred,***" citing *Legal Voice I* as authority.  DE 150 at 3:14 (emphasis added).

But this precise argument has been repeatedly rejected as a matter of law.  A "party may 'incur' attorney fees even if the party is not personally obligated to pay such fees."  *Satchell v. Wallace*, 439 F. App'x 644, 645 (9th Cir. 2011); *accord Nadarajah v. Holder*, 569 F.3d 906, 916 (9th Cir. 2009).  "[A]wards of attorneys' fees where otherwise authorized are not obviated by the fact that individual plaintiffs are not obligated to compensate their counsel." *Ed A. Wilson, Inc. v. GSA*, 126 F.3d 1406, 1409-10 (Fed. Cir. 1997) (collecting authorities awarding fees to litigant where attorney was paid by a third party).  In that case the statute (like many others) expressly authorized cost-shifting of "fees and other expenses ***incurred by that party.***"  *Id.* at 1408 (quoting 5 USC § 504).  The court specifically rejected the argument advanced by AT&T here, that the party had not "incurred" the fees because its attorneys had been paid by an insurance company.  The court authorized the award, reasoning that the situation was no different from ones in which "courts have awarded attorney fees under EAJA and similar fee-shifting statutes requiring that fees be 'incurred' when the prevailing party is represented by a legal services organization or counsel appearing pro bono," or  "when the prevailing party is an attorney appearing pro se."  *Id.* at 1409 (citations omitted).  In other words, the fees are still deemed to be "incurred" even if they were paid by a third party or assumed by the attorneys themselves.  *See Nadarajah*, 569 F.3d at 916 ("Important public policy considerations dictate that [the court] should not punish an 'undercharging' civil rights attorney," but instead must award attorneys' fees based on prevailing market rates).

The policy of the statutes that expressly use the term "incurred" is precisely the same with regard to cost-shifting under Rule 45.  In *Legal Voice I,* the Ninth Circuit interpreted the 1991 amendment whereby Rule 45(d)(2)(ii) was adopted to make "cost shifting mandatory in all instances in which a non-party ***incurs*** significant expense from compliance with a subpoena."  *Id.* 738 F.3d at 1184 (emphasis added).  The court held that the nonparty's attorney fees were "recoverable by *pro*

*bono* attorneys to the same extent that they are recoverable by attorneys who charge for their services." *Legal Voice II*, 757 F.3d at 1017; *accord Brandenburger v. Thompson*, 494 F.2d 885, 889 (9th Cir. 1974) (failing to award fees to pro bono counsel would discourage entities from assisting litigants who are unable to pay).

Needless to say, if BTB-MTS obtains a cost-shifting award, it will reimburse Dow Jones for the money it had advanced to cover such costs.  Koltun Decl., ¶ 15.[9]  If it did not do so, Dow Jones would doubtless have a claim of unjust enrichment. But by the same token, to discount the amount of costs to be shifted on the grounds that that Dow Jones had advanced those costs would unjustly enrich AT&T.  That would contradict the policy of Rule 45's cost-shifting requirement.  *Legal Voice II,* 757 F.3d at 1017.

**III.    The "significant expenses" sought are reasonable; they include only time spent complying with the subpoena after January, when BTB-MTS hired an ESI vendor**

AT&T's contends that BTB-MTS is seeking compensation for expenses that did not result from compliance with the subpoena.  AT&T is mistaken.  It relies on *Valcor* for the proposition that the "inefficient manner in which [BTB-MTS] chose to respond to the subpoena demonstrates [their] interest in the outcome of the case and undermines [their] contention that these expenses result[ed] in compliance with the subpoena.  DE 150 at 5-7 & n. 14 (quoting *Valcor*).

But the situation here is completely different.  What the court was discussing was the nonparty's attempt to be compensated for its attorneys' work ***contesting*** the subpoena.  *Valcor,* 2018 US Dist. Lexis 142120 at *7-8.  Here, BTB-MTS has ***not*** sought reimbursement for any time by staff or attorneys in contesting the subpoena; nor indeed is it seeking reimbursement for ***any time*** spent by staff, attorneys or vendors ***prior to hiring the vendor*** A&M to comply with the subpoena.  Thus AT&T's complaint that BTB-MTS's initial production was "inadequate" and had to be "redo[ne]," (DE 150 at 16-18) is irrelevant, because BTB-MTS is not seeking compensation for that.[10]

---

[9] The Court could also order that such reimbursement take place.
[10] Moreover, BTB-MTS's contesting of the subpoena hardly showed that it had a financial stake in the outcome of the case.  On the contrary, BTB-MTS protested vigorously against being dragged into this case and asserted a First Amendment privilege against producing documents to ***either*** party.  DE 99 at

Joshua Koltun ATTORNEY

The fact that this Court ordered compliance with the subpoena does not negate the cost-shifting, for that cost-shifting is a mandatory element of the Court's power to compel compliance: "the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance."  Rule 45(d)(2)(ii).  Moreover, the mandatory cost-shifting does not require that the court to have issued an order at all.  All that is required is that the subpoenaed party put the requesting party on notice that it will seek reimbursement of costs.  *See, e.g., Gamefam v. WowWee Grp,* 2024 U.S. Dist. LEXIS 47464, at *17 (N.D. Cal. Mar. 18, 2024).

Here, BTB-MTS argued to the Court that Rule 45(d)(2)(B)(ii) required that AT&T reimburse it for such expenses.  DE 109 at 19-20.  AT&T was not only put on notice, it did not contest BTB-MTS's right to shift costs. DE 115 at 11 n.6.  Had AT&T contested that obligation, BTB-MTS would have asked the Court to adjudicate its rights in advance.

The costs BTB-MTS seeks – ESI vendor fees, attorney fees, and the value of MTS staff time ----- are all properly compensable.  *See, e.g., Gamefam,* 2024 U.S. Dist. LEXIS 47464, at *19-29 (N.D. Cal. Mar. 18, 2024); *Barracuda Networks,* 2020 U.S. Dist. LEXIS 183538, at *2-6 & n.1 (C.D. Cal. July 17, 2020); *Nitsch v. Dreamworks Animation SKG Inc.*, 2017 U.S. Dist. LEXIS 34106, at *12-14 (N.D. Cal. Mar. 9, 2017).

The demands AT&T had made, and later expanded, concerning the devices and computers and accounts to be imaged and downloaded, created a massive set of documents and files to be searched.  Oza Decl., ¶ 3.   Working closely together and under the supervision of counsel, A&M personnel and Jones and Rydel-Fortner conducted numerous word searches (including ones proposed by AT&T) and reviewed tens of thousands of documents for responsiveness.  Koltun Decl., ¶ 8, 12.  This included reviewing many thousands of documents generated by word searches proposed by AT&T that BTB correctly believed were highly unlikely to produce any s any substantial number of (even marginally) responsive documents.  *Id.*

---

19:9-11.  In any event, as noted above, BTB-MTS is not seeking reimbursement for its attorney's work in contesting the subpoena.  And, as noted above in section I.A., *Valcor* involved a nonparty that had a very substantial financial stake in the litigation.

Joshua Koltun  ATTORNEY

ATTORNEY

Joshua Koltun

1    **ESI Vendor Fees.** BTB-MTS is entitled to the fees incurred by its ESI vendor, A&M which

2    had been specifically recommended by AT&T.  Koltun Decl., ¶ 10, Exhs. B -E.  The enormous, and

3    expanding, scope of the devices and accounts  to be imaged and downloaded and searched, and the

4    extensive give and take concerning the various word-searches that were performed in order to find any

5    even marginally responsive documents to the subpoenas, required extensive assistance from A&M.

6    *Id.,* ¶8, 12, Oza Decl., ¶ 3.¶

7    **Attorney Fees** To determine a reasonable attorney fee, federal courts use the "lodestar," that is

8    "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly

9    rate.""  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  Where the attorneys worked *pro bono,* the

10   court's task is to determine "whether, in light of the circumstances, the time could reasonably have

11   been billed to a private client."  *Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008).

12   Here, the fees sought were actually paid by Dow Jones, which is thus a powerful indication that the

13   fees were reasonable.  The fees sought are for work that Koltun did in supervising and actively

14   participating in the search for and review of potentially responsive documents, in dealing with endless

15   correspondence with AT&T counsel concerning same, and in various checking and validating of the

16   production.  Koltun Decl., ¶8, 12.    *Id.*  The number of hours charged, 125.2, is eminently reasonable

17   given the enormous scope of the review.  *Id.,* ¶ 11 & Exh G.[11]

18   In order to properly supervise the review, Koltun had to spend considerable time reviewing

19   and discussing documents with Jones and Rydel-Fortner to understand what documents were

20   responsive and which were not.  Koltun Decl., ¶ 12.  Notably, in meet and confer discussions after the

21   Court's January 25 order, AT&T's counsel urged BTB-MTS to conduct word searches and then,

---

[11]Koltun's hourly rate ($550) is the rate he actually charges in the marketplace and that was actually paid by Dow Jones. Koltun Decl., ¶ 2.  Koltun has been practicing law for 30 years.  *Id.*  Koltun is a solo practitioner and works without associates or paralegals.  His hourly rate reflects that, and is far below what he would be charging if he had remained at a commercial firm, and is well below what is charged for comparably experienced attorneys in his field, or even senior associates.  *Id.  See, e.g., McGillvary v. Netflix, Inc.*, 2024 U.S. Dist. LEXIS 185755, at *6-7 (C.D. Cal. Oct. 9, 2024) (surveying fee awards to California media attorneys in other cases and approving fee award of $693 for a partner and $616 for counsel); *Franco v. Ruiz Food Prods.*, 2012 U.S. Dist. LEXIS 169057, at *55-56 (E.D. Cal. Nov. 27, 2012) (surveying prevailing rates in E.D.Cal as of 2012 and approving rate of $675 an hour for partner with 20 years of experience).

rather than review the documents for responsiveness, simply send them to *AT&T's* counsel to review. *Id.* That, of course, would have been highly irregular,[12] and was inconsistent with the Court's denial of AT&T's proposed order. It would also have been hugely more expensive to AT&T, for AT&T's counsel would have been sent a huge volume of documents, the majority of which were unresponsive, and then would have had to review them without the benefit of BTB-MTS knowledge of their own documents.[13]  *Id.* But of course that huge expense would have gone to AT&T's counsel.

BTB-MTS is also entitled to attorney fees for the time spent on this motion and related papers. "federal courts have uniformly held that attorneys are entitled to be compensated for the time reasonably spent establishing their right to the fee." *Legal Voice II,* 757 F.3d at 1016-17 (collecting authorities).   BTB-MTS has incurred $22165 in such fees to date (40.3 hours), and reserves the right to seek such further attorney fees as may be incurred in the future.  Koltun Decl., ¶ 14, Exh. H.

***MTS Staff Time***.  The time for which Jones and Rydel-Fortner are seeking compensation is ***solely*** for time they spent reviewing documents for responsiveness, under the active supervision of counsel, as they recorded it contemporaneously in MTS's timekeeping system.  Jones Decl., ¶ 11, Exh. E.  The time was only spent on document review.  *Id.* AT&T's suggestion that Jones and Rydel-Fortner might have been spending time preparing a bid to AT&T for cable work (DE 150 at 3:18)  is absurd, as explained above in section I.C.

All these expenses were reasonably incurred in complying with the subpoena and therefore should be reimbursed.

---

[12] The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production, 19 Sedona Conf. J. 1 (2018); available at The Sedona Conference®, at 129 ("typical production, in which the responding party identifies and produces responsive information, allows the party with the greatest knowledge of the computer systems to search and utilize the systems to produce responsive information.").

[13] Sedona Principles at 119, 120 ("the responding party must make decisions on what is required to meet its preservation and production obligations based on direct input from those inside the organization who create, receive, and store their own information (i.e., individual custodians) … Rarely will a court or opposing party have direct access to the specific knowledge required to make those decisions")

Joshua Koltun ATTORNEY

Joshua Koltun ATTORNEY

**IV.     BTB-MTS is also entitled to sanctions under Rule 45(d)(1) because AT&T and its attorneys pursued discovery against it for improper purposes**

Even if BTB-MTS were not otherwise entitled to shift the foregoing costs under Rule 45(d)(2)(B)(ii), they would be entitled to the same amount as sanctions under Rule 45(d)(1).  *Legal Voice,* 738 F.3d at 1185.  Such sanctions are appropriate, for example, when a party issues a subpoena in bad faith, for an improper purpose, or in a manner inconsistent with existing law. *Id.* (citing *Mattel Inc. v. Walking Mt. Prods.*, 353 F.3d 792, 813-14 (9th Cir. 2003).

In *Mattel,* the court awarded sanctions, including attorney fees, because the improper purpose of the subpoena was to "get the [nonparty] to exert pressure on the witnesses not to testify," and to force the nonparty … to provide uncompensated expert testimony.  *Id.*  "A growing problem has been the use of subpoenas to compel the giving of evidence and information by unretained experts."  *Id.* (citing Advisory Note to 1991 Amendments).

AT&T subpoenaed BTB-MTS for a similarly improper purpose.  AT&T has essentially used this Court's subpoena powers to conscript BTB-MTS to supply expert data in this case, and now is seeking to avoid paying them for their time and expense in doing so.

The discovery sought never served any legitimate litigation purpose.  AT&T was always remarkably candid that it has reopened this case in order to provide a forum to rebut "the *Journal's* testing methods and the reliability of its results and reporting."  *See* DE 41 at 5.  AT&T elected to vacate the Consent Decree so that it could seek discovery "in the hands of third parties" – i.e. the *Journal* and BTB-MTS – "so that the issues may be adjudicated based on science in open court."  DE 49 at 3:24-25.

AT&T was seeking discovery from BTB-MTS about the Journal/EDF/MTS investigation, not because it needed it to build its own case that the Cables posed no environmental threat, but because it wished to **rebut** the reporting in the *Journal,* and prove that it was "biased," and "unscientific.'  DE 41 at 5.  But the Journal's reporting was not itself an issue in the case.  If AT&T had simply acceded to BTB-MTS claim of privilege, BTB-MTS information would never have been available to Plaintiffs in this case.  DE 99 at 18:9-11.  But because AT&T insisted on forcing BTB-MTS to produce such documents, Plaintiffs experts had access to information that they used in support of their case that the

Cables were unsafe.

At the end of the day AT&T decided **not** to have the safety of the Cables "adjudicated based on science in open court." Prior to the parties making their expert disclosures, AT&T agreed to remove the Cables without conditions. DE 157 (MacLear Decl.) ¶ 58. In supporting the (second) entry of the Consent Decree, AT&T attached a variety of expert reports, and announced that "the claims regarding the cables have been investigated and disproven," and so it is now "prepared to fulfill its original commitment to remove the cables." DE 148 at 2:16-21

But of course, nothing has been proven or disproven; AT&T has deliberately avoided the "adjudication" it had said it wanted. The experts whose reports AT&T filed in court had never been presented in discovery, nor had any experts been deposed, nor had any rebuttal reports prepared.

AT&T made no effort to make use of the information BTB-MTS had produced, including extensive video documentation and mapping of damage to the Cables, or information concerning the locations of MTS sampling and test results. Indeed, the only sampling that AT&T relied upon in its expert reports had already been done by August 2023, at the time AT&T vacated the Consent Decree.[14] By contrast, Plaintiff had divers resample the locations previously sampled by MTS and defendants' experts, as well as additional locations.[15] DE 156-10 (Wren Decl.), ¶ 11. AT&T's experts did not use divers to collect their samples. *Id.,* ¶ 20. Plaintiff contends that the results obtained by its sampling and testing confirms and validates the allegations of the Compliant and fully justifies the removal of the Cables. *Id.,* 13-19.

---

[14] One of AT&T's experts, purporting to opine on the validity of *Journal/*MTS sampling and testing, states that "no information on the sampling locations was provided." DE 148-10 at 22. That location information was produced to the parties by MTS, and Plaintiff's expert retested at those locations DE 156-10, ¶ 11.

[15] AT&T's expert reports all reference and rely on sampling that was done by Haley and Aldritch in 2021 or by Ramboll in June and July 2023; *See* DE 148-3 (Schoof Decl.) at 27, 30 (Ramboll sampling); *see, e.g.* DE 148-2 at 14; *compare* DE 33 at 2 (AT&T's experts have performed "extensive water sampling and field investigations in and around the Cables in Lake Tahoe using the 'best available methodologies,' and concluded Lake Tahoe's 'water quality is not adversely impacted by the two legacy communications cables"); 33-1, Exh. A (Haley & Aldrich report); DE 41 at 2 & Exh A at 3, 6 (AT&T has had "another prominent, third party consulting firm" perform testing in Lake Tahoe that is consistent with Haley & Aldrich report); DE 91 at 1:12-16.

Joshua Koltun ATTORNEY

AT&T's willingness to remove the Cables without conditions, before the expert discovery phase of this case, speaks for itself.  Rather than obtain the adjudication it said it wanted, AT&T apparently thought it prudent to follow the legendary strategy suggested by one Senator concerning continuing U.S. involvement in the Vietnam war: "Lets declare victory and go home." [16]   And now AT&T wants to saddle MTS with an enormous bill for this misadventure.  The Court should sanction AT&T and its counsel accordingly.

***Conclusion***

AT&T's refusal to fully reimburse the significant expenses it imposed on BTB-MTS is unsupported by the law.  This Court should award such expenses, as well as attorney fees in obtaining this relief.

November 6, 2024

_____/s/_____

Joshua Koltun
Attorney for Nonparty Witnesses Below the
Blue, Marine Taxonomic Services, Ltd, Seth
Jones, and Monique Rydel-Fortner ("BTB-
MTS")

---

[16] This famous quote, ascribed to Senator George Aiken, is apocryphal; what he actually said was more complicated and less punchy.

Joshua Koltun ATTORNEY