Joshua Koltun (Bar No. 173040)
One Sansome Street
Suite 3500, No. 500
San Francisco, California 94104
Telephone: 415.680.3410
Facsimile: 866.462.5959
joshua@koltunattorney.com

Attorney for Nonparty Witnesses
Marine Taxonomic Services, Ltd,
Below the Blue, Seth Jones, and
Monique Rydel-Fortner ("BTB-MTS")

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE,<br><br>Plaintiff,<br>v.<br><br>PACIFIC BELL TELEPHONE COMPANY<br><br>Defendant | Case 2:21-cv-00073-JDP |
| PACIFIC BELL TELEPHONE COMPANY,<br><br>Movant,<br>v.<br><br>MARINE TAXONOMIC SERVICES, LTD.<br><br>Respondent | Case No. 2:24-cv-00022-KJM-JDP<br><br>**DECLARATION OF JOSHUA KOLTUN IN SUPPORT OF BTB-MTS'S MOTION TO SHIFT COSTS**<br><br>Zoom Hearing: December 12, 2024<br>Time:             10 am<br>Courtroom     9<br>Judge:            Hon. Jeremy D. Peterson |

I, Joshua Koltun, declare as follows:

1.      I am counsel of record for nonparty witnesses Marine Taxonomic Services, Ltd ("MTS"), Below the Blue ("BTB"), Seth Jones, and Monique Rydel-Fortner (collectively, "BTB-MTS")  in this action.

2.      I am a solo practitioner. I graduated Yale Law School in 1993, and began practicing law after one year clerking for Judge Robert Keeton of the District of Massachusetts. Prior to starting my own practice in 2007, I was a partner at the San Francisco firm Steinhart & Falconer, and then, through mergers, at the firm that ultimately became DLA Piper.  In 2007, my last year at DLA Piper, my standard hourly rate was $530 an hour. Had I continued to work at DLA Piper or another large firm, my billing rate would likely now be considerably higher than that.  For example, James Chadwick, my former partner in the media practice at DLA Piper (and of equivalent seniority), was, as of 2019, charging $775 an hour, and his senior associate with 11 years of experience in the media and entertainment practice was charging $685 an hour, both of which rates were upheld as reasonable in *Abbas v. Vertical Entm't, LLC*, No. 2:18-cv-7399-CBM-AFM, 2019 U.S. Dist. LEXIS 181056, at *3-5 (C.D. Cal. Oct. 18, 2019).

3.      I have extensive experience as a litigator, and in particular representing media companies and individuals in matters involving the First Amendment. My experience representing individuals who --like BTB-MTS -- published their own materials on the internet dates back to the very outset of the phenomenon. *See Nicosia v. De Rooy*, 72 F.Supp.2d 1093 (N.D. Cal. 1999) (representing a blogger before the term "blogger" had even been coined).

4.      My current billable hourly rate is $550 an hour.  That is the rate at which I have been charging my commercial clients, and that is the rate at which I have been billing Dow Jones for my work representing BTB-MTS.  Dow Jones has been paying my bills on an ongoing basis and has at no point requested a reduction for any of my work.  I operate as a solo practitioner, without associates,

which enables me to provide efficient services at reasonable cost, compared to larger firms in which partners of his seniority delegate work to less experienced associates. My hourly rate reflects the fact that I perform all legal work on a matter.

5.   In late November 2023, once it became evident that the Vance Center would be unable to fulfill its commitment to locate *pro bono* legal representation for BTB-MTS, outside counsel for the *Journal* contacted me and indicated that Dow Jones would pay his fees if he would step in and represent BTB-MTS. I first spoke to Jones on November 22, 2023, and shortly thereafter BTB-MTS signed a written engagement agreement with me.

6.   I conferred with AT&T counsel and told them that that BTB-MTS would make a joint production of documents to the identical subpoenas. I proposed that AT&T stipulate to transfer the motion to compel regarding the MTS subpoena, which was in the Southern District, so that the two identical subpoenas could be considered by this Court. AT&T refused. I then moved the court in the Southern District to transfer the MTS subpoena. It did so, so that this Court could "make a "unified set of rulings on issues presented by . . . identical subpoenas" served on MTS, BTB, and Jones. I attach as ***Exhibit A*** the order entered by the Court in that case.

7.   BTB-MTS made an initial production of documents in response to AT&T's subpoena, objected to producing documents concerning the investigation and reporting it had conducted with the *Journal*, and began meeting and conferring with AT&T concerning the review and production of ESI.

8.   In January 2024, MTS signed a written engagement with Alvarez & Marsel ("A&M"), an ESI vendor that had been recommended by AT&T. By the time this Court issued a deadline for compliance with the subpoena. Jones and Rydel-Fortner and I had already begun, and continued, to work nonstop with A&M to search for responsive documents. A&M imaged and downloaded the computers, various devices and accounts that AT&T had demanded. Over the course of the production, AT&T expanded its demands as to the persons whose devices and accounts to be

- 2 -

searched, and BTB-MTS acceded to these demands, which further increased the time needed to be spent on searching and reviewing documents.  I consulted with AT&T on possible word-searches but (working with Jones, Rydel-Fortner and A&M) made the ultimate determinations of responsiveness.

9.     BTB-MTS reviewed tens of thousands of documents for responsiveness.  *Id.*  After filtering and de-duplication, A&M processed over 1.3 million documents that were searched and reviewed for production.  BTB-MTS produced 18,182 Documents to AT&T.  The vast majority of these costs concerned BTB-MTS reporting with the *Journal* and EDF.

10.     In communications with AT&T counsel, I asked on behalf of MTS that AT&T to reimburse it for the significant expenses that it incurred in complying with the subpoena, to wit: $227,512 for fees charged by A&M, $68,860 in attorney fees, and $85,269 in hours spent by Jones and Rydel-Fortner (at their ordinary billable rates), for time spent reviewing documents in complying with the subpoena.  I attach as ***Exhibits B, C, D & E*** the relevant invoices A&M has sent to MTS.  I attach as ***Exhibit F*** an accounting of my hours spent on complying with the subpoena after MTS engaged A&M, which time was downloaded from my timekeeping system.  Relevant timesheets for the work performed by Mr. Jones and Ms. Rydel-Fortner is attached to the Jones Declaration.   No expenses incurred prior to January 2024 are being sought.   Dow Jones advanced payment for 20% of the A&M fees, in the understanding that it would be reimbursed upon an award of fees.

11.     The fees sought that I asked A&M to pay, which A&M refused to pay, were for work that I did in supervising and actively participating in the search for and review of potentially responsive documents, in dealing with endless correspondence with AT&T counsel concerning same, and in various checking and validating of the production.  I believe the number of hours charged, 125.2, is eminently reasonable given the enormous scope of the review.

12.     In order to properly supervise the review, I had to expend considerable time discussing documents with Jones and Rydel-Fortner to understand what documents were responsive and which

were not.     Notably, in meet and confer discussions after the Court's January 25 order, AT&T's counsel (Messrs. Dhillon and Kelley) urged BTB-MTS to conduct word searches and then, rather than review the documents for responsiveness, simply send them to *AT&T's* counsel to review. I thought that the suggestion was highly irregular and inconsistent with the Court's denial of AT&T's proposed order.  It would also have been hugely more expensive to AT&T, for AT&T's counsel would have been sent a huge volume of documents, the majority of which were unresponsive, and then would have had to review them without the benefit that I had of BTB-MTS knowledge of their own documents.

13. In 2023 AT&T posted annual net income of $15.6 billion, as shown in its annual report, available at this hyperlink: Annual Report 2023 | AT&T,  relevant pages of which I attach as ***Exhibit G***

14. BTB-MTS has also incurred $22165 in attorney fees (40.3 hours) in seeking relief from this Court for AT&T's refusal to pay the foregoing significant expenses.  I attach hereto as ***Exhibit H*** an accounting of such fees to date, downloaded from my timekeeping system, and BTB-MTS reserves the right to seek such further attorney fees as may be incurred in the future.

15. If BTB-MTS obtains a cost-shifting award, it will reimburse Dow Jones for the money it had advanced to cover such costs.  What I propose is that, in the event of an award to MTS, AT&T wire the funds awarded to my trust account.  I would then reimburse Dow Jones for any portion of the award that it had already paid either to me, or to A&M.  With Dow Jones approval, I would retain any unpaid portions of my own bills.  I would remit the remainder  to A&M such money as was awarded based on its invoices, and remit such portion to MTS as was awarded.

16. I attach as ***Exhibit I*** a status report filed by AT&T in the proceeding in the Southern District concerning the MTS subpoena.

1  I declare under penalty of perjury under the laws of the United States that the foregoing is true and

2  correct.

3  Executed in San Francisco on November 6, 2024.

*[signature]*

Joshua Koltun