NAVI SINGH DHILLON (SBN 279537)
navidhillon@paulhastings.com
PETER C. MEIER (SBN 179019)
petermeier@paulhastings.com
LUCAS V. GRUNBAUM (SBN 314180)
lucasgrunbaum@paulhastings.com
PAUL HASTINGS LLP
101 California Street, 48th Floor
San Francisco, California  94111
Telephone:  (415) 856-7000
Fax: (415) 856-7100

HARIKLIA KARIS (*admitted pro hac vice*)
hkaris@kirkland.com
ROBERT B. ELLIS (*admitted pro hac vice*)
rellis@kirkland.com
MARK J. NOMELLINI (*admitted pro hac vice*)
mnomellini@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone:  (312) 862-2000
Fax: (312) 862-2200

JON DAVID KELLEY (*admitted pro hac vice*)
jon.kelley@kirkland.com
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, TX 75205

Attorneys for Defendant
PACIFIC BELL TELEPHONE COMPANY

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE,<br><br>Plaintiff,<br><br>vs.<br><br>PACIFIC BELL TELEPHONE COMPANY,<br><br>Defendant. | CASE NO. 2:21-cv-00073-JDP<br><br>**DEFENDANT PACIFIC BELL TELEPHONE COMPANY'S OPPOSITION TO BTB/MTS'S MOTION TO SHIFT COSTS**<br><br>Zoom Hearing: January 9, 2025<br>Time: 10 am<br>Courtroom 9<br>Judge: Hon. Jeremy D. Peterson |

# TABLE OF CONTENTS

**Page(s)**

I.     INTRODUCTION ................................................................................................. 1

II.    FACTUAL BACKGROUND ................................................................................ 4

III.   ARGUMENT ....................................................................................................... 8

    A.     The 1991 Amendments Do Not Preclude Consideration of a Third Party's
        Non-Financial Interest In the Litigation.................................................... 8

    B.     BTB/MTS Is An Interested Party .............................................................. 9

    C.     BTB/MTS's First Amendment Arguments Fail........................................ 12

    D.     BTB/MTS Has Not Incurred Any "Significant" Expenses...................... 13

    E.     BTB/MTS also cannot show that its fees result from compliance........... 17

    F.     BTB/MTS's request for sanctions is meritless and fails for reasons the
        record itself makes clear........................................................................... 19

IV.    CONCLUSION ..................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Balfour Beatty Infrastructure, Inc. v. PB & A, Inc.*,
   319 F.R.D. 277 (N.D. Cal. 2017) ...................................................................... *passim*

*Callwave Communications v. Wavemarket, Inc.*
   2014 WL 291218 (N.D. Cal. June 26, 2024) ................................................................8

*Cornell v. Columbus McKinnon Corp.*,
   2015 WL 4747260 (N.D. Cal. Aug. 11, 2015) ................................................. *passim*

*Ed A. Wilson, Inc. v. GSA*,
   126 F.3d 1406 (Fed. Cir. 1997) .......................................................................3, 14

*In Re Exxon Valdez*,
   142 F.R.D. 380, 383 (D.D.C.1992) ...............................................................8, 10

*First Am. Corp. v. Price Waterhouse LLP*,
   184 F.R.D. 234 (S.D.N.Y. 1998) ..............................................................................9

*Hyundai Motor Am., Inc. v. Pinnacle Grp., LLC*,
   2016 WL 6208313 (C.D. Cal. Apr. 20, 2016) ..........................................................9

*Legal Voice v. Stormans Inc.*,
   738 F.3d 1178 (9th Cir. 2013) ................................................................................12

*Nadarajah v. Holder*,
   569 F.3d 906 (9th Cir. 2009) ..................................................................................15

*Satchell v. Wallace*,
   439 F. App'x 644 (9th Cir. 2011) ...........................................................................15

*Shasta Linen Supply, Inc. v. Applied Underwriters Inc.*,
   2018 WL 2981827 (E.D. Cal. June 14, 2018) ..........................................................9

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) .................................................................................................12

*Tutor-Saliba Corp. v. United States*,
   32 Fed. Cl. 609 (1995) ...............................................................................................9

*United States v. McGraw-Hill Cos.*,
   302 F.R.D. 532 (C.D. Cal. 2014) ............................................................................16

*United States v. Rivera-Guerrero*,
   377 F.3d 1064 (9th Cir. 2004) ................................................................................13

*Valcor Eng'g Corp. v. Parker Hannifin Corp.*,
  2018 WL 3956732 (C.D. Cal. July 12, 2018) ................................................................. *passim*

*Wall Indus., Inc. v. United States*,
  15 Cl. Ct. 796 (1988) ......................................................................14, 15

**Statutes**

Equal Access to Justice Act ......................................................................14, 15

**Rules**

Rule 45 ................................................................................................ *passim*

**Other Authorities**

Black's Law Dictionary 57 (6th ed.1990) ......................................................................12

1

## I.      INTRODUCTION

2       Rule 45 was "not intended as a mechanism for entities which stand to benefit from certain

3  litigation outcomes to evade discovery costs arising from their involvement in the underlying acts

4  that gave rise to the lawsuit." *Valcor Eng'g Corp. v. Parker Hannifin Corp.*, 2018 WL 3956732, at

5  *2 (C.D. Cal. July 12, 2018).   But that is exactly what BTB/MTS is trying to do.   However it is

6  described, it cannot be seriously disputed that BTB/MTS was involved in the underlying acts that

7  gave rise to this lawsuit and has had an ongoing interest in this case from its conception to this day.

8  From the beginning of this lawsuit, BTB/MTS "st[ood] to benefit from" cable removal, and the

9  fees BTB/MTS seeks to recover in its Motion to Shift Costs (the "Motion") are "discovery costs

10  arising from their involvement in the underlying acts that gave rise to the lawsuit." *Id*.   Moreover,

11  its fees have been paid by third parties and are patently improper, and much—if not all—of these

12  fees result from its own actions.   BTB/MTS's Motion should be denied.

13       The chief factor in determining whether cost-shifting is appropriate "is the extent to which

14  the nonparty has an interest in the outcome of the case."   *Id*.   BTB/MTS has an interest in spades.

15  BTB/MTS's principals (i) discovered the Lake Tahoe cables (Dkt. 161, at ¶ 3); (ii) cut a portion of

16  the cables and tested it for lead (*id*.); (iii) founded BTB in South Lake Tahoe, in part to "press[] for

17  the removal of the Lake Tahoe cables" (Dkt. 99, at 17); (iv) contacted Plaintiff's lawyers and asked

18  them to file this lawsuit (Dkt. 161, ¶ 3); and (v) "brought [the case] to [Plaintiff] on a platter." Dkt.

19  65-13, at 7.

20       But that is not all.   BTB/MTS sought to profit from this litigation both during its pendency

21  and going forward.   It (i) sought in 2022 to be awarded a contract under which MTS would have

22  been paid to remove the cables; (ii) "stayed behind the scenes" of the litigation so MTS could win

23  the cable removal contract, but announced it was prepared to "help the [litigation] fight if needed"

24  (Kelley Decl.,[1] Ex. A); (iii) used this Lake Tahoe litigation to "set the path forward and pave the

25  way to push for removal across the US . . . through our non profit – Below the Blue" (Ex. C); and

26  (iv) stated that drawing attention to the lead cables in Tahoe and elsewhere was part of a "long

27

28  _____

[1]      All citations to "Ex." refer to exhibits to the Declaration of Jon Kelley, filed concurrently
herewith.

game" that will "lead to a LOT of work for our industry in years to come," and that "[w]e are front and center so hopefully that will lead to good things after the dust settles."  Exs. C-D.

BTB/MTS claims that "the only 'interest' that the court may consider is whether the nonparty has such a substantial financial interest in the litigation as to affect the 'significance' of the expenses."  Mot. at 7.  But BTB/MTS cites no authority that supports this sweeping proposition. BTB/MTS instead cites cases holding that a financial interest is *sufficient* to bar cost-shifting—not that a substantial financial interest is *necessary*.  To the contrary, even when, as in *Balfour Beatty Infrastructure, Inc. v. PB & A, Inc.*, 319 F.R.D. 277 (N.D. Cal. 2017), there is "no evidence" a third party "ha[d] a financial interest in the outcome of this case," cost-shifting is inappropriate when the third party is "involved in the underlying acts that gave rise to the lawsuit."  *Id*. at 282 (internal citation omitted).  BTB/MTS also claims that it had no financial interest "*at the time it complied with the subpoena*."  Mot. at 10 (emphasis added).  But consideration of a party's financial interest is not limited to the time of subpoena compliance, and, in any case, BTB/MTS's interest has continued throughout the pendency of this litigation.  *Valcor Eng'g Corp.,* 2018 WL 3956732, at *4 (denying cost shifting where third party was "intimately involved in the acts giving rise to the litigation," which pre-dated the subpoena); *Balfour Beatty*, 319 F.R.D. at 282 (same).

In any event, BTB/MTS had both a financial interest and a non-financial interest here, each of which is independently sufficient to bar cost shifting.  Seth Jones and Monique Fortner are principals of both BTB and MTS.  Below the Blue ("BTB") is a South Lake Tahoe environmental organization whose goal was to remove the cables (*see, e.g.*, https://belowtheblue.org/), Marine Taxonomic Services ("MTS") is a for-profit company that does environmental consulting and removes materials (like cables) from bodies of water.  *See, e.g.*, https://marinetaxonomicservices.com/.  When Jones and Fortner discovered the Tahoe cables, Jones' reaction was: "We can just pull this up and scrap it, it's got to be worth a lot."  Ex. E.  After BTB/MTS asked Plaintiff to file the lawsuit, Jones stated: "I hope we can do removal as well but maybe not since we would help the fight if needed and not stay behind the scenes."  Ex. A.  MTS later submitted to Pacific Bell a bid on a six-figure project to remove the cables.  Ex. F.

Nor does BTB/MTS's financial interest end with Lake Tahoe.  BTB/MTS also hoped that this lawsuit would lead to other cable-removal efforts across the country, and that MTS would be paid to remove cables nationwide.  Ex. C (Lake Tahoe litigation used to "set the path forward and pave the way to push for removal across the US . . . through our non profit – Below the Blue"); Ex. D (Seth Jones prediction that drawing attention to the lead cables in Tahoe and elsewhere would lead to "a lot" of work for the "industry," and MTS would be "front and center").  Under well-established caselaw, the Court may consider *both*: (1) the financial interest of for-profit MTS; and (2) the environmental interest of non-profit BTB.

BTB/MTS also cannot recover because it has incurred no expense in connection with Pacific Bell's subpoena.  All of the fees incurred by BTB/MTS's attorney Joshua Koltun have been paid by Dow Jones.  Dkt. 88-1, ¶ 4; Kelley Decl., ¶ 14.  BTB/MTS cite to *Ed A. Wilson, Inc. v. GSA*, 126 F.3d 1406, 1409-10 (Fed. Cir. 1997), for the assertion that "fees are still deemed to be 'incurred' even if they were paid by a third party or assumed by the attorneys themselves." Mot. at 12.  But *Wilson* stands for the uncontroversial proposition that "the insured can be viewed as having incurred legal fees *insofar as they have paid for legal services in advance as a component of the union dues or insurance premiums*." *Id.* at 1410 (emphasis added).  This is not an insurance case, and BTB/MTS does not claim to have paid "union dues or insurance premiums."  In *none* of the cases cited by BTB/MTS did the non-party *both* (1) have all its attorney fees paid by a separate third party (as here, with Dow Jones), and (2) not pay union dues or insurance premiums (as here).

Finally, Rule 45 only authorizes fee-shifting arising from subpoena compliance.  It does not authorize fee-shifting where a non-party has repeatedly flouted Court orders.  Here, Jones and Fortner—as principals of BTB/MTS—(1) evaded process servers for several weeks; and (2) ignored several orders from this Court and the District Court for the Southern District of California.  Both Pacific Bell and this Court spent substantial time and resources securing BTB/MTS's compliance with a straightforward subpoena.  Jones, Fortner, BTB, and MTS should not be rewarded for their repeated violations of Court orders.

## II.   FACTUAL BACKGROUND

Seth Jones "first discovered the cable in 2011 . . . Jones and his family had done a lot of work with scrap metal growing up so when Jones saw the cable, he immediately recognized the copper, lead and other components. 'At the time I was like, 'we can just pull this up and scrap it, it's got to be worth a lot.'" Ex. E.

In 2018, Jones "performed an assay and determined that the cable was sheathed in lead." Dkt. 161, ¶ 3.  From 2018 to 2020, Jones "attempted to interest government environmental regulators in the lead cables at the bottom of the lake." *Id*.

In 2020, Jones and Fortner founded BTB in part to advocate for the removal of the cables. Dkt. 99, at 17.  According to its website, BTB is a Tahoe-based "nonprofit dedicated to removing foreign debris from water bodies and educating the public about pollution. BTB collects hands-on data that helps facilitate policy change and enforcement *while working with environmental lawyers*, local agencies and residents."  Dkt. 65-4.  BTB "work[s] *closely with* a *team of environmental lawyers*, local agencies and residents to help guide our path."  *Id*. (emphasis added).  In a brief filed in this Court, BTB has agreed that it is "a nonprofit environmental group that has actively pressed for the removal of Lake Tahoe cables for years and views itself as a 'watchdog.'" Dkt. 99, at 17. BTB states as part of its "purpose" that it is "not afraid to use the strength of the law" in pursuit of these goals. Dkt. 56-4.

In 2020, BTB turned to its "team of environmental lawyers" to ask them to file this lawsuit. Dkt. 65-4; *see also* Dkt. 161, ¶ 3.  As one plaintiff's lawyer admitted, BTB/MTS brought this lawsuit to them "on a platter."  Dkt. 65-13, at 7 ("We didn't go to Lake Tahoe and take water samples near the cable. They did. And we didn't take samples of soil near cables. They did."). Plaintiff's lawyers described BTB, MTS, Jones, and Fortner as "indispensable" to their case, Dkt. 57-1 at Ex. B, and included them in their initial disclosures.  *See* Ex. K, at 2.  After Plaintiff's lawyers placed the cable in a "kiddie swimming pool" for testing, Plaintiff believed "we had the evidence that we needed to bring the case."  Dkt. 65-13, at 7.

BTB did not file the lawsuit itself, however.  BTB's principals, Jones and Fortner, are also the principals of MTS, and they hoped MTS would win the contract to remove the Tahoe cables.

As the lawsuit was being initiated, Jones told a friend he "hope[d] we can do removal as well but maybe not since we would help the fight if needed and not stay behind the scenes."  Ex. A.

On January 8, 2021, six days before the lawsuit was filed, Lake Tahoe resident Evan Dreyer emailed AT&T employee Torrey Denoo, copying Jones and Fortner and conveying an offer from Jones and Fortner to take Denoo on "a boat patrol to share their insights on where the cable goes and on shore infrastructure."  Ex. H.  After the boat ride, Jones reached out to Denoo to ask him to "stay in touch and let us know if you need anything."  *Id*.  Months later, in July of 2021, Jones reached out to Plaintiff's counsel—Kirk Boyd—and asked for "any updates" on the case, noting that BTB/MTS was "ready to dig in as needed."  Ex. B.  Plaintiff's counsel responded, noting that "the [consent decree] will include 1.5 million for removal of the cable."  *Id*.  Boyd noted that he had "been trying to arrange having this work done by you . . . from the start."  *Id*.  Boyd suggested Jones may want to start "on the written estimate" and take into consideration that Pacific Bell "will not pay the 1.5 as a lump sum, but that amount will be set aside to get the job done."  *Id*.  Boyd assured Jones that "considering the earlier estimates that we have talked about, this should be more than enough," and reaffirmed his goal that BTB/MTS would "have the winning estimate."  *Id*.  Almost immediately after the initial consent decree was entered, Jones reached out to Denoo to pitch BTB/MTS's services for removal of the cables, explaining they were "very interested in helping with cable removal in Tahoe as well as planning and permitting" and "transport and disposal as well. It's all something we can handle with bringing in a couple of subs."  Ex. I.  Jones asked Denoo to "let me know your plans and schedule with this project," and noted that BTB/MTS was "very well connected with the local agencies" and could help "make the process as smooth[] as possible…which in Tahoe can still be rough."  *Id*.  On December 15, 2021, Denoo took Jones up on his offer to submit a bid for the removal project, formally requesting that MTS provide a quote.  On January 18, 2022, MTS submitted a bid, which was unsuccessful. *See* Ex. F.

BTB/MTS now incorrectly claims that, once Pacific Bell awarded the bid to someone else, BTB/MTS had no remaining financial interest.  Mot. at 6.  In fact, BTB/MTS looked beyond Lake Tahoe in seeking to profit from cable removal.  Jones told a friend that he wanted to use the Lake Tahoe litigation to "*set the path forward and pave the way to push for removal across the US . . .*

through our non profit – Below the Blue." Ex. C (emphasis added).  BTB/MTS chose Lake Tahoe as the first place to bring a lawsuit as part of a broader strategy.  *Id*.  Removal of the Tahoe cables, according to Jones, "will set a precedent for the removal of more lead sheathed cables,"  and BTB/MTS was committed "to continue to push this issue forward on a local and national level." Dkt. 65-11.  Jones further stated that drawing attention to the lead cables in Tahoe and elsewhere was part of a "long game" that will "*lead to a LOT of work for our industry in years to come. We are front and center so hopefully that will lead to good things* after the dust settles." Ex. D (emphasis added).

To support their cable-removal "long game," after this lawsuit was filed, Jones and Fortner coordinated with the Environmental Defense Fund and the *Wall Street Journal* to conduct lead-cable testing in six regions across the United States.  Jones and Fortner prepared a 66-page Lead Cable Investigation Report documenting their lead-cable testing at numerous sites.  Dkt. 65-8.

In July of 2023, the Journal published articles regarding lead-clad cables in Lake Tahoe and elsewhere.  Dkts. 65-9, 65-10.  The articles prominently cite Jones and Fortner for their work on lead cables in Lake Tahoe and across the country.  According to the Journal, Jones and Fortner "assisted the Journal in site visits, collecting the samples—sometimes through scuba diving—and tabulating the data." *Id*.

After the lawsuit was reopened, Pacific Bell sought to serve identical subpoenas on BTB, MTS, Jones, and Fortner, asking for documents, communications, and information related to their sampling and testing of lead-clad cables.  Jones and Fortner repeatedly avoided service.[2]  On August 9 and 10, 2023, Pacific Bell succeeded in serving BTB/MTS.

The compliance deadlines for the subpoenas passed on August 23 and 24, 2023, and BTB/MTS failed to provide any substantive response.  Even after the deadline passed, Pacific Bell

---

[2]   *See* Dkt. 63, at 4; *see also* Dkt. 63-9, at 1-3 (reflecting three separate process servers attempting to serve Jones at a San Marcos, California address on four separate occasions between August 4 and August 8); *id*. at 4-5 (reflecting six separate attempts to serve Jones at a new address in Solana Beach); Dkt. 63-4 (reflecting two additional attempts to serve Jones at his San Marcos address); Dkt. 63-10 (documenting multiple attempts to serve Fortner and noting that no one answered the door although multiple vehicles were present).

made multiple efforts to confer in good faith with BTB/MTS to avoid motion practice, including a letter sent September 5 and emails sent September 11 and September 14.  Dkt. 65-16.

On September 26, 2023, Pacific Bell was forced to file a motion to compel. Dkt. 65.  On November 13, this Court granted Pacific Bell's motion to compel, and ordered BTB/MTS to produce all documents responsive to the subpoena by November 30.  Dkt. 80.  After BTB/MTS sought an extension, the Court entered another order reiterating that BTB/MTS must produce "all documents as to which there is no objection" by December 7.  Dkt. 90.  BTB/MTS failed to comply with both orders.  Jones and Fortner also improperly (i) self-selected documents instead of having an attorney conduct the review; (ii) relied in part on search terms they refused to disclose; (iii) claimed they may have lost responsive data from their phones; and (iv) failed to produce various responsive, unobjected to texts and emails by the Court-imposed December 7 deadline.  Dkt. 104-7.  On January 4, 2024, Pacific Bell was again forced to file a motion to compel BTB/MTS's compliance with the Court's orders.  Dkt. 104.

On January 25, 2024, the Court granted Pacific Bell's second motion to compel. Dkt. 124.  The Court stated BTB/MTS failed to comply with its orders and failed to ask for an extension:

> [BTB/MTS] is out of compliance with the November 13th and December 7th orders at this time . . . [and] did not seek an extension of time from the Court as would seem to have been appropriate if compliance was not possible. These are court orders. This is not an agreement between the parties.

1/25/2024 Hrg. Tr., at 16:12-14; 16-19.

In response to the Court's third order, BTB/MTS produced additional documents responsive to Pacific Bell's subpoena. Kelley Decl., ¶ 11.  BTB/MTS then demanded that Pacific Bell pay all fees associated with its alleged "compliance" with Pacific Bell's subpoena. *Id*., ¶ 12.  The parties met and conferred, including so that Pacific Bell could understand who paid the costs and fees at issue. *Id*. ¶ 14.  Counsel for BTB/MTS denied that there was any "written agreement" whereby Dow Jones paid his fees.  Ex. J ("I do not have any written agreement with the Wall Street Journal (Dow Jones, actually), but they have been paying my bills and have paid me for the work claimed in my Rule 45 motion.").  In an October 20, 2024 email, Pacific Bell's counsel stated:  "we understand your email to mean that you will not provide or describe any agreements you or any

other party have with Dow Jones regarding the costs and fees sought in your motion, other than to say there are no 'written agreements' between Dow Jones and you." *Id*.  Counsel for BTB/MTS responded: "Jon.  My god.  Dow Jones has agreed to pay my fees defending the subpoena.  That's it!" *Id*.  BTB/MTS then filed the instant Motion, seeking over $400,000 in fees allegedly associated with its compliance.  Dkt. 158.

## III.   ARGUMENT

### A.    The 1991 Amendments Do Not Preclude Consideration of a Third Party's Non-Financial Interest In the Litigation.

BTB/MTS argues that the 1991 amendments to Rule 45 preclude consideration of a third party's non-financial interest in the litigation.  But BTB/MTS fails to point to a single case holding as much.  As the court in *Callwave Communications v. Wavemarket, Inc.* concluded, "[w]hile the drafters of new Rule 45 clearly intended to expand the protection for non-parties . . . there is no indication that they also intended to overrule prior Rule 45 case law, under which a non-party can be required to bear some or all of its expenses where the equities of a particular case demand it." 2014 WL 2918218, at *3 (N.D. Cal. June 26, 2014) (citing *In Re Exxon Valdez,* 142 F.R.D. 380, 383 (D.D.C.1992).  So, while there is "some disagreement among the district courts as to whether and to what extent courts may still consider the equitable factors that were utilized in the pre-1991 analysis," no court has held that a third party's non-financial interest is irrelevant.  As the Court explained in *Valcor Eng'g Corp.*, 2018 WL 3956732, at *2–3, a third party's "interest in the litigation" is always important:

> Following *Legal Voice*, there is some disagreement among the district courts as to whether and to what extent courts may still consider the equitable factors that were utilized in the pre-1991 analysis.  [Gathering authority on both sides.]  MEDAL argues that none of these factors should be considered, because they have been rendered "outdated and obsolete" by the change in Rule 45 and *Legal Voice*.
> . . .
> Additionally, the Court finds that MEDAL's interest in the litigation is a valid consideration in determining whether cost-shifting is appropriate. The Court finds the following reasoning persuasive:
>
> *Rule [45] is aimed at protecting persons who are disinterested, and thus have little to gain from their outlays in compliance cost*−such as when "a non-party [is] required to provide a list of class members." Fed. R. Civ. P. 45, Advisory Committee Notes. ... The Rule was meant to protect those who are "powerless to control the

scope of litigation and discovery, and should [therefore] not be forced to subsidize an unreasonable share of the costs of a litigation" that does not concern them.  It was not intended as a mechanism for entities which stand to benefit from certain litigation outcomes to evade discovery costs arising from their involvement in the underlying acts that gave rise to the lawsuit.

*Id.* (emphasis added) (internal citations omitted).[3]

**B.      BTB/MTS Is An Interested Party.**

BTB/MTS is nothing like "a truly disinterested non-party."  *Valcor Eng'g Corp.,* 2018 WL 3956732, at *4.  MTS had a financial interest in cable removal – both in Lake Tahoe and beyond.  And BTB is a South Lake Tahoe organization created to press for cable removal, including for alleged aesthetic reasons.  BTB/MTS's non-financial interest and financial interest are each independently sufficient to bar cost-shifting here.

1.      No Financial Stake is Necessary For a Third Party to Be "Interested."

BTB/MTS argues that "the only interest the court can consider is whether the nonparty has a substantial financial stake in the outcome." Mot. at 7 (emphasis added).  BTB/MTS then cites cases holding that a financial stake is relevant.  But none hold that a financial stake is *necessary*.

Other cases—ignored by BTB/MTS—reinforce that no financial interest is required.  In *Balfour*, the court declined to order cost-shifting because the third party was "purportedly involved 'in the underlying acts that gave rise to the lawsuit,'" despite the fact that it had no financial interest:

---

[3]      *See also Cornell v. Columbus McKinnon Corp.*, 2015 WL 4747260 (N.D. Cal. Aug. 11, 2015) (declining to award fees to third party for subpoena compliance where third party was interested in the outcome of the litigation); *see also Shasta Linen Supply, Inc. v. Applied Underwriters Inc.*, 2018 WL 2981827, at *5 (E.D. Cal. June 14, 2018) (declining to award cost-shifting because the movant, "while a third party, had a business relationship with the parties that renders it 'interested' for the purposes of determining production cost allocation"); *Balfour Beatty Infrastructure, Inc.*, 319 F.R.D. at 282 (declining to order cost shifting to a nonparty because that party was "purportedly involved 'in the underlying acts that gave rise to the lawsuit'"); *Hyundai Motor Am., Inc. v. Pinnacle Grp., LLC,* 2016 WL 6208313, at *1 (C.D. Cal. Apr. 20, 2016) (finding non-party Mobis was not entitled to cost-shifting because "Mobis does not stand as an entirely disinterested third party.")  Courts have also considered whether the third party was involved in the events leading to the litigation and therefore could have reasonably anticipated being drawn into the litigation. *See* First Am. Corp. v. Price Waterhouse LLP, 184 F.R.D. 234, 242 (S.D.N.Y. 1998) (party is interested if it was substantially involved in the underlying transaction and should have reasonably anticipated being drawn into the litigation); Tutor-Saliba Corp. v. United States, 32 Fed. Cl. 609, 610 n. 5 (1995) (the fact that the non-party was "substantially involved in the underlying transaction and could have anticipated that [its involvement might] reasonably spawn some litigation, and discovery" was a circumstance weighing against shifting costs).

> [T]here is no evidence that URS has a financial interest in the outcome of this case. However, URS perhaps is not in the typical position of a completely uninterested nonparty, as it was purportedly involved "in the underlying acts that gave rise to the lawsuit." *Cornell,* 2015 WL 4747260, at \*5.

319 F.R.D. 277 at 282-83.

Similarly, in *Valcor Eng'g Corp.,* 2018 WL 3956732, the Court relied on the third party's "financial interest" *and* two other factors in holding the third party was "interested" for Rule 45 purposes. *See* 2018 WL 3956732 at \*6 ("In light of MEDAL's close involvement in the design and/or testing of one of the main ASM parts at issue in this lawsuit, the common interest agreement between MEDAL and Valcor, *and MEDAL's financial interest* in the outcome of this lawsuit, the Court finds that MEDAL is an interested party.") (emphasis added).[4]

BTB itself is a quintessentially interested party. BTB's goal was to get the Tahoe cables removed (Dkts. 99, at 17; 161-1, at 2-3), which is also the objective of plaintiff's claims. *See* Plf.'s Am. Compl. (Dkt. 12), ¶ 40 (seeking "an injunction ordering Pac Bell to remove the Cables from Lake Tahoe"). BTB's principals—Jones and Fortner—found the cables and had them tested for lead. Dkt. 161 ¶ 3. BTB then asked its team of "environmental lawyers" to file this lawsuit to "set the path forward and pave the way to push for removal across the US . . . through our non profit – Below the Blue." Ex. C. The text message attached to Jones' declaration confirms this:

> I've been in contact with some environmental lawyers about the big cable. And they are optimistic it will get removed and ATT will be forced to pay. . . They asked what we wanted . . . As in what we personally[5] wanted to sue them for . . . I thought it was silly . . . But I guess it's a thing. . . . Anyway I told him our only *interest was in getting the cable removed.*

---

[4]    *See also Cornell*, 2015 WL 4747260, at \*3 ("While slightly more attenuated than its direct financial interest, the outcome of this case could also affect FedEx's employee training, safety policies, and future exposure to liability… FedEx is quite unlike the type of 'nonparty' entity that Congress envisioned it was protecting when it amended Rule 45." *See In re Exxon Valdez,* 142 F.R.D. 380, 383 (D.D.C.1992) (emphasis added) (listing '*disinterested* expert witnesses' as an example of the class of people Congress meant to protect when enacting the 1991 amendments) (emphasis [in original]).")

[5]    Whether Jones and Fortner had any "personal" causes of action against Pacific Bell is irrelevant. BTB/MTS both had financial and non-financial interests in the litigation regardless of whether Jones and Fortner could state claims in their individual capacities.

Dkt. 161-1, 2-3 (emphasis added).  BTB/MTS's "interest" in "getting the cable removed" precludes it from being "a truly disinterested non-party." *Valcor Eng'g Corp.,* 2018 WL 3956732, at \*4.  For these reasons, BTB/MTS is "quite unlike the type of 'nonparty' entity that Congress envisioned it was protecting when it amended Rule 45." *Cornell*, 2015 WL 4747260, at \*3.  As in *Cornell*, "[w]hile [BTB/MTS] is nominally a non-party, its interest in the outcome of this case rivals that of the parties." *Id.* at \*5.  "Given this dynamic," BTB/MTS's "motion comes close to wielding the shield of Rule 45 as a sword." *Id*.

2.     BTB/MTS Also Had a Financial Interest In This Litigation.

But BTB/MTS also had a financial interest in this litigation.  First, BTB/MTS wanted to win the contract to remove Lake Tahoe cables.  Second, BTB/MTS sought to use the Lake Tahoe litigation to "set the path forward and pave the way to push for removal across the US."  Ex. C.

Before this lawsuit was filed, Jones stated to a friend: "I hope we can do removal as well but maybe not since we would help the fight if needed and not stay behind the scenes."  Ex. A.  Plaintiff, in turn, tried "to arrange having this [cable] work done by you [MTS]." *Id*.  Almost immediately after this Court entered the initial consent decree, MTS reached out to Pacific Bell to pitch MTS' services for removal of the cables, noting they were "very interested in helping with cable removal in Tahoe as well as planning and permitting" and "transport and disposal as well. It's all something we can handle with bringing in a couple of subs."  Ex. I.  On January 18, 2022, MTS submitted a bid for the removal project.  Ex. F.

BTB/MTS argues that "the contention that, *at the time it complied with the subpoena*, BTB-MTS was hoping AT&T would hire it to do permitting/surveying work is absurd."  Mot. at 10 (emphasis added).  But consideration of a party's financial interest is not limited to the time of subpoena compliance. *Valcor Eng'g Corp.,* 2018 WL 3956732, at \*4 (denying cost shifting where third party was "intimately involved in the acts giving rise to the litigation," which pre-dated the subpoena); *Balfour Beatty*, 319 F.R.D. at 282 (same).

In any event, BTB/MTS's financial interest extended far beyond Lake Tahoe.  BTB/MTS scouted and tested hundreds of cable locations across the country and published the results in a report.  Dkt. 65-8.  BTB/MTS admitted publicly its expectation that removal of the Tahoe cables

would "set a precedent for the removal of more lead sheathed cables at locations uncovered by this investigative report."  Dkt. 65-11. Jones confirmed this in an email to his friend, noting that BTB/MTS used the Lake Tahoe litigation to "set the path forward and pave the way to push for removal across the US."  Ex. C.  BTB/MTS chose Lake Tahoe as the first place to bring a lawsuit as part of a broader strategy.  *Id*.  In a 2023 email, Jones explained that this "long game" would "lead to a LOT of work for our industry in years to come. We are front and center . . . ."  Ex. D.

In sum, Jones, Fortner, and BTB/MTS sought to profit from the removal of cables, both in Lake Tahoe and across the country. This financial motive existed before and throughout this case.

**C.    BTB/MTS's First Amendment Arguments Fail.**

BTB/MTS argues that it should not be "disqualified from cost-shifting because of its environmental advocacy," as doing so would "unconstitutionally penalize BTB-MTS" for its "First Amendment activities."  Mot. at 10.  BTB/MTS argues further that "[t]he Ninth Circuit in *Legal Voice I* squarely ruled that a nonprofit advocacy organization that had brought attention to the issue that is the subject of the litigation was fully entitled to cost-shifting."  Mot. at 1.

As an initial matter, the role of the non-party in *Legal Voice I* (the Law Center) was much more limited than BTB/MTS's role here.  *Legal Voice v. Stormans Inc.*, 738 F.3d 1178, 1181 (9th Cir. 2013) ("The Law Center was *among the organizations* bringing these reports to the Board's attention. The Law Center was also *a member* of a task force that participated in the rule-making process.") (emphasis added)).   Here, by contrast, BTB/MTS served this lawsuit to Plaintiff's counsel "on a platter."  Dkt. 65-13, at 7.

Furthermore, nothing in *Legal Voice I* suggests that the non-party (the Law Center) had a financial interest in the litigation, as MTS does here.  Likewise, nothing in *Legal Voice I* suggests the Law Center had an aesthetic interest in the outcome.  Here, by contrast, BTB's own website claims it has an aesthetic interest in Lake Tahoe.  *See* https://belowtheblue.org/about-us-1 ("Below the Blue . . .  is a culmination of years of hard work, real science and an absolute labor of love for our beautiful community and its ecosystems."); Black's Law Dictionary 57 (6th ed.1990) (defining "aesthetic" as "[r]elating to that which is beautiful or in good taste"); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) (discussing aesthetic interest in environmental context).

Most importantly, the Ninth Circuit *Legal Voice I* opinion did not analyze the Law Center's "interest" in the case. The word "interest" does not appear in the *Legal Voice I* opinion. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *United States v. Rivera-Guerrero,* 377 F.3d 1064, 1071 (9th Cir. 2004).

BTB/MTS next argues that its "actions were protected First Amendment activities" that could be characterized as "journalism." Mot. at 11. But this Court has already rejected that argument. In its January 25, 2024 ruling, the Court found that BTB/MTS "does not have standing to assert the journalist's privilege" because "it's a privilege that belongs to journalists" and "does not apply to non-journalists, for example, sources" like BTB/MTS. 1/25/2024 Hrg. Tr., at 50-51.

Finally, BTB/MTS argues that what matters is whether BTB/MTS was a "wrongdoer." Mot. at 11. But that consideration is irrelevant. What matters is "the extent to which the nonparty has an interest in the outcome of the case." *See Cornell*, 2015 WL 4747260, at *5. Here, BTB/MTS does not and cannot deny that it had "an interest in the outcome of the case," (*id.*)—so much so that they were willing to "help the fight if needed." Ex. A.

**D.    BTB/MTS Has Not Incurred Any "Significant" Expenses.**

BTB/MTS has not, in fact, actually incurred any expenses; therefore, it cannot show it has incurred the "significant expense[s]" required for reimbursement under Rule 45. BTB/MTS seeks two categories of expenses. First, BTB/MTS seeks reimbursement of fees paid to Alvarez & Marsal ("A&M") for document collection and production and to its attorney Joshua Koltun for time spent allegedly complying with the subpoena. Second, BTB/MTS seeks reimbursement for over 500 hours Jones and Fortner allegedly spent complying with the subpoena. Neither is compensable.

1.    <u>BTB/MTS is not responsible for payment of the fees at issue.</u>

BTB/MTS is not entitled to reimbursement of fees paid to its attorney Joshua Koltun for time spent allegedly advising on subpoena compliance, or to A&M for document collection and production. Koltun's fees have already been paid by Dow Jones—not BTB/MTS. Ex. J.

1   BTB/MTS cannot demand reimbursement of expenses under Rule 45 that it has not incurred.[6]  *See*

2   *Wall Indus., Inc. v. United States,* 15 Cl. Ct. 796 (1988) (no attorney fees to plaintiff where "no

3   credible evidence was proffered establishing that [the plaintiff] assumed any responsibility to pay

4   for the legal fees and other expenses incurred in the refund litigation").

5       BTB/MTS's reliance on *Wilson* is misplaced.  First, *Wilson* addresses only the availability

6   of attorney fees under the Equal Access to Justice Act ("EAJA") and says nothing about cost-

7   shifting under Rule 45(d)(2)(B)(ii).  *See* 126 F.3d at 1408 ("The primary and narrow question

8   before us is whether, under the Act, Wilson has 'incurred' legal fees when its insurer is responsible

9   for paying them. This is an issue of statutory interpretation.").  Second, in *Wilson*, an insurance

10  company was responsible for paying attorney fees for the insured nonparty pursuant to an

11  agreement.  That agreement provided a "loan" to the insured, and the insured "assigned any claim

12  it might have against the government and the amount of any potential recovery to [the insurer]."

13  *Id*. at 1406.  In contrast, BTB/MTS's counsel has expressly disclaimed the existence of any written

14  agreement between BTB/MTS and Dow Jones.  Ex. J.

15      Most importantly, the *Wilson* court held that "[i]t [wa]s [the insured]'s exposure to increased

16  premiums and our view that it effectively incurred attorney fees by prepaying them via its premium

17  payments that distinguishes this case from *Comserv* and *Wall Indus., Inc. v. United States,* 15 Cl.

18  Ct. 796 (1988)."  *Wilson*, 126 F.3d at 1407 n.4.  Here, BTB/MTS does not claim either (i) "that it

19  effectively incurred attorney fees by prepaying them via its premium payments" or (ii) "exposure

20  to increased [attorney fees]," and is not entitled to recover any such fees as a result.  *Id.*

21      BTB/MTS's counsel claims that "Dow Jones advanced payment . . . in the understanding

22  that it would be reimbursed upon an award of fees," and that he intends to  "reimburse Dow Jones"

23  with any cost-shifting funds awarded, but this does nothing to change the analysis. Dkt. 162, at ¶¶

24

---

25  [6]      BTB/MTS argues that the parties' "relative financial resources shows . . . that the expenses
    at issue are clearly significant to BTB/MTS, and insignificant to AT&T."  Not so.  The parties'
26  financial status is relevant only insofar as BTB/MTS might be required to pay certain amounts for
    compliance with the subpoenas, but no one—not even BTB/MTS—alleges BTB/MTS has ever
27  paid anything.  For this reason, the "relative financial resources" of the parties are irrelevant. In any
    case, the party paying the fees sought in the Motion—Dow Jones—has significant financial
28  resources, reporting a 2023 net income of $660 million.  Ex. L.

10, 15.  MTS/BTB's counsel admits that no written agreement with Dow Jones exists—either with BTB/MTS or its counsel.  *See* Ex. J.  And even if such a written agreement did exist, it would still be an insufficient basis to award fee-shifting.  In *Wall Industries*, cited in *Wilson*, non-party Arthur Young "took full responsibility for . . . all legal fees and expenses," and plaintiff *Wall* assigned any recovery of attorney fees to Arthur Young through a written agreement. *Wall Indus., Inc. v. United States,* 15 Cl. Ct., at *799 (internal quotations omitted).  However, the *Wall* court declined to award attorney fees to Wall despite its status as a prevailing plaintiff, finding that, as here, "no credible evidence was proffered establishing that [Wall] assumed any responsibility to pay for the legal fees and other expenses incurred in the refund litigation." *Id*. at *802.  Notwithstanding Wall's written obligation to repay Arthur Young its attorney fees, the court held that Wall "[wa]s not eligible under the EAJA because it failed to *incur* any legal expenses." *Id*. at *800.  The "critical fact," observed the court, was "that Wall, the prevailing party, did not become subject to the payment of legal fees, but rather it was Arthur Young." *Id*. at *803 (internal citations omitted).  The *Wall* court also distinguished *pro bono* cases, noting that "in the case at bar, the representation was not pro bono." *Id.* *802.  The Court should deny BTB/MTS's Motion for the same reasons.

Plaintiff also cites *Nadarajah v. Holder*, 569 F.3d 906 (9th Cir. 2009), where a court held that attorney fees had been "incurred."  Mot. at 12.  In *Nadarajah*, a native of Sri Lanka was detained and improperly denied parole despite being granted asylum. Through *pro bono* representation, he appealed a denial of his writ of habeas corpus, was released from prison, and sought recovery of his attorney fees. *Nadarajah* did not involve a third party (like Dow Jones) paying the attorney fees for the *pro bono* plaintiff or its attorneys.[7]  Had such a third-party payment occurred, no attorney fees would have been incurred by the party or the party's attorney.

*None* of the cases cited by BTB/MTS involved a third-party who both (1) had all its attorney fees paid by a third party, and (2) did not pay insurance premiums.  Unlike the cases BTB/MTS cites, Dow Jones chose to fund legal representation for BTB/MTS and its principals without any written agreement.  *See* Ex. J.  BTB/MTS did not pay Dow Jones any insurance premiums or union

---

[7]    Likewise, in *Satchell v. Wallace*, 439 F. App'x 644, 645 (9th Cir. 2011), there is no evidence that a separate third party (like Dow Jones) paid the relevant attorney fees.

1  dues in return for legal representation.  BTB/MTS has not—and cannot—offer any "credible

2  evidence" establishing that it "assumed any responsibility to pay for the legal fees and other

3  expenses incurred," and its Motion should be denied. *Wall Indus.,* 15 Cl. Ct. at 802.

4  2.  Time billed by Jones and Fortner is not compensable.

5      The Court should not award any time billed by Jones and Fortner for two additional reasons.

6      First, every written description included for these 505 hours are identical, reading simply:

7  "Project Management." *See* Dkt. 161-1, at 17-24.  This lack of detail prevents the court from

8  performing a meaningful review to determine the amount of time expended on subpoena

9  compliance.  Thus, the Court cannot determine if the time billed by Jones and Fortner was

10 reasonable or necessary.  The Court should decline to award these fees on this basis.

11     Second, Jones attests in his declaration that every one of the 505 hours reflected in the time

12 he and Ms. Fortner billed was exclusively attributable to "review of documents," which he and

13 Fortner were reviewing "for responsiveness."  Dkt. 161, ¶ 11.  But at the January 25 hearing, the

14 Court twice instructed BTB/MTS that Jones and Fortner were *not* to review for relevance: "Let me

15 note determinations of relevance . . . those need to be made by the attorneys.  We can't offload

16 those to third parties . . . However, you cannot, Mr. Koltun, offload the responsibility of determining

17 relevancy to non-lawyers or to the principals."  1/25/2024 Hrg. Tr., at 52:11-14; 54:11-13.

18     Worse yet, though Mr. Koltun attests that he "supervised" Jones and Fortner's document

19 review, billing records submitted by BTB/MTS reflect that he first met with Jones and Fortner to

20 discuss "privilege and responsiveness review" on January 17, 2024. Dkt. 162-1, at 40.  Yet before

21 that date—between January 8 and January 16, 2024—Jones and Fortner billed a combined 60.5

22 hours*. See* Dkt. 161-1, at 17, 20-21.  This highlights the reason courts require submission of

23 detailed entries: either Mr. Koltun did not supervise over 60 hours of responsiveness review

24 conducted by his clients at the outset of document collection (making that review wasteful and

25 contrary to the Court's instruction that relevance determinations "need to be made by the

26 attorneys"), or Jones and Fortner did not actually undertake 60.5 hours of responsiveness review

27 during that time.  But the Court cannot determine the answer because it necessarily depends on the

28 evidence, and the evidence describes every one of those 60.5 hours as devoted to "Project

Management." *See id*.  The Court should decline to award these fees.

> **E.      BTB/MTS also cannot show that its fees result from compliance.**

BTB/MTS also cannot show that its fees "result[] from compliance" with the subpoena.

Courts have explained that "an unreasonably incurred expense is not an expense 'resulting from compliance' . . . In other words, Rule 45 does not cut a blank check to non-parties—unnecessary or unduly expensive services do not 'result from compliance' and, therefore, do not count as 'expenses.'" *United States v. McGraw-Hill Cos.*, 302 F.R.D. 532, 536 (C.D. Cal. 2014); *see also Balfour Beatty*, 319 F.R.D. at 281–82 ("Additionally, the nonparty seeking cost shifting must demonstrate that its costs are reasonable and resulted from compliance with the subpoena.").  "Rather than looking to the cost of compliance in a vacuum, courts must evaluate that cost in light of all the relevant facts and circumstances." *Cornell,* 2015 WL 4747260, at *4.

BTB/MTS's principals attempted to avoid service of the subpoenas issued by Pacific Bell for months, requiring Pacific Bell to file a request for special service.  Dkt. 63; *see also supra* at Sec. II; n.2.  Once BTB/MTS and its principals were served with the subpoenas, they failed to "seek an extension of time from the Court," failed to comply with the subpoenas, and failed to comply with multiple orders issued by the Court that required production of all responsive documents, a fact the Court confirmed on the record.  *See* 1/25/2024 Hrg. Tr., at 16:12-14 ("Below the Blue is out of compliance with the November 13th and December 7th orders at this time.").

Pacific Bell was also forced to file separate motions to compel Jones and MTS in other jurisdictions.  Pacific Bell served MTS with a subpoena on August 10, 2023.  MTS failed to produce any documents by the August 24 compliance date.  On September 21, Pacific Bell filed a Motion to Compel in the Southern District of California.  SD Cal. Case No. 2:24-cv-22-KJM-JDP, Dkt. 1.  That Court issued an order directing Pacific Bell and MTS to meet and confer.  *Id*., Dkt. 6.  MTS refused to confer despite Pacific Bell's repeated attempts, and on November 6, 2023, Judge Crawford ordered MTS "TO SHOW CAUSE in writing by no later than November 30, 2023: (1) why it did not comply with the Court's September 21, 2023 Order; and (2) why Pacific Bell's Renewed Motion should not be granted." *Id*., Dkt. 14.

BTB/MTS increased the costs associated with responding to the subpoena dramatically through its noncompliance with the Court's orders. It was only because BTB/MTS proved unwilling to make any production that Pacific Bell moved to compel in the first instance, and only because BTB/MTS failed to comply with the Court's orders that Pacific Bell moved to compel a second time. By the time of the hearing on Pacific Bell's second motion to compel, six months had passed since BTB/MTS was served with the subpoena, and yet it still had not complied. During the hearing, the Court observed succinctly: "Below the Blue did nothing in terms of subpoena response with no valid excuse." 1/25/2024 Hrg. Tr., at 50:22-23. As a result, the Court ordered BTB/MTS to make a production within two weeks. Dkt. 127. It was this order—and the subsequent review and production over a condensed two-week timeframe—that necessitated the costs included in BTB/MTS's Motion.

Pacific Bell has served 18 other subpoenas on 18 other non-parties in this case, and not one necessitated a motion to compel—let alone multiple motions to compel. Kelley Decl., ¶ 15. As the court reasoned in *Cornell*, the unnecessarily "hard fought" nature of BTB/MTS's discovery compliance "unnecessarily increased the cost of compliance." *Cornell v. Columbus McKinnon Corp.*, 2015 WL 4747260, at *4.

The *Valcor* case is particularly instructive. There, a third party called MEDAL sought to recover $476,000 in costs allegedly attributable to compliance with a subpoena—an amount the Court found to be "extremely high and objectively unreasonable." 2018 WL 3956732, at *3. Much of this expense was incurred due to MEDAL's "tactical decision to aggressively challenge every aspect of the subpoena," which led to two separate motions to compel, both of which were granted. *Id*. The Court observed that "the positions MEDAL took in opposing those motions demonstrated little interest in minimizing expenses or preventing further motion practice," particularly because "the result of these tactical decisions was that MEDAL essentially had to re-review the documents it had collected, thereby incurring significant additional expenses." *Id*. Moreover, MEDAL was "intimately involved in the acts giving rise to the litigation and has a financial interest in the case." *Id*. at *4. Based on these combined facts, the court held "that MEDAL is an interested party and therefore not entitled to cost-shifting under Rule 45." *Id*. at *6. The Court also noted in its holding

"the aggressive and inefficient manner in which MEDAL chose to respond to the subpoena demonstrates its interest in the outcome of this case and undermines MEDAL's contention that these expenses 'result[ed] from compliance' with the subpoena within the meaning of Rule 45(d)(2)(B)(ii)." *Id.*

Here, BTB/MTS seeks $402,165 in costs, which is barely less than the amount the *Valcor* court found to be "extremely high and objectively unreasonable." Like the third party in *Valcor*, BTB/MTS also made a "tactical decision to aggressively challenge every aspect of the subpoena," which also led to two separate motions to compel, both of which were granted. *Id.* at *3. BTB/MTS demonstrated the same lack of "interest in minimizing expenses or preventing further motion practice," and as a direct result of its tactical decisions, BTB/MTS had "to re-review the documents it had collected, thereby incurring significant additional expenses." BTB/MTS and its principals were "intimately involved in the acts giving rise to the litigation and ha[d] a financial interest in the case," and chose to respond to the subpoenas in an "aggressive and inefficient manner," further demonstrating their "interest in the outcome of this case." *Id.* at *3, *6. And, as in *Valcor*, BTB/MTS's "aggressive litigation tactics are also relevant because they tend to demonstrate MEDAL is not a truly disinterested non-party." *Valcor*, 2018 WL 3956732, at *4; *see also* Section III.B, *supra*. Here, the court should follow the precedent set in *Valcor* and hold that BTB/MTS's status as an interested party precludes it from cost-shifting under Rule 45.

### F.   BTB/MTS's request for sanctions is meritless and fails for reasons the record itself makes clear.

BTB/MTS's argument that the Court should award sanctions is frivolous. BTB/MTS argues that Pacific Bell had not yet used documents produced by BTB/MTS at the time the case settled. BTB/MTS does not know how Pacific Bell would have used BTB/MTS documents in depositions, in summary judgment, in pretrial submissions, or at trial—none of which have occurred yet. For example, Plaintiff named Jones, Fortner, and MTS as witnesses with "discoverable information that support Plaintiff's claims" in its initial disclosures. Ex. K. Pacific Bell obviously would have used BTB/MTS's documents to cross-examine Jones and Fortner in their depositions and at trial.

1

## IV.   CONCLUSION

For the foregoing reasons, Pacific Bell respectfully requests that the Court deny BTB/MTS's Motion to Shift Costs.   A proposed order has been submitted for the Court's consideration.

DATED: November 20, 2024

Respectfully submitted,

*/s/ Hariklia Karis*

HARIKLIA KARIS (*admitted pro hac vice*)
hkaris@kirkland.com
ROBERT B. ELLIS (*admitted pro hac vice*)
rellis@kirkland.com
MARK J. NOMELLINI (*admitted pro hac vice*)
mnomellini@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Fax: (312) 862-2200

JON DAVID KELLEY (*admitted pro hac vice*)
jon.kelley@kirkland.com
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, TX 75205

NAVI SINGH DHILLON (SBN 279537)
navidhillon@paulhastings.com
PETER C. MEIER (SBN 179019)
petermeier@paulhastings.com
LUCAS V. GRUNBAUM (SBN 314180)
lucasgrunbaum@paulhastings.com
PAUL HASTINGS LLP
101 California Street, 48th Floor
San Francisco, California  94111
Telephone:  (415) 856-7000
Fax: (415) 856-7100

Attorneys for Defendant
PACIFIC BELL TELEPHONE COMPANY

- 20 -