1 │ NAVI SINGH DHILLON (SBN 279537)
  │ navidhillon@paulhastings.com
2 │ PETER C. MEIER (SBN 179019)
  │ petermeier@paulhastings.com
3 │ LUCAS V. GRUNBAUM (SBN 314180)
  │ lucasgrunbaum@paulhastings.com
4 │ PAUL HASTINGS LLP
  │ 101 California Street, 48th Floor
5 │ San Francisco, California 94111
  │ Telephone: (415) 856-7000
6 │
  │ HARIKLIA KARIS (*admitted pro hac vice*)
7 │ hkaris@kirkland.com
  │ ROBERT B. ELLIS (*admitted pro hac vice*)
8 │ rellis@kirkland.com
  │ MARK J. NOMELLINI (*admitted pro hac vice*)
9 │ mnomellini@kirkland.com
  │ KIRKLAND & ELLIS LLP
10 │ 300 North LaSalle
  │ Chicago, IL 60654
11 │ Telephone: (312) 862-2000
12 │ JON DAVID KELLEY (*admitted pro hac vice*)
  │ jon.kelley@kirkland.com
13 │ KIRKLAND & ELLIS LLP
  │ 4550 Travis Street
14 │ Dallas, TX 75205
15 │ Attorneys for Defendant
  │ PACIFIC BELL TELEPHONE COMPANY
16 │

17 │ UNITED STATES DISTRICT COURT

18 │ EASTERN DISTRICT OF CALIFORNIA

| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, | CASE NO. 2:21-cv-00073-JDP |
|---|---|
| Plaintiff, | **DEFENDANT PACIFIC BELL TELEPHONE COMPANY'S OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS** |
| vs. | |
| PACIFIC BELL TELEPHONE COMPANY, | Date: January 9, 2025 |
| Defendant. | Time: 9:00 A.M. |
| | Courtroom: 9 |
| | Judge: Hon. Jeremy D. Peterson |
| | Action Filed: January 14, 2021 |
| | Trial Date: None |

1

## <u>TABLE OF CONTENTS</u>

2
I.    INTRODUCTION .................................................................................................... 1

3
II.   Factual and Procedural Background ....................................................................... 4

4
  A.   By CSPA's Counsel's Own Admission, This Case Was Handed To Them "On a Platter." 4

5
  B.   This Case Went Dormant for Nearly Two Years. ............................................. 6

6
  C.   The Case Was Revived For Less Than A Year, During Which No Depositions, Summary
7      Judgment Filings, Significant Motion Practice, Expert Disclosures, or Pretrial Filings
       Occurred. ........................................................................................................... 7

8
  D.   CSPA's Increases Its Fees by Over 490% From First Phase of Litigation. ......... 9

9
III.  LEGAL STANDARD ........................................................................................... 11

10
IV.   ARGUMENT ....................................................................................................... 12

11
  A.   CSPA's Proposed Lodestar Amount Is Unreasonable. ...................................... 12

12
    1.   The Number of Hours Billed by CSPA's Counsel Is Unreasonable. .......... 12

13
      a.   CSPA's Claimed Hours Are Patently Unreasonable Given the Early Settlement
           of this Case. ............................................................................................. 12
14
15
      b.   CSPA's Time Records Confirm That It Improperly Seeks To Recover Fees For
           Work That Did Not Contribute To The Parties' Settlement. .................... 15

16
      c.   CSPA's Claimed Hours Are Excessive Because Its Claims Were Not Novel... 18

17
    2.   The Hourly Rate Requested by CSPA's Counsel Is Unreasonable in Light of the
         Rates Prevailing in the Community for Similar Work. ............................... 19
18
19
  B.   No Fee Multiplier Is Warranted. ...................................................................... 22

20
  C.   CSPA's Requested Costs Are Not Compensable. ............................................ 24

21
V.    CONCLUSION ..................................................................................................... 25

22

23

24

25

26

27

28

DEFENDANT'S OPPOSITION TO PLAINTIFF'S                           Case No. 2:21-cv-00073-JDP
MOTION FOR ATTORNEYS' FEES AND COSTS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aranow v. D.C.*,
780 F. Supp. 46 (D.D.C. 1992) ........................................................................ 25

*Asberry v. City of Sacramento/Sanitation Dep't*,
2004 WL 3636054 (E.D. Cal. 2004) .................................................................. 14

*Blum v. Stenson*,
465 U.S. 886 (1984) ............................................................................ 19, 22

*Bui v. Nguyen*,
230 Cal. App. 4th 1357 (2014) .......................................................................... 11

*Busch v. CitiMortgage, Inc.*,
2011 WL 3627042 (N.D. Cal. 2011) ................................................................. 18

*Cal. Open Lands v. Butte Cnty. Dep't of Pub. Works*,
2022 WL 286542 (E.D. Cal. 2022) .................................................................... 19

*Cal. Sportfishing Prot. All. v. Chico Scrap Metal, Inc.*,
2016 WL 105252 (E.D. Cal. 2016) ............................................................ 20, 21

*California Sportfishing Protection Alliance v. Forever Resorts, LLC*,
2017 WL 550043 (E.D. Cal. Feb. 10, 2017) ........................................... *passim*

*Camacho v. Bridgeport Fin., Inc.*,
523 F.3d 973 (9th Cir. 2008) ............................................................................. 19

*City of Burlington v. Dague*,
505 U.S. 557 (1992) .......................................................................................... 22

*City of Santa Rosa v. Patel*,
191 Cal. App. 4th 65 (2010) .............................................................................. 11

*Clark v. City of Los Angeles*,
803 F.2d 987 (9th Cir. 1986) ............................................................................. 15

*Cmty. Ass'n Underwriters of Am., Inc. v. Queensboro Flooring Corp.*,
2016 WL 1076910 (M.D. Pa. 2016) .................................................................. 15

*Coldani v. Hamm*,
2011 WL 2160929 (E.D. Cal. June 1, 2011) ..................................................... 11

*Cruz ex rel. Cruz v. Alhambra Sch. Dist.*,
601 F. Supp. 2d 1183 (C.D. Cal. 2009) ............................................................ 15

- ii -

*Ecological Rights Found. v. Hot Line Constr., Inc.*,
  2024 WL 3507023 (C.D. Cal. 2024)................................................................12, 21

*Gates v. Deukmejian*,
  987 F.2d 1392 (9th Cir. 1992)..................................................................................19

*Glover v. I.C. Sys., Inc.*,
  2020 WL 3105091 (M.D. Ga. 2020).........................................................................12

*Heidtman v. Cnty. of El Paso*,
  171 F.3d 1038 (5th Cir. 1999)..................................................................................23

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983)..................................................................................................18

*Hernandez v. Spring Charter Inc.*,
  2020 WL 1171121 (N.D. Cal. 2020).........................................................................18

*Hinds Invs., L.P. v. United Fabricate Supply Inc.*,
  2008 WL 11338683 (C.D. Cal. 2008).......................................................................14

*Hoefle v. Colvin*,
  2014 WL 5217041 (E.D. Cal. 2014)..........................................................................15

*Indep. Project, Inc.*, 397 F. Supp. 3d at 495 ................................................................18

*Juvera v. Salcido*,
  2013 WL 6628039 (D. Ariz. 2013)............................................................................12

*Ketchum v. Moses*,
  24 Cal. 4th 1122 (Cal. 2001).....................................................................................15

*Laffitte v. Robert Half Int'l Inc.*,
  1 Cal. 5th 480 (2016) ................................................................................................11

*McCown v. City of Fontana*,
  565 F.3d 1097 (9th Cir. 2009)......................................................................11, 15, 16

*Med. Protective Co. v. Pang*,
  25 F. Supp. 3d 1232 (D. Ariz. 2014).........................................................................19

*Melendres v. Maricopa Cnty.*,
  878 F.3d 1214 (9th Cir. 2018)...................................................................................15

*Mitchell v. Sun City Lincoln Hills Cmty. Ass'n*,
  2022 WL 16739570, at *4 (E.D. Cal. 2022), *report and recommendation
  adopted*, 2022 WL 17812809 (E.D. Cal. 2022) .......................................................19

*Moore v. Mount Zion Baptist Church*,
  2024 WL 4133030 (M.D. Tenn. Sept. 10, 2024) ..........................................*passim*

- iii -

*Nat. Res. Def. Council, Inc. v. E.P.A.*,
  1998 WL 704368 (D.C. Cir. Sept. 3, 1998) .......................................................... 25

*Norman v. Hous. Auth. of City of Montgomery*,
  836 F.2d 1292 (11th Cir. 1988) ......................................................................... 24

*Olson v. Auto. Club of S. Cal.*,
  42 cal. 4th 1142 (Cal. 2008) .............................................................................. 25

*Outdoor Sys., Inc. v. City of Mesa*,
  997 F.2d 604 (9th Cir. 1993) ............................................................................. 15

*Parkinson v. Hyundai Motor Am.*,
  796 F. Supp. 2d 1160 (C.D. Cal. 2010) .............................................................. 22

*Pelayo v. Platinum Limousine Servs., Inc.*,
  2016 WL 5402185 (D. Haw. 2016) ..................................................................... 17

*Penn. v. Del. Valley Citizens' Council for Clean Air*,
  478 U.S. 546 (1986) ........................................................................................... 22

*Perdue v. Kenny A. ex rel. Winn*,
  559 U.S. 542 (2010) ................................................................................ 4, 22, 24

*Prison Legal News v. Schwarzenegger*,
  608 F.3d 446 (9th Cir. 2010) ............................................................................. 21

*Puccio v. Love*,
  2020 WL 434481 (S.D. Cal. 2020) ..................................................................... 15

*Quevedo v. New Albertsons, Inc*,
  2015 WL 10939716 (C.D. Cal. 2015) ................................................................. 13

*QVC, Inc. v. MJC Am., Ltd.*,
  2013 WL 3976043 (E.D. Pa. 2013) ..................................................................... 15

*Roth Grading, Inc. v. Martin Bros. Constr.*,
  562 F. Supp. 3d 1094 (E.D. Cal. 2022) .............................................................. 19

*Salvage v. Kia Motors Am., Inc.*,
  2010 WL 11596178 (C.D. Cal. 2010) ................................................................. 17

*Shipes v. Trinity Indus.*,
  987 F.2d 311 (5th Cir. 1993) ............................................................................. 23

*Siafarikas v. Mercedes- Benz USA, LLC*,
  2022 WL 16926265 (E.D. Cal. 2022) ................................................................. 19

*Sierra Club v. E.P.A.*,
  769 F.2d 796 (D.C. Cir. 1985) ..................................................................... 24, 25

*Trujillo v. Orozco*,
  2018 WL 1142311 (N.D. Cal. 2018), *aff'd*, 790 F. App'x 96 (9th Cir. 2020)........................ 18

*W. Va. Univ. Hosps., Inc. v. Casey*,
  499 U.S. 83 (1991) ............................................................................................................ 25

*In re Wash. Pub. Power Supply Sys. Secs. Litig.*,
  19 F.3d 1291 (9th Cir. 1994)............................................................................................. 24

**Statutes**

28 U.S.C. § 1920 ...................................................................................................................... 25

42 U.S.C. § 6972(e) ...................................................................................................... 11, 24, 25

42 U.S.C. § 7607(f) .................................................................................................................. 24

California Code of Civil Procedure Section 1021.5.......................................................... 11, 25

Clean Air Act ...................................................................................................................... 20, 24

RCRA ............................................................................................................................. *passim*

Resource Conservation and Recovery Act............................................................................... 11

**Rules**

Federal Rules of Evidence 702 and 703.................................................................................... 9

Rule 26(f) .................................................................................................................................... 5

**Other Authorities**

*Plaintiffs' Motion for Attorneys' Fees and Costs*, No. 5:20-cv-01108-AB-KK ......................... 13

1

# I.     INTRODUCTION

2     Plaintiff California Sportfishing Protection Alliance's ("CSPA") requested attorney fees are

3 unreasonable at every step.  The reported hours do not reflect the work that was reasonably

4 necessary to prosecute this case, which was dormant for two years and never progressed beyond

5 document productions.  The suggested hourly rates are excessive and bear no resemblance to those

6 approved by courts in this district for similar work.  And the 2.0x multiplier that CSPA proposes is

7 contrary to well-established law.  By inflating its lodestar and applying an exaggerated multiplier,

8 CSPA's fee request is excessive under any plausible theory and should be rejected.

9     When the parties sought entry of the First Consent Decree in September 2021, Pacific Bell

10 agreed as a compromise to CSPA's request for $220,000 in attorney fees.  Dkt., 22 at 8. That

11 $220,000 compromise was beyond generous and remains an appropriate award.

12     The First Consent Decree was proposed only days after Pacific Bell answered CSPA's

13 amended complaint.  By CSPA's counsel's own admission, Seth Jones and Monique Fortner

14 handed this case to them "on a platter," Dkt. 65-13, at 7, saving CSPA's counsel the time and

15 expense of doing the work that would normally precede filing a complaint.  Indeed, when Pacific

16 Bell agreed to that request, CSPA's counsel had done little more than draft CSPA's complaints,

17 engage in settlement negotiations, and prepare the First Consent Decree.

18     The First Consent Decree paused this litigation for nearly two years, so the $220,000

19 attorney fee that was generous in September 2021 remains reasonable today.  But rather than adhere

20 to that reasonable compromise or perhaps seek a modest increase to reflect the minimal amount of

21 work required after the litigation resumed in August 2023, CSPA today requests roughly $1.3

22 million—more than *six times* the fee it initially agreed to in the First Consent Decree.  Nothing in

23 the record remotely supports such a jump.  To the contrary, little has changed since the entry of that

24 decree.  While the First Consent Decree was in effect, *Pacific Bell*—not CSPA—actively worked

25 to satisfy the terms of the decree regarding the removal of cables from Lake Tahoe.  CSPA's

26 counsel had no business billing significant time during that two-year period.  Indeed, several of

27 CSPA's counsels' time entries during that period criticize other of CSPA's counsel for billing hours

28 on "micromanagement of AT&T's project to remove cables."  Dkt. 156-7, at 77.

Even after that consent decree was vacated, there was not a single deposition, no summary judgment filings, no expert disclosures, and no pretrial filings before the parties agreed to the Second Consent Decree.  Pacific Bell during this period sought CSPA's cooperation on joint environmental sampling of the water and sediment near the cables, rather than seeking to litigate CSPA's claims. Dkt. 125, at 2.  CSPA, however, spurned Pacific Bell's repeated requests for such cooperation (Dkt. 131, at 1-2) and needlessly drove up both parties' burden and expense from litigation.[1]  CSPA's own unreasonable conduct created unnecessary work and expense for both parties, and it should not be rewarded for it.

Two analogous cases that settled at an early stage, *California Sportfishing Protection Alliance v. Forever Resorts, LLC*, 2017 WL 550043 (E.D. Cal. Feb. 10, 2017), and *Moore v. Mount Zion Baptist Church*, 2024 WL 4133030 (M.D. Tenn. Sept. 10, 2024), are instructive.  *Forever Resorts*—which remarkably is not cited in CSPA's motion even though CSPA was involved in the case—was brought by *this plaintiff*, represented by *these plaintiff's lawyers*,[2] involving this *same statute (Proposition 65)*, and heard by *this Court*.  And in that case, which similarly settled before any depositions, CSPA claimed under 200 hours—less than one-tenth of the amount claimed by CSPA here. After the Court rejected CSPA's first proposed settlement, CSPA in *Forever Resorts* moved *again* for approval of the settlement but, "rather than address the Court's concerns regarding the fees," it "disingenuously lowered the requested hourly rate," while "also increas[ing] the number of hours sought to once again reach a request" for the same amount of fees that the Court previously found to be unreasonable.  *Forever Resorts, LLC*, No. 2:16-cv-1595, Dkt. 25; 57, at 2. Judge England rejected CSPA's "disingenuous" claims for *196.3 hours* of work (over 2,000 hours less than the number of hours CSPA claims here).  *Id.*  Due to CSPA's and its counsel's repeated efforts to circumvent the Court's orders, Judge England issued an order to show cause, ultimately dismissed CSPA's claims with prejudice, and awarded no attorney fees.  *Id.*, Dkt. 60.

---

[1]     In its statement in support of the settlement (in which Pacific Bell expressly disclaimed liability), Pacific Bell attached the reports of experts who concluded that the Cables pose no risk to human health or the environment.  Dkts. 148 at 2; 148-1–148-10.  CSPA, by contrast, engaged in minimal expert work.

[2]     Andrew Packard and William Carlon were counsel for CSPA in the *Forever Resorts* case.  Both Mr. Packard and Mr. Carlon are also counsel for CSPA in this litigation.

CSPA's current inflated fee motion suggest that CSPA has not learned from Judge England's repeated rejection of its fee motions in *Forever Resorts*. And CSPA's failure to cite *Forever Resorts* (notwithstanding that it involves the same plaintiff, lawyers, statute, and Court as here) speaks volumes.

Likewise, *Moore* settled after document production, written discovery, and a single deposition, but prior to dispositive motion practice or trial. And there, the court found just *550 hours* to have been reasonably expended by plaintiffs' counsel. Crediting either the number of hours awarded in *Moore* or the number sought (and rejected) by CSPA in *Forever Resorts*, given this case's similar procedural posture, would more accurately reflect the time and effort that *should* have been expended by CSPA's counsel—not the extraordinary and unwarranted *2,265.1 hours* CSPA seeks here.

CSPA's lodestar is also based on unreasonable billing rates. CSPA's counsel's rates must align with those that prevail in the community (the Sacramento Division of the Eastern District) for similar work performed by attorneys of comparable skill and experience. CSPA's requested hourly rates—which range from $325 for a first-year associate up to $725 for experienced partners—diverge sharply from those granted for similar Proposition 65 work in this Division. CSPA's counsel's own time entries admit that the disparity is the result of their attempts to secure *Bay Area*, not Sacramento, rates. *See* Dkt. 156-6, at 56 ("[T]eleconference with M. Maclear re: Eastern District rate recovery and recent victories that *could be used to argue for Bay Area rates* for recovery where local organization couldn't find local counsel.") (emphasis added).

CSPA glosses over the most on-point precedents closer to home. Chief among them is, once again, *California Sportfishing Protection Alliance v. Forever Resorts, LLC*, 2017 WL 550043 (E.D. Cal. Feb. 10, 2017). *Forever Resorts* is also instructive with respect to hourly rates because it involves the same plaintiff, plaintiffs' lawyers, statute, and Court. There, Judge England rejected hourly rates akin to those proposed by CSPA here, finding them "*well above the usually accepted rates*" in the Eastern District of California for lawyers of comparable experience, and instead applied a rate of "$425 per hour for principals and $225 per hour for associates." *Id.* at *2 (emphasis added). This Court should follow Judge England's lead and grant CSPA's counsel (inflation-

adjusted[3]) rates of between $290 and $550.  If the Court were to adopt the 550 hours found to be reasonable in *Moore* (which involved one deposition, in contrast to zero depositions here) and multiply that by the CPI-adjusted hourly rates that Judge England found reasonable for these same plaintiffs' attorneys in *Forever Resorts* (on average $420 per hour, after adjusting for CPI), the result is $231,000.  This result further supports the $220,000 amount that should be awarded here.

Finally, even setting aside CSPA's inflated lodestar, CSPA's multiplier argument fails. Several of the factors that CSPA invokes are subsumed within the lodestar and therefore fall far short of overcoming the "strong presumption that the lodestar is sufficient." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 546 (2010).  And another factor—that no public or charitable funding was allegedly provided—simply has no basis in the record, contrary to CSPA's claim in its motion.  On the contrary, communications by CSPA's counsel, along with billing records, show that CSPA's counsel made numerous fundraising efforts in connection with this case, entered into funding agreements with the Rose Foundation, and received funding.  A fee multiplier is rarely appropriate and is certainly unwarranted here.

Pacific Bell should not pay for CSPA's inflated attorney fees.  Instead, the original $220,000 amount remains appropriate to reflect what a competent attorney in the community should have billed for this Proposition 65/RCRA case.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  By CSPA's Counsel's Own Admission, This Case Was Handed To Them "On a Platter."

This case has required minimal substantive work for CSPA's counsel.  From the outset, CSPA's counsel admitted that this case was "brought to [them] on a platter."  Dkt. 65-13, at 7.

Third parties Seth Jones and Monique Fortner, principals of the environmental consulting firm Marine Taxonomic Services, Ltd. ("MTS") and related nonprofit Below the Blue ("BtB"), observed the cables at issue in this suit (the "Cables") in 2012 during an exploratory dive in Lake Tahoe.  Dkt. 100 ¶ 2.  In 2014, Jones and Fortner cut a piece off one of the Cables and, four years later, "performed an assay," from which they concluded that it was allegedly "primarily composed

---

[3]   These inflation adjustments were calculated using the United States' Bureau of Labor Statistics CPI Adjustment Calculator. *See* https://data.bls.gov/cgi-bin/cpicalc.pl.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR ATTORNEYS' FEES AND COSTS

Case No. 2:21-cv-00073-JDP

of lead." *Id.*  In 2020, after these years of investigation, Jones and Fortner "brought the matter to the attention of CSPA's counsel" and provided CSPA's counsel the severed cable segment. *Id.* ¶ 3. CSPA's counsel "learned of the existence of the Cables" only because Jones and Fortner reached out to them about the cables and relied almost entirely on the investigation conducted by Jones and Fortner in fashioning their case, without any substantial pre-suit fact-finding of its own. Dkt. 156-1, at 3.  Its counsel's 2023 statement about the genesis of this case is telling:

> William Verick: [Y]ou know, we litigated the Lake Tahoe case that was kind of brought to us on a platter. And the Wall Street Journal went out and spent a lot of time and did a lot of digging, and found out stuff we wish we had known when we were bringing the case.  We didn't go to Lake Tahoe and take water samples near the cable.  They did.  And we didn't take samples of soil near cable.  They did.

Dkt. 65-13, at 7.

CSPA filed suit against Pacific Bell in January 2021. Dkt. 1.  CSPA amended its Complaint in April 2021 (Dkt. 6), and Pacific Bell filed its Answer in May 2021 (Dkt. 8).  In August 2021, CSPA filed a Second Amended Complaint, to which Pacific Bell did not object.  Dkts. 12; 13.  In September 2021, Pacific Bell filed its Answer to Plaintiff's Second Amended Complaint.  Dkt. 15.

During this initial stage of the litigation, the parties were in settlement discussions.  Just three days after Pacific Bell filed its Answer to the Second Amended Complaint—and before any further proceedings, such as motion practice or a Rule 26(f) discovery conference— CSPA moved for entry of the parties' proposed Consent Decree. Dkts. 16; 16-2.  CSPA filed notice of the parties' proposed Amended Consent Decree (the "First Consent Decree") one month later.  Dkt. 18.

The First Consent Decree provided that, without any "admission as to any fact, finding, issue of law, or violation of law" by Pacific Bell, the parties had agreed to "resolve this matter," including through "removal of the Cables," to avoid further "cost[s] and expense[s] associated with litigation."   Dkt. 22, at 3.   To fully resolve the dispute, Pacific Bell agreed to "reimburse Plaintiff . . . $220,000" for its "reasonably incurred investigative, expert, consulting and attorneys' fees and costs."  *Id.* at 8.  The Court entered the First Consent Decree on November 5, 2021.  Dkt. 21.  At the time of entry, this case was "deemed dismissed with prejudice" (although the Court "retain[ed] jurisdiction to resolve any disputes or enforce any terms of th[e] Decree").  *Id.* at 10.

**B.      This Case Went Dormant for Nearly Two Years.**

The Court's entry of the First Consent Decree effectively ended the litigation on agreed terms, eliminating any reasonable need for CSPA to invest substantial time or resources in this matter.  The only outstanding obligations under the First Consent Decree remained with Pacific Bell, which was required to (1) "promptly pursue the process to secure all necessary local, state and federal permits or other authorizations necessary for lawful removal . . .  of the Cables (the 'Authorizations')"; (2) "notify Plaintiff in writing within five (5) business days" of receiving the required Authorizations; and (3) "remove the Cables from Lake Tahoe . . . within ninety (90) days following receipt of all Authorizations . . . or as soon thereafter as reasonably practicable," subject to "all applicable laws, rules and regulations." *Id.* at 5–6.  If Pacific Bell did not receive the required Authorizations within six months, the First Consent Decree provided that the parties could agree to a six-month extension. *Id.* at 5.  The burden was thus solely on Pacific Bell to obtain the required Authorizations and notify CSPA when it received those Authorizations.

Pacific Bell promptly began to secure the required Authorizations to remove the Cables, preparing and submitting numerous applications to state and federal agencies.  But "due to the uncertainty surrounding" the timeline for agency review, and because Pacific Bell had not "received any assurances" as to when the Authorizations would be issued, the parties mutually agreed to an initial six-month extension for Pacific Bell to obtain the Authorizations.  The parties also stipulated to several additional extensions, all of which were approved by the Court.  Dkts. 23–28.

Pacific Bell received its final required Authorization on April 28, 2023.  Dkt. 29, at 2.  In its subsequent status reports to the Court, Pacific Bell explained, however, that because the Authorizations "impose[d] several conditions on the removal of the Cables, including prohibiting work during the peak recreation season," Pacific Bell could not legally remove the Cables until "the end of the peak recreation season"—September 2023.  Dkts. 29 at 2–3, 33 at 3–4, 36 at 3, 39 at 2.  In response, CSPA repeatedly filed its own status reports that baselessly challenged this clear legal constraint on the timing for removing the Cables.  Dkts. 30, 32, 35, 40.

The parties thus reached an impasse regarding the timeline for removal of the Cables.

In August 2023, after a series of Wall Street Journal articles made claims about the safety of lead-clad cables in Lake Tahoe and elsewhere, the First Consent Decree was vacated without opposition by CSPA (Dkt. 54), to permit further environmental investigation, analysis, and testing to confirm that the cables were not impacting water and sediment quality.  Dkt. 49.

CSPA and its lawyers have had to do very little to advance this case.  There was no active litigation between the entry of the First Consent Decree on November 5, 2021, and vacatur of that decree nearly two years later on August 1, 2023.  Nonetheless, CSPA's counsel somehow seek to be paid for 192 hours during this period (Dkt. 156-1, at 17), including for unnecessary and often non-substantive activities, including "[m]emorandum to co-counsel re: progress of permitting of project to remove cables"; "[d]ownload and review permit drawings"; "[d]ownload and review U.S. Army Corps of Engineers pre-construction notice materials"; and "[r]ead amended State Lands Commission lease."  Dkt. 156-7, at 78, 82.  CSPA's counsel's own time entries further admit their extreme over-involvement in the cable-removal process, calling it "micromanagement."  156-7 at 77 ("Address issues re: plaintiff's micromanagement of AT&T's project to remove cables."); ("Address need not to micromanage AT&T's project to remove cables.").

## C.   The Case Was Revived For Less Than A Year, During Which No Depositions, Summary Judgment Filings, Significant Motion Practice, Expert Disclosures, or Pretrial Filings Occurred.

After being revived, this lawsuit was active for less than a year before being settled again, and no significant litigation occurred during that time.  The parties had a status conference in August 2023, and the Court entered an Initial Pretrial Scheduling Order in October.  Dkts. 60–62, 70.  The Initial Pretrial Scheduling Order provided that initial expert disclosures be served on April 12, 2024, discovery conclude on July 12, 2024, and dispositive motions be heard by September 12, 2024.  Dkt. 70, at 2–3.  In November 2023, CSPA moved to extend some deadlines (Dkt. 85), and the Court extended the deadline for expert disclosures to July 10, 2024, close of discovery to October 18, 2024, and hearing of dispositive motions to December 19, 2024.  Dkt. 127.

During 2023 and early 2024, Pacific Bell requested CSPA's cooperation on a joint environmental investigation of CSPA's allegations.  Dkt. 56, at 1.  CSPA at first signaled it would comply with Pacific Bell's request, telling the Court the parties would "work together through the

discovery process to make sure that, when possible, discovery is done cooperatively, including perhaps having divers for both parties present together for the collection of samples." *Id.*  CSPA also promised that "an agreement as to how testing should be done" would eliminate "quarrels about how the samples were taken, or how tests were done." *Id.*  Pacific Bell took CSPA's promises seriously, proposing "the parties agree to a process for split samples to be collected in the field in connection with that sampling."  Dkt. 125, at 2.  But CSPA, led by additional litigation counsel retained in October 2023 (Dkt. 85, at 8), rejected these efforts (Dkt. 131, at 1-2), and insisted on litigating (Dkt. 130).  CSPA thus needlessly drove up the burden and expense of litigation.

In contrast, Pacific Bell endeavored to limit the cost and burden of litigation.  It engaged in only modest written discovery:  The parties stipulated to a protective order and each served discovery requests and written responses.  CSPA made a single production of 766 documents, and Pacific Bell produced a total of 2,158 documents.  Pacific Bell also issued subpoenas to third parties, including those that had served the case to CSPA "on a platter."  In April 2024, CSPA served a letter on Pacific Bell alleging deficiencies in its production, but the parties resolved their disagreements through the meet-and-confer process, and CSPA never filed any motion to compel.  CSPA also served seven subpoenas to third parties and received small productions (totaling 4,395 documents) in response.  In May 2024, CSPA scheduled the single deposition to be noticed in this case: a 30(b)(6) deposition of third-party MTS.  Counsel for MTS requested to extend the deposition date weeks before it was set to occur, and the deposition was removed from the calendar shortly thereafter.  It was never rescheduled.  No additional depositions were noticed, and no depositions ever occurred.

By June 2024, when this litigation was paused again, the parties had not conducted any depositions, exchanged expert disclosures, or submitted pretrial filings.  The only motions that have been filed are (1) scheduling motions; (2) motions relating to settlement; and (3) motions to compel filed by Pacific Bell against third parties, which CSPA did not brief.[4]  Nor was a trial date set.  In

---

[4]   The parties submitted informal 3-page letters in April 2023 on a split sampling issue, but that issue was mooted when CSPA conducted sampling without providing split samples to Pacific Bell, contrary to the Court's suggestion during a conference that CSPA should allow split samples.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR ATTORNEYS' FEES AND COSTS

Case No. 2:21-cv-00073-JDP

September 2024, CSPA moved for approval of the parties' new proposed Consent Decree (Dkt. 147), and Pacific Bell filed a statement in support of the Consent Decree (Dkt. 148). The parties thereafter filed an Amended Consent Decree (the "Second Consent Decree") (Dkts. 155, 155-1), which the Court entered on November 7, 2024, dismissing this action with prejudice. Dkt. 165.

After the vacatur of the First Consent Decree, Pacific Bell asked nine leading scientists and environmental experts to investigate the Wall Street Journal's claims that the lead-clad telecom cables in Lake Tahoe may raise a public health concern. The reports of all nine demonstrated that the cables did not pose any risk to human health or the environment. Dkt 148, at 3–5. CSPA, by contrast, engaged in minimal expert work. In support of its fee motion, CSPA submitted the declaration of Ian Wren, a self-described "hydrologist and advocate" (https://www.sflcv.org/boardmembers), who focuses his work on "[s]pearhead[ing] advocacy direction" for San Francisco Baykeeper. Dkt. 156-10, at 11. But CSPA never disclosed a report from Wren, and Wren's declaration merely lobs unfounded allegations of environmental harm, without providing foundation as to the purported basis or methods for his claims, as required by Federal Rules of Evidence 702 and 703. Moreover, even the limited sampling data provided by Wren supports the conclusion of Pacific Bell's experts that no drinking water systems near the cables contained lead in excess of the EPA action level for drinking water. Dkt. 156-10 at 17 (reporting alleged lead concentration for sample TCP-3-W, in the vicinity of the Eagle Point Campground intake). Indeed, testing performed by a California state agency of that water led it to conclude that the "water is safe for drinking." Kelley Decl.,[5] Ex. A.

**D.    CSPA's Increases Its Fees by Over 490% From First Phase of Litigation.**

Although the parties paused this litigation less than a year after it was reinitiated—with the fact-discovery deadline four months out, the dispositive-motion-hearing deadline six months out, and no trial date set (largely due to CSPA's own motion for extensions, Dkt. 85)—CSPA's counsel unreasonably seek fees constituting a 490% increase from the first half of the litigation to the second. These fees—prior to minor "billing judgment" reductions—include approximately 514.5

---

[5]    All citations to "Ex." refer to exhibits to the Declaration of Jon Kelley, filed concurrently herewith.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR ATTORNEYS' FEES AND COSTS

Case No. 2:21-cv-00073-JDP

hours for "case management and handling," 484 hours for "post-filing investigations," 849.5 hours for "discovery," and (remarkably) 190.8 hours for work on the fee petition. Dkt. 156-1, at 14–17.

CSPA's counsel billed for a host of unnecessary tasks that did nothing to advance this litigation, including drafting a never-filed motion for summary judgment ten months before it was due, drafting motions to compel that were unnecessary and never filed, and preparing for the 30(b)(6) deposition of the party that had already handed CSPA the case "on a platter" and that likewise never occurred. CSPA's counsel also billed for improper or unrelated tasks, including work related to subpoenas CSPA improperly served on Pacific Bell's experts and subsequently withdrew, as well as work related to CSPA's fundraising efforts.

Finally, contrary to its claims that no charitable funding was provided, CSPA's counsel received compensation from other sources, including through an organization called the Rose Foundation. In an email to Jones and Fortner dated August 23, 2023, CSPA's counsel (Kirk Boyd) requested photos of the Tahoe cables for "our fundraising webpage with the Rose Foundation" Ex. B. Mr. Boyd noted, "we already have one donation of $1,000 and there [are] others that are interested in funding[.]" *Id*. In an email dated September 8, 2023, CSPA's counsel (Andrew Packard) noted that a "funding agreement with Rose is ready," and "the website donations mechanism should go live shortly." Ex. C. This website went live in September of 2023 and included photos of the Tahoe cables provided by MTS, a description of the lawsuit and the testing required, and a request for donations from "any person or organization who would like to donate and help pay for this testing and expert work." Ex. E. This litigation fund was classified as a "Fiscally Sponsored Project" through the Rose Foundation, meaning donations were "received and processed by the Rose Foundation, and then passed on to the project"—in this case, to CSPA. Ex. D. On September 11, 2023, Mr. Boyd responded to Mr. Packard, thanking him for "getting the Rose Foundation set up," and noting that "a philanthropist from San Francisco, has already contributed $2,000 to this fund." Ex. C. Mr. Boyd observed that it was "great to have a fund to which we can direct donations," and represented that he would continue his own "fundraising around the lake." *Id*. Mr. Boyd continued those fundraising efforts through a March 22, 2024

fundraiser at the Tahoe National Brewing Company, with tickets starting at $10. Ex. G.[6]  All funds raised at the event were to go to the "litigation fund" set up through the Rose Foundation. *Id.*  CSPA itself publicly requested "contribution[s] to the Rose Foundation's special litigation fund," which "goes exclusively to support litigation costs for CSPA's court case against AT&T." Ex. K.  As of the date of this filing, the Rose Foundation still invites donations to the "Get the Lead Out of Our Lake Fund" on its website, which it identifies is "for the California Sportfishing Protection Alliance." Ex. F.

### III.    LEGAL STANDARD

The Resource Conservation and Recovery Act (RCRA) provides that a court, "in issuing any final order in any action brought pursuant to this section . . . may award costs of litigation (including reasonable attorneys' fees and expert fees) to the prevailing or substantially prevailing party, whenever the court determines such an award is appropriate." 42 U.S.C. § 6972(e).

California Code of Civil Procedure Section 1021.5 provides that, "a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

In each case, "[t]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates."  *See Coldani v. Hamm*, 2011 WL 2160929, at *2 (E.D. Cal. June 1, 2011); *Bui v. Nguyen*, 230 Cal. App. 4th 1357, 1365-66 (2014).  The focal point for calculating fees is the lodestar, achieved by "multiplying the number of hours reasonably spent on the litigation by a reasonable hourly rate."  *McCown v. City of*

---

[6]    A March 12, 2024 article published by the Sierra Sun quotes extensively from an "informational presentation" given by Mr. Boyd to the Tahoe City Downtown Association's Board of Directors, during which Mr. Boyd "made the announcement" that a fundraiser would take place on March 22 at the Tahoe National Brewing Company. Ex. G.  The article provides a link to the Rose Foundation website and encourages readers to donate to the "litigation fund." *Id.*

*Fontana*, 565 F.3d 1097, 1102 (9th Cir. 2009); *Laffitte v. Robert Half Int'l Inc.*, 1 Cal. 5th 480, 503 (2016); *see also City of Santa Rosa v. Patel*, 191 Cal. App. 4th 65, 69 (2010).

IV.   ARGUMENT

**A.   CSPA's Proposed Lodestar Amount Is Unreasonable.**

There is no justification for the fees CSPA seeks to recover.  The calculation of attorneys' fees begins with an analysis of the "lodestar"—that is, the multiplication of "the number of hours reasonably spent on the litigation" by counsel "by a reasonable hourly rate."  *McCown*, 565 F.3d at 1102.  Here, neither the hours billed nor the rate sought by CSPA's counsel are reasonable.  The Court should therefore reject CSPA's proposed attorneys' fees.

1.   The Number of Hours Billed by CSPA's Counsel Is Unreasonable.

CSPA requests recovery of attorneys' fees for 2,265.1 hours of work logged by its counsel, accounting for purported reductions for "billing judgment," related to this litigation.  *See* Dkt. 156-1, at 13–18.  But the number of hours for which it seeks to recover fees is excessive, unnecessary, and patently unreasonable in light of this case's early settlement and the fact that there were no depositions taken, no expert disclosures, no summary judgment filings, no significant disputed motions involving CSPA, no trial preparation, and no trial.  Precedent uniformly supports a significantly lower number of credited hours in analogous circumstances.

<blockquote>a.   CSPA's Claimed Hours Are Patently Unreasonable Given the Early Settlement of this Case.</blockquote>

Courts have routinely reduced a party's requested fees where, as here, a case settles early in the litigation—during the discovery phase and before any depositions, expert disclosures, dipositive motions, or pre-trial filings.  *See, e.g.*, *Glover v. I.C. Sys., Inc.*, 2020 WL 3105091, at *5 (M.D. Ga. 2020) (finding it "patently unreasonable" for "experienced" attorneys to spend excessive time on a case with "no dispositive motions, normal (and somewhat limited) discovery, and an accepted settlement offer within 10-months"); *Juvera v. Salcido*, 2013 WL 6628039, at *13 (D. Ariz. 2013) (finding fees "substantially less" where "case settled during the exchange of paper discovery and before any depositions were taken" instead of "shortly before or during trial").

CSPA's requested 2,265.1 hours of attorneys' fees simply fail to comport with the limited substantive work necessary since the First Consent Decree was vacated.

The case CSPA cites in support of the reasonableness of the number of hours it expended—*Ecological Rights Found. v. Hot Line Constr., Inc.*—only reinforces the unreasonable nature of the fees CSPA seeks.   Plaintiffs in *Hot Line* were awarded recovery of 3,000 hours of legal time incurred when the case was settled "on the eve of trial," based on the extensive discovery and pretrial activities that had already taken place.  2024 WL 3507023, at *1 (C.D. Cal. 2024).  As the below chart reflects, the advanced nature of the litigation that warranted the *Hot Line* fee award could not be more different than the facts in this case:

| Topic | Hot Line Construction | CSPA v. Pacific Bell |
|---|---|---|
| **Depositions** | 13[7] | 0 |
| **Expert Discovery** | "[S]ignificant expert discovery, including working with Plaintiffs' expert to prepare multiple expert reports from Plaintiffs' expert and reviewing and assisting Plaintiffs' expert to respond to multiple expert reports from Hot Line"[8] | Plaintiff disclosed no experts |
| **Pretrial Filings** | "21 significant pretrial filings"[9] <br> • Proposed Findings of Fact and Law <br> • Exhibit List <br> • Joint Stipulations <br> • Written Direct Examination Declarations | None |
| **Trial Subpoenas** | "Dozens"[10] | None |
| **Trial Preparation** | Significant[11] <br> • Coordinating with and preparing trial witnesses <br> • Demonstrative exhibits <br> • Drafting examination and cross-examination questions <br> • Drafting opening statements and closing arguments | None |

---

[7]     *Plaintiffs' Motion for Attorneys' Fees and Costs*, No. 5:20-cv-01108-AB-KK, Dkt. 259, at 4, l. 19 (C.D. Cal. Jan. 19, 2024).
[8]     *Id.* at 2, ll. 23-26.
[9]     *Id.* at 10, ll. 3-18.
[10]     *Id.* at 10, ll. 13-15.
[11]     *Id.* at 10, ll. 15-18.

Indeed, in cases farther along than this one and cited in CSPA's brief, courts have found far fewer hours to have been reasonably expended. *See, e.g.*, *Quevedo v. New Albertsons, Inc*, 2015 WL 10939716, at *4 (C.D. Cal. 2015) (awarding fees for 734.47 hours when counsel "conduct[ed] discovery, t[ook] and defend[ed] depositions, oppos[ed] [defendant]'s motion for summary judgment and motions in limine, [] prepar[ed] pretrial and trial documents," and represented plaintiff in trial); *Asberry v. City of Sacramento/Sanitation Dep't*, 2004 WL 3636054, at *3 (E.D. Cal. 2004) (469.46 hours after depositions, summary judgment, and six-day trial); *Hinds Invs., L.P. v. United Fabricate Supply Inc.*, 2008 WL 11338683, at *2 (C.D. Cal. 2008) (252.62 hours following summary judgment).

CSPA attempts to bolster its counsel's hours by asserting that "this case has been litigated for over three and a half years," Dkt. 156-1, at 20, but it ignores that the litigation was dormant for nearly two years after entry of the First Consent Decree.  Moreover, for the ten months preceding its entry, the parties had not passed the pleadings stage.  And even when the case was resumed following vacatur of the First Consent Decree, the parties engaged in little more than document production.  CSPA has no reasonable basis for claiming ***more*** billable hours than counsel in cases that involved expert reports, depositions, summary judgment proceedings, and even trial.

This case is more like *Moore v. Mount Zion Baptist Church*, 2024 WL 4133030 (M.D. Tenn. Sept. 10, 2024), where the court awarded plaintiffs 550 hours in fees for a case that settled early in the litigation.  There, plaintiff sought a fee award reflecting 1,100 hours of attorney work, notwithstanding that the case settled after document production, written discovery, and the taking of a single third-party deposition.  *Moore*, 2024 WL 4133030, at *5.  In assessing the requested fee, the court noted that the plaintiff "did not file or respond to a single dispositive motion, and they did not prepare for or conduct a trial."  *Id.*  The court concluded that "[u]nder these circumstances, under any standard . . . *1,100 hours is an astoundingly unreasonable number of hours* to have expended on this case, no matter how complicated the discovery and the discovery dispute may have been."  *Id.* (emphasis added).  Accordingly, the court "f[ound] a fee award based on *550 hours to be reasonable, given that the case did not require dispositive motions, preparing for or taking numerous depositions, or preparing for or conducting trial*."  *Id.* at *6 (emphasis added).

*California Sportfishing Protection Alliance v. Forever Resorts, LLC*, 2017 WL 550043, (E.D. Cal. Feb. 10, 2017), another Proposition 65 case settled in this District (but not included in plaintiff's brief), is also instructive. Like this case*, Forever Resorts* was resolved before any depositions were taken. CSPA claimed 196.3 hours, but this Court rejected that number as "disingenuous." *See Forever Resorts, LLC*, No. 2:16-cv-1595, Dkt. 57. The same is true here, and the Court should allow a similarly reduced award. Assuming that this Court follows *Moore* (which involved one deposition) and finds 550 hours to be reasonable, and multiplies that number by the CPI-adjusted hourly rates that Judge England found reasonable in *Forever Resorts* ($420 per hour, after taking the partner/associate blended rate and adjusting for CPI), then the result is $231,000— near the $220,000 that should be awarded here.

        b.     **CSPA's Time Records Confirm That It Improperly Seeks To Recover Fees For Work That Did Not Contribute To The Parties' Settlement.**

CSPA's counsel's recorded time for numerous tasks that did not advance this case's resolution is further evidence of the unreasonableness of their claimed hours. In determining the reasonable number of hours billed by counsel, a court must exclude any hours "that are excessive, redundant, or otherwise unnecessary." *McCown*, 565 F.3d at 1102 (internal citation omitted); *Hoefle v. Colvin*, 2014 WL 5217041, at *2 (E.D. Cal. 2014); *Cruz ex rel. Cruz v. Alhambra Sch. Dist.*, 601 F. Supp. 2d 1183, 1191 (C.D. Cal. 2009). Neither "'[p]adding' in the form of inefficient or duplicative efforts" or "[o]verlitigation deemed excessive" is compensable. *Puccio v. Love*, 2020 WL 434481, at *6 (S.D. Cal. 2020); *Ketchum v. Moses*, 24 Cal. 4th 1122, 1131 (Cal. 2001).

Courts decline to award fees for work that did not "contribute[] to any favorable result achieved by the litigation." *Outdoor Sys., Inc. v. City of Mesa*, 997 F.2d 604, 619 (9th Cir. 1993) (quoting *Clark v. City of Los Angeles*, 803 F.2d 987, 993 (9th Cir. 1986)). That includes, for example, work related to motions or pleadings that are never filed or depositions that are never taken. *See, e.g.*, *Melendres v. Maricopa Cnty.*, 878 F.3d 1214, 1216 (9th Cir. 2018) (declining to award "fees for preparing an answering brief that they never filed"); *QVC, Inc. v. MJC Am., Ltd.*, 2013 WL 3976043, at *5 (E.D. Pa. 2013) (declining to "award a fee for work done on a motion that was not filed with the court."); *Cmty. Ass'n Underwriters of Am., Inc. v. Queensboro Flooring*

- 15 -

1   *Corp.*, 2016 WL 1076910, at *7 (M.D. Pa. 2016) (denying "attorney fees in connection with [a]

2   deposition" that "never actually occurred").

3          Here, CSPA seeks to recover fees for various categories of work that did not ultimately

4   contribute to this case's resolution.  For example, it improperly seeks recovery for:

5          •      Entries related to the "vacatur process" of the First Consent Decree, including

6   "ensuring the implementation of the First Consent Decree, and participating in the vacatur process

7   thereof."  There is no justifiable reason why CSPA's counsel would spend nearly 200 hours on such

8   work—especially when the removal of the Cables was solely Pacific Bell's responsibility and

9   CSPA had no objection to vacatur of the First Consent Decree.  CSPA's counsel essentially

10  admitted that these hours were inflated because it "micromanage[d]" Pacific Bell's "project to

11  remove the cables." Dkt. 156-7, at 77 ("Address issues re: plaintiff's micromanagement of AT&T's

12  project to remove cables."); ("Address need not to micromanage AT&T's project to remove

13  cables.").  The time expended by CSPA's counsel "micromanag[ing]" the removal of the Cables,

14  and passively acceding to Pacific Bell's request to vacate of the First Consent Decree, certainly did

15  not advance this case's settlement and were both "excessive" and "unnecessary."  *McCown*, 565

16  F.3d at 1102.

17         •      Entries related to a motion for summary judgment that CSPA never filed (and did

18  not contribute to settlement).  *See* Kelley Decl., ¶ 9(a).  The time spent on this summary-judgment

19  motion was especially unreasonable given that it predated the dispositive-motion-hearing deadline

20  at all times by six to fourteen months (even before the deadline was extended until December 19,

21  2024).  It was also unreasonable given that summary judgment is granted or denied based on

22  undisputed facts that are developed during discovery and, while the parties produced some

23  documentary evidence before they paused the litigation in August 2024, they still had not conducted

24  depositions or exchanged expert disclosures.  Without that, CSPA's counsel could not have

25  reasonably spent so many hours on a summary judgment motion on the merits.

26         •      Entries related to drafting other motions CSPA did not file, including a motion to

27  compel "internal documents" and a privilege log from Pacific Bell.  *Id.*, ¶ 9(b).  Again, because

28  Pacific Bell did not know about these motions, they could not have affected Pacific Bell's behavior,

- 16 -

1    and thus could not have hastened Pacific Bell's agreement to the Second Consent Decree.  These

2    motions to compel were also unnecessary because Pacific Bell consistently conferred in good faith

3    with CSPA, produced all non-privileged documents it had identified through a reasonable search

4    that were responsive to its discovery requests, and provided a sufficiently detailed privilege log.

5         •   Entries related to preparing for depositions that never occurred.  That included time

6    spent preparing for the deposition of MTS (the entity that handed the case to CSPA "on a platter"),

7    which was cancelled by mutual agreement.  *Id.*, ¶ 9(c).  It also included time related to a "person

8    most qualified deposition," the subject of which is unclear.  *Id.*  In any event, because no other

9    depositions besides MTS's were noticed and no depositions actually took place, any related work

10   did not contribute to resolution.

11        •   Entries related to subpoenas improperly served on Pacific Bell's experts and the

12   resulting "expert discovery dispute."  *Id.*, ¶ 9(d).  Time expended related to these subpoenas was

13   unreasonable because they were unlawful and unnecessary, in part due to their premature request

14   for expert discovery.  *See* Ex. H.  Pacific Bell immediately notified CSPA of its objections, and

15   CSPA agreed to withdraw both, admitting they "improperly seek data and information Plaintiff has

16   already requested in its discovery to Pacific Bell." *See* Ex. I.  No time spent on these subpoenas

17   affected this case's resolution.  Courts have declined to credit hours in analogous circumstances,

18   and the Court should do the same here.  *See Salvage v. Kia Motors Am., Inc.*, 2010 WL 11596178,

19   at *2 (C.D. Cal. 2010) (declining to credit counsel's time spent on meritless and improper filings,

20   including documents "stricken for failure to comply with the Local Rules," an untimely opposition

21   to a motion, and a motion to strike that counsel withdrew the next day).

22        •   Entries related to litigation funding arrangements, including correspondence with

23   the Rose Foundation, which established a fund for the litigation.  Kelley Decl., ¶ 9(e).  CSPA's

24   counsel exchanged emails confirming that the "funding agreement with Rose [wa]s ready," shortly

25   before the website for donations went live in September 2023.  Ex. C.  Any work related to the

26   financing of the litigation was irrelevant to the claims at issue and this case's outcome.  *See Pelayo*

27   *v. Platinum Limousine Servs., Inc.*, 2016 WL 5402185, at *6 (D. Haw. 2016) (deducting "time

28   spent on client agreements that did not contribute to the litigation").

1    These are just some examples of hours purportedly spent by CSPA's counsel in connection

2    with this litigation that were unreasonable and unnecessary given they were not "expended in

3    pursuit of the ultimate result achieved"—here, the settlement. *Hensley v. Eckerhart*, 461 U.S. 424,

4    435 (1983) (internal citation omitted). These examples further support a significant reduction to

5    those hours.

6                    c.    CSPA's Claimed Hours Are Excessive Because Its Claims Were Not
                          Novel.

7    CSPA argues that the excessive hours claimed are warranted because its claims here were

8    "novel," requiring its counsel to expend more time than usual for legal research. Dkt. 156-1, at 25–

9    26, 31. But CSPA and its counsel claim to have "vast experience litigating cases similar to this

10   one," as detailed throughout CSPA's motion for attorneys' fees and accompanying declarations.

11   *See Indep. Project, Inc.*, 397 F. Supp. 3d at 495; Dkt. 156-1, at 29. CSPA touts the "expertise and

12   competency" of its counsel, detailing both their extensive "general litigation experience" and

13   "specific RCRA and Prop 65 experience." Dkt. 156-1, at 29.

14   CSPA's counsel's self-professed experience litigating cases of this kind should result in

15   billing efficiencies, not inflated billing. "Given the high volume of [RCRA and Prop 65] cases

16   which [Plaintiff]'s counsel attests [they] handle[] and the substantial experience which counsel

17   attests [they] ha[ve], it seems strange that so many hours were needed to litigate this case." *See*

18   *Hernandez v. Spring Charter Inc.*, 2020 WL 1171121, at *5 (N.D. Cal. 2020); *see also Trujillo v.*

19   *Orozco*, 2018 WL 1142311, at *4 (N.D. Cal. 2018), *aff'd*, 790 F. App'x 96 (9th Cir. 2020). CSPA's

20   counsel cannot attest to both its extensive experience litigating this kind of case while also asserting

21   that CSPA's claims were so "novel" as to justify exorbitant amounts of time on legal research.

22   CSPA's response—that its case was "novel" because its counsel had "identified no case that

23   alleged a discharge to drinking water in violation of Proposition 65 from an in situ telephone

24   cable"—misses the mark. Dkt. 156-1, at 25–26. After all, "every case arises on different facts"; it

25   is the basic duty of counsel to extract the "legal principles" from one case and "apply [those

26   principles] to the facts of [a new] case." *Busch v. CitiMortgage, Inc.*, 2011 WL 3627042, at *2

27   (N.D. Cal. 2011). Simply because CSPA's claims arose from a "unique factual scenario" does not

28

- 18 -

merit inflated attorney fees.  *See Med. Protective Co. v. Pang*, 25 F. Supp. 3d 1232, 1244 (D. Ariz. 2014) (declining to increase attorneys' fees where a claim "did not involve novel legal questions" but merely a "different factual scenario[]").  The fact that CSPA's counsel struggled to fit these facts into legal precedent doesn't mean they should get inflated compensation.

> 2.  The Hourly Rate Requested by CSPA's Counsel Is Unreasonable in Light of the Rates Prevailing in the Community for Similar Work.

CSPA's requested hourly rates range from $325 for a first-year associate to $725 for partners.  Dkt. 156-1, at 29.  These rates are unreasonable because they do not match the "rate[s] prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation."  *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008) (internal citation omitted).  That requires consideration of "the rates of attorneys practicing in the forum district."  *Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992).  "[T]he burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits— that the requested rates" align with prevailing community rates.  *Camacho*, 523 F.3d at 980 (quoting *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984)).  CSPA has failed to carry its burden of showing that its requested rates accord with those charged for similar services by attorneys of comparable skill, experience, and reputation in the Sacramento Division of the Eastern District of California.

Courts in the Sacramento Division of the Eastern District of California have generally approved rates of $200 or less for junior attorneys to $500 or less for partners with decades of experience.  *See, e.g.*, *Mitchell v. Sun City Lincoln Hills Cmty. Ass'n*, 2022 WL 16739570, at *4 (E.D. Cal. 2022), *report and recommendation adopted*, 2022 WL 17812809 (E.D. Cal. 2022) (reducing hourly rate to $375 for "managing shareholder for [] firm in Sacramento" and $250 for attorney with three years of experience); *Roth Grading, Inc. v. Martin Bros. Constr.*, 562 F. Supp. 3d 1094, 1102 (E.D. Cal. 2022) (approving hourly rate of $300 for Sacramento attorney with over 40 years in practice and a specialty in complex business litigation); *Cal. Open Lands v. Butte Cnty. Dep't of Pub. Works*, 2022 WL 286542, at *2 (E.D. Cal. 2022) (approving hourly rate of $400 for associate counsel and $450 for counsel with 28 years of experience); *Siafarikas v. Mercedes- Benz USA, LLC*, 2022 WL 16926265, at *3 (E.D. Cal. 2022) (approving hourly rate of $250 for an

- 19 -

1    attorney who had practiced law for three years and $500 for an attorney who had practiced law for

2    21 years).  The Court should reduce CSPA's counsel's proposed rates to similar standard rates.

3        *Cal. Sportfishing Prot. All. v. Forever Resorts, LLC*, 2017 WL 550043, (E.D. Cal. 2017)—

4    another recent Proposition 65 case brought by CSPA, represented by the same lawyers and heard

5    before this Court—is directly on point but absent from CSPA's motion.  That is unsurprising: the

6    hourly rates approved there were well below those CSPA seeks here.  There, CSPA's counsel

7    proposed hourly rates of $225 and $375 for associates and $795 for a principal.  *Id.* at *2.  Judge

8    England found those rates "well above the usually accepted rates" in the Eastern District of

9    California for lawyers of comparable experience.  *Id.*  He instead found reasonable rates of "$425

10   per hour for principals and $225 per hour for associates."  *Id.*  That finding should carry special

11   weight here given that it came from the same Court applying the same standard to the same lawyers

12   in the same type of case (Proposition 65).  Accounting for inflation since 2017—CSPA's counsel's

13   hourly rates should be between $290 for junior associates and $550 for the senior partners.  *See*

14   Bureau of Labor Statistics Inflation Adjustment, https://data.bls.gov/cgi-bin/cpicalc.pl.

15       Tellingly, after the Court rejected CSPA's first proposed settlement in *Forever Resorts*,

16   CSPA (represented by attorneys also representing it here), the Court denied a *second* motion by

17   CSPA to approve the settlement because, "rather than address the Court's concerns regarding the

18   fees, the parties disingenuously lowered the requested hourly rate, but also increased the number

19   of hours sought to once again reach a request" for the same amount that the Court previously found

20   to be unreasonable.  *Forever Resorts, LLC*, No. 2:16-cv-1595, Dkt. 25; 57, at 2.  Due to CSPA's

21   and its counsel's repeated efforts to circumvent the Court's orders, including two subsequent orders

22   to show cause, the Court dismissed CSPA's claims with prejudice "for failure to comply with the

23   applicable rules and orders of this Court."  *Id.*, Dkt. 60.

24       The only other published decision that Pacific Bell located in which a federal court

25   evaluated an attorney fee request by CSPA is *Cal. Sportfishing Prot. All. v. Chico Scrap Metal,*

26   *Inc.*, 2016 WL 105252, at *2 (E.D. Cal. 2016).  The *Chico* court denied CSPA any fee recovery

27   whatsoever because, as here, its counsel had not "pointedly stated the prevailing rate in this

28   community for a comparable Clean Water Act litigator." *Id.* at *2–3.  In particular, CSPA's counsel

1    failed to submit evidence of "personal knowledge of Sacramento rates."  *Id.*  For instance, one

2    attorney merely "outline[d] his personal knowledge concerning San Francisco rates and 'across the

3    state' rates."  *Id.*  The court thus found that the attorney's "belief [wa]s not 'satisfactory evidence

4    of the prevailing market rate.'"  *Id.*  Other attorneys similarly made conclusory statements regarding

5    Sacramento rates, so the Court denied CSPA's motion for fees in its entirety.  *Id.*

6            Like in *Chico Scrap Metal*, CSPA has again "not pointedly stated the prevailing rate in this

7    community for a comparable [RCRA and Proposition 65] litigator."  *Id.*  CSPA offers the

8    declaration of Richard Drury.  Dkt. 156-9.  But Mr. Drury's declaration only discusses (1) non-

9    Sacramento cases and (2) Sacramento cases not involving RCRA or Proposition 65.  *See id.*  As in

10   *Chico*, the Drury declaration "fails to carry its burden to demonstrate that the requested rates are

11   reasonable."  *California Sportfishing,* 2016 WL 105252, at *2–3.

12           CSPA points again to *Hot Line Constr.* in an attempt to justify its exorbitant rates.  2024

13   WL 3507023.  But *Hot Line* dealt with reasonable rates in the "*Los-Angeles-Orange County area*"

14   in the Central District of California.  *Id.* at *3 (emphasis added).  These "out-of-forum rates"—in

15   Los Angeles County, no less—are irrelevant to the reasonable rates in the Sacramento Division in

16   the Eastern District of California.  *See Chico Scrap Metal, Inc.*, 2016 WL 105252, at *2 (declining

17   to apply San Francisco rates in the Sacramento Division of the Eastern District).

18           CSPA also invokes the *Laffey* matrix, which the Ninth Circuit has suggested is not a reliable

19   tool for determining prevailing market rates outside of Washington, D.C.—the market for which it

20   was created—"let alone in a legal market 3,000 miles away."  *See Prison Legal News v.*

21   *Schwarzenegger*, 608 F.3d 446, 454 (9th Cir. 2010).  *Id.*  And although CSPA attempts to contort

22   *Laffey* so that it fits the Sacramento market, the right result is much simpler:  the Court can look

23   directly at its own precedent—especially precedent in the District regarding Proposition 65—in

24   determining appropriate hourly rates.

25           Indeed, although CSPA complains that "there are *no published opinions within the Eastern*

26   *District* providing fee awards in the *RCRA* context" (Dkt. 156-1, at 20) (emphasis added), CSPA

27   fails to disclose that there are multiple published opinions in this District—indeed, decisions

28   *involving CSPA*—rejecting fee awards in the *Proposition 65* context, including one where CSPA

(1) sought an excessive billing rate, and then (2) "rather than address the Court's concerns regarding the fees, . . . disingenuously lowered the requested hourly rate, but also increased the number of hours sought." *Forever Resorts*, No. 2:16-cv-1595, Dkt. 57.  Because CSPA has "fail[ed] to carry its burden to demonstrate that [its] requested rates are reasonable," the Court should reduce its requested rates to the rates found to be reasonable by Judge England in *Forever Resorts*.  2017 WL 550043, at *2 (setting hourly rate for CSPA's lawyers of "$425 per hour for principals and $225 per hour for associates").

### B.    No Fee Multiplier Is Warranted.

CSPA claims that a 2.0 fee multiplier is warranted in this case, but it fails to overcome the "strong presumption that the lodestar is sufficient." *Perdue*, 559 U.S. at 546.  To secure a fee multiplier (of any size), CSPA "has the burden of identifying a factor that the lodestar does not adequately take into account and proving with specificity that an enhanced fee is justified." *Id.* CSPA cites several factors it claims favor applying a multiplier, discussed in turn below, but none of them—either alone or in combination—justifies applying a multiplier.  Dkt. 156-1, at 31–32.

*Novelty*:  First, even assuming *arguendo* that CSPA raised novel claims, "'novelty [and] complexity of the issues' . . . are presumably fully reflected in the lodestar amount, and thus cannot serve as independent bases for increasing the basic fee award." *Penn. v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986); *see also Blum*, 465 U.S. at 898.

*Risk*:  Second, CSPA's contention that the "risk" in taking this case on a contingency basis warrants a fee multiplier is wrong as a matter of law.  In assessing attorney fees under fee-shifting statutes like RCRA that authorize recovery to "prevailing part[ies]," the Supreme Court has held that a "multiplier derived simply from the plaintiff's chance of success must be rejected as contrary to the congressional scheme." *Del. Valley Citizens' Council for Clean Air*, 483 U.S. at 720 (internal quotation marks omitted); *see also City of Burlington v. Dague*, 505 U.S. 557, 565 (1992).  In any event, CSPA has failed to set forth evidence showing that "risk of non-payment is not already accounted for in [its] lodestar calculation," and, therefore, has not met its burden of establishing the need for enhancement through a multiplier. *Parkinson v. Hyundai Motor Am.*, 796 F. Supp. 2d 1160, 1173 (C.D. Cal. 2010).

***Other Employment***: Third, "preclusion of other employment" is also "generally subsumed within the lodestar," and CSPA provides no evidence or "reason why that is not the case here." *Heidtman v. Cnty. of El Paso*, 171 F.3d 1038, 1043 (5th Cir. 1999). Indeed, "potential loss of income [to CSPA's counsel] in refusing other employment [wa]s compensated for in the number of hours [they] billed in the instant case." *Shipes v. Trinity Indus.*, 987 F.2d 311, 322 (5th Cir. 1993). Therefore, the purported preclusion of other employment does not warrant a fee multiplier.

***Funding***: Fourth, CSPA's claim that "[n]o public or charitable funding was provided" (Dkt. 156-1 at 31) is plainly contradicted by its own billing records. *See, e.g.*, Dkt. 156-6, at 20 ("Draft and reply to emails regarding amendment between plaintiff and Rose Foundation, and draft email for information needed to request reimbursement for expert expenses from Rose Foundation."), ("Teleconference with C. Schutes re: financing/directions to Rose Foundation."), 21 ("Review funding agreement with Rose Foundation and confirm client approval."), ("Draft email to Rose Foundation re: fund establishment."); 156-15, at 25 ("[R]eview funding report from Rose."). The record evidence also confirms CSPA's counsel received funds from public and charitable sources that were donated for the express purpose of funding CSPA's case. These funds were donated as early as August 2023, and were submitted beginning in September of 2023 through the Rose Foundation website, which provided an online donation page for the specific purpose of donating to CSPA's counsel to "help pay for this testing and expert work." *See* Exs. B, E. CSPA's counsel openly admitted to continuing their own "fundraising around the lake" while the lawsuit was pending, including through a March 2024 article published by a local Tahoe-based newspaper and a fundraiser promoted by CSPA's counsel held at a local Tahoe brewery. *See* Ex. G. As further confirmation, Pacific Bell served CSPA with discovery requesting documents related to funding its litigation efforts—including "the litigation fund hosted by the Rose Foundation"—and CSPA admitted in response that it was "withholding documents responsive to th[ese] Request[s]" based on a relevance objection. *See* Ex. J. CSPA further objected to providing information concerning the funding it received and its donors, noting that disclosing this information could "have a chilling effect on current and future donors' willingness to financially support the organization and/or litigation." *See id*. This further reinforces that no fee multiplier should be applied.

***Results***:  Fifth, CSPA suggests that a fee multiplier is necessary to account for the "exceptional results" it obtained in this litigation.  But CSPA can hardly say that the result here— a routine settlement in which Pacific Bell has not admitted any liability and compromised with CSPA to avoid further litigation costs—is "exceptional" in any regard.  *See In re Wash. Pub. Power Supply Sys. Secs. Litig.*, 19 F.3d 1291, 1303 (9th Cir. 1994) (affirming denial of a results multiplier based on finding that $687 million settlement did not "exceed the extraordinary"); *Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292, 1302 (11th Cir. 1988) ("Exceptional results are results that are out of the ordinary, unusual or rare.  Ordinarily, results are not exceptional merely because of the nature of the right vindicated or the amount recovered. . . . Even if the results obtained are exceptional, no enhancement is permissible unless there is specific evidence in the record to show that the quality of the representation was superior to that which one would reasonably expect in light of the rates claimed.").  In any event, this factor is subsumed in the lodestar amount, as CSPA itself boasts that it achieved this result through its "superior performance"—performance already accounted for in the reasonable hourly rate commanded by attorneys of similar skill and experience—so does not warrant a multiplier.  *Perdue*, 559 U.S. at 554.

### C.    CSPA's Requested Costs Are Not Compensable.

CSPA also seeks $133,678.51 in costs, primarily for "investigative" and "expert consultant" services, including factual investigation, sampling, and drafting of expert reports (which were never exchanged with Pacific Bell).  Dkt. 156-1, at 32.  RCRA provides that a court may "award costs of litigation," including "reasonable attorneys' fees and expert fees," 42 U.S.C. § 6972(e).

But such costs do not include fees incurred by non-testifying consulting experts.  Courts have held that the similar fee provision in the Clean Air Act[12] does not "allow for fees in connection with the services of outside, nontestifying experts."  *Sierra Club v. E.P.A.*, 769 F.2d 796, 812 (D.C. Cir. 1985); *see also Nat. Res. Def. Council, Inc. v. E.P.A.*, 1998 WL 704368, at *1 (D.C. Cir. Sept. 3, 1998).  The plaintiffs in *Sierra Club* sought reimbursement for the work of their "technical

---

[12] Similar to the fee provision in RCRA, that provision provides that "[i]n any judicial proceeding under this section, the court may award costs of litigation (including reasonable attorney and expert witness fees) whenever it determines that such award is appropriate."  42 U.S.C. § 7607(f).

DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR ATTORNEYS' FEES AND COSTS

Case No. 2:21-cv-00073-JDP

consultant," who "aided [them] in preparing their case." 769 F.2d at 812. The court declined to find that the consultant's fees were reimbursable as "expert fees," reasoning that the consultant merely "review[ed] [] regulations . . . in th[e] case on the administrative record" without testifying in "hearings before this or any other court." *Id.* It also determined that the consultant's "services d[id] not fall under the traditional concept of costs." *Id.*; *see* 28 U.S.C. § 1920. The Court thus denied the plaintiffs' request for fees connected to the work of its expert consultant. *Id.*

The same outcome is warranted under RCRA's similar fee provision. *See* 42 U.S.C. § 6972(e). Like the consultant in *Sierra Club*, CSPA's experts served solely in the role of technical consultants, helping it prepare its case through oversight of its sampling efforts. Their fees thus are neither compensable as expert fees, nor general "costs" under RCRA. *See Aranow v. D.C.*, 780 F. Supp. 46, 48 (D.D.C. 1992) ("None of the categories of expenses listed in § 1920 can reasonably be read to include fees for services rendered by an expert employed by a party in a nontestimonial advisory capacity.") (quoting *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 87 (1991)).

Moreover, although California Code of Civil Procedure Section 1021.5 is conspicuously "silent with respect to expert witness fees." *Olson v. Auto. Club of S. Cal.*, 42 cal. 4th 1142, 1148 (Cal. 2008). The California Supreme Court has thus confirmed that because attorneys' fees and expert fees "are viewed as distinct and independent subsets of the costs of litigation," Section 1021.5 does not "permit[] an award of expert witness fees." *Id.* Therefore, CSPA is not entitled to recover any form of expert fees under either RCRA or Section 1021.5.

## V.    CONCLUSION

For the foregoing reasons, Pacific Bell respectfully requests that this Court award CSPA's counsel no more than $220,000 (a reasonable lodestar for fees), with no multiplier, and order CSPA to bear the costs of its investigative or expert consultant services.

1    DATED: November 21, 2024                Respectfully submitted,

2                                            */s/ Hariklia Karis*

3                                            HARIKLIA KARIS (*admitted pro hac vice*)
     hkaris@kirkland.com

4                                            ROBERT B. ELLIS (*admitted pro hac vice*)
     rellis@kirkland.com

5                                            MARK J. NOMELLINI (*admitted pro hac vice*)
     mnomellini@kirkland.com

6                                            KIRKLAND & ELLIS LLP
     300 North LaSalle

7                                            Chicago, IL 60654

8                                            Telephone: (312) 862-2000
     Fax: (312) 862-2200

9

10                                           JON DAVID KELLEY (*admitted pro hac vice*)
     jon.kelley@kirkland.com

11                                           KIRKLAND & ELLIS LLP
     4550 Travis Street

12                                           Dallas, TX 75205

13                                           Attorneys for Defendant

14                                           PACIFIC BELL TELEPHONE COMPANY

15

16

17

18

19

20

21

22

23

24

25

26

27

28