1  Joshua Koltun (Bar No. 173040)
   One Sansome Street
2  Suite 3500, No. 500
   San Francisco, California  94104
3  Telephone:  415.680.3410
   Facsimile:  866.462.5959
4  joshua@koltunattorney.com

5
   Attorney for Nonparty Witnesses
6  Marine Taxonomic Services, Ltd,
   Below the Blue, Seth Jones, and
7  Monique Rydel-Fortner ("BTB-MTS")

8

9                    UNITED STATES DISTRICT COURT

10                   EASTERN DISTRICT OF CALIFORNIA

11                                        | Case 2:21-cv-00073-JDP

12 CALIFORNIA SPORTFISHING
   PROTECTION ALLIANCE,
13
                Plaintiff,
14 v.

15 PACIFIC BELL TELEPHONE COMPANY

16
                Defendant
17

18 PACIFIC BELL TELEPHONE COMPANY,   | Case No. 2:24-cv-00022-KJM-JDP

19                                    | **BTB/MTS REPLY IN SUPPORT OF**
                Movant,               | **MOTION TO SHIFT COSTS**
20 v.
                                      | Zoom Hearing:  January 9, 2025
21 MARINE TAXONOMIC SERVICES, LTD.    | Time:              10 am
                                      | Courtroom          9
22              Respondent            | Judge:             Hon. Jeremy D. Peterson

23
                                      | Filed herewith:
24
                                      | Second Declaration of Joshua Koltun
25                                    | [Updated Proposed] Order

26

27

28

1
2
3

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................................ii

Introduction...................................................................................................................1

Argument .......................................................................................................................3

I.    BTB/MTS has no "interest" in the litigation that can be a basis for denying or reducing its right to cost-shifting ...........................................................................................................3

  A.    BTB's "environmental interest" has no bearing on cost-shifting .................................3

    1.    The very authority that AT&T relies on to show the relevance of BTB's "environmental interest" shows that it is irrelevant......................................................................3

    2.    AT&T's proposed rule exempting advocates for their "nonfinancial interest" in public interest litigation would violate the First Amendment ..............................................7

  B.    BTB/MTS does not have a financial interest that would warrant denying or reducing its right to cost-shifting .............................................................................................................9

II.   AT&T's argument that BTB/MTS cannot be said to have "incurred" an expense that it did not pay has been squarely rejected by the Ninth Circuit...................................................10

III.  The requested fees were all reasonably incurred to comply with the subpoena ...........................12

IV.   BTB/MTS is also entitled to the requested expenses as sanctions under Rule 45 (d)(1) ..............15

Conclusion ....................................................................................................................17

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### TABLE OF AUTHORITIES

**Cases**

*Allstate Ins. Co. v. Vavasour*, 797 F. Supp. 785, 787 (N.D. Cal. 1992) .................................................4

*Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009) ....................................................4

*Balfour Beatty Infrastructure, Inc. v. PB& A, Inc.,* 319 F.R.D. 277, 282-83 (N.D. Cal 2017) ..1, 3, 4, 5, 9

*Branzburg v. Hayes,* 408 U.S. 665, 695 (1972). ....................................................................................8

*Cornell v. Columbus McKinnon Corp.*, 2015 U.S. Dist. LEXIS 105450, at *8 (N.D. Cal. Aug. 11, 2015) ..........................................................................................................................1, 3, 4, 5, 7

*Farr v. Pitchess*, 522 F.2d 464, 467-68 (9th Cir. 1975) ........................................................................8

*First Am. Corp. v. Price Waterhouse Ltd. Liab. P'ship*184 F.R.D. 234, 242 (S.D.N.Y. 1998)...............9

*Gamefam, Inc. v. WowWee Grp. Ltd.,* 2024 U.S. Dist. LEXIS 47464, at *25-26 (N.D. Cal. Mar. 18, 2024) ........................................................................................................................................13, 14

*Haglund v. Sawant,* 781 F. App'x 586, 589 (9th Cir. 2019 ....................................................................7

*Hyundai Motor Am., Inc. v. Pinnacle Grp., LLC, ,* 2014 U.S. Dist. LEXIS 194242, at *1-3 (C.D. Cal. Oct. 7, 2014). ..........................................................................................................................5

*In re Grand Jury Proceedings*, 5 F.3d 397, 402 (9th Cir. 1993) .............................................................8

*In re Sanomedics, Inc.*, 583 B.R. 796, 799-800 (Bankr. S.D. Fla. 2018) ...............................................16

*Legal Voice v. Stormans, Inc.* 738 F.3d 1178 (9th Cir. 2013 *("Legal Voice I")* .................................1, 3, 6

*Legal Voice v. Stormans Inc.,* 757 F.3d 1015, 1017 (9th Cir. 2014) ("*Legal Voice II*); ...................10, 11

*Leuzinger v. Cty. of Lake*, 2009 U.S. Dist. LEXIS 29843, at *8 (N.D. Cal. Mar. 27, 2009)................15

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347, 115 S. Ct. 1511, 1519 (1995) .......................7

*NAACP v. Button*, 371 U.S. 415, 429-30, 83 S. Ct. 328, 336 (1963) ....................................................7

*Nadarajah v. Holder*, 569 F.3d 906, 916 (9th Cir. 2009). ...................................................................11

*Rawlings v. Heckler,* 725 F.2d 1192, 1195 (9th Cir. 1984) ....................................................................4

*Satchell v. Wallace*, 439 F. App'x 644, 645 (9th Cir. 2011); .................................................................10

*Shasta Linen Supply, Inc. v. Applied Underwriters, Inc.*, 2018 U.S. Dist. LEXIS 100158, at *5-6, 18-

19 (E.D. Cal. June 13, 2018)...................................................................................5

*Shoen v. Shoen*, 5 F.3d 1289, 1293 (9th Cir 1993). ..............................................8

*Smith v. Ark. State Highway Emps.*, 441 U.S. 463, 464, 99 S. Ct. 1826, 1827-28 (1979) .....................7

*Tutor-Saliba Corp. v. United States*, , 32 Fed. Cl. 609, 612  (1995). .....................................5

*United States v. McGraw-Hill Cos.*, 302 F.R.D. 532, 536 (C.D. Cal. 2014)..........................7, 9, 10, 12

*Valcor Eng'g Corp.v. Parker Hannafin Corp.* 2018 U.S. Dist Lexis 142120 at * 6, 10, 11 (C.D. Cal. July 12, 2018)..................................................................1, 3, 4, 7, 9, 10

*Wall Indus. Inc. v. United States,* 15 Cl.Ct. 796, 799 (1988)...............................................11

**Other Authorities**

Sedona Principles, Third Edition: 19 Sedona Conf. J. 1 (2018) at ........................................14

**Rules**

Fed.R.Civ.P.ule 45 ..................................................................................passim

*Introduction*

Rule 45(d)(2)(ii) is mandatory.  The court is obligated to shift "significant" costs from the nonparty to the requesting party "as a matter of course." *Cornell v. Columbus McKinnon Corp.*, 2015 U.S. Dist. LEXIS 105450, at *8 (N.D. Cal. Aug. 11, 2015).  The excuses AT&T offers for its refusal to reimburse these costs have no support in the law.  Indeed AT&T has egregiously misstated the law.

AT&T argues that BTB's discovering that there were lead-clad cables at the bottom of Lake Tahoe ("Cables") and advocating for their removal makes it an "interested party."  This argument is premised on AT&T's contention that "non-financial" interests such as an "environmental" or "aesthetic" interest disqualifies a nonparty from the right to be reimbursed for "significant expense."  This proposition is flatly contrary to the Ninth Circuit's ruling in *Legal Voice v. Stormans* that the only question for the Court is whether the costs were "significant."  *Id.* 738 F.3d at 1178, 1185 (9th Cir. 2013)("*Legal Voice I*").

In support of its theory that this court may consider "nonfinancial" interests such as BTB's "environmental" interest, AT&T relies -- over and over again – on a premise with which BTB/MTS agrees: that a nonparty party should be considered an "interested party" if it "stand[s] to benefit from certain litigation outcomes" because of its "involvement in the ***underlying acts that gave rise to the lawsuit.***"[1]

The highlighted phrase is a well-understood legal phrase, and it does not mean what AT&T thinks it means.  It does not mean "things the nonparty did that helped persuade plaintiff to bring the lawsuit."  Instead, the "underlying acts" that "give rise" to a lawsuit are the acts ***by the defendant*** on which ***plaintiff's causes of action*** are based.  Here, those acts are AT&T's placement and abandonment of lead-clad cables at the bottom of Lake Tahoe.  There can be no contention that BTB/MTS had any involvement in that.

---

[1]  DE 170 at 1:2-10 (citing *Valcor Eng'g Corp.v. Parker Hannafin Corp.* 2018 U.S. Dist Lexis 142120 at * 6, 10, 11 (C.D. Cal. July 12, 2018)(emphasis added) and *Balfour Beatty Infrastructure, Inc. v. PB&A, Inc.*, 319 F.R.D. 277, 282-83 (N.D. Cal. 2017) (emphasis added)).  *See* DE 170 at 2:10, 9:3, 9:17-18; 9:23; 10:3 (citing the exact phrase) and *see also*  DE 170 at 2:14-16, 11:23-25, 18:25-28; 19:12 (citing very similar phrase)

AT&T also argues that MTS had a financial interest that renders it an "interested party," namely its hope that AT&T would hire it to assist with the removal of the Cables.  AT&T concedes that MTS had already been rejected for such work well before it issued the subpoena.  But AT&T claims that is irrelevant.  In support of this contention, AT&T cites cases where the nonparty was involved in "acts that gave rise to the lawsuit" that had predated the subpoena, reasoning that these show that a previously existing "financial interest" is enough to be rendered an "interested party"

But this simply repeats the error discussed above.  Of course the "acts giving rise to the litigation" preceded the subpoena – they are the acts that had to have happened in order for the lawsuit to be filed in the first place!  But the "financial interest" that such a party faces is a ***present*** financial interest – the risk that the nonparty may also be liable for those acts.  That is why the nonparty "stands to benefit from certain litigation outcomes."  If there is no present interest in the outcome of the case, the nonparty is not an "interested party."

AT&T also contends that BTB/MTS did not "incur" significant expenses because it has not actually paid for those expenses.[2]  But the Ninth Circuit has squarely rejected that argument, ruling that a party (or nonparty) "incurs" attorney fees even if it has no obligation to pay the attorneys.  AT&T concedes that the Ninth Circuit has so ruled, but argues that this ruling only applies if the attorneys agreed to work for free, not if the attorneys are paid by a third party.  But AT&T cannot offer any authority or explanation for that limitation.  That limitation would directly contravene the policy of Rule 45, that a party that issues a subpoena should shoulder the "significant" burden that the subpoena imposes.

That Rule is an important check against misusing the subpoena powers of this Court.  If AT&T is able to place that burden on Dow Jones, which it considers its adversary because the *Wall Street Journal* brought public attention to the issue of lead-clad cables, then it will have succeeded in misusing the powers of this Court.

---

[2] This argument does not apply to the lost time of Jones and Rydel-Fortner, who have not been and will not be compensated by Dow Jones.  So to argue against reimbursing them, AT&T manufactures a frivolous accusation of misconduct.  See Section III.

*Argument*

1

2    **I.    BTB/MTS has no "interest" in the litigation that can be a basis for denying or reducing its
3          right to cost-shifting**

4          The court's task here is routine and simple: to determine whether the costs imposed by the

5    subpoenaing party were "significant," and require the subpoenaing party to pay such an amount that

6    the remainder is not significant. *Legal Voice I,* 738 F.3d at 1185; *Cornell*, 2015 U.S. Dist. LEXIS

7    105450, at *8.

8          AT&T seeks to avoid paying any portion of the enormous expense it imposed by this

9    subpoena. It argues that BTB/MTS is an "interested party," and thus ineligible for cost-shifting,

10   because (i) the nonprofit BTB had a "non-financial interest," – an "environmental" or "aesthetic"

11   interest, and (ii) MTS had a "financial interest" in the case. DE 170 at 7:6-8; 9:6-11.

12         Neither contention has any merit.

13         **A.    BTB's "environmental interest" has no bearing on cost-shifting**

14
15              **1.    The very authority that AT&T relies on to show the relevance of BTB's
                      "environmental interest" shows that it is irrelevant.**

16
17         AT&T claims that BTB/MTS has cited no authority to support the proposition that the

18   nonparty must have such a substantial financial interest in the litigation as to affect the significance of

19   the expenses. DE 170 at 6:3-5. But BTB/MTS relied on precisely the same authorities -- indeed, on

20   the same *precise phrase* --, to show that its environmental interest is *irrelevant* as AT&T relied on to

21   show that it is *relevant*. DE 159 at 11:2-13.

22         AT&T's error is that it misapprehends the legal significance of that common legal phrase.

23   AT&T argues that a nonparty should be considered an "interested party" if it "stand[s] to benefit from

24   certain litigation outcomes" because of its "involvement in the *underlying acts that gave rise to the

25   lawsuit."* DE 170 at 1:2-10; 2:10, 9:3, 9:17-18; 9:23, (citing *Valcor Eng'g Corp.v. Parker Hannafin

26   Corp.* 2018 U.S. Dist Lexis 142120 at *6, 10, 11 (C.D. Cal. July 12, 2018) and *Balfour Beatty

27   Infrastructure, Inc. v. PB& A, Inc.,* 319 F.R.D. 277, 282-83 (N.D. Cal 2017) (emphasis added); *see

28   also* 10:3 DE 170 at 2:14-16, 11:23-25, 18:25-28; 19:12 (citing very similar phrase). AT&T argues

- 3 -

that BTB/MTS meets that standard because it discovered the Cables, advocated for their removal, and brought the cables to the attention of plaintiffs' counsel. DE at 1:13-19.

AT&T is twisting the well-understood meaning of the legal phrase.  The "underlying acts" that "give rise" to a suit are the acts **by defendant, on which its liability** is premised.  *See, e.g., Rawlings v. Heckler,* 725 F.2d 1192, 1195 (9th Cir. 1984) (the phrase "underlying government action giving rise to the litigation" is used to mean the "underlying government action" that lacked factual or legal justification); *Allstate Ins. Co. v. Vavasour*, 797 F. Supp. 785, 787 (N.D. Cal. 1992) ("insurers must look beyond the causes of action actually pled to determine whether the underlying facts giving rise to the lawsuit might support a covered claim"), *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009) ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").

The nonparties ***financial*** stake in the litigation is relevant because that stake "renders the discovery expenses… less 'significant'" to the nonparty.  *Cornell,* 2015 U.S. Dist. Lexis 105450 at 9-10.  In *Cornell,* the financial stake was "direct," because the nonparty Fedex, who was already paying medical expenses and disability benefits to plaintiff that it would recoup if plaintiff won its product liaibilty suit against defendant; indeed, it had filed a lien against "any judgement or settlement in plaintiff's favor." *Id.* at *9-10.

Similarly, nonparties have a financial interest if they "***stand to benefit*** from certain litigation outcomes" because of their "involvement in the ***underlying acts that gave rise to the lawsuit.***" *Valcor, supra, Balfour, supra,* (emphasis added)*.* They "stand to benefit" because they may face legal liability or indemnity obligation because of that involvement.  *Id.*  Contrary to AT&T, it matters very much whether the nonparty is potentially a "wrongdoer."  DE 170 at 13:11-12.  That potential exposure to liability is a concrete financial stake, which makes it a relevant consideration in determining whether the costs of compliance are "significant."  Every single one of the cases on which AT&T relies to show that "nonfinancial" interests are relevant, all involve either (i) some direct financial stake in the outcome of the litigation or (ii) an indirect financial stake by reason of such

1   potential liability. [3]

2        This includes *Balfour,* on which AT&T relies to show that "nonfinancial" interests such as

3   "environmental" interests are relevant.  170 at 915-18.   To be sure, the court in that case stated that

4   the nonparty did not have a "financial interest" in the case.  *Id.* 319 F.R.D. at 282.  But in context it is

5   clear that the court was using this term in a narrow sense, to mean a direct financial stake such as a

6   lien.[4]  The nonparty's "involvement in the underlying acts that gave rise to the lawsuit" was the reason

7   cost-shifting was denied.  As in all of AT&T's other cases, that was an indirect substantial financial

8   stake in the outcome of the litigation.  *Id.* The defendant was alleged to have failed to properly design

9   a feature of a contractual project; the nonparty had been hired by plaintiff to review defendants' plans

10  to ensure compliance, and had required defendant to alter the design.  *Id.* at 282-83.

11       Here, the "underlying acts that gave rise to [this] lawsuit" are AT&T's placement and

12  abandonment of lead-clad cables at the bottom of Lake Tahoe.  BTB/MTS's ***discovery*** of those acts is

13  not what gives rise to AT&T's liability.  It does not matter whether BTB/MTS advocated the removal

14  of the Cables or brought their existence to plaintiff's attorneys.  None of these are the "underlying acts

15  that gave rise to this litigation."

16

17  _____

18       [3]In *Shasta Linen Supply, Inc. v. Applied Underwriters, Inc.*, the defendant was accused of
    fraud and unfair business practices in the selling of its insurance polices; the nonparty was defendant's
    agent that had sold the policy to plaintiff and had received a sizable commission for doing so.  *Id.*

19  2018 U.S. Dist. LEXIS 100158, at *5-6, 18-19 (E.D. Cal. June 13, 2018)
         In *Hyundai Motor Am., Inc. v. Pinnacle Grp., LLC,* the party was a distributor of Hyundai auto

20  parts that was suing defendant on a trademark and unfair competition claim for selling inferior
    knockoff lookalike imitations.  *Id.*, 2014 U.S. Dist. LEXIS 194242, at *1-3 (C.D. Cal. Oct. 7, 2014).

21  The nonparty was like the plaintiff, a subsidiary of Hyundai distributing its parts, and would have
    benefited financially if plaintiff had succeeded in enjoining the alleged knockoffs.  *Id*, 2016 U.S. Dist.

22  LEXIS 184742, at *2-4 (C.D. Cal. Apr. 20, 2016).
         In *Tutor-Saliba Corp. v. United States*, the nonparty had failed to give notice that it would seek

23  cost-shifting, and thus was precluded from getting reimbursed for "significant expenses."  *Id.,* 32 Fed.

24  Cl. 609, 612  (1995).  *Id.*  In a footnote, the court noted that the nonparty had been "substantially
    involved in the underlying transaction," and thus would not have qualified for sanctions under the

25  more lenient "undue burden" standard.  *Id.* at 610 n.5.

26       [4] The court in *Balfour* mentions "financial interest" at a point where it is citing *Cornell,* which

27  involved a direct financial interest, and in citing "the underlying acts that gave rise to the lawsuit," it
    is also relying on *Cornell.  Balfour,* 319 FRD at 282.

28

1
2
3
4
5

Thus BTB/MTS's acts do not make it an "interested party." AT&T has cited no cases that come anywhere close to suggesting that, in a citizen suit seeking to enforce a statute on behalf of the general public, an advocacy group that has advocated for the same result is an "interested party." DE 170 at 10:11 ("BTB itself is a quintessentially interested party.  BTB's goal was to get the Tahoe cables removed. [cites], which is also the objective of plaintiff's claims.")

6
7
8
9
10
11
12
13
14

Indeed, the "environmental interest" BTB  has in this case is precisely parallel to the interest the nonparty advocacy group had in *Legal Voice I*.[5]  Like BTB,  the group in that case had raised an issue of public interest – the refusal of pharmacies to dispense contraceptives -- to the attention of the government and public and that issue had become the basis of the underlying litigation.  *Id.* 738 F.3d at 1181.  The premise that the advocacy group's non-financial "interest" in the public availability of contraceptives was relevant to cost-shifting cannot be squared with the Ninth Circuit's ruling that it was error to consider whether the expenses were an "undue burden" on the nonprofit organization. *Id.,* 738 F.3d at 1185.  "The **only** question before the court in considering whether to shift costs is whether the subpoena imposes significant expense on the non-party." *Id.* (emphasis added).[6]

15

That sole question necessarily encompasses ***financial*** considerations such as the direct or

16

---

17
18
19

    [5] One difference between *Legal Voice* and this case is that the nonparty in that case had succeeded in persuading the government to take the action it desired, and plaintiffs were challenging that action, whereas in this case the government took no action and plaintiffs were seeking (and succeeded in obtaining) a court order requiring the desired result.  But in both cases the nonfinancial "interest" is exactly parallel.

20
21
22

    [6] Thus the advocacy group's "nonfinancial" interest was hardly an issue that had escaped the Ninth Circuit's attention, as AT&T insists. DE 170 at13:1-5.  The court was fully aware of, and discussed, the advocacy groups involvement and interest in contraception issue, when it ruled that the only issue was the "significance" of the expense, and that $20,000 was clearly "significant." *Id.,* 738 F.3d at 1181.

23
24
25

    AT&T's other attempts to distinguish *Legal Voice I* are without merit.  It argues that the "role" of the advocacy group in *Legal Voice* was smaller than that of BTB, because other groups were also involved in that contraceptive-related advocacy.  DE at 12:15-20.  Even if that were true that BTB's role was larger, there is no reason why that would make any difference.  But in fact there were other advocacy groups pushing for the removal of the Cables, for example, the League to Save Lake Tahoe, which funded BTB/MTS's survey the damage and location of the Cables, and which has issued a joint press release with AT&T touting its recent agreement to remove the Cables.  See DE 100, ¶ 5; Second Koltun Decl., Exh. A.

26
27

    AT&T's argument that BTB can be distinguished because BTB's interest is "aesthetic" is mysterious.  DE 170-at 12:22-28.  Why would an advocacy group with an "aesthetic" interest, rather than a "reproductive" interest, find it any easier to bear costs?

28

1 indirect financial stake the nonparty has in the outcome of the case (as discussed above) or the
2 "financial ability of the non-party to bear some costs." *Cornell,* 2015 U.S. Dist. Lexis 10540 at * 5-6;
3 *United States v. McGraw-Hill Cos.*, 302 F.R.D. 532, 536 (C.D. Cal. 2014) (courts should consider
4 prior decisions as "benchmarks" for what is significant, including the Ninth Circuit's determination
5 that "$20,000 is 'significant' for a nonprofit legal advocacy group.") [7]  But it cannot take into account
6 *non-financial* considerations.  *Cf. Cornell*, 2015 U.S. Dist. LEXIS 105450, at *7-8 (After 1991,
7 courts must "focus solely on whether costs are "significant," and "a non-party's expenses are not made
8 less significant by the fact that the litigation is important to the general public."); *Valcor* 2018 U.S.
9 Dist. LEXIS 142120, at *7 n.2 (same).

### 2. AT&T's proposed rule exempting advocates for their "nonfinancial interest" in public interest litigation would violate the First Amendment

12       AT&T's proposed rule, exempting from cost-shifting a nonparty that has advocated, in the
13 public interest, the same remedy as is being sought in a public-interest lawsuit, would
14 unconstitutionally penalize advocates for their protected First Amendment activities.  AT&T claims
15 that this Court's ruling that BTB/MTS investigation of lead-clad cables was not "journalism"
16 forecloses this argument.  AT&T is mistaken.

17       Contrary to AT&T, the First Amendment does not only protect "journalism."  DE 170 at 13:6-
18 7.  It also protects advocacy and petitioning the government to take action.  *See, e.g, NAACP v.*
19 *Button*, 371 U.S. 415, 429-30, 83 S. Ct. 328, 336 (1963); *Smith v. Ark. State Highway Emps.*, 441 U.S.
20 463, 464, 99 S. Ct. 1826, 1827-28 (1979); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347,
21 115 S. Ct. 1511, 1519 (1995).  Indeed, BTB/MTS's environmental advocacy is "political speech," the
22 very core of what the First Amendment protects.  *See, e.g., Haglund v. Sawant,* 781 F. App'x 586, 589
23 (9th Cir. 2019) (statements about landord's code violations are protected "political advocacy.").  Thus,
24 contrary to AT&T (DE 170-6:10) this Court's ruling that BTB-MTS's investigation was not

_____

26    [7] The cases AT&T rely on for its "nonfinancial" argument also consider the financial resources
27 of the nonparty, in addition to its involvement in the acts giving rise to liability. *Balfour*, 319 F.R.D. at
282; *Shasta Linen*, 2018 U.S. Dist. LEXIS 100158, at *17-18.

1    "journalism" is irrelevant to the issue of whether AT&T's proposed rule is unconstitutional.

2            Moreover, the Court's ruling that BTB/MTS was not a "journalist" was clearly erroneous.  It

3    relied on the factual determination that BTB/MTS was merely a "source" for the *Wall Street Journal*.

4    DE 124 at 6.  But this was contrary to the undisputed evidence that had been brought to this Court's

5    attention –indeed had put before the Court **by AT&T** --  namely that (i) MTS had **separately published**

6    the results of the investigation it had conducted in collaboration with the *Journal,* and (ii) that MTS

7    and EDF had had the intention to separately publish such a report from the inception of the

8    investigation, an intent that was corroborated by a contemporaneous written contract. [8]

9            Now, indeed, on this motion, AT&T **relies upon** the fact that "BTB/MTS scouted and tested

10   hundreds if cable locations across the country and **published the results in a report.**" DE 170 at

11   11:26-27 (emphasis added); 6:13-17.  That investigation was the primary focus of the discovery at

12   issue in this case, and the vast majority of the documents produced in this case had to do with that

13   investigation.  Koltun Decl., ¶9.

14           Whether that investigation is deemed to be "journalism" or, as AT&T characterizes it, as

15   "advocacy," it is protected First Amendment activity.  Thus to penalize BTB/MTS by denying it cost-

16   _____

17           [8] *See* DE 99 at 10:1-3, DE 100, ¶¶ 6, 8; DE 65-14 (asking Court to compel MTS to produce,
     "All Documents and Communications concerning the Marine Taxonomic Services and Below the
18   Blue Lead Cable Investigation Report, available at https://belowtheblue.org/edf-report" (Request No.
     9)). DE 113-1 ¶ (stating that MTS published report of its investigation on the internet), Exh 2 (copy of
19   MTS Report), Exh. 3 (contract); DE 114 at 10:16-11:28 (bringing this undisputed evidence to the
     Court's attention); *compare* DE 124 at 5 (correctly citing *Shoen v. Shoen*, 5 F.3d 1289, 1293 (9th Cir.
20   1993)) as requiring that the journalist show that it (i) "had 'the intent to use material—sought,
     gathered or received—to disseminate information to the public and [ii] such intent existed at the
21   inception of the newsgathering process.'"
             Strangely, the Court relied on Justice White's opinion in *Branzburg v. Hayes* for its ruling that
22   BTB/MTS was a source, not a journalist.  DE 124 at 6 (citing *Branzburg,* 408 U.S. 665, 695 (1972).
     But the Supreme Court in *Branzburg* had held that neither the reporter nor the source has any
23   privilege not to testify.  *Id.* at 693-95.  If that were the operative rule, there would be no reporter's
     privilege at all.  But there is, for, as the Ninth Circuit has held, *Branzburg* is **limited to the grand jury
24   context**.  Justice Powell was the fifth Justice to join Justice White's opinion, and his concurrence in
     *Branzburg,* together with the opinions of the four dissenting Justices in *Branzburg,* is the basis for the
25   Reporters' Privilege recognized by the Ninth Circuit in the non-grand jury context.  *See Farr v.
     Pitchess*, 522 F.2d 464, 467-68 (9th Cir. 1975); *In re Grand Jury Proceedings*, 5 F.3d 397, 402 (9th
26   Cir. 1993).  In *Shoen,* the Court had noted that "[e]ight of the other nine circuits that have decided the
     question" had similarly reasoned that Justice White's opinion was the minority opinion insofar as it
27   applied in the non-grand jury context.  *Id.* 5 F.3d at 1292 & n.5 (collecting authorities).  *See* DE 114 at
     6:14- 7:14 (bringing to Court's attention the inapplicability of Justice White's opinion to this case).

28

1   shifting on the basis of that advocacy would be unconstitutional. *See, e.g., S*peiser v. Randall, 357

2   U.S. 513, 535-36, 78 S. Ct. 1332, 1345-46 (1958) (Douglas, J., concurring).

3       **B.    BTB/MTS does not have a financial interest that would warrant denying or reducing
            its right to cost-shifting**

4

5       For the reasons explained in the previous section, BTB/MTS can only be considered to be an

6   interested party if it has a financial stake in the outcome of this litigation so substantial that it is

7   relevant to considering whether the cost of compliance with the subpoena was "significant." *Cornell,*

8   2015 U.S. Dist. Lexis 105450 at *9-10.  Even if it had a substantial financial stake in the outcome of

9   the litigation, it still might be entitled to reimbursement for some of the costs of compliance. *See*

10  *McGraw-Hill,* 302 F.R.D. at 536 & n.1 ("it is highly probable that some portion of the costs of

11  production will shift" to the subpoenaing party, even though the nonparty "may deserve the lion's

12  share of the blame."); *First Am. Corp. v. Price Waterhouse Ltd. Liab. P'ship*184 F.R.D. 234, 242

13  (S.D.N.Y. 1998) (nonparty accounting firm that "played a role" and had a "unique responsibility" for

14  the collapse of a bank was required to aborb "a portion" of the expense of compliance with discovery).

15      Here, BTB/MTS had no financial stake in the outcome of this case that would render it an

16  "interested party."  There is no dispute that, at the time that BTB/MTS was complying with the

17  subpoena, it had no expectation or hope that it would be hired by AT&T to assist it in removing the

18  Cables.  The parties are in agreement about the facts. *Compare* DE 159 at 9:8-26 with DE 170 at

19  5:23-24 (by January 2022 MTS had been rejected for such work).

20      But AT&T argues that " consideration of a party's financial interest is not limited to the time

21  of subpoena compliance," arguing that in cases such *Valcor* and *Balfour,* the nonparty was denied

22  cost-shifting because it was "'intimately involved in the acts giving rise to the litigation,' which pre-

23  dated the subpoena." DE 170 at 11:20-25.

24      But AT&T is simply repeating the error discussed above in section I.A.  The "acts giving rise

25  to the litigation" may pre-dated the subpoena, but they are relevant ***at the time of compliance.***  In

26  *Valcor*, for example, the nonparty had manufactured the part that had allegedly failed; the court

27  explained how that fact gave it a ***present*** financial interest in the outcome of the case:

28

> If [plaintiff] prevails on its claims for warranty costs against Valcor, [nonparty]MEDAL could be liable to Valcor for those costs. Conversely, should a jury determine that Parker cannot engage a second-source supplier, Parker could be required to continue purchasing ASMs from Valcor, which contain the fiber membranes that MEDAL supplies. Thus, MEDAL has potential financial exposure in this lawsuit if Parker prevails, but it will dramatically benefit if Valcor prevails. Either result directly impacts MEDAL financially.

*Valcor,* 2018 U.S. Dist. LEXIS 142120, at *11-12.

BTB/MTS's  "acts" that AT&T cites are not the "acts giving rise to the litigation," and the parties agree that any hope MTS had of being hired by AT&T had been extinguished well before AT&T reopened this case and subpoenaed BTB/MTS.  Thus BTB/MTS cannot be considered an "interested party."[9]

## II.    AT&T's argument that BTB/MTS cannot be said to have "incurred" an expense that it did not pay has been squarely rejected by the Ninth Circuit

AT&T argues that "BTB/MTS has not, in fact, actually incurred any expenses, therefore, it cannot show that it incurred the significant expense[s] required for reimbursement under Rule 45." DE 170 at 13:17-18.  BTB/MTS has not "incurred" the expenses, according to AT&T's argument, because it has never "paid anything."  *Id.* at 170 at 14:26-27.

But the Ninth Circuit has repeatedly rejected this precise argument.  Indeed, in *Legal Voice,* the seminal Rule 45 case, the court held that the the nonparty's attorney fees were "recoverable by *pro bono* attorneys to the same extent that they are recoverable by attorneys who charge for their services." *Legal Voice v. Stormans Inc.,* 757 F.3d 1015, 1017 (9th Cir. 2014) ("*Legal Voice II*); *accord Satchell v. Wallace*, 439 F. App'x 644, 645 (9th Cir. 2011); *Nadarajah v. Holder*, 569 F.3d 906, 916

---

[9] The only present financial interest that AT&T can conjure is the contention that BTB/MTS is hoping that the removal of the Cables at Lake Tahoe will lead to the removal of similar lead-sheathed cables that it uncovered around the country in its investigation, and that such future removal would provide work for MTS's "industry," and that MTS would hope to get some of that work.  DE 170 at 11:26-12:1-6.  But even if one assumes *arguendo* that this is MTS's hope, it is too remote and hypothetical to be the sort of concrete financial stake that would warrant characterizing MTS as an "interested party." Moreover, even interested parties may shift some costs to the subpoenaing party, and the potential financial benefit here is so hypothetical, and AT&T's financial resources so vast, that it does not justify reducing the cost award to any substantial degree.  *See McGraw-Hill,* 302 F.R.D. at 536.

1   (9th Cir. 2009).

2          AT&T concedes that in *Nadaradjah,* the court held that the attorney fees had been "incurred,"

3   but asserts, without any support, that it would not have done so if a third party had paid the fees.  DE

4   170 AT 15:16-22.  But here is how the court explained the principle: "the presence of an attorney-

5   client relationship suffices to entitle prevailing litigants to receive fee awards." *Nadarajah*, 569 F.3d

6   at 916.  There is no dispute that BTB/MTS has an attorney client relationship with the undersigned.

7   DE 162, ¶ 5.  Here is how the Ninth Circuit explained the relevant principle in *Satchell*: A "party may

8   'incur' attorney fees even if the party is not personally obligated to pay such fees."  *Id.,* 439 Fed.

9   App'x  at 644.

10          AT&T suggests that this principle is limited to EAJA cases, (DE 170 at 5-7), but the Ninth

11  Circuit has applied the principle in the **seminal** Rule 45 case.  *Legal Voice  II..,* 757 F.3d at 1017.

12  AT&T does not discuss *Legal Voice II.*

13          AT&T cites *Wall Indus. Inc. v. United States* to support its argument.  DE 170 at 15:3-14

14  (citing *Wall,* 15 Cl.Ct. 796, 799 (1988)).  But that case relied on precisely the argument that was

15  rejected by the Ninth Circuit, namely that the term "incurred" requires that the party itself be obligated

16  to pay the fees, and thus that **neither a party that is represented pro bono** nor one has been paid by a

17  third party is ineligible for attorney fees.[10]

18          On AT&T's theory, if the undersigned had agreed to represent BTB/MTS *pro bono,* or if Weil

19  Gotshall or Covington had not reneged on their original agreement to represent BTB/MTS *pro bono,*

20  it would be obligated to reimburse those fees, but if the Dow Jones paid those fees, it not obligated to

21  reimburse Dow Jones.[11]

22

23          [10] *Wall* is distinguishable for another reason.  In that case the party seeking the fees (Wall) was
    only nominally a party in the case, whereas "third party" paying the fees was the "sole beneficiary" of
24  the litigation and had selected and controlled the attorneys who had litigated the claim.  *Id.* at 802,
    804.  Here, BTB/MTS is the one who had to comply with the subpoena, and the undersigned had an
25  engagement agreement only with BTB/MTS, and did not represent Dow Jones. Koltun Decl, ¶ 5.

26          [11]BTB/MTS has stipulated that the Court may order that Dow Jones be reimbursed for any
    funds it has advanced the undersigned or A&M, and that any funds owed A&M be paid to A&M.  See
27  DE 159 at 13:5-6, 25-26; Updated Proposed Order, filed herewith.

28

1    That makes no sense, and it is clearly contrary to the policy behind Rule 45, which is as

2    follows:

3        Someone must pay the costs of production—the issue is whether those costs
         should fall on a party to the suit or a non-party who is powerless to control the
4        scope of discovery. The Ninth Circuit has clarified that the former bears the
         burden, to the extent that the expenses are significant."

5
     *McGraw-Hill,* 302 F.R.D. at 535-36.
6
         It would directly contradict that policy if AT&T were entitled to avoid shouldering the
7
     massive burden it created by its enormous discovery request and place that burden on a nonparty,
8
     Dow Jones.[12]  This is particularly so in this case, in which AT&T views Dow Jones as an adversary
9
     for having published articles in the *Journal* raising environmental concerns about the lead-clad cables
10
     it has abandoned around the country.  As discussed further in section IV, AT&T reopened this case for
11
     the sole (and improper) purpose of obtaining an "adjudication" as to the safety of lead-clad cables
12
     precisely because of the *Journal's* reporting on the issue.
13

14   **III.    *The requested fees were all reasonably incurred to comply with the subpoena***

15       AT&T makes much of the fact that this Court ordered BTB-MTS to comply with the

16   subpoena, DE 170 at 17-18.  But that can hardly be a reason to deny cost shifting, because the

17   requirement that the court protect the nonparty from paying "significant expenses" is a **limitation** on

18   the power of the court to order compliance in the first place. The " ***order*** " – i.e. the order to compel --

19   must "protect" the nonparty from "significant expense" in compliance.  Rule 45(d)(2)(ii).

20       BTB/MTS is only requesting fees that it reasonably incurred in complying with the subpoena.

21   AT&T repeats all the arguments it has made about BTB/MTS's purported inadequate compliance with

22   the subpoena prior to January, but it fails to acknowledge that BTB/MTS is not seeking to be

23   compensated for any fees or costs incurred during that time.  DE 170 at 17.  Contrary to AT&T,

24   BTB/MTS is not seeking any reimbursement for motion practice, other than this cost shifting motion.

25

26       [12]Incidentally, the financial information that AT&T attached to its opposition is for Dow, Inc.,
     the chemical company, which does not have and has never had any relationship to Dow Jones. DE
27   170-14.

28

1    DE 159 at 12:12-24.

2          AT&T does not argue specifically that either A&M's rates or Koltun's rates were

3    unreasonable.  (Indeed AT&T had recommended A&M).  It does contend that the "condensed two

4    week time frame" somehow increased the costs for which BTB/MTS is seeking reimbursement.  DE

5    18 at 9-11.  But AT&T fails to explain why the condensed time frame would increase the number of

6    hours that were spent on compliance, and indeed Vishal Oza of A&M, who has extensive experience

7    in these matters, testified that the charges would not have been any different if there had been a longer

8    time frame.  Oza Decl.,¶ 2.  Moreover, the work was not done in a "two week" time frame.  First,

9    BTB/MTS and Koltun began working with A&M *before* the Court entered its order for production to

10   take place two weeks later.  Second,  once BTB/MTS had made its massive document production

11   within the deadline, AT&T engaged in extensive correspondence with Koltun concerning whether any

12   responsive documents might remain to be produced, and expanding the universe of documents that it

13   wished BTB/MTS to search.  Koltun Decl, ¶¶8, 11  & Exh. F.

14         AT&T also refuses to compensate Jones and Rydel-Fortner for their time, claiming that it is

15   "not compensable."  DE 170 at 16:4.  AT&T does not cite any law to support this, and the law is clear

16   that such time is compensable.  *See, e.g., Gamefam, Inc. v. WowWee Grp. Ltd.,* 2024 U.S. Dist.

17   LEXIS 47464, at *25-26 (N.D. Cal. Mar. 18, 2024) (awarding $149,565.34 for time employees spent

18   on compliance related tasks, at rates of $200 to $300 an hour); Advisory Note to 1991 Amendments to

19   Rule 45 ("lost earnings").

20         Jones and Rydel-Fortner have not and will not be paid by Dow Jones, so that cannot be the

21   reason to refuse to pay for their time.

22         So, to come up with a reason to not compensate Jones and Rydel-Fortner, AT&T, as is its

23   habit, accuses Koltun, Jones and Rydel-Fortner of misconduct.  The basis of this accusation is as

24   follows.

25         First, AT&T claims that "this Court twice instructed BTB/MTS that Jones and [Rydel-]Fortner

26   were *not* to review for relevance."  DE 170 at 16:13-15.  This is an egregious misrepresentation of the

27   Court's lengthy colloquy with Koltun on this issue.  The snippet of the transcript that AT&T is citing

28   was the Court's response to the *false* accusation that AT&T had made that Koltun had not been

involved in *supervising* Jones and Rydel Fortner in the responsiveness review.  DE 110, ¶ 4. But the Court made it clear that Jones and Rydel Fortner would be reviewing documents:

> MR. KOLTUN: … what [the ESI vendor] does not do is figure out what's responsive …
>
> THE COURT: -- there needs to be an attorney supervising and involved in this. And if you've got great vendors and your clients understand, you may not have to do a lot as an attorney; or if it's not the case, you may have to do a whole lot. I can't say. …We have to live in the specific facts of the case. I think, Mr. Koltun, …the attorney has a definite role that is not delegable and that, you know, will persist throughout the system. It's just we're using different -- different tools than we would have been using 50 years ago.

DE 122 at 57:10-24.

The proposition that employees of the subpoenaed party should not be involved in the review of documents is a repetition of the accusations of misconduct that AT&T had made in support of its requested order that the ESI vendor make responsiveness determinations, namely that Koltun should have "collected" BTB/MTS and Jones and Rydel-Fortner's "computers and electronic devices and conduct[ed] the review himself."  DE 104-1 at 5:4-5.

The contention was frivolous.  An attorney should be involved in supervising the document review.  He is not obligated to, and indeed, should not, bar the knowledgeable persons from the process.  *See* Sedona Principles, Third Edition: 19 Sedona Conf. J. 1 (2018) at 120 ("the responding party must make decisions on what is required to meet its preservation and production obligations *based on direct input from those inside the organization who create, receive, and store their own information (i.e., individual custodians).*") (emphasis added).  Indeed, it was not only *proper* for Jones and Rydel-Fortner to be involved in the review of documents, that is precisely what is compensable.  *See, e.g., Gamefan,* 2024 U.S. Dist. LEXIS 47464 at 26 (noting that nonparty's employees should be compensated for their time in searching for and producing responsive documents).

Second, AT&T contends that Koltun "did not supervise over 60 hours of Jones and Rydel Fortner's document review."  DE 170 at18-23.  This contention is false.  First, it is based on the

factual premise that Koltun did not "meet" with Jones or Rydel Fortner between January 8 and January 16 to supervise their document review.[13]   But the time records show that Koltun had multiple communications with them between January 7 and January 16.  DE 162-1, Exh. F.  Second, it ignores the nature of the "different tools" to which the Court referred.  As AT&T well knows, the document review with A&M was conducted via Relativity software.  That software enabled Jones and Fortner to review documents and put them in a queue for possible production, flagging them with comments, for Koltun to review.  Second Koltun Decl., ¶ 2.  "Supervising" does not mean that the attorney must be physically present, standing and looking over the employees shoulder while she reviews documents.

"In determining reasonable hours, an attorney's sworn declaration and time records are entitled to 'a presumption of credibility.'"  *Leuzinger v. Cty. of Lake*, 2009 U.S. Dist. LEXIS 29843, at *8 (N.D. Cal. Mar. 27, 2009).  To clarify one point, Koltun began in January 2024 to segregate and separately enter the time he spent in compliance with the subpoena from time he spent on other matters, for example, working on motions and preparing for the hearing on January 25.   Second Koltun Declaration, ¶ 2.  Of course, after January 25 Koltun had nothing to work on except compliance with the subpoena, nor, during the entirety of the time requested, did A&M or Jones or Rydel-Fortner.[14]  The time entries of the attorneys, employees, and ESI vendor all corroborate one another.  Given the massive document review that was undertaken, there is no reason to doubt that the hours spent on this massive document production were reasonable.   DE 160, ¶¶ 2-4; DE 161,  ¶11 & Exh. E; DE 162,  ¶8-12 & Exhs. B-F.

## IV.     BTB/MTS is also entitled to the requested expenses as sanctions under Rule 45(d)(1).

AT&T purports to understand BTB/MTS's sanctions argument to be that it should be

---

[13]  Note, by the way, that this period is before the "compressed two week timeframe" referenced by AT&T.  Indeed, at the hearing Koltun had described at some length to the Court the massive nature of the undertaking that had already commenced in working with the ESI vendor. *See, e.g.* DE 122 at 54-:24-56:22.

[14]  MTS uses billing software that only allows for a limited notation, from a drop-down menu, as to what the employee was working on.  DE 161, ¶11.

1    sanctioned because it did not "use" the documents "produced by BTB/MTS before the case settled."

2    DE 170 at 19:21.  AT&T misses the point.

3          This is not a typical case in which the parties chose to settle a case before trial.  This is a case

4    that had *already settled,* leading to the first Consent Decree.  The only reason AT&T has ever offered

5    for why it withdrew from that Consent Decree was that it wished to obtain an "adjudication" in light

6    of the BTB/MTS and the *Journal's* investigation and reporting on lead-clad cables.  AT&T told the

7    Court at the time that the adjudication was necessary in order to "assess the condition of the

8    underwater cables to determine their condition, their current and anticipated releasee to the

9    environment, and the risks posed by their removal *or leaving them in place*."  DE 41 at 2:21-3:2

10   (emphasis added).

11         Now AT&T contends, to the contrary, that it always intended to "fulfill its original

12   commitment to remove the cables," and is now doing so, even though it contends that it claims to

13   have "disproven" the *Journal's* reporting.  DE 148 at 20-21. "In 2021, we agreed to remove these

14   cables to avoid the distraction and expense of protracted litigation. Last summer, following news

15   reports regarding the cables, we *paused the removal* process to allow for further analysis by experts.

16   Now that these studies have been performed and confirmed the safety of the cables, we can return to

17   our commitment to remove the cables."  Second Koltun Decl., Exh. A (emphasis added).

18         But if AT&T always intended to remove the Cables *whatever the result of the adjudication*,

19   then AT&T was highjacking this proceeding, and the formidable power of the Court's discovery

20   processes, for the improper purpose of taking discovery "in the hands of third parties," who had

21   published a report about the environmental risks of lead-clad cables that displeased AT&T.   DE 49 at

22   3:24-25  A party that is not seeking meaningful judicial relief has no legitimate purpose for using the

23   powers of the court's discovery processes.  *See In re Sanomedics, Inc.*, 583 B.R. 796, 799-800 (Bankr.

24   S.D. Fla. 2018) (purchaser of de minimis bankruptcy claim had "improper motive" for seeking

25   discovery).

26         If AT&T had *sued* BTB/MTS or the *Journal* over that reporting, they would have been

27   entitled to bring an anti-SLAPP motion, and AT&T would have had to face the risk of paying *all of*

28   *the fees* BTB/MTS or the *Journal* had spent defending the case, *including* any discovery that the

1  Court had allowed to take place.  *See, e.g.,* Cal. C.C.P. 425.16 (c)(2).  But rather expose itself to that
2  risk, AT&T chose to exploit its ability to use the Court's subpoena powers to take discovery of
3  BTB/MTS and, indirectly, of the *Journal.*

4      As the Advisory Note to  the 1991 amendments to Rule 45 explains, that Rule gives attorneys
5  the awesome power of an officer of the court, "entitled to use the court's contempt power to
6  investigate facts in dispute."  That grant of power is "necessarily accompany[ed]" by "increased
7  responsibility and liability for the misuse of this power."

8      If AT&T avoids reimbursing the costs it has imposed on nonparties, it will have succeeded in
9  abusing the powers of this Court.

10                              ***Conclusion***

11     AT&T's reasons for failing to reimburse the significant expenses it imposed by its subpoena
12  are without merit.  The Court should order it to pay those expenses, and the attorney fees incurred in
13  forcing it to do so, including fees for the preparation of this reply brief.  Second Koltun Declaration, ¶
14  3-4; [Updated Proposed] Order.

15

16  December 2, 2024                    _____/s/_____
17                                      Joshua Koltun
                                        Attorney for Nonparty BTB/MTS
18

19

20

21

22

23

24

25

26

27

28