MATTHEW MACLEAR (State Bar No. 209228)
Email: mcm@atalawgroup.com
JASON FLANDERS (State Bar No. 238007)
Email: jrf@atalawgroup.com
ERICA A. MAHARG (State Bar No. 279396)
Email: eam@atalawgroup.com
J. THOMAS BRETT (State Bar No. 315820)
Email: jtb@atalawgroup.com
AQUA TERRA AERIS LAW GROUP
4030 Martin Luther King Jr Way
Oakland, CA 94609
Tel: (415) 568-5200

[Additional counsel on p. 2]

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE,<br><br>            Plaintiff,<br><br>    v.<br><br>PACIFIC BELL TELEPHONE COMPANY<br><br>            Defendant. | Case No.: 2:21-cv-00073-JDP<br><br>**SUPPLEMENTAL DECLARATION OF J. KIRK BOYD IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS UNDER THE RESOURCE CONSERVATION AND RECOVERY ACT (42 U.S.C. § 6972(e)) AND CODE OF CIVIL PROCEDURE SECTION 1021.5** |

ANDREW L. PACKARD (State Bar No. 168690)
Email: andrew@packardlawoffices.com
LAW OFFICES OF ANDREW L. PACKARD
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel: (707) 782-4060
Fax: (707) 782-4062

WILLIAM VERICK (State Bar No. 140972)
Email: wverick@igc.org
KLAMATH ENVIRONMENTAL LAW CENTER
1125 16th Street, Suite 204
Arcata, CA 95521
Tel: (707) 630-5061; Fax: (707) 630-5064

J. KIRK BOYD (State Bar No. 122759)
Email: jkb@drjkb.com
LAW OFFICE OF JOHN KIRK BOYD
548 Market St., Suite 1300
San Francisco, CA 94104-5401
Tel: (415) 440-2500

BRIAN ACREE (State Bar No. 202505)
Email: brian@brianacree.com
LAW OFFICES OF BRIAN ACREE
331 J Street, Suite 200
Sacramento, CA 95814
Tel: (916) 505-6861

WILLIAM CARLON (State Bar No. 305739)
Email: william@carlonlaw.com
LAW OFFICE OF WILLIAM CARLON
437 Post Street
Napa, CA 94559

Tel: (530) 514-4115

I, J. Kirk Boyd, declare:

1.      The facts set forth in this Supplemental Declaration are based on my personal knowledge; if called to testify as a witness, I could and would competently testify thereto under oath. As to those matters that reflect a personal opinion, they reflect my personal opinion and judgment upon the matter.

2.      I am more than eighteen years old and am competent to testify as to the matters set forth herein.

3.      I am an attorney licensed to practice law in the State of California. I am also an attorney of record representing the California Sportfishing Protection Alliance ("CSPA" or "Plaintiff"), the Plaintiff in this action.

4.      I make this Supplemental Declaration in support of Plaintiffs' Motion for Attorneys' Fees and Costs based upon my personal knowledge, unless otherwise stated.

**I.      Correction of Factual Misstatements in Defendant's Memorandum and Declaration in Opposition to Plaintiff's Motion for Attorney's Fees.**

5.      I have been involved in the litigation of this case for over four years and continue to be involved in the case. On November 21, 2024, and in days after, I reviewed Defendant Pacific Bell Telephone Company's ("Defendant") Memorandum in Opposition to Plaintiff's Motion for Attorney's Fees and Defendant's Declaration in support of its Opposition. They contain numerous factual misstatements.

6.      To provide the Court with a correct factual picture, I will address these misstatements and present what occurred as I recall it.

**A.  Protracted Discovery**

7.      I participated in the discovery process for this case. I edited and drafted requests for admission, requests for production, and interrogatories, reviewed Defendant's responses thereto, and drafted meet-and-confer letters. I also evaluated and drafted a motion to compel and participated in several meet-and-confer conferences when the Defendant refused to produce any documents related to lead discharges in Lake Tahoe.

8.      Jon David Kelly states in his Declaration in Support of Defendant's Opposition to Plaintiff's Motion for Fees that "the parties have only engaged in modest discovery." ECF No. 171-2 at 2. This is incorrect. The parties engaged in extensive discovery. Defendant repeatedly refused to respond to Plaintiff's discovery requests, resulting in repetitive efforts by Plaintiff to obtain documents and admissions. For a detailed recitation of discovery and related disputes, please see the Declaration of Erica A. Maharg.

9.      Two examples reflect what transpired. Throughout the case, Defendant kept stating to the Court and the public that it had its own internal documentation showing that lead was not discharging from its cables ("the Cables") into Lake Tahoe. Defendant produced and publicized these documents from its experts readily, even outside the expert discovery process.

10.      Plaintiff served extensive, detailed production of document requests asking for other internal documents that Defendant had which discussed whether the lead from the Cables was discharging into Lake Tahoe and other lakes with the same type of cables, whether the lead might cause harm, or even expose the Defendant to potential liability. Defendant did not produce a single document containing internal discussions of the lead cables it has abandoned in Lake Tahoe and elsewhere.

11.      Plaintiff sought board minutes and other documentation that might reflect discussions of lead-containing cables and related issues, and Defendant refused to produce any of them. Plaintiff sought any memos prepared for the board or corporate officers on discharge and harm issues. Again, nothing was forthcoming from Defendant. Plaintiff sought internal documents of any kind discussing the Cables among corporate officers or risk managers. Nothing was produced. These were likely topics for a motion to compel, which was only averted by Defendant's offer to remove the Cables.

12.      The likelihood of lead discharge and potential harm from Defendant's Cables has been an issue for many years. It is unlikely that there are no internal documents within the scope of Plaintiff's Request for Production of Documents, particularly when there are existing documents outside of Defendant's internal documents that include statements from Defendant's employees

discussing lead cable issues. This is why repeated, time-consuming efforts were made to obtain documents.

13.     While Defendant did not produce key internal documents, it did produce multiple waves of documents that were not pertinent, dated by decades, and were scarcely connected to Plaintiff's document requests. It was quite time consuming to review these productions and try to figure out how they were related to the document requests.

14.     Mr. Kelly also states in his declaration that only one deposition was noticed in the case. ECF No. 171-2 at 2. This is in part because Defendant did not produce the documents needed to take depositions.

15.     The same occurred with Plaintiff's written interrogatories. Plaintiff asked for the identification of Defendant's board and other meetings where there was discussion of the discharge of lead from the Cables, and/or harm that could occur from that discharge. Defendant did not identify any board or other meetings. Nor did Defendant identify any board members or officers who had engaged in such discussions. This made it difficult to initiate depositions without Defendant's objection that there was nothing linking a prospective deponent to cable discussions.

16.     Defendant's responses to Requests for Admissions are another example of how protracted discovery led to no response.

17.     Under the Proposition 65 cause of action in this case, once Plaintiff proved that some of the 100,000+ pounds of lead in the Cables (which had been dragging over rocky bottoms during storms for decades and often had visible spots that had worn down to the lead in the Cables) was discharging into Lake Tahoe, then the burden of proof would shift to the Defendant.

18.     Plaintiff asked Defendant to admit or deny that discharge was occurring. Plaintiff asked whether discharge was occurring generally, and within specific time periods such as the past one, three, and five years. Plaintiff also requested that Defendant admit that discharge was continuing.

19.     Defendant repeatedly provided non-responsive answers rather than admitting or denying what science proved was happening, that a discharge was occurring and continued to occur.

20.   Because of Defendant's refusal to admit or deny discharge, Plaintiff was required to expend considerable time, effort, and funds to prove that the cables had discharged lead for many years and were continuing to discharge lead.

21.   Both the Defendant's Opposition and Declaration in support of their Opposition fail to discuss or recognize the extensive work that Plaintiff had to do to prove the science in the case.

**B.  Work Between April 2023 and August 2023**

22.   Defendant claims in its Opposition that "[t]here was no active litigation between the entry of the First Consent Decree on November 5, 2021, and vacatur of that decree nearly two years later on August 1, 2023." ECF No. 171 at 13. This claim is inaccurate. From April 2023 through August 2023, there was considerable litigation in this case. During this time, after all the authorizations needed for removal had been obtained by Defendant, this Court held Status Conferences for which briefs were submitted by the parties, in addition to appearances. These Status Conferences focused on when the removal process would commence.

23.   In April, 2023, it was apparent to the Defendant that all permits were near completion, and the last remaining permit from the U.S. Forest Service could be expected soon. Defendant's "receipt of all authorizations" occurred on April 28, 2023.

24.   Before April 28, 2023, I had done research into the time it would take to remove the Cables once removal operations commenced. Based upon estimates from barge operators, it would take 10 to 14 days. (Ultimately, once removal of the Cables commenced in November 2024, they were fully removed within 14 days.) Therefore, there was time to remove the Cables before the "recreation season," starting Memorial Day 2023, and after it ended on Labor Day 2023.

25.   As part of preparation for Status Conferences, I encouraged Defendant to act quickly to remove the Cables in May. Defendant did not make arrangements to remove the Cables in May, and then asserted that it could not remove the Cables by Memorial Day, and, therefore, it would not commence removal until October 2023.

26.   There was a disagreement between the parties regarding whether the permits created an absolute ban on removal between Memorial Day and Labor Day. Defendant claimed that there

1   was an absolute ban. On May 22, 2023, Plaintiff asked the Court for 10 days to contact agencies

2   and see if there was an absolute ban. ECF No. 30.

3       27.     The Court granted Plaintiff's request and ordered the parties to submit follow up

4   Status Conference briefs by June 2, 2023, on the issue of whether the agency permits created an

5   absolute ban for removal between Memorial Day and Labor Day. ECF No. 31.

6       28.     During the 10-day period provided by the Court, I contacted the agencies which had

7   given the permit authorizations and provided the Court with a Status Conference update on June 2,

8   2023. ECF No. 32. As part of that filing, I included emails from the Tahoe Regional Planning

9   Agency and the California Department of Parks and Recreation which reflected that there was no

10  absolute ban on removal.

11      29.     Despite the emails from Tahoe Regional Planning Agency and the California

12  Department of Parks and Recreation, in its June 2, 2023, Status Conference update, Defendant

13  continued to assert there was an absolute prohibition on removal between Memorial Day and Labor

14  Day. ECF No. 33.

15      30.     This Court then ordered a further Status Conference on June 22, 2023, with Status

16  Conference briefs to be filed by June 15, 2023. ECF No. 34.

17      31.     In their June 15 Status Conference briefs, Plaintiff and Defendant continued to

18  disagree regarding whether there was an absolute ban on removal over the summer. ECF Nos. 35-

19  36. I submitted an email from the California Department of Fish and Wildlife stating that there was

20  no absolute ban on removal of the Cables between Memorial Day and Labor Day. ECF No. 37.

21      32.     On June 22, 2023, this Court held a Status Conference hearing in this case. I spoke

22  with the Court on behalf of the Plaintiff. At that time there was lengthy discussion about whether

23  operations to remove Cables from Lake Tahoe could take place within 90 days after the final

24  permit was issued, as was required by the First Consent Decree (with a deadline of July 27, 2023),

25  or if the removal should be delayed until September 6, 2023. Defendant made the argument that for

26  boating safety, removal operations should not begin in the months of July and August, but that

27  Defendant would commence removal on September 6, 2023, as long as the California Department

28  of Parks and Recreation had issued a permit allowing it to commence by that date. As part of this

conversation, the Court questioned whether mobilization could begin prior to the commencement date so that the date would not slip. Counsel for Defendant said that logistical preparation would be made ahead of time so that the September 6, 2023, commencement date would be met. While Plaintiff felt that the boating safety concerns could be addressed, based on representations to the Court from Defendant that the removal work would begin on September 6, 2023, and that it would take approximately three weeks to remove the Cables, Plaintiff agreed to the September 6, 2023, date for the commencement of removal.

33.     The Court ordered on June 22, 2023,  that a further Status Conference be held on July 17, 2023, with supplemental Status Conference briefs filed by July 12, 2023. ECF No. 38.

34.     In its July 12, 2023, Status Conference brief, Plaintiff explained to the Court that there had been further follow up communication with Defendant since the June 22, 2023, Status Conference hearing, and again the June 22, 2023, agreement in court was confirmed: the Cables would be removed on September 6, 2023. ECF No. 40.

35.     Despite the extensive litigation throughout May to July 2023, including hearings and the filing of briefs leading to an eventual agreement, with representations by the Defendant on the record on June 22, 2023, that there was a date certain for removal to commence, Defendant now claims that this was a "dormant period" where no fees are justified.

36.     The record shows that in the months prior to the termination of the First Consent Decree, extensive litigation was done to ensure that a fixed removal date was established, including a promise by Defendant that it would abide by that date. An agreement, not an impasse, was reached.

37.     Although the parties had agreed to a removal date, when the Wall Street Journal published an article on July 9, 2023, about Defendant's abandoned lead cables, the Defendant claimed there was some type of disagreement remaining – an impasse on the removal date – so it would terminate the First Consent Decree.

38.     Defendant's claimed disagreement triggering termination was tenuous, but Plaintiff was faced with seeking to enforce the First Consent Decree, with many more months of litigation,

1  or accepting termination and winning on science that would be hard fought. Plaintiff accepted

2  termination and said to the Court that it would "let science be the guide" for outcome.

3       **C.  Expert Work to Prove Science**

4       39.   Defendant claims in its Opposition that Plaintiff "engaged in minimal expert work"

5  to support its urging this Court to drastically reduce Plaintiff's fees. ECF No. 171 at 15. This claim

6  is inaccurate. Just the opposite occurred. It took extensive expert work, both to develop the

7  protocols for collecting test samples and to do the diving to implement the protocols so that science

8  could indeed guide this Court. Defendant's claim that "little has changed since the entry of that

9  decree" (the First Consent Decree) is simply untrue. ECF No. 171 at 7.

10      40.   To prove the science, test results were needed showing that lead levels in the

11  sediment, water, algae, and fish near the Cables were higher near the Cables than away from them.

12  This would prove the discharge and show that lead was discharging from the Cables into the water,

13  algae, and sediment.

14      41.   It took time and experts to gather up sufficient evidence of showing that, in addition

15  to the fraying of the Cables through wind and tidal surges, lead was inevitably making its way

16  through the stainless-steel strands around it and into the bitumen (tar) outer layer, which would

17  then dissolve, along with the lead, into the water and sediment of Lake Tahoe.

18      42.   Counsel Matt Maclear and the firm Aqua Terra Aeris had extensive experience with

19  testing and entered the case. I had been meeting with local divers and I observed Mr. Maclear

20  arrange for highly skilled divers to collect the needed scientific evidence. Whereas the Defendant

21  based its science claims mostly on water samples from a sampler it dropped from a boat

22  supposedly within 6 inches of the Cables, Plaintiff took many sediment and algae samples at and

23  away from the cables and water samples at the Cables using a syringe. These showed convincingly

24  that there was more lead in the algae, water, and sediment adjacent to the Cables than away from

25  them, thereby proving what the laws of physics stated: there was lead discharge from the Cables

26  into the water of Lake Tahoe.

27

28

43.     Plaintiff's thorough test results also proved that lead was discharging into the bitumen outer layer of the Cables and gathering in organic matter (algae or biofilm) that was accumulating on the outer layer of the Cables.

44.     Mr. Kelly emphasizes in his Declaration that no summary judgment motion was filed in this case and claims that time entries related to a motion for summary judgment should be discarded. ECF No. 171-2 at 2. The test results described above took considerable orchestration by Mr. Maclear and hard work by the divers, along with an expert's oversight. This was done in the spring of 2024. I was drafting a Motion for Summary Judgment based on these test results, and the applicable laws, at the time that settlement negotiations commenced on the Second Consent Decree in June 2024. Once these negotiations were underway, I ceased my work on the motion.

45.     Similarly, Mr. Kelly asserts in his Declaration that no motion to compel a privilege log was filed, so this time too should be disregarded. ECF No. 171-2 at 2. As discussed above, Defendant refused to produce any documents reflecting internal discussions about the discharge of lead from the Cables or the harm that discharge might cause. As Plaintiff's pressure increased for the documents, which I participated in, Defendant started providing privilege logs that were inadequate based upon Ninth Circuit and Eastern District standards. It was apparent that the Court would be needed to resolve this dispute, and I began preparing written legal arguments, with authorities, for discussion with my co-counsel prior to the commencement of negotiations on the Second Consent Decree. As with the summary judgment, once negotiations on the Second Consent Decree were well underway, I ceased preparation of a litigation strategy, including detailed privilege logs and, perhaps, some limited *in camera* review. No internal documents among board members or officers within Defendant which discuss discharge, or the potential harm that discharge could cause, have ever been produced.

46.     Mr. Kelly also asserts in his Declaration that any fee entries for a litigation fund with the Rose Foundation should be denied. I live near Tahoe City and for much of these four years of litigation I have had a physical law office in downtown Tahoe City. Repeatedly, in Tahoe City, at gatherings on West Shore of Lake Tahoe, and at events on East Shore, I personally had people tell me they had been told that the Cables were not discharging lead and that they were causing no

harm, as if they were an inert mass sitting on the bottom and not getting any worse. My response was that Einstein might have a different view, that the laws of physics made it likely that there was some lead discharge and that this is why we have independent courts to "let science be the guide." I did not seek recovery for these conversations. Still, it was clear in the case that considerable assessment by experts would be needed, along with extensive testing, including sediment testing. Defendant had considerable funds for experts and testing. The fund created with the Rose Foundation was for the retention of experts and testing. The hours to create the fund are few, and while warranted based on the facts of this case and the public benefit arising from the removal of the lead cables from Lake Tahoe, those hours, as a matter of billing judgment, were cut from the lodestar sought here.

47.    I have carefully reviewed my time records, and prior to the opening Motion for Fees, I have reduced my lodestar by 19%.

48.    Since the Notice of Motion and Motion for Fees and Costs was filed, I have expended 12.6 hours. My time has been spent preparing this declaration, corresponding with co-counsel on counterarguments to Defendant's Opposition, and reviewing the reply. In an exercise of billing judgment, my hours sought during this time have been reduced by 7.3 hours, which equals 58%.


I declare, under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on December 6, 2024, at North Lake Tahoe, California.

_____/S/ J. Kirk Boyd_____
J. Kirk Boyd