1  MATTHEW MACLEAR (State Bar No. 209228)
   Email: mcm@atalawgroup.com
2  JASON FLANDERS (State Bar No. 238007)
   Email: jrf@atalawgroup.com
3  ERICA A. MAHARG (State Bar No. 279396)
   Email: eam@atalawgroup.com
4  J. THOMAS BRETT (State Bar No. 315820)
   Email: jtb@atalawgroup.com
5  AQUA TERRA AERIS LAW GROUP
6  4030 Martin Luther King Jr Way
   Oakland, CA 94609
7  Tel: (415) 568-5200

8

9  [Additional counsel on p. 2]

10 Attorneys for Plaintiff
   CALIFORNIA SPORTFISHING
11 PROTECTION ALLIANCE

12              **UNITED STATES DISTRICT COURT**

13            **EASTERN DISTRICT OF CALIFORNIA**

14

15 | CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, | **Case No.: 2:21-cv-00073-JDP** |
   
   **SUPPLEMENTAL DECLARATION OF WILLIAM VERICK IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES UNDER THE RESOURCE CONSERVATION AND RECOVERY ACT (42 U.S.C. § 6972(e)) AND CODE OF CIVIL PROCEDURE SECTION 1021.5**

16

17                     Plaintiff,

18              v.

19 PACIFIC BELL TELEPHONE CO.,

20                     Defendant.

21

22

23

24

25

26

27

28

SUPPLEMENTAL DECLARATION OF W. VERICK IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS

1   ANDREW L. PACKARD (State Bar No. 168690)
    Email: andrew@packardlawoffices.com
2   LAW OFFICES OF ANDREW L. PACKARD
3   245 Kentucky Street, Suite B3
    Petaluma, CA 94952
4   Tel: (707) 782-4060
    Fax: (707) 782-4062
5
    WILLIAM VERICK (State Bar No. 140972)
6   Email: wverick@igc.org
7   KLAMATH ENVIRONMENTAL LAW CENTER
    1125 16th Street, Suite 204
8   Arcata, CA 95521
    Tel: (707) 630-5061; Fax: (707) 630-5064
9
    J. KIRK BOYD (State Bar No. 122759)
10  Email: jkb@drjkb.com
    LAW OFFICE OF JOHN KIRK BOYD
11  548 Market St., Suite 1300
12  San Francisco, CA 94104-5401
    Tel: (415) 440-2500
13
    BRIAN ACREE (State Bar No. 202505)
14  Email: brian@brianacree.com
    LAW OFFICES OF BRIAN ACREE
15  331 J Street, Suite 200
    Sacramento, CA 95814
16  Tel: (916) 505-6861

17  WILLIAM CARLON (State Bar No. 305739)
    Email: william@carlonlaw.com
18  LAW OFFICE OF WILLIAM CARLON
19  437 Post Street
    Napa, CA 94559
20  Tel: (530) 514-4115

21

22

23

24

25

26

27

28

---

SUPPLEMENTAL DECLARATION OF W. VERICK IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS'
FEES AND COSTS                                                                                    2

Pursuant to 28 U.S.C. § 1746, I, William Verick, declare as follows:

1.      The facts set forth in this declaration are based on my personal knowledge; if called to testify as a witness, I could and would competently testify thereto under oath. As to those matters that reflect a personal opinion, they reflect my personal opinion and judgment upon the matter.

2.      I am more than eighteen years old and am competent to testify as to the matters set forth herein.

3.      I am an attorney licensed to practice law in the State of California. I am also an attorney of record representing the California Sportfishing Protection Alliance ("CSPA" or "Plaintiff"), the plaintiff in this action.

4.      I make this Supplemental Declaration in support of Plaintiffs' Motion for Attorneys' Fees and Costs, filed herewith, based upon my personal knowledge, unless otherwise stated, and as already noted, I am competent to testify to the matters set forth herein.

5.      I make this declaration to clarify the reasons I performed legal work on this case during the time between this Court's November 5, 2021, entry of the first Amended Consent Decree (ECF No. 17) and the Court's August 1, 2023, vacatur of that agreement – at Defendant Pacific Bell Telephone Company's ("Pacific Bell" or "Defendant") request – whereupon litigation resumed in earnest. I also make this declaration to explain what Plaintiff's counsel did in bringing and litigating this case that I believe merits a multiplier to the Plaintiff's counsels' loadstar fee amount.

**I.      Dormancy of Litigation -- November 5, 2021, to August 1, 2023.**

6.      On November 5, 2021, the court approved and entered an Amended Consent Decree ("First Consent Decree"). This Consent Decree resolved the disputes amongst the parties and required removal of the abandoned telecommunications cables at issue in this lawsuit ("the Cables") and included provisions for payment of Plaintiff's attorneys' fees contingent upon removal of the Cables.  As a result, Plaintiff terminated all legal work related to prosecuting the matter. It was, however, still important to Plaintiff and the public that Defendant remove the Cables. The November 5, 2021, First Consent Decree required Defendant remove the cables only if the cost of doing so would be less than $1,500,000.00. Because the attorneys' fees amount had already been

set, there was no financial incentive for Plaintiff's counsel to continue work on the case. Our client, however, maintained an interest in ensuring that the terms of the First Consent Decree be carried out. Principally, this meant that the Cables had to be removed. So CSPA's attorneys continued work to the extent work was necessary to understand and evaluate the reasonableness of Defendant Pacific Bell's efforts to obtain the permits it needed to remove the Cables, and to be prepared to act if Pacific Bell unreasonably delayed the Cable removal process. Accordingly, the time I spent on the case during this period was focused on monitoring Pacific Bell's efforts to obtain the permits needed, to advise our client on the Cable removal process, and to be prepared to intervene in that process if needed.

7.      For reasons I never did understand, Defendant refused to include Plaintiff as an interested party in the permitting process, which would have automatically included Plaintiff's counsel as a recipient of the documents that were being exchanged between Pacific Bell and the local, regional, state, and federal agencies whose consent was needed if the required permits were to be obtained via a California Environmental Quality Act ("CEQA") notice of exemption. Because Plaintiff did not automatically receive these documents, we had to take the time to ask Pacific Bell to provide us with them. Sometimes this was an easy process; sometimes we had to meet and confer informally with Pacific Bell in order to receive the latest round of communications between Pacific Bell and the relevant agencies.

8.      Once we received the documents, I had to read them and sometimes research the issues that arose. An example would be the surveys that were required for the Tahoe Yellow Cress – an endangered species that grows around the shores of Lake Tahoe. Not only did I read the correspondence between Pacific Bell and the agencies, as well as amendments to the proposed project description, but I also researched the kinds of surveys that would probably have to be conducted and the time periods during which such surveys could be performed. This research was essential for me to be able to effectively evaluate how this requirement would affect the timing of the removal process for the Cables.

9.      It was my view that it would be malpractice on my part if I did not read, keep track of, and understand the removal processes as they evolved. I also spent a limited amount of time keeping my co-counsel informed about what I was finding and the implications for the timing during which the Cables might be removed, as well as whether anything in the permitting process would drive up the cost of Cable removal so high that Pacific Bell would be allowed under the terms of the First Consent Decree to decline to remove the Cables.

10.      Sometime in the late spring of 2023, after Pacific Bell had obtained virtually all the permits required for cable removal, Defense counsel informed us that the cables could not be removed during the Memorial Day to Labor Day recreational season. This motivated me to go back and re-read some of the correspondence between Pacific Bell and the relevant agencies. My review of this correspondence led me to understand that the project description itself precluded removing the cables during the Memorial Day to Labor Day season, which convinced me that it was reasonable for Pacific Bell to wait until after Labor Day to remove the Cables.

11.      I discussed this with my co-counsel to gain an agreement on how to advise our client about the reasonableness of delaying removal of the Cables until after Labor Day. The result was that CSPA reluctantly agreed that it was reasonable for Pacific Bell to remove the Cables after Labor Day.

12.      On June 22, 2023, during a hearing before the court, the parties agreed to a removal commencement date of September 6, 2023. After this, beginning on July 9, 2023, the Wall Street Journal ran a series of articles regarding the impact of lead bearing telecommunications cables in the environment nationwide. It appeared to me that Defendant's parent company, AT&T, was embarrassed and infuriated by the Wall Street Journal articles. Defendant tried to create a loophole in the First Consent decree by saying that the parties were at an impasse as to a removal date when the parties had agreed to one (September 6, 2023) on June 22, 2023. Pacific Bell asserted that it wanted to litigate and win this case to prove that the Cables posed no threat of harm to people or the environment. Pacific Bell accordingly requested, and this Court granted, Defendant's request to vacate the First Consent Decree.

SUPPLEMENTAL DECLARATION OF W. VERICK IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS'
FEES AND COSTS                                                                                                    5

13.     It was of considerable disadvantage to Plaintiff that during the dormant period, we had not continued to work on proving CSPA's affirmative case and/or refuting Pacific Bell's affirmative defenses.

**II.     Why a Multiplier is Appropriate**

14.     When Pacific Bell abruptly sought to vacate the First Consent Decree, CSPA had to begin sprinting from a standstill in order to build its affirmative case. This entailed a flurry of work to locate experts to formulate a sampling plan by which CSPA could obtain admissible, credible evidence that the Cables were discharging significant amounts of lead into Lake Tahoe. This was made especially difficult because Marine Taxonomic Services ("MTS"), the organization CSPA had planned to use to obtain water and sediment samples from the Cables and their vicinity, was suddenly faced with third-party discovery demands from Pacific Bell, which intimidated MTS and led it to refuse to provide any diving services to CSPA for this case. Similarly, another local diving organization that had originally indicated a willingness to provide diving services was later told by its board that it would not be allowed to do so. CSPA finally engaged an organization to provide diving services, but this process was made longer and much more difficult because the third-party discovery Pacific Bell sought against MTS demonstrated how aggressively this corporate behemoth was willing to go to force those who might work for CSPA to hire lawyers to defend against Pacific Bell's discovery efforts.

15.     The intimidation local divers faced for associating with CSPA increased the level of difficulty CSPA had to overcome to find willing commercial divers and experts to litigate this case and provides, by itself, one justification to apply a multiplier to CSPA's attorneys fee loadstar.

16.     The novelty of litigating the discharge prohibition prong of Proposition 65 (Cal. Health & Saf. Code § 25249.5) as applied to abandoned underwater telecommunications cables provides another justification to apply a multiplier to CSPA's attorneys fee loadstar.

17.     For at least the past twenty years, I have been a member of the advisory board of Prop 65 Clearing House, a San Francisco-based publication that tracks and reports on Proposition 65, its implementing regulations, as well as all news pertaining to actions brought to enforce the

Proposition 65 and the legal outcomes of those actions. Enforcement of Proposition 65 has been the primary focus of my legal practice since 1994. As such, I am familiar with both the law and its regulations and actions brought to enforce both prongs of Proposition 65 – the right to know provisions and the discharge prohibition provisions.

18.     The discharge prohibition prong of Proposition 65,Cal. Health & Safety Code section 25249.5, is a seldom used enforcement tool, so there is little case law that interprets the provisions of this part of Proposition 65.  In my experience, there are only a handful of Proposition 65 discharge cases filed every year compared to 1,000+ warning cases filed under Proposition 65's right to know provisions every year. Discharge cases that do exist tend to focus on a concentration of a pollutant (such as lead) in a medium (such as water, oil or milk), which then flows into a source of drinking water.  Health & Safety Code section 25249.9(b)(1) provides a *de minimus* affirmative defense if the defendant can prove that less than a "significant amount" of a listed chemical will enter a source of drinking water. Health & Safety Code section 25249.11(c) further defines "significant amount" as an amount that, pursuant to Health & Safety Code section 25249.10, is exempt from the Proposition 65 warning provisions. This amount is keyed to "the level in question" which is defined under 27 Cal. Code of Regs. § 25721(a) and (b) as a concentration of a listed chemical in a "medium of exposure" which, in the case of the Proposition 65 discharge prohibition prong, would then flow into a source of drinking water.

19.     In a sense, Proposition 65 treats the source of drinking water (in this case, Lake Tahoe) as if it were a "person exposed." The discharge is prohibited if the "medium of exposure" (i.e., the effluent) in which the listed chemical is (or becomes) entrained is of a concentration that would require a Proposition 65 warning if the effluent – ***before it entered Lake Tahoe*** – were drinking water that a person would drink.  Health & Safety Code sections 25249.9 (b)(1), 25249.11(c) and 25249.10(c). The case at hand concerns a discharge paradigm different in kind from a concentration of a listed chemical in a "medium of exposure" that then enters a source of drinking water. The Cables, which are the "container" of the lead here, and from which lead discharges, are completely solid. The lead discharges by leaving its solid form, dissolving directly

1    into the water column of Lake Tahoe, which itself is a source of drinking water. The lead never

2    exists as a concentration in a separate medium such as water, oil or milk.

3        20.      The path CSPA took in its Proposition 65 claim for relief was completely untrodden.

4    It required a scientific approach different in kind from what Proposition 65 enforcers have generally

5    employed. To this end, CSPA engaged an expert metallurgist/materials scientist who could explain

6    galvanic activity that accelerates the tendency of lead to dissolve in water when that lead is in close

7    proximity to both water and the strands of copper wire that were contained inside the lead conduit

8    in the Cables. Collecting samples of water coming off the Cables underwater while the sample itself

9    was being taken underwater in the Lake Tahoe water column, all while following strict sample

10    collection protocols to avoid cross contamination and sample integrity, was of a degree of difficulty

11    different in kind from the more typical method of holding a sample jar into flowing or cascading

12    water or collecting drips of oil from a drum or tank.

13        21.      All of this was in addition to the added difficulty of developing a sampling plan for

14    discharges from a miles-long object at the bottom of a large, cold lake, a process once again

15    different in kind from walking around a location and looking for discharge locations. For example,

16    inspection of the Cables using a remote operated vehicle ("ROV"), and the taking of water,

17    sediment and biological samples had to be done by divers, who had to spend time decompressing

18    after diving to observe and sample the Cables or to collect samples of lead discharged from the

19    Cables.

20        22.      CSPA also developed an alternative way to show that the discharge of lead from the

21    Cables would not be exempt from Proposition 65 pursuant to Health & Safety Code section

22    25249.10.  It was obvious to us that Pacific Bell would argue that the lead dissolved into the totality

23    of Lake Tahoe would be so diluted that simply drinking the water of Lake Tahoe would result in a

24    concentration in the larger water column of Lake Tahoe would be lower than the liability threshold

25    under the Act.  This required that CSPA find ways in which lead from the Cables was at a

26    concentration in a medium that would give rise to Proposition 65 liability if that medium were to

27    leave the Cables and enter into a source of drinking water such as Lake Tahoe.  CSPA consulted

28

SUPPLEMENTAL DECLARATION OF W. VERICK IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS'
FEES AND COSTS                                                             8

research on how plants and organic matter bind to lead and can concentrate it.  Lead has an affinity to bind to organic molecules (which is why activated charcoal can effectively filter lead out of water or other media).  CSPA's divers noticed that there was a biofilm made up of bacteria and algae (which are themselves composed of organic molecules) that coated long stretches of the Cables, so CSPA had its divers take samples of the biofilm to determine whether it had concentrated lead leaving the Cables.  Some of the samples of the biofilm showed concentrations of lead as great as tens of millions of parts per billion, which equates to lead being expressed as a percentage of the algae itself.  This biofilm was a medium that contained lead from the Cables concentrated to extremely high levels, and the biofilm would decay, slough off the cables, and thus enter the Lake.

23.	This approach – sampling and analyzing biofilm – is something that Pacific Bell never considered when it conducted its own sampling and analysis of lead discharged from the Cables.  The novelty of the application of Proposition 65 to submarine telecommunications cables and the resourcefulness of CSPA's approach is yet another basis for the court to apply a multiplier to CSPA's attorneys fee loadstar.

24.	Since the Notice of Motion and Motion for Fees and Costs was filed, I have spent 7.6 hours on this matter since Defendant served its Opposition. My time has been spent preparing this declaration, corresponding with co-counsel on counterarguments to Defendant's opposition, and reviewing the reply brief. In an exercise of billing judgment, my hours sought during this time have been reduced by 2.1 hours, which equals 31%.


I swear under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on December 6, 2024, at Arcata, California.


/S/ William Verick
William Verick

SUPPLEMENTAL DECLARATION OF W. VERICK IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS									9