NAVI SINGH DHILLON (SBN 279537)
navidhillon@paulhastings.com
PETER C. MEIER (SBN 179019)
petermeier@paulhastings.com
LUCAS V. GRUNBAUM (SBN 314180)
lucasgrunbaum@paulhastings.com
PAUL HASTINGS LLP
101 California Street, 48th Floor
San Francisco, California  94111
Telephone:  (415) 856-7000
Fax: (415) 856-7100

HARIKLIA KARIS (*admitted pro hac vice*)
hkaris@kirkland.com
ROBERT B. ELLIS (*admitted pro hac vice*)
rellis@kirkland.com
MARK J. NOMELLINI (*admitted pro hac vice*)
mnomellini@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone:  (312) 862-2000
Fax: (312) 862-2200

JON DAVID KELLEY (*admitted pro hac vice*)
jon.kelley@kirkland.com
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, TX 75205

Attorneys for Defendant
PACIFIC BELL TELEPHONE COMPANY

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE,<br><br>Plaintiff,<br><br>vs.<br><br>PACIFIC BELL TELEPHONE COMPANY,<br><br>Defendant. | CASE NO. 2:21-cv-00073-DAD-JDP<br><br>**DEFENDANT PACIFIC BELL TELEPHONE COMPANY'S OPPOSITION TO BTB/MTS'S REQUEST FOR RECONSIDERATION BY THE DISTRICT COURT OF MAGISTRATE JUDGE'S RULING DATED SEPTEMBER 30, 2025**<br><br>Judge: Hon. Dale A. Drozd<br>Magistrate: Hon. Jeremy D. Peterson |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ......................................................................................... 1

II.    FACTUAL BACKGROUND ....................................................................... 1

III.    LEGAL STANDARD .................................................................................. 6

IV.    ARGUMENT ............................................................................................... 7

    A.    BTB/MTS Has No Right To Reconsideration. ........................................... 7

    B.    BTB/MTS Is An Interested Party.................................................................. 9

    C.    BTB/MTS's First Amendment Arguments Fail........................................... 14

    D.    BTB/MTS Has Not Incurred Any "Significant" Expenses................................. 14

    E.    BTB/MTS's Request for Sanctions is Meritless and Fails for Reasons the Record Itself Makes Clear.......................................................................... 18

V.    CONCLUSION ........................................................................................... 19

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3
**Cases**

4
*Balfour Beatty Infrastructure, Inc. v. PB & A, Inc.*,
5
    319 F.R.D. 277 (N.D. Cal. 2017) ................................................................ *passim*

6
*Callwave Communications v. Wavemarket, Inc.*
    2014 WL 291218 (N.D. Cal. June 26, 2024) .......................................................8

7
*Cornell v. Columbus McKinnon Corp.*,
8
    2015 WL 4747260 (N.D. Cal. Aug. 11, 2015) ............................................ *passim*

9
*Ed A. Wilson, Inc. v. GSA*,
    126 F.3d 1406 (Fed. Cir. 1997) .............................................................3, 14
10

*In Re Exxon Valdez*,
11
    142 F.R.D. 380, 383 (D.D.C.1992) ............................................................8, 10

12
*First Am. Corp. v. Price Waterhouse LLP*,
13
    184 F.R.D. 234 (S.D.N.Y. 1998) .....................................................................9

14
*Hyundai Motor Am., Inc. v. Pinnacle Grp., LLC*,
    2016 WL 6208313 (C.D. Cal. Apr. 20, 2016) ..................................................9
15

*Legal Voice v. Stormans Inc.*,
16
    738 F.3d 1178 (9th Cir. 2013) .........................................................................12

17
*Nadarajah v. Holder*,
18
    569 F.3d 906 (9th Cir. 2009) ...........................................................................15

19
*Satchell v. Wallace*,
    439 F. App'x 644 (9th Cir. 2011) ....................................................................15
20

*Shasta Linen Supply, Inc. v. Applied Underwriters Inc.*,
21
    2018 WL 2981827 (E.D. Cal. June 14, 2018) ..................................................9

22
*Summers v. Earth Island Inst.*,
23
    555 U.S. 488 (2009) .......................................................................................12

24
*Tutor-Saliba Corp. v. United States*,
    32 Fed. Cl. 609 (1995) .....................................................................................9
25

*United States v. McGraw-Hill Cos.*,
26
    302 F.R.D. 532 (C.D. Cal. 2014) ...................................................................16

27
*United States v. Rivera-Guerrero*,
    377 F.3d 1064 (9th Cir. 2004) .........................................................................13
28

*Valcor Eng'g Corp. v. Parker Hannifin Corp.*,
  2018 WL 3956732 (C.D. Cal. July 12, 2018) .................................................. *passim*

*Wall Indus., Inc. v. United States*,
  15 Cl. Ct. 796 (1988) ...................................................................................14, 15

**Statutes**

Equal Access to Justice Act ....................................................................................14, 15

**Rules**

Rule 45 ................................................................................................................... *passim*

**Other Authorities**

Black's Law Dictionary 57 (6th ed.1990) ..................................................................12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.    INTRODUCTION

BTB/MTS's motion fails at the outset. The only parties whose consent is relevant or required under 28 U.S.C. § 636(c) and Federal Rule 73—Pacific Bell and the California Sportfishing Protection Alliance—long ago consented to allow Judge Peterson to resolve all matters in this litigation. A non-party witness has no right to district-court review of a magistrate judge's order in a consent case, which even BTB/MTS acknowledged when it moved Pacific Bell's motions to compel to Judge Peterson. Because BTB/MTS is not entitled to review of Judge Peterson's order, its request for reconsideration must be denied outright.[1]

If the Court reaches the merits, it should affirm Judge Peterson's ruling for multiple independently sufficient reasons. First, Judge Peterson correctly concluded that Rule 45 was "not intended as a mechanism for entities" like BTB/MTS "which stand to benefit from certain litigation outcomes to evade discovery costs arising from their involvement in the underlying acts that gave rise to the lawsuit." Order (Dkt. 178) at 20 (quoting *Cornell v. Columbus McKinnon Corp.*, 2015 WL 4747260, *5 (N.D. Cal. Aug. 11, 2015). Instead, Rule 45 aids only disinterested third parties. BTB/MTS is anything but a disinterested subpoena recipient. BTB/MTS's principals discovered the Lake Tahoe cables, recruited plaintiff's counsel to sue, and stated that BTB/MTS "will" obtain "a LOT of work" from cable-removal "across the US" in "the coming years." *Id.* at 22 (citing Dkt. 170-6). Those financial and strategic interests bar cost-shifting under Rule 45. Second, BTB/MTS' First Amendment arguments fail. Finally, BTB/MTS never incurred the fees it seeks in any event— they were paid by Dow Jones.

For each of these reasons, BTB/MTS's motion should be denied.

## II.    FACTUAL BACKGROUND

This case is about legacy lead-clad cable at Lake Tahoe. Seth Jones "first discovered the cable in 2011 . . . Jones and his family had done a lot of work with scrap metal growing up so when Jones saw the cable, he immediately recognized the copper, lead and other components. 'At the time I was like, 'we can just pull this up and scrap it, it's got to be worth a lot.'" Dkt. 170-7.

---

[1]    BTB/MTS could have asked Judge Peterson to reconsider his ruling if it thought it had a good faith basis to do so. BTB/MTS chose not to do so.

In 2018, Jones "performed an assay and determined that the cable was sheathed in lead." Dkt. 161, ¶ 3. From 2018 to 2020, Jones unsuccessfully "attempted to interest government environmental regulators in the lead cables at the bottom of the lake." *Id*.

In 2020, Jones and Monique Rydel-Fortner founded BTB in part to advocate for the removal of the cables. Dkt. 99, at 17. According to its website, BTB is a Tahoe-based "nonprofit dedicated to removing foreign debris from water bodies and educating the public about pollution. BTB collects hands-on data that helps facilitate policy change and enforcement *while working with environmental lawyers*, local agencies and residents." Dkt. 65-4. BTB "work[s] *closely with a team of environmental lawyers*, local agencies and residents to help guide our path." *Id*. (emphasis added). BTB agrees that it is "a nonprofit environmental group that has actively pressed for the removal of Lake Tahoe cables for years and views itself as a 'watchdog.'" Dkt. 99, at 17. BTB states as part of its "purpose" that it is "not afraid to use the strength of the law" in pursuit of these goals. Dkt. 56-4.

Although BTB and MTS are nominally separate entities, Seth Jones is President & CEO of MTS and Monique Rydel-Fortner is a senior scientist and senior project manager at MTS (in addition to both founding BTB). BTB/MTS have proceeded in this litigation as one, along with Jones and Fortner. *See* Dkt. 99, at 1 & n.1 (BTB/MTS explaining that the term "BTB/MTS is used to refer to" Below the Blue, Marine Taxonomic Services, Seth Jones, and Monique Rydel-Fortner); Dkt. 109, at 1 (same). MTS has also stated that BTB is "the nonprofit arm of MTS." *See Pacific Bell v. Marine Taxonomic Services,* No. 23-cv-000022, Dkt. 20, at 1.

In 2020, BTB turned to its "team of environmental lawyers" to file this lawsuit. Dkt. 65-4; *see also* Dkt. 161, ¶ 3. As one of those lawyers admitted, BTB/MTS brought this lawsuit to them "on a platter." Dkt. 65-13, at 7 ("We didn't go to Lake Tahoe and take water samples near the cable. They did. And we didn't take samples of soil near cables. They did."). Plaintiff described BTB, MTS, Jones, and Fortner as "indispensable" to their case, Dkt. 57-1 at Ex. B, and included them in their initial disclosures. After placing the cable in a "kiddie swimming pool" for testing, Plaintiff believed "we had the evidence that we needed to bring the case." Dkt. 65-13, at 7.

BTB did not file the lawsuit itself, however. BTB's principals, Jones and Fortner, are also the principals of MTS, and they hoped MTS would win the contract to remove the Tahoe cables. As this lawsuit was being initiated, Jones told a friend he "hope[d] we can do removal as well but maybe not since we would help the fight if needed and not stay behind the scenes." Dkt. 170-3.

On January 8, 2021, six days before the lawsuit was filed, Lake Tahoe resident Evan Dreyer emailed AT&T employee Torrey Denoo, copying Jones and Fortner and conveying an offer from Jones and Fortner to take Denoo on "a boat patrol to share their insights on where the cable goes and on shore infrastructure." Dkt. 170-10. After the boat ride, Jones reached out to Denoo to ask him to "stay in touch and let us know if you need anything." *Id*.

Plaintiff filed this suit in January 2021 alleging violations of state and federal environmental law. Dkt. 1. Pacific Bell and Plaintiff later entered a consent decree to resolve the litigation, which included provisions for removing the cables at issue. Dkt. 22 (order entering amended consent decree). That consent decree also provided that if certain conditions were met, "this Decree shall be null and void and vacated at the written election of either Party." Dkt. 22 at 6.

Shortly after filing this suit, in July of 2021, Jones reached out to Plaintiff's counsel—Kirk Boyd—and asked for "any updates" on the case, noting that BTB/MTS was "ready to dig in as needed." Dkt. 170-4. Plaintiff's counsel responded, noting that "the [consent decree] will include 1.5 million for removal of the cable." *Id*. Boyd noted that he had "been trying to arrange having this work done by you . . . from the start." *Id*. Boyd suggested Jones may want to start "on the written estimate" and take into consideration that Pacific Bell "will not pay the 1.5 as a lump sum, but that amount will be set aside to get the job done." *Id*. Boyd assured Jones that "considering the earlier estimates that we have talked about, this should be more than enough," and reaffirmed his goal that BTB/MTS would "have the winning estimate." *Id*.

Soon after the initial consent decree was entered, Jones reached out to Denoo to pitch BTB/MTS's services for removal of the cables, explaining they were "very interested in helping with cable removal in Tahoe as well as planning and permitting" and "transport and disposal as well. It's all something we can handle with bringing in a couple of subs." Dkt. 170-11. Jones asked Denoo to "let me know your plans and schedule with this project," and noted that BTB/MTS was

1    "very well connected with the local agencies" and could help "make the process as smooth[] as

2    possible…which in Tahoe can still be rough." *Id*.  On December 15, 2021, Denoo invited Jones and

3    MTS to provide a quote for the removal project.   On January 18, 2022, MTS submitted an

4    unsuccessful bid. *See* Dkt. 170-8.

5            Even then, BTB/MTS still had a financial interest because BTB/MTS hoped the Lake Tahoe

6    litigation would lead to broader opportunities to profit from cable removal.  Jones told a friend that

7    he wanted to use the Lake Tahoe litigation to "*set the path forward and pave the way to push for*

8    *removal across the US* . . . through our non profit – Below the Blue." Dkt. 170-5 (emphasis added).

9    BTB/MTS chose Lake Tahoe as the first place to bring a lawsuit as part of a broader strategy.  *Id*.

10   Removal of the Tahoe cables, according to Jones, would "set a precedent for the removal of more

11   lead sheathed cables," and BTB/MTS was committed "to continue to push this issue forward on a

12   local and national level."  Dkt. 65-11.  Jones further stated that this strategy was part of a "long

13   game" that will "lead to a LOT of work for our industry in years to come. We are front and center

14   so hopefully that will lead to good things after the dust settles."  Dkt. 170-6.

15           To support their cable-removal "long game," after this lawsuit was filed, Jones and Fortner

16   coordinated with the Environmental Defense Fund and the *Wall Street Journal* to conduct lead-

17   cable testing in six regions across the United States.  Jones and Fortner prepared a 66-page Lead

18   Cable Investigation Report documenting their lead-cable testing at numerous sites.  Dkt. 65-8.

19           In July of 2023, the Journal published articles regarding lead-clad cables in Lake Tahoe and

20   elsewhere.  Dkts. 65-9, 65-10.  The articles prominently cite Jones and Fortner's work on lead

21   cables in Lake Tahoe and across the country.  According to the Journal, Jones and Fortner "assisted

22   the Journal in site visits, collecting the samples—sometimes through scuba diving—and tabulating

23   the data." *Id*.

24           After these sensationalist articles ran, Pacific Bell elected to exercise its right to vacate the

25   amended consent decree and reopen the litigation.  Dkt. 49.  Because of their deep involvement in

26   the litigation, Pacific Bell tried to serve identical subpoenas on BTB, MTS, Jones, and Fortner,

27   requesting documents, communications, and information related to their sampling and testing of

28

lead-clad cables.[2]  Jones and Fortner repeatedly avoided service.[3]  On August 9 and 10, 2023, Pacific Bell succeeded in serving BTB and MTS.[4]

BTB/MTS failed to provide any substantive response to the subpoenas.  Even after the deadline passed, Pacific Bell made multiple efforts to confer in good faith with BTB/MTS to avoid motion practice, including a letter sent September 5 and emails sent September 11 and September 14. Dkt. 65-16.

Pacific Bell was forced to file a motion to compel. Dkt. 65.  Judge Peterson granted that motion to compel and ordered BTB/MTS to produce all documents responsive to the subpoena by November 30.  Dkt. 80.  After BTB/MTS sought an extension, the Court gave them more time but ordered BTB/MTS to produce "all documents as to which there is no objection" by December 7. Dkt. 90.  BTB/MTS failed to comply with both orders.  Jones and Fortner also improperly (i) self-selected documents instead of having an attorney conduct the review; (ii) relied in part on search terms they refused to disclose; (iii) claimed they may have lost responsive data from their phones; and (iv) failed to produce various responsive texts and emails by the Court-imposed December 7 deadline.  Dkt. 104-7.  On January 4, 2024, Pacific Bell was again forced to file a motion to compel BTB/MTS's compliance with the Court's orders.  Dkt. 104.

Soon after, the Court granted Pacific Bell's second motion to compel. Dkt. 124.  The Court stated BTB/MTS failed to comply with its orders and failed to ask for an extension:

> [BTB/MTS] is out of compliance with the November 13th and December 7th orders at this time . . . [and] did not seek an extension of time from the Court as would seem to have been appropriate if compliance was not possible. These are court orders. This is not an agreement between the parties.

Dkt. 122 (1/25/2024 Hrg. Tr.) at 16:12-14; 16-19.

---

[2]     Pacific Bell's subpoena to MTS issued from the Southern District of California because MTS is located in that district.  *See Pacific Bell v. Marine Taxonomic Services*, No. 23-cv-000022, Dkt. 5-1.  MTS requested that subpoena "be transferred to the Eastern District." *Id*. Dkt. 20, at 3.

[3]     Dkt. 63, at 4; *see e.g.,* Dkt. 63-9, at 1-3 (reflecting three separate process servers attempting to serve Jones at a San Marcos, California address on four separate occasions between August 4 and August 8); *id*. at 4-5 (reflecting six separate attempts to serve Jones at a new address in Solana Beach); Dkt. 63-4 (reflecting two additional attempts to serve Jones at his San Marcos address); Dkt. 63-10 (documenting multiple attempts to serve Fortner and noting that no one answered the door although multiple vehicles were present).

[4]     Jones and Fortner were not served until September of 2023.

In response to the Court's third order, BTB/MTS produced additional documents responsive to Pacific Bell's subpoena. Dkt. 170-2 (Kelley Decl.), ¶ 11. BTB/MTS then demanded that Pacific Bell pay all fees associated with its alleged "compliance" with Pacific Bell's subpoena. *Id*., ¶ 12. The parties met and conferred, including so that Pacific Bell could understand who paid the costs and fees at issue. *Id*., ¶ 14. Counsel for BTB/MTS denied that there was any "written agreement" whereby Dow Jones paid his fees. *Id*., ¶ 14. In an October 20, 2024 email, Pacific Bell's counsel stated: "we understand your email to mean that you will not provide or describe any agreements you or any other party have with Dow Jones regarding the costs and fees sought in your motion, other than to say there are no 'written agreements' between Dow Jones and you." Dkt. 170-12. Counsel for BTB/MTS responded: "Jon. My god. Dow Jones has agreed to pay my fees defending the subpoena. That's it!" *Id*. BTB/MTS then filed the instant Motion, seeking over $400,000 in fees allegedly associated with its compliance. Dkt. 158.

On September 30, 2025, Judge Peterson denied BTB/MTS' motion for cost shifting. Rather than seek reconsideration in the docket where that adverse order was entered, BTB/MTS first attempted to reopen the related but separate subpoena-enforcement proceeding that had already been closed, *Pacific Bell Telephone Co. v. Marine Taxonomic Services, Ltd.*, E.D. Cal. No. 2:24-cv-00022-KJM-JDP (the "MTS action"). On October 14, 2025, BTB/MTS filed in the MTS action a "Request for Reconsideration by the District Court of Magistrate Judge's Ruling" together with an accompanying memorandum and proposed order. *See* MTS Dkt. 35–37. On October 16, 2025, the Clerk issued a notice of docket correction in the MTS case, instructing that the filings be "disregarded and refiled in the correct case number," 2:21-cv-00073-JDP. Later that same day, BTB/MTS filed its motion for reconsideration in this case. *See* Dkt. 179–181.

### III.    LEGAL STANDARD

If this Court substantively reviews Judge Peterson's ruling as if it were a Report and Recommendation rather than a properly entered order by consent under Rule 73(a) (which it should not), that ruling may only be disturbed if it is clearly erroneous or contrary to law. When a party objects to a magistrate judge's ruling, a district court will review or reconsider the ruling under the "clearly erroneous or contrary to law" standard. 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a);

*Khrapunov v. Prosyankin*, 931 F.3d 922, 930-31 (9th Cir. 2019); *Grimes v. City and Cnty. of San Francisco*, 951 F.2d 236, 240-41 (9th Cir. 1991).[5] A magistrate judge's factual findings or discretionary decisions are "clearly erroneous" only when the district court is left with the definite and firm conviction that a mistake has been committed. *Sec. Farms v. Int'l Bhd. of Teamsters*, 124 F.3d 999, 1014 (9th Cir. 1997); *Avalos v. Foster Poultry Farms*, 798 F. Supp. 2d 1156, 1160 (E.D. Cal. 2011). "[R]eview under the clearly erroneous standard is significantly deferential, requiring a definite and firm conviction that a mistake has been committed." *Sec. Farms*, 124 F.3d at 1014 (citing *Exxon Co. v. Sofec Inc.,* 54 F.3d 570, 576 (9th Cir.1995), *aff'd,* 517 U.S. 830 (1996)). The district court "may not simply substitute its judgment for that of the deciding court." *Grimes*, 951 F.2d at 241 (citation omitted); *Avalos*, 798 F. Supp. 2d at 1160. The "contrary to law" standard allows independent, plenary review of purely legal determinations by the magistrate judge. *See Avalos*, 798 F. Supp. 2d at 1160; *Perez v. City of Fresno*, 519 F. Supp. 3d 718, 722 (E.D. Cal. 2021). "An order is contrary to law when it fails to apply or misapplies relevant statutes, case law, or rules of procedure." *Perez*, 519 F. Supp. 3d at 722 (citation omitted).

## IV.    ARGUMENT

### A.    BTB/MTS Has No Right To Reconsideration.

Because the parties to this case consented to proceeding before Judge Peterson, Dkt. 17, BTB/MTS's motion should be denied because there is no right for further District Court review. *See* 28 U.S.C. § 636(c)(3); Fed. R. Civ. P 73(c).

BTB/MTS knew the parties had consented to proceeding before Judge Peterson when it sought to have Pacific Bell's motions to compel consolidated before him. *See Pacific Bell v. Marine*

---

[5]     BTB/MTS wrongly suggests (at 6) that this Court should review Judge Peterson's order de novo. Section 636(b)(1)(A) makes clear that district courts review magistrate judge rulings on non-dispositive motions—like BTB/MTS's fee-shifting request here—under a "clearly erroneous or contrary to law" standard. *See* Fed. R. Civ. P. 72(a); *U. S. v. Raddatz*, 447 U.S. 667, 673 (1980) (same); *Peralta v. Martel*, 2011 WL 6759543, at *1 (E.D. Cal. Dec. 22, 2011) (same).
None of the cases cited by BTB/MTS (at 6) state otherwise—they neither involve magistrate judges nor invoke Section 636. *See Whitmire v. C.I.R.*, 178 F.3d 1050, 1051 (9th Cir. 1999) (reviewing tax court); *Estate of McClatchy v. C.I.R.*, 147 F.3d 1089, 1090 (9th Cir. 1998) (same); *Durando v. United States*, 70 F.3d 548, 549 (9th Cir. 1995) (reviewing district court's summary judgment grant); *Stivers v. Pierce*, 71 F.3d 732, 751 (9th Cir. 1995) (same).

1   *Taxonomic Services*, No. 23-cv-000022, Dkt. 19 (seeking transfer to the "Underlying Litigation:

2   2:21-cv-00073-JDP"); Dkt. 114, at 9 (BTB/MTS's request "to get these matters consolidated before

3   this court").  Only now, having lost its attempt to shift costs, does BTB/MTS seek to challenge

4   Judge Peterson's authority.  This eleventh-hour tactic by a self-described "nonparty" should be

5   rejected out of hand.

6        BTB/MTS wrongly suggests (at 4-5) that its status as a nonparty witness means that its

7   consent is relevant and that it retains a right to review by a district judge.  BTB/MTS concedes

8   throughout its motion to reconsider that it is a "nonparty."  Dkt. 180, at 1-2, 5, 7-17.  And, as the

9   Ninth Circuit has made clear, "only the consent *of the 'parties'*" is needed—the views of a nonparty

10  are irrelevant. *Robert Ito Farm, Inc. v. Cnty. of Maui*, 842 F.3d 681, 684 (9th Cir. 2016) (emphasis

11  added) (rejecting proposed intervenor's objection to magistrate judge) (quoting *People Who Care*

12  *v. Rockford Bd. of Educ.*, 171 F.3d 1083, 1089 (7th Cir. 1999)); *see also* Fed R. Civ. P. 73(a) ("a

13  magistrate judge may, if all parties consent, conduct a civil action or proceeding").

14       This is why the Ninth Circuit rejected a prospective intervenor's request for district court

15  reconsideration of a magistrate judge's ruling denying intervention.  *Robert Ito Farm*, 842 F.3d at

16  1089 (noting that the proposed intervenor could seek appellate review in the court of appeals, but

17  not the district court).  So too here.  BTB/MTS, like the proposed intervenor, is a nonparty.  Its

18  consent isn't needed—and, under Section 636(c), it has no path to district court review of Judge

19  Peterson's ruling on cost shifting. *See id.* at 684 (no district court review of nonparty's challenge

20  to magistrate's order in consent case); *People Who Care*, 171 F.3d at 1089 (same).

21       Moreover, BTB/MTS's sole case supports Pacific Bell—not BTB/MTS.  In *Irwin v.*

22  *Mascott*, the Ninth Circuit confirmed that a magistrate judge has jurisdiction over a non-party—

23  notwithstanding the non-party's failure to consent.  *See* 370 F.3d 924, 930-31 (9th Cir. 2004).

24  BTB/MTS reliance (at 5 n.3) on Local Rule 303 is equally misplaced—it applies only when *the*

25  *parties* haven't consented. *See* L.R. 301.

26       What's more, BTB/MTS expressly sought to join this issue before Judge Peterson knowing

27  full well that the parties had consented to proceeding before him.  Even if BTM/MTS's consent

28  was required under Section 636(c)—and it is not—BTB/MTS should be treated as having

1    constructively consented and waiving any objection before Judge Peterson by expressly requesting

2    to join this case with full knowledge that the parties had consented to proceeding before him.

3          This Court should reject BTB/MTS's motion to reconsider for either of these reasons.

4          **B.     BTB/MTS Is An Interested Party.**

5          If the Court considers the merits, BTB/MTS is nothing like "a truly disinterested non-party,"

6    and therefore cannot recover under Rule 45.  *Valcor Eng'g Corp.,* 2018 WL 3956732, at *4.  MTS

7    had a financial interest in cable removal – both in Lake Tahoe and beyond.  And BTB is a South

8    Lake Tahoe organization created to press for cable removal.  BTB/MTS's financial interest and

9    non-financial interest are each independently sufficient to bar cost-shifting here.

10              1.     BTB/MTS Had a Financial Interest In This Litigation.

11         BTB/MTS had a financial interest in this litigation.  First, BTB/MTS wanted to win the

12   contract to remove Lake Tahoe cables.  Second, BTB/MTS sought to use the Lake Tahoe litigation

13   to "set the path forward and pave the way to push for removal across the US."  Dkt. 170-5.

14         Before this lawsuit was filed, Jones stated to a friend: "I hope we can do removal as well

15   but maybe not since we would help the fight if needed and not stay behind the scenes."  Dkt. 170-

16   3.  Plaintiff, in turn, tried "to arrange having this [cable] work done by you [MTS]."  *Id.*  Soon after

17   this Court entered the initial consent decree, MTS reached out to Pacific Bell to pitch MTS' services

18   for removal of the cables, noting that it was "very interested in helping with cable removal in Tahoe

19   as well as planning and permitting" and "transport and disposal as well. It's all something we can

20   handle with bringing in a couple of subs."  Dkt. 170-11.  On January 18, 2022, MTS submitted an

21   unsuccessful bid for the removal project.  Dkt. 170-8.

22         BTB/MTS argues that "at the time it was forced to incur the 'significant expenses' at issue

23   here, BTB-MTS did not have even a 'speculative' hope of getting work from AT&T" for the

24   removal of the Lake Tahoe cables.  Dkt. 180 (Motion for Reconsideration) at 11. But consideration

25   of a party's financial interest is not limited to the time of subpoena compliance.  *Valcor Eng'g*

26   *Corp.,* 2018 WL 3956732, at *4 (denying cost shifting where third party was "intimately involved

27   in the acts giving rise to the litigation," which pre-dated the subpoena); *Balfour Beatty v. PB & A,*

28   *Inc.*, 319 F.R.D. 277, 282 (N.D. Cal. 2017) (same).

1    BTB/MTS's financial interest extended far beyond Lake Tahoe, anyway.  BTB/MTS

2    scouted and tested hundreds of cable locations across the country and published the results in a

3    report.  Dkt. 65-8.  BTB/MTS admitted publicly its expectation that removal of the Tahoe cables

4    would "set a precedent for the removal of more lead sheathed cables at locations uncovered by this

5    investigative report."  Dkt. 65-11. Jones confirmed this in an email to his friend, noting that

6    BTB/MTS used the Lake Tahoe litigation to "set the path forward and pave the way to push for

7    removal across the US."  Dkt. 170-5.  BTB/MTS chose Lake Tahoe as the first place to bring a

8    lawsuit as part of a broader strategy.  *Id*.  In a 2023 email, Jones explained that this "long game"

9    "will lead to a LOT of work for our industry in years to come. We are front and center . . . ."  Dkt.

10    170-6.

11    Based on these emails, Judge Peterson found (1) Jones "provided important information

12    that plaintiff needed to bring this action, and he remained in contact with plaintiff's counsel

13    regarding the prospect of MTS being hired to remove the cables th[at] form the basis of this case";

14    and (2) "Jones opined that his work on this action and with the Wall Street Journal would result in

15    a lot of work for his industry, which he apparently believed would pay dividends as soon as 'the

16    dust settles.'" Order (Dkt. 172) at 22.

17    Judge Peterson's factual findings are proper and certainly not clearly erroneous.

18    BTB/MTS response boils down to two arguments.  First, BTB/MTS points to Judge

19    Peterson's use of the word "industry" – "Jones opined that his work on this action and with the

20    Wall Street Journal would result in a lot of work *for his industry*." *Id*. (emphasis added.)  But

21    BTB/MTS ignores the next sentence of Jones' email, quoted by Judge Peterson, making clear that

22    BTB/MTS is "front and center" in the industry: "*We are front and center* so hopefully that will lead

23    to good things after the dust settles." *Id*. (emphasis added).  What matters is the financial benefit to

24    BTB/MTS, not whether others in the industry who were less "front and center" might also benefit.

25    *Id*.

26    Second, BTB/MTS contends that Jones' email was discussing "a remote and conjectural

27    financial possibility." Dkt. 180 (BTB/MTS Motion for Reconsideration) at 11.  But that is not what

28    Jones said: "[t]his will be a slow process but **will** lead to a LOT of work for our industry in the

years to come. We are front and center so hopefully that will lead to good things after the dust settles." Order (Dkt. 178) at 22. BTB/MTS does not and cannot point to any authority for the proposition a non-party with a financial interest may obtain cost-shifting as long as the financial interest stretches over a period of "years." *Id*. Where, as here, a non-party states that "a LOT of work" "will" come from a lawsuit, that non-party is not "disinterested," regardless of when the non-party's financial recovery occurs.

In sum, Jones, Fortner, and BTB/MTS sought to profit from the removal of cables, both in Lake Tahoe and across the country. This financial motive existed before and throughout this case.

### 2.    No Financial Stake is Necessary For a Third Party to Be "Interested."

BTB/MTS argues that the only interest the court can consider is whether the nonparty has a substantial financial stake in the outcome. Dkt. 180 (Motion for Reconsideration) at 8-10. BTB/MTS then cites cases holding that a financial stake is relevant. BTB/MTS plainly have a financial interest here, but Judge Peterson correctly held that no financial stake is *necessary*.

Other cases—ignored by BTB/MTS—explain that no financial interest is required. In *Balfour*, the court declined to order cost-shifting because the third party was "purportedly involved 'in the underlying acts that gave rise to the lawsuit,'" even though it had no financial interest:

> [T]here is no evidence that URS has a financial interest in the outcome of this case. However, URS perhaps is not in the typical position of a completely uninterested nonparty, as it was purportedly involved "in the underlying acts that gave rise to the lawsuit." *Cornell v. Columbus McKinnon Corp.,* 2015 WL 4747260, at *5 (N.D. Cal Aug. 11, 2015).

319 F.R.D. 277 at 282-83.

Similarly, in *Valcor Eng'g Corp.,* 2018 WL 3956732, the court relied on the third party's "financial interest" *and* two other factors in holding the third party was "interested" under Rule 45. *See* 2018 WL 3956732, at *6 ("In light of MEDAL's close involvement in the design and/or testing of one of the main ASM parts at issue in this lawsuit, the common interest agreement between MEDAL and Valcor, *and MEDAL's financial interest* in the outcome of this lawsuit, the Court finds that MEDAL is an interested party.") (emphasis added).[6]

---

[6]    *See also Cornell*, 2015 WL 4747260, at *3 ("While slightly more attenuated than its direct financial interest, the outcome of this case could also affect FedEx's employee training, safety

BTB is a quintessentially interested party. BTB's goal was to get the Tahoe cables removed (Dkts. 99, at 17; 161-1, at 2-3), which is also the objective of plaintiff's claims. *See* Plf.'s Am. Compl. (Dkt. 12), ¶ 40 (seeking "an injunction ordering Pac Bell to remove the Cables from Lake Tahoe"). BTB's principals—Jones and Fortner—found the cables and had them tested for lead. Dkt. 161, ¶ 3. BTB then asked its team of "environmental lawyers" to file this lawsuit to "set the path forward and pave the way to push for removal across the US . . . through our non profit – Below the Blue." Dkt. 170-5. The text message attached to Jones' declaration confirms this:

> I've been in contact with some environmental lawyers about the big cable. And they are optimistic it will get removed and ATT will be forced to pay. . . They asked what we wanted . . . As in what we personally[7] wanted to sue them for . . . I thought it was silly . . . But I guess it's a thing. . . . Anyway I told him our only *interest was in getting the cable removed*.

Dkt. 161-1, 2-3 (emphasis added). BTB/MTS's "interest" in "getting the cable removed" means it cannot be "a truly disinterested non-party." *Valcor Eng'g Corp.,* 2018 WL 3956732, at \*4. For these reasons, BTB/MTS is "quite unlike the type of 'nonparty' entity that Congress envisioned it was protecting when it amended Rule 45." *Cornell*, 2015 WL 4747260, at \*3. As in *Cornell*, "[w]hile [BTB/MTS] is nominally a non-party, its interest in the outcome of this case rivals that of the parties." *Id.* at \*5. "Given this dynamic," BTB/MTS's "motion comes close to wielding the shield of Rule 45 as a sword." *Id*

### 3. The 1991 Amendments Do Not Preclude Consideration of a Third Party's Non-Financial Interest in the Litigation.

BTB/MTS argues that the 1991 amendments to Rule 45 preclude consideration of a third party's non-financial interest in the litigation. But BTB/MTS cannot point to a single case holding as much. As the court in *Callwave Commc'ns v. Wavemarket, Inc.* concluded, "[w]hile the drafters of new Rule 45 clearly intended to expand the protection for non-parties . . . there is no indication

---

policies, and future exposure to liability… FedEx is quite unlike the type of 'nonparty' entity that Congress envisioned it was protecting when it amended Rule 45. *See In re Exxon Valdez,* 142 F.R.D. 380, 383 (D.D.C.1992) (listing '*disinterested* expert witnesses' as an example of the class of people Congress meant to protect when enacting the 1991 amendments) (emphasis [in original])."

[7] Whether Jones and Fortner had any "personal" causes of action against Pacific Bell is irrelevant. BTB/MTS both had financial and non-financial interests in the litigation regardless of whether Jones and Fortner could state claims in their individual capacities.

1    that they also intended to overrule prior Rule 45 case law, under which a non-party can be required

2    to bear some or all of its expenses where the equities of a particular case demand it." 2014 WL

3    2918218, at *3 (N.D. Cal. June 26, 2014) (citing *In Re Exxon Valdez,* 142 F.R.D. at 383. So, while

4    there is "some disagreement among the district courts as to whether and to what extent courts may

5    still consider the equitable factors that were utilized in the pre-1991 analysis," no court has held

6    that a third party's non-financial interest is irrelevant. As the Court explained in *Valcor Eng'g*

7    *Corp.*, 2018 WL 3956732, at *2–3, a third party's "interest in the litigation" is always important:

> Following *Legal Voice*, there is some disagreement among the district courts as to whether and to what extent courts may still consider the equitable factors that were utilized in the pre-1991 analysis. [Gathering authority on both sides.] MEDAL argues that none of these factors should be considered, because they have been rendered "outdated and obsolete" by the change in Rule 45 and *Legal Voice*.
> . . .
> Additionally, the Court finds that MEDAL's interest in the litigation is a valid consideration in determining whether cost-shifting is appropriate. The Court finds the following reasoning persuasive:
>
> > *Rule [45] is aimed at protecting persons who are disinterested, and thus have little to gain from their outlays in compliance cost*−such as when "a non-party [is] required to provide a list of class members." Fed. R. Civ. P. 45, Advisory Committee Notes. ... The Rule was meant to protect those who are "powerless to control the scope of litigation and discovery, and should [therefore] not be forced to subsidize an unreasonable share of the costs of a litigation" that does not concern them. It was not intended as a mechanism for entities which stand to benefit from certain litigation outcomes to evade discovery costs arising from their involvement in the underlying acts that gave rise to the lawsuit.

*Id.* at *2 (emphasis added) (internal citations omitted).[8]

---

[8]    *See also Cornell v. Columbus*, 2015 WL 4747260 (declining to award fees to third party for subpoena compliance where third party was interested in the outcome of the litigation); *see also Shasta Linen Supply, Inc. v. Applied Underwriters Inc.*, 2018 WL 2981827, at *5 (E.D. Cal. June 14, 2018) (declining to award cost-shifting because the movant, "while a third party, had a business relationship with the parties that renders it 'interested' for the purposes of determining production cost allocation"); *Balfour*, 319 F.R.D. at 282 (declining to order cost shifting to a nonparty because that party was "purportedly involved 'in the underlying acts that gave rise to the lawsuit'"); *Hyundai Motor Am., Inc. v. Pinnacle Grp., LLC,* 2016 WL 6208313, at *1 (C.D. Cal. Apr. 20, 2016) (finding non-party Mobis was not entitled to cost-shifting because "Mobis does not stand as an entirely disinterested third party.") Courts have also considered whether the third party was involved in the events leading to the litigation and therefore could have reasonably anticipated being drawn into the litigation. *See First Am. Corp. v. Price Waterhouse LLP*, 184 F.R.D. 234, 242 (S.D.N.Y. 1998) (party is interested if it was substantially involved in the underlying transaction and should have reasonably anticipated being drawn into the litigation); *Tutor-Saliba Corp. v.*

## C.    BTB/MTS's First Amendment Arguments Fail.

BTB/MTS argues that it should not be disqualified from cost-shifting because of its environmental advocacy, as doing so would penalize BTB-MTS for its "First Amendment" activities.  Dkt. 180 (Motion for Reconsideration) at 13-14.  This argument fails.

This case bears little resemblance to *Legal Voice I*.  There, non-party Law Center's role was much more limited than BTB/MTS's, here. *See Legal Voice v. Stormans Inc.*, 738 F.3d 1178, 1181 (9th Cir. 2013) ("The Law Center was *among the organizations* bringing these reports to the Board's attention. The Law Center was also *a member* of a task force that participated in the rule-making process.") (emphasis added)).  By contrast, BTB/MTS served this lawsuit to Plaintiff's counsel "on a platter." Dkt. 65-13, at 7.

And nothing in *Legal Voice I* suggests that the non-party had a financial interest or aesthetic interest in the outcome.  As described above, MTS has an obvious financial interest.  BTB's own website similarly establishes it has an aesthetic interest in Lake Tahoe.  *See* https://belowtheblue.org/about-us-1 ("Below the Blue . . .  is a culmination of years of hard work, real science and an absolute labor of love for our beautiful community and its ecosystems."); Black's Law Dictionary 57 (6th ed.1990) (defining "aesthetic" as "[r]elating to that which is beautiful or in good taste"); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) (discussing aesthetic interest in environmental context).

Most importantly, the Ninth Circuit *Legal Voice I* opinion did not analyze the Law Center's "interest" in the case.  In fact, the word "interest" does not appear in the *Legal Voice I* opinion. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *United States v. Rivera-Guerrero,* 377 F.3d 1064, 1071 (9th Cir. 2004) (citation omitted).

## D.    BTB/MTS Has Not Incurred Any "Significant" Expenses.

BTB/MTS has not, in fact, actually incurred any expenses; therefore, it cannot show it has

---

*United States*, 32 Fed. Cl. 609, 610 n. 5 (1995) (the fact that the non-party was "substantially involved in the underlying transaction and could have anticipated that [its involvement might] reasonably spawn some litigation, and discovery" was a circumstance weighing against shifting costs).

incurred the "significant expense[s]" required for reimbursement under Rule 45. BTB/MTS seeks two categories of expenses. First, BTB/MTS seeks reimbursement of fees paid to Alvarez & Marsal ("A&M") for document collection and production and to its attorney Joshua Koltun for time spent allegedly complying with the subpoena. Second, BTB/MTS seeks reimbursement for over 500-hours Jones and Fortner allegedly spent complying with the subpoena. Neither is compensable.

### 1.    BTB/MTS is not responsible for payment of the fees at issue.

BTB/MTS is not entitled to reimbursement of fees paid to its attorney Joshua Koltun for time spent allegedly advising on subpoena compliance, or to A&M for document collection and production. Koltun's fees have already been paid by Dow Jones—not BTB/MTS. Dkt. 170-12. BTB/MTS cannot demand reimbursement of expenses under Rule 45 that it has not incurred.[9] *See Wall Indus., Inc. v. United States,* 15 Cl. Ct. 796 (1988) (no attorney fees to plaintiff where "no credible evidence was proffered establishing that [the plaintiff] assumed any responsibility to pay for the legal fees and other expenses incurred in the refund litigation").

BTB/MTS's reliance on *Ed A. Wilson, Inc. v. GSA*, 126 F.3d 1406 (Fed. Cir. 1997), is misplaced. First, *Wilson* addresses the availability of attorneys' fees under the Equal Access to Justice Act ("EAJA") rather than cost-shifting under Rule 45(d)(2)(B)(ii). *See* 126 F.3d at 1408 ("The primary and narrow question before us is whether, under the Act, Wilson has 'incurred' legal fees when its insurer is responsible for paying them. This is an issue of statutory interpretation."). Second, in *Wilson*, an insurance company was responsible for paying attorneys' fees for the insured nonparty. The agreement at issue provided a "loan" to the insured, and the insured "assigned any claim it might have against the government and the amount of any potential recovery to [the insurer]." *Id*. at 1407. In contrast, BTB/MTS's counsel has expressly disclaimed the existence of any written agreement between BTB/MTS and Dow Jones. Dkt. 170-12.

---

[9]    BTB/MTS argues that the parties' "relative financial resources shows . . . that the expenses at issue are clearly significant to BTB/MTS, and insignificant to AT&T." The parties' financial status is relevant only insofar as BTB/MTS might be required to pay certain amounts for compliance with the subpoenas. But no one alleges BTB/MTS has ever actually paid anything. For this reason, the "relative financial resources" of the parties are irrelevant. The party paying the fees sought in the Motion—Dow Jones—has significant financial resources, reporting a 2023 net income of $660 million. Dkt. 170-14.

1        Most importantly, the *Wilson* court held that "[i]t [wa]s [the insured]'s exposure to increased

2  premiums and our view that it effectively incurred attorney fees by prepaying them via its premium

3  payments" that mattered. *Wilson*, 126 F.3d at 1411 n.4.  Here, BTB/MTS does not claim either (i)

4  "that it effectively incurred attorney fees by prepaying them via its premium payments" or (ii)

5  "exposure to increased [attorney fees]," and is not entitled to recover any such fees as a result.  *Id.*

6        BTB/MTS's counsel claims that "Dow Jones advanced payment . . . in the understanding

7  that it would be reimbursed upon an award of fees," and that he intends to "reimburse Dow Jones"

8  with any cost-shifting funds awarded, but that does not change the analysis. Dkt. 162, ¶¶ 10, 15.

9  MTS/BTB's counsel admits that no written agreement with Dow Jones exists—either with

10  BTB/MTS or its counsel.  *See* Dkt. 170-2 (Kelley Decl.), ¶ 14 and Dkt. 170-12 ("I do not have any

11  written agreement with the Wall Street Journal (Dow Jones, actually), but they have been paying

12  my bills and have paid me for the work claimed in my Rule 45 motion.").  And even if such a

13  written agreement did exist, it would still be an insufficient basis to award fee-shifting.  In *Wall*

14  *Industries*, cited in *Wilson*, non-party Arthur Young "took full responsibility for . . . all legal fees

15  and expenses," and plaintiff *Wall* assigned any recovery of attorney fees to Arthur Young through

16  a written agreement. *Wall Indus.,* 15 Cl. Ct., at *799 (internal quotations omitted).

17        The *Wall* court nonetheless declined to award attorneys' fees to Wall despite its status as a

18  prevailing plaintiff, finding that, as here, "no credible evidence was proffered establishing that Wall

19  assumed any responsibility to pay for the legal fees and other expenses incurred in the refund

20  litigation." *Id*. at *802.  Notwithstanding Wall's written obligation to repay Arthur Young its

21  attorney fees, the court held that Wall "[wa]s not eligible under the EAJA because it failed to *incur*

22  any legal expenses." *Id*. at *800 (emphasis in original).  The "critical fact," observed the court, was

23  "that Wall, the prevailing party, did not become subject to the payment of legal fees, but rather it

24  was Arthur Young."  *Id*. at *803 (internal citations omitted).  The *Wall* court also distinguished *pro*

25  *bono* cases, noting that "[i]n the case at bar, the representation was not pro bono." *Id.* *802.  The

26  Court should deny BTB/MTS's Motion for the same reasons.

27        Plaintiff also cites *Nadarajah v. Holder*, 569 F.3d 906 (9th Cir. 2009) (Motion for

28  Reconsideration at 14), but that case too is clearly distinguishable.  In *Nadarajah*, a native of Sri

Lanka was detained and improperly denied parole despite being granted asylum. Through *pro bono* representation, he appealed a denial of his writ of habeas corpus, was released from prison, and sought recovery of his attorney fees. *Nadarajah* did not involve a third party (like Dow Jones) paying the attorney fees for the *pro bono* plaintiff or its attorneys.[10]  Had such a third-party payment occurred, no attorney fees would have been incurred by the party or the party's attorney.

*None* of the cases cited by BTB/MTS involved a third-party who both (1) had all its attorney fees paid by a third party, and (2) did not pay insurance premiums.  Unlike the cases BTB/MTS cites, Dow Jones chose to fund legal representation for BTB/MTS and its principals without any written agreement.  BTB/MTS did not pay Dow Jones any insurance premiums or union dues in return for legal representation.  BTB/MTS has not—and cannot—offer any "credible evidence" establishing that it "assumed any responsibility to pay for the legal fees and other expenses incurred," and its Motion should be denied. *Wall Indus.,* 15 Cl. Ct. at 802.

2.    BTB/MTS's argument concerning "waiver" is untimely, and Pacific Bell has not waived any argument against payment of A&M's fees.

BTB/MTS also argue that they "reasonably relied upon the understanding" that AT&T would reimburse A&M's expenses, and that "AT&T waived any argument that it was not obligated to reimburse the costs of its recommended ESI vendor." Mot. at 7-8.  This argument—raised for the first time in BTB/MTS's Motion for Reconsideration—fails twice over.

First, BTB/MTS failed to make this argument in their original cost-shifting briefing and raised it for the first time in their motion for reconsideration.  The Court should exercise its discretion and refuse to consider this argument as improperly raised. *See* Kelley Decl., Ex. 1, email from J. Koltun to J. Kelley, dated Oct. 19, 2025 ("I do not believe that the parties have a right to raise on reconsideration arguments and authorities not raised before the Magistrate"); *United States v. Howell*, 231 F.3d 615, 623 (9th Cir. 2000) (affirming the district court's refusal to consider "supplemental factual allegations presented for the first time in [an] objection to the magistrate judge's recommendation). This Court can reject this argument on this basis alone.

---

[10]    BTB/MTS's citation to *Satchell v. Wallace*, 439 F. App'x 644, 645 (9th Cir. 2011) is also unavailing because there was no evidence that a separate third party (like Dow Jones) paid the relevant attorneys' fees.

Moreover, the argument has no merit. In an effort to avoid unnecessary motion practice, Pacific Bell proposed a protocol for the collection of BTB/MTS documents which involved Pacific Bell offering to pay up to $100,000 for the cost of hiring a discovery vendor. BTB/MTS *rejected* that offer. Tellingly, immediately before BTB/MTS hired A&M, their counsel made clear that the parties would litigate the cost-shifting issue after BTB/MTS's production was complete, stating: "We are in the process of engaging a third party vendor to assist with this document production. It is our position that the costs of using this vendor should be borne by AT&T under Fed.R.Civ.P. 45(d)(2)(B)(ii) . . . It would make the most sense to adjudicate such cost-shifting issues once the production is concluded and there is a full record of expenses." Kelley Decl., Ex. 2, email from J. Koltun to J. Kelley, dated Jan. 2, 2024. This clear communication from BTB/MTS's counsel belies any notion that A&M was hired "upon the understanding that these expenses would be reimbursed." Mot. at 8. To the contrary, counsel for BTB/MTS understood that adjudication by the Court would be necessary "once the production is concluded." *Id.*

This is why BTB/MTS's original fee motion never once asserted that BTB/MTS engaged A&M in reliance on an expectation of full reimbursement, nor did it argue that AT&T waived any argument against reimbursement of A&M's fees. *See generally*, Dkt. 158; Dkt. 173. Only now, ten months after the briefing closed and BTB/MTS lost, has BTB/MTS claimed that it "reasonably relied" on Pacific Bell's offer to pay costs. Dkt. 180, at 7-8.

**E.    BTB/MTS's request for sanctions is meritless and fails for reasons the record itself makes clear.**

As Judge Peterson concluded, BTB/MTS's argument that the Court should award sanctions is without merit. BTB/MTS argues that Pacific Bell had not yet used documents produced by BTB/MTS at the time the case settled. BTB/MTS does not know how Pacific Bell would have used BTB/MTS documents in depositions, in summary judgment, in pretrial submissions, or at trial—none of which were conducted due to a subsequent settlement. For example, Plaintiff named Jones, Fortner, and MTS as witnesses with "discoverable information that support Plaintiff's claims" in its initial disclosures. Dkt. 170-13. Pacific Bell would have used BTB/MTS documents to cross-examine Jones and Fortner in their depositions and at trial. As Judge Peterson concluded:

1    "AT&T's decision to declare the initial consent decree null and void, and to defend against the

2    Wall Street Journal's accusations—which overlap with the allegations asserted against it in this

3    action—in a public forum does not evidence bad faith. Considering AT&T's contention that the

4    cables pose no risk of harm to the environment, its decision seems rational."  Order (Dkt. 178) at

5    23 n.16.

6                              **V.    <u>CONCLUSION</u>**

7        For the foregoing reasons, Pacific Bell respectfully requests that the Court deny

8    BTB/MTS's Motion for Reconsideration.

9      DATED: October 28, 2025                    Respectfully submitted,

10
                                                  */s/ Hariklia Karis*
11                                                HARIKLIA KARIS (*admitted pro hac vice*)
                                                  hkaris@kirkland.com
12                                                ROBERT B. ELLIS (*admitted pro hac vice*)
                                                  rellis@kirkland.com
13                                                MARK J. NOMELLINI (*admitted pro hac vice*)
                                                  mnomellini@kirkland.com
14                                                KIRKLAND & ELLIS LLP
15                                                300 North LaSalle
                                                  Chicago, IL 60654
16                                                Telephone: (312) 862-2000
                                                  Fax: (312) 862-2200
17
18                                                JON DAVID KELLEY (*admitted pro hac vice*)
                                                  jon.kelley@kirkland.com
19                                                KIRKLAND & ELLIS LLP
                                                  4550 Travis Street
20                                                Dallas, TX 75205

21                                                NAVI SINGH DHILLON (SBN 279537)
                                                  navidhillon@paulhastings.com
22                                                PETER C. MEIER (SBN 179019)
                                                  petermeier@paulhastings.com
23                                                LUCAS V. GRUNBAUM (SBN 314180)
                                                  lucasgrunbaum@paulhastings.com
24                                                PAUL HASTINGS LLP
                                                  101 California Street, 48th Floor
25                                                San Francisco, California  94111
                                                  Telephone:  (415) 856-7000
26                                                Fax: (415) 856-7100

27                                                Attorneys for Defendant
28                                                PACIFIC BELL TELEPHONE COMPANY